# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS
# WESTERN DIVISION

| | |
|---|---|
| SANDRA BOND, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>BERKSHIRE BANK and BERKSHIRE HILLS BANCORP,<br><br>            Defendants. | Case No. 16-30050-MGM<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Sandra Bond ("Plaintiff"), individually and on behalf of all others similarly situated, as for her Amended Class Action Complaint (the "Complaint") against Defendants Berkshire Bank ("Berkshire Bank") and Berkshire Hills Bancorp ("Berkshire Hills") (collectively, "Defendants" or "Berkshire"), hereby alleges as follows:

## NATURE OF ACTION

1.      At all relevant times, Plaintiff has been a customer of Berkshire Bank, a subsidiary of Berkshire Hills, which has approximately ninety-three branch offices located throughout Massachusetts, New York, Connecticut, and Vermont.  Beginning in around 2010, Defendants utilized an unfair and deceptive "Overdraft Opt-In" form ("Opt-In form") (attached hereto as Exhibit A) to create an agreement ("Overdraft Agreement") with its customers that states: "an overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."  The plain language of Berkshire's "Overdraft Opt-In" form

clearly states that in order for an "overdraft" to occur, the customer's account must not have enough money in it (*i.e.*, "actual balance") at the time Berkshire pays a transaction.

2.      Under the Electronic Fund Transfers Act, Reg E, Defendants were prohibited from assessing and charging overdraft fees to any customer unless they provided the customer with written notice, which clearly and accurately described Defendants' overdraft fee practices and policies; obtained the customer's affirmative consent to participate in the overdraft program; and provided written confirmation of the customer's consent along with a statement informing the customer of the right to revoke his or her consent. *See* 12 C.F.R. § 205.17(b)(1).

3.      Defendant's Opt-In form unfairly and deceptively failed to disclose to Berkshire's customers that Berkshire intended to implement an entirely different and contradictory definition of "overdraft."   In reality, Berkshire used an artificial, internal, and hidden calculation to determine customer's "available balance" and used customer's "available balance" rather than "actual balance" when determining overdrafts and assessing overdraft fees.

4.      Berkshire's scheme was designed to maximize Defendants' overdraft revenue. Oftentimes Plaintiff's and other customers' "available balance" was less than the "actual balance" on their accounts due to "pre-authorization holds" placed by Berkshire for pending point-of-sale (POS) transactions.   Importantly, Berkshire's "pre-authorization holds" reduced customer's "available balance," but not their "actual balance," because the "holds": (i) had not been presented for settlement/payment by the third party merchant; and (ii) money had not been paid out by Berkshire for the POS transaction.   In fact, some "pre-authorization holds" are never presented for settlement and payment.   Others are paid out by Berkshire at a later date, typically within a few days, and only after they are submitted for settlement and payment by the third party merchant.   Only then does Berkshire pay the merchant for the POS transaction

from the account and the "actual balance" is reduced accordingly.  Berkshire wrongfully treated the "pre-authorization holds" effectively as posted, paid transactions for purposes of charging overdraft fees.

5.      Defendants' misleading and inaccurate Overdraft Opt-In form and methodology of assessing and charging customers overdraft fees ignored Defendants' own contractual definition of "overdraft" and violated Reg E by misrepresenting to customers that overdrafts would be determined based upon "actual balance" rather than "available balance."  Berkshire generated a greater number of overdrafts and charged customers substantially more money in overdraft fees by implementing an "available balance" calculation than if it had assessed overdraft fees based upon Plaintiff's and customers' "actual balance."

6.      Although Defendants secretly calculated overdrafts based upon customers' "available balance," Defendants' unfair and deceptive 2012 and 2013 Account "Terms and Conditions" mirrored the Overdraft Opt-In form and further misrepresented to customers that overdrafts are determined based upon  customers' "actual balance:"

> If an item is presented without sufficient funds in your account to pay it**,** we may, at our discretion, pay the item (creating overdraft) or return the item (NSF)… (*See* Berkshire's 2012 Account "Terms and Conditions," "Payment Order of Items" "Exhibit B," attached hereto at p.14 and Berkshire's 2013 "Terms and Conditions", "Exhibit C," attached hereto at p. 25.)

7.      Defendants' "Terms and Conditions" also misrepresented to customers that Defendants would pay the "smallest items" first:

> When processing items drawn on your account, our policy is to pay them according to the dollar amount. We pay the smallest items first.  The order in which items are paid is important if there is not enough money in your account to pay all the items that are presented.  Our payment policy minimizes the number of items that may result in an overdraft or NDF fee. (Exhibit C, at p. 25)

> Our policy is to pay items in the order they are received. If they are received at the same time, we pay the smallest item first. (Exhibit B at p. 14)

8.      Defendants violated the 2012 and 2013 "Account Terms and Conditions" by improperly assessing and charging improper and excessive overdraft fees, even when customers had enough money in the accounts to pay transactions or were not actually overdrawn and by, *inter alia*, reordering, manipulating, and failing to order transactions from smallest to largest.

9.      Furthermore, Defendants have consistently misrepresented and failed to disclose adequately their overdraft rules, regulations, and policies to their customers.  These insufficient disclosures only made customers' attempts to avoid overdraft fees more difficult because subsequent transactions (following internal "pre-authorization holds") were compared against an "available balance" that was reduced to account for these earlier "held" transactions. Without any way of seeing these "holds" on their account statements, customers had neither a way of determining their available balance nor a means of avoiding overdraft fees that resulted from holds affecting the available balance.

10.     Furthermore, Defendants' 2012 and 2013 Account "Terms and Conditions" and Overdraft Opt-In forms misrepresented that "overdrafts occur when you do not have enough money in your account to cover a transaction, but we pay it anyway" (*see* Exhibit A) (*i.e.* "actual balance"), when, in fact, Defendants were using an entirely different, manipulative, secretive, unconscionable and more damaging "available balance" methodology in order to impose the maximum number of overdraft fees and reap many millions of dollars in illicit profits at the expense of their customers.   Even more egregious, Defendants exploited customers by using "pre-authorization holds" to artificially create overdrafts and assessing and charging overdraft fees when, in fact, Defendants faced no risk because the actual cash balance in the account had not dropped below zero, even after all items were paid.  Defendants then

4

assessed additional overdraft fees when the "pre-authorization hold" items were paid a few days later.

11.     For certain transactions occurring after July 10, 2010, Defendants' unfair practices and policies with respect to overdraft fees also resulted in violations of the federal Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et al.* (the "EFTA"), and the regulations promulgated thereunder, including, but not limited to, Regulation E, 12 C.F.R. § 205.17 ("Reg E").

12.     By virtue of the above, Defendants' unfair and deceptive overdraft fee practices and policies include the following:

- Approving one-time debit card and point-of-sale transactions, including cash withdrawal transactions at automatic teller machines (ATMs) owned or controlled by Defendants (collectively referred to herein as "Electronic Transactions"), which triggered the assessment and charging of overdraft fees to customers;

- Reordering or otherwise manipulating Electronic Transactions and/or traditional checking account transactions ("Check Transactions") in order to increase in the number of overdraft fees assessed and charged to customers;

- Reordering, manipulating, or failing to pay POS, Electronic Transactions and/or Check Transactions from lowest dollar amount to highest dollar amount, in violation of Defendants' 2012 and 2013 Account Terms and Conditions, in order to increase the amount of overdraft fees assessed and charged to Plaintiff and other bank customers;

- Assessing and/or charging overdraft fees even when customers had sufficient funds in their accounts to pay the transactions;

- Failing to inform customers that Berkshire determined overdraft and assessed and/or charged overdraft fees based upon a customer's "available balance" (not "actual balance") and that "pre-authorization holds" would immediately reduce the customer's "available balance" when authorized.

- Assessing and charging overdraft fees in instances where customers' accounts contained enough money to pay all items presented but Defendants' "held" and effectively removed the money for "pre-authorization" transactions,

creating a negative "available balance"; then, Defendants charged customers additional overdraft fees when the same "held" transactions settled and/or were presented for payment, days later—a predatory practice termed "double-dipping");

- Failing to alert customers that a POS transaction would result in an overdraft fee and failing to provide customers with an opportunity to cancel such transaction;

- Failing to provide customers with accurate "available balance" versus "actual balance" information and with accurate and clear information regarding how the bank's internal "available balance" calculation is completed, which encouraged Electronic Transactions and Check Transactions even when Defendants knew an overdraft would occur based on the methodology used by Defendants in calculating the funds in customer accounts;

- Utilizing held funds on charges to drop the available balance without said charge being reflected in the account balance made available to Plaintiff, and, in turn, assessing and charging new overdraft fees into an account with a lower than displayed balance, generating new overdraft fees hidden by these holds;

- Breaching their agreements with customers and the covenant of good faith and fair dealing through their unfair overdraft fee practices and policies;

- Assessing and charging overdraft fees in violation of the EFTA and Reg E;

- Converting money belonging to customers through Defendants' unfair overdraft fee practices and policies; and

- Becoming unjustly enriched at the expense of customers through their unfair overdraft fee practices and policies.

13.     Banks like Berkshire have utilized overdraft fees as a major profit source.  Indeed, the Form 10-K filed by Berkshire Hills for the fiscal year ended December 31, 2014 reveals that Berkshire Bank received "$10 million in overdraft income" in 2014 alone.

14.     Almost by definition, the overdraft fees assessed and charged by Defendants disproportionately affect their poorer customers, who are more likely than others to maintain low balances.  One economic research firm that has conducted studies for the government, as

well as banks, estimates that ninety percent (90%) of all overdraft fees are paid by the poorest ten percent (10%) of banking customers. Moreover, the overdraft fees charged by Defendants inherently result in a detrimental "domino effect" for customers because the imposition of an overdraft fee on an account with a negative balance necessarily makes it less likely that a positive balance will be restored, and, in turn, leads to the imposition of further fees.

15.     Given the prevalence of Electronic Transactions, Defendants are also in a better position than ever before to decline a particular transaction when the customer's account lacks sufficient funds. Indeed, at the time Electronic Transactions occur, Defendants are able to determine whether there are sufficient funds in a customer's account to cover that particular transaction. Defendants have the technological capability to decline such a transaction (which they do when a particular transaction would exceed a pre-determined, overdraft tolerance limit for the customer's account), or to notify the customer at the moment the transaction would result in an overdraft and corresponding overdraft fee. Nonetheless, rather than declining Electronic Transactions when there are insufficient funds available, or warning the customer that an overdraft fee will be charged if he or she proceeds with such an Electronic Transaction, Defendants have regularly and routinely processed Electronic Transactions and then assessed customers overdraft fees.

**16.**     Defendants have consistently failed to provide and disclose fully accurate explanations of their overdraft policies and procedures; indeed, their secretive "available balance" calculation was not explained in any detail until 2015. It is absent from the 2010 Opt-In forms, as well as the 2012 and the 2013 Account Terms and Conditions. Thus, Defendants offered even less information to Plaintiff in 2012 and 2013 (when many of Plaintiff's fees occurred) than they do to their customers today.

## **THE PARTIES**

17.     Plaintiff is a citizen of the Commonwealth of Massachusetts, residing at 27 South Brook Road, East Longmeadow, Massachusetts.

18.     Berkshire Bank is a citizen of the Commonwealth of Massachusetts. It was charted in Massachusetts on February 2, 1846 and maintains its principal executive offices at 24 North Street, Pittsfield, Massachusetts.

19.     Berkshire Hills is a citizen of the State of Delaware and the Commonwealth of Massachusetts.  It was incorporated in Delaware and maintains its principal executive offices at 24 North Street, Pittsfield, Massachusetts.

20.     Berkshire Hills is responsible for Plaintiff's damages and the damages of the proposed class because: (i) it was responsible for the breaches and violations described herein by its own actions and/or omissions; (ii) its agents were responsible for the breaches and violations described herein by acts and/or omissions committed within the scope of their authority; (iii) it is a co-conspirator or co-participant in the unfair practices and other violations described herein; and/or (iv) it or its agents actively participated in the unfair practices and other violations described herein.

21.     At all relevant times, Berkshire Hills had knowledge of the breaches and violations described herein and/or Berkshire Bank's direct involvement in such breaches and violations.

22.     The Berkshire Hills 2014 10-K identifies Berkshire Hills as "the holding company for Berkshire Bank."  As the holding company for Berkshire Bank, Berkshire Hills has, at all relevant times, maintained control over Berkshire Bank.

23.     Berkshire Hills has maintained such control over Berkshire Bank that it should be considered an alter ego of Berkshire Bank, a joint enterprise with Berkshire Bank, and/or as jointly controlled with Berkshire Bank, and it would be unfair to recognize the separate corporate existence of Berkshire Hills and Berkshire Bank vis-à-vis the claims asserted herein by Plaintiff and the proposed class.

## JURISDICTION AND VENUE

24.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) certain members of the proposed class are citizens of a State or States different from any defendant; and (ii) the amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

25.     The Court also has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because the claims asserted by Plaintiff and the proposed class arise under the laws of the United States, including, without limitation, the EFTA.

26.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because: (i) Defendants reside and/or maintain their principal places of business in this district; (ii) a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in this district; and/or (iii) Defendants are subject to personal jurisdiction in this district.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on behalf of all Berkshire Bank customers in the United States who were charged one or more overdraft fees on or after July 1, 2010 (the "Class").

28.     Plaintiff reserves the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.

29.     Excluded from the Class are: (i) Defendants and any entities in which Defendants have a controlling interest; (ii) any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendants; (iii) the United States District Court Judge(s) to whom this action or any transferred action is assigned and any member of any such Judge's immediate family and any other judicial officer assigned to this action or any transferred action; (iv) all persons or entities with claims against Defendants for personal injury, wrongful death, and/or emotional distress; and (v) all persons or entities that properly execute and timely file a request for exclusion from the Class.

30.     **Numerosity.** The members of the Class are so numerous that joinder of all members would be impracticable.  The Class consists of hundreds or thousands of members and the identity of those persons is within the knowledge of and can be ascertained by resorting to Defendants' records.

31.     **Commonality.** There are questions of law and fact common to each member of the Class that predominate over any questions affecting the individual members.  These include whether Defendants:

- Approved Electronic Transactions, which triggered the charging of overdraft fees to the members of the Class;

- Reordered or otherwise manipulated Electronic Transactions and/or Check Transactions in order to increase in the number of overdraft fees charged to the members of the Class;

- Reordered, manipulated, or failed to pay POS, Electronic Transactions and/or Check Transactions from lowest dollar amount to highest dollar amount, in violation of Defendants' 2012 and 2013 Account Terms and Conditions, in

order to increase the amount of overdraft fees charged to the members of the Class;

- Assessed and/or charged overdraft fees even when customers had enough money in their accounts ("actual balance") to pay the transactions;

- Assessed and/or charged overdraft fees where customers' accounts contained enough money ("actual balance") to pay all items presented but Defendants' "held" and effectively removed the money for "pre-authorization" transactions, creating a negative "available balance; then, Defendants charged customers additional overdraft fees when the same "held" transactions settled and/or were presented for payment, days later - a predatory practice termed "double-dipping";

- Failed to provide members of the Class with accurate "available balance" versus "account balance" information and with accurate and clear information regarding how the bank's internal "available balance" calculation is completed, which encouraged Electronic Transactions and Check Transactions even when Defendants knew an overdraft would occur based on the methodology used by Defendants in calculating the funds in customer accounts;

- Utilized held funds on charges to drop the available balance without said charge being reflected in the account balance made available to Plaintiff, and, in turn, assessed and/or charged new overdraft fees into an account with a lower than displayed balance, generating new overdraft fees hidden by these holds.

- Breached their agreements with members of the Class and/or the covenant of good faith and fair dealing through their unfair overdraft fee practices and policies;

- Converted money belonging to customers through their unfair overdraft fee practices and policies; and/or

- Were unjustly enriched at the expense of the members of the Class through their unfair overdraft fee practices and policies.

.

32.     **Typicality.** Plaintiff asserts claims that are typical of the members of the Class, all of whom were customers of Defendants that were improperly assessed and/or charged one or more overdraft fees due to Defendants' unfair overdraft fee practices and policies, including, without limitation, Defendants' reordering or other manipulation of Electronic Transactions

and/or Check Transactions, Defendants' failure to notify customers that certain Electronic Transactions would result in overdraft fees, and/or Defendants' failure to comply with the EFTA. Plaintiff and the members of the Class have similarly suffered harm arising from Defendants' contractual breaches and/or legal violations as described herein.

33. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff fits within the proposed class definition and Plaintiff's interests do not conflict with the interests of the members of the Class. Plaintiff is committed to this litigation and will prosecute this action vigorously for the benefit of the members of the Class. Plaintiff is represented by experienced and able attorneys from coordinated law firms that will collectively and jointly serve as class counsel. Class counsel has litigated numerous class actions, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the members of the Class.

34. **Superiority of Class Action.** A class action is the best available method for the efficient adjudication of the issues raised herein because individual litigation of each Class member's claims would be impractical and unduly burdensome to the courts. Plaintiff and the members of the Class have suffered irreparable harm as a direct or proximate result of Defendants' breaches and violations as described herein. Because of the size of the claims of most proposed Class members, standing alone, would be *de minimis*, such Class members could not afford to seek legal redress for the breaches and violations described herein. Without the class action vehicle, the members of the Class would have no reasonable remedy and would continue to suffer losses as Defendants continue to engage in the breaches and violations described herein; moreover, Defendants would be unjustly permitted to retain the pecuniary benefits they have received and continue to receive from their violations of the law.

Furthermore, individual litigation of each proposed Class member's claims has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  There will be no difficulty in management of this action as a class action.

35.     **Injunctive and/or Declaratory Relief.** Defendants' acts and omissions are uniform as to Plaintiff and all members of the Class. Defendants have refused to act on grounds that apply generally to Plaintiff and all members of the Class, such that final injunctive relief and/or declaratory relief is appropriate with respect to the Class as a whole.

## FACTUAL ALLEGATIONS

**A.**     **Defendants' Deceptive Practices and Policies with Respect to Overdraft Fees**

36.     Defendants are in the business of providing customers with a variety of banking products and services.  Customers who open a checking account at one of Defendants' branch offices are generally provided with traditional checks as well as one or more debit cards. Through their debit cards, customers can engage in various types of transactions using funds from their checking accounts, including, without limitation, Electronic Transactions (such as POS transactions or the withdrawal of cash through ATMs).  When a customer attempts to execute an Electronic Transaction, Defendants are notified almost instantaneously when the customer's debit card is swiped, dipped, or inserted at the POS or ATM and have the option to either accept or decline the transaction at that time.  A time-stamp is usually retained by Defendants, which records the exact time of Electronic Transaction.  For Check Transactions, on the other hand, Defendants determine the amount of funds available in a customer's account,

in their discretion, at any time between the time that a particular item is received and the time that Defendants return the item or send a notice in lieu of return.

37.     Defendants employ sophisticated computer software to automate their overdraft fee practices and policies.   These software programs were designed and/or configured by Defendants, or their agents, to increase the number of overdrafts that occur and, thus, the amount of overdraft fees assessed and/or charged to each customer.   These practices were utilized, at a minimum, in 2012 and 2013 in direct conflict with Defendants' own Terms and Conditions, which stated that they would seek to minimize overdraft fees:

> When processing items drawn on your account, our policy is to pay them according to the dollar amount. We pay the smallest items first.  The order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented. Our payment policy minimizes the number of items that may result in an overdraft or NSF fee.

38.     Due to the design and/or configuration of the software programs used by Defendants, the transaction records for checking accounts maintained by Defendants' customers are reordered, otherwise manipulated (such as by use of customers' "available balance" internally depleted by "pre-authorization holds," instead of "actual balance") or not ordered per the above policy such that they will be depleted more rapidly and more overdraft fees are likely to be assessed and/or charged.  Indeed, in certain instances, overdraft fees were charged by Defendants when, but for the reordering, manipulation, or lack of ordering per the Terms and Conditions, there would have been sufficient funds available in the customer's account to cover the requested transaction, and no overdraft would have occurred. There is simply no justification for these practices other than to increase the number of overdraft fees Defendants can assess.

39.     Defendants have also utilized their software programs so that customer transactions will be approved even though Defendants know that such transactions will result in overdrafts and the corresponding assessment and/or charging of overdraft fees.

40.     Defendants have regularly and routinely assessed and/or charged overdraft fees even at times when customers have sufficient funds available to cover the requested transactions.

41.     Defendants have in some instances charged overdraft fees on held transactions that were authorized initially into positive available funds after assessing overdraft fees on later transactions that depleted the Plaintiff's or Class member accounts.

42.     Plaintiff and members of the Class have had their Electronic Transactions and/or Check Transactions reordered and otherwise manipulated by Defendants in violation of their 2012 and 2013 Terms and Conditions.  If Defendants had not reordered, failed to order items from smallest to largest, and otherwise manipulated such Electronic Transactions and/or Check Transactions, Plaintiff and the members of the Class would not have been assessed and/or charged as many overdraft fees.

43.     Defendants have failed to disclose sufficiently and clearly their overdraft fee practices and policies — especially regarding Berkshire's methodology for the calculation of "available balance" and the significant effects of "pre-authorization holds" on the "available balance" as opposed to the "actual balance" — leading to an unnecessarily excessive number of overdraft fees incurred by Plaintiff and members of the Class.

44.     Furthermore, because of Defendants' unfair overdraft fees practices and policies, Plaintiff and members of the Class accrued overdraft fees that were unreasonably assessed and that created a domino effect.  The imposition of an overdraft fee on an account with a negative

balance necessarily makes it less likely that a positive balance will be restored, and, in turn, leads to the imposition of further fees.

45.     As a result of Defendants' unfair overdraft fee practices and policies, Defendants have improperly deprived Plaintiff and the members of the Class of significant funds, causing ascertainable monetary loss and damages.

**B.     Defendants Have Breached Their Agreements with Customers**

46.     Defendants' overdraft fee practices and policies are neither contemplated by their agreements with customers nor authorized under the plain contractual terms.  In fact, through their acts and omissions, Defendants have violated several express provisions of their agreements with customers (including the terms and conditions of their various disclosures to customers), the covenant of good faith and fair dealing, and common law.

47.     Defendants did not sufficiently disclose their practices and policies to customers, especially regarding the available balance calculation.  In fact, Defendants clearly recognized that inadequacy when, in 2015, they discussed the "available balance" calculation and effectively changed their contractual definition of "overdraft" from an overdrawing of "actual balance" to "available balance."  According to the the 2015 Terms and Conditions (attached hereto as Exhibit D):

> [s]ometimes funds in your account are not available to cover your checks and other items, and it may appear that you have enough funds in your account to cover a debit but still get an overdraft fee on the debit. This can occur when your account balance included funds that were not available at the time we processed the debit. Funds subject to a hold, dispute or legal process are not available funds.

48.     Prior to 2015, such a statement regarding the available balance calculation was non-existent, making it exceedingly difficult for customers to understand how their account functions and how to avoid overdraft fees.

49.     Additionally, Defendants' 2012 Account Terms and Conditions state that Berkshire Bank's "policy is to pay items in the order they are received," and, "[i]f they are received at the same time, [Berkshire Bank] will pay the smallest items first." (*see* Exhibit B). Also, Defendants' 2013 Account Terms and Conditions state that their policy is to "pay the smallest item first… (to) minimize the number of items that may result in an overdraft and NSF fee." (*see* Exhibit C).

50.     Moreover, the Overdraft Opt-In Form defines an "overdraft" as occurring only when a customer "do[es] not have enough money in [his or her] account to cover a transaction, but [Berkshire Bank] pay[s] it anyway."  *See* Exhibit A, p. 9.

51.     Defendants have failed to abide by the plain language of the 2010 Opt-In forms, the 2012 and 2013 Terms and Conditions and/or their other agreements with customers by, among other things: (i) imposing overdraft fees based upon customer's "available balance" rather than "actual balance"; (ii) assessing and/or charging overdraft fees even when there were sufficient funds available in customer accounts to cover the transactions at issue; (iii) imposing additional overdraft fees when "pre-authorization holds" settled even though Defendants had already reduced customers' balances by the "held" amounts (creating interim overdraft(s)) and charged overdrafts on items presented for payment during the "hold" period, thus "double dipping"); (iv) reordering, manipulating, or not ordering Electronic Transactions and Check Transactions from lowest dollar amount to highest dollar amount such that the lowest amounts are not paid first and the amount of overdraft fees charged is not minimized per both agreements referenced above.

52.     Defendants' breaches of their agreements with customers, as described above, have harmed Plaintiff and members of the Class who have paid numerous improper and excessive overdraft fees.

53.     As a result of Defendants' breaches of their agreements with customers, Defendants have improperly deprived Plaintiff and the members of Class of significant funds, causing ascertainable monetary loss and damages.

**C.     Defendants Have Violated the EFTA and Reg E**

54.     Defendants have also assessed and/or charged overdraft fees to Plaintiff and the members of the EFTA Class in violation of the EFTA and Reg E.

55.     Under Reg E, Defendants were prohibited from assessing and/or charging overdraft fees to any customer unless and until they provided the customer with written notice, separate from all other information, which clearly and accurately described Defendants' overdraft fee practices and policies; obtained the customer's affirmative consent to participate in the overdraft program; and provided written confirmation of the customer's consent along with a statement informing the customer of the right to revoke his or her consent. *See* 12 C.F.R. § 205.17(b)(1).

56.     From the above summary of the disclosures made in the Overdraft Opt-In forms and the Account Terms and Conditions, it is clear that Defendants did not clearly and accurately describe and, in fact, misrepresented their overdraft policies to customers in 2010, 2012, and/or 2013.

57.     For customers who opened accounts prior to July 1, 2010, Defendants could not assess and/or charge overdraft fees on or after August 15, 2010, unless and until they had complied with the requirements of Reg E.

58.     For customers who opened accounts on or after July 1, 2010, Defendants could not assess and/or charge overdraft fees on or after July 1, 2010, unless and until they had complied with the requirements of Reg E.

59.     The Electronic Transactions described herein qualify as an "electronic funds transfer" under the EFTA and Reg E.

60.     Defendants qualify as banks, or "financial institutions," which provide overdraft services as contemplated by the EFTA and Reg E.

61.     If Defendants had not violated EFTA and Reg E, Plaintiff and members of the Class would not have been assessed and/or charged improper or excessive overdraft fees.

62.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

**D.     Defendants Have Failed to Follow Guidance Regarding "Best Practices"**

63.     By and through their unfair and deceptive overdraft fee practices and policies, as described herein, Defendants have failed to follow the list of "best practices" for overdraft programs set forth in the *Joint Guidance on Overdraft Protection Programs* (the "Joint Guidance") issued by the United States Department of Treasury, the Office of Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies"). *See* 70 F.R. 9127-01, 9127 (Feb. 24, 2005).

64.     Defendants' unfair and deceptive overdraft fee practices and policies, as described herein, have made and continue to make it difficult for customers to avoid injury even if they carefully track the balances of their respective accounts.  Indeed, the Agencies have stated that injury resulting from practices and policies such as those employed by Defendants "is not

reasonably avoidable" by the customer. *See* 73 F.R. 28904-01, 28929. More specifically, the Agencies have noted that, "[a]lthough consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or credit for a returned purchase will be made available." *See* 73 F.R. 28904-01, 28929.

65.     So, too, here, customers have lacked and continue to lack sufficient information about key aspects of their accounts with Defendants due, at least in part, to Defendants' failure to make adequate disclosures.

66.     As a result of Defendants' unfair overdraft fee practices and policies, as described herein, Defendants' customers – including Plaintiff and members of the Class – have been harmed.

## PLAINTIFF-SPECIFIC FACTS

67.     At all relevant times, Plaintiff has been a holder and/or authorized user of a joint checking account at Berkshire Bank (the "Account").

68.     The Account was opened at Woronoco Savings Bank in or around 2002; however, in or around December 2004, Berkshire Hills acquired Woronoco Bancorp, Inc. (the holding company for Woronoco Saving Bank) and, as a result, the Account was moved to Berkshire Bank.

69.     In connection with the opening of the Account, Defendants and/or their predecessors-in-interest issued checks and a debit card to Plaintiff.

70.     The checks and debit card issued to Plaintiff allowed Plaintiff to access funds in the Account through Electronic Transactions and Check Transactions.

71.     Defendants wrongfully assessed and/or charged multiple overdraft fees to Plaintiff by and through their acts or omissions with respect to Plaintiff and the Account.  For example:

- On November 30, 2012, only one debit resulting in an overdraft is reflected on the Account statement, yet two overdraft fees totaling $64.00 were charged to the Account;

- On February 26, 2013, the Account statement reflected a positive balance for the entire month of February, yet an overdraft fee of $32.00 was charged to the Account;

- On April 17, 2013, the Account statement reflected a positive balance and the Account Balance displayed enough money to cover all transactions paid by Berkshire, yet an overdraft fee of $32.00 was charged to the Account on April 17th due to a lower "available balance" created as a result of a "pre-authorization hold" on a $95.01 Coach store transaction that was authorized and approved on April 17, 2013, but had not settled to Plaintiff's account and had not been paid out of the Account by Defendants on that date;

- Following this unexpected overdraft charge, on April 19, 2013, the $95.01 Coach store transaction approved on April 17th settled to Plaintiff's account. Her account statements reflect a positive ending balance between April 17, 2013 and April 19, 2013, yet Defendants charged her account an overdraft fee of $32.00 on April 19, 2013, on that very same Coach transaction that Defendants had already used to reduce Plaintiff's available balance on April 17th.  This is despite the fact that the Coach transaction was initially authorized into a sufficiently positive account balance. Thus, Defendants assessed and/or charged overdraft fees as a result of the held transaction even though it was authorized into a sufficiently positive balance, and they simultaneously used this obscure and undisclosed hold procedure to generate multiple other overdraft fees;

- Moreover, on April 19, 2013, the Account statement reflected a sufficiently positive balance to cover all transactions paid by Defendants, yet an overdraft fee of $32.00 was charged to the account on April 19, 2013, due to a negative available balance created as a result of a pre-authorization hold on a transaction that was authorized and approved on April 19, 2013, but not settled to Bond's account nor paid out of the account by Defendants on that date;

- On October 18, 2013, four overdraft fees totaling $128.00 were charged to the Account, yet if Defendants paid the smallest items first (as set forth in the

2012 Disclosure and the 2013 Terms and Conditions), at most, only one overdraft fee would have resulted;

- On December 12, 2013, five overdraft fees totaling $160.00 were charged to the Account, yet if Defendants paid the smallest items first (as set forth in the 2012 Disclosure and the 2013 Terms and Conditions), at most one overdraft fee would have resulted.  Moreover, on December 12, 2013, the Account had enough money to cover all transactions, except one, yet Defendants charged five overdraft fees due to a negative available balance created as a result of several debit card pre-authorization holds on transactions authorized and approved on December 12, 2013 (Ann Taylor Loft, Francesca, and Salon 511), but not settled to Plaintiffs  account nor paid out of the Account on that date;

- Between December 13-16, 2013, the aforementioned transactions authorized and approved on December 12th settled to Plaintiff's account.  Defendants then charged her account multiple overdraft fees on those very same transactions (Ann Taylor Loft, Francesca, and Salon 511) that Defendants had already used to reduce her available balance back on December 12th; thus, Defendants used the same transaction twice to manipulate the Account and generate multiple overdraft fees;

- On December 23, 2013, two overdraft fees totaling $64.00 were charged to the Account, yet if Defendants paid the smallest items first (as set forth in the 2012 Disclosure and the 2013 Terms and Conditions), at most one overdraft fee would have resulted;

- On January 6, 2014, the Account statement reflected a positive ending balance of $493.87 and the Account had enough money to cover all transactions paid by Berkshire on said date, yet five overdraft fees totaling $160.00 were charged to the Account on January 6, 2014, due to a negative "available balance" created as a result of several debit card "pre-authorization holds on transactions (Amazon $97.04, Amazon $249.53, and Tory Burch Web $430.48) that were authorized and approved on January 6, 2014, but had not settled to Plaintiff's account and had not been paid out of the Account by Defendants on that date;

- Then, on January 7, 2014, the $97.04 and $249.53 Amazon transactions, approved on January 6, 2014, settled to Plaintiff's account.  Her account statement reflects a positive opening balance on January 7, 2013, yet Defendants then charged two additional overdraft fees on January 7, 2014, on those very same "Amazon" transactions that they had already used to reduce Plaintiff's available balance back on January 6, 2014.  Despite the fact that Plaintiff had a positive ledger balance and had enough money in her account to cover at least one of those Amazon charges.  Moreover, because the "pre-

authorization hold" for Tory Burch Web was still in effect on January 7, 2014, it caused a negative "available balance" and Bond's account was assessed and/or charged the two aforementioned overdraft fees on the Amazon transactions as well as one additional overdraft fee;

- On January 8, 2014, the $430.48 Tory Burch Web transaction approved on January 6, 2014 settled to Plaintiff's account.  Her account statement reflects a positive balance on January 6, 2013, yet Defendants charged an overdraft fee on January 8, 2014, for the very same "Tory Burch Web" transaction that they had already used to reduce her available balance and charge multiple overdraft fees back on January 6, 2014, and again on January 7, 2014. Despite the fact that Plaintiff had a positive ledger balance and had enough money in her account on January 8, 2014, to cover the $430.48 Tory Burch Web charge to her account.  Thus, on two occasions (January 7th and January 8th), Defendants charged overdraft fees as a result of the held transactions even though they were authorized into a sufficiently positive balance, and they simultaneously used this obscure and undisclosed hold procedure to generate multiple other overdraft fees;

- On March 24, 2014, two overdraft fees totaling $64.00 were assessed and/or charged to the Account, yet if Defendants paid the smallest items first (as set forth in the 2012 Disclosure and 2013 Terms and Conditions), at most, only one overdraft fee would have resulted;

- On April 14, 2014, three overdraft fees totaling $96.00 were assessed and/or charged to the Account, yet if Defendants paid the smallest items first (as set forth in the 2012 Disclosure and the 2013 Terms and Conditions, at most, only two overdraft fees would have resulted;

- On November 12, 2014, one overdraft fee totaling $35.00 for $87.00 check #1197 and one NSF Return Item Fee for a $350.00 ACH debit were assessed and/or charged to the Account, yet if the Defendants paid the smallest items first (as set forth in the 2012 Disclosure and the 2013 Terms and Conditions), at most, only one of those two fees would have resulted because there were sufficient funds in Plaintiff's account to pay check #1197.  Also, Defendants wrongfully subtracted $350.00 from Bond's account balance even though Defendants did not actually pay out the $350.00 ACH debit from her account.

- On December 15, 2014, two NSF Return Item Fees (NSF) totaling $70.00, for a $320.83 ACH debit and $80 check #1216, were assessed and/or charged to the Account, yet if the Defendants paid the smallest items first (as set forth in the 2012 Disclosure and the 2013 Terms and Conditions), at most, only one of those two fees would have resulted. Moreover, there were sufficient funds in Bond's account to pay check #1216.  Also, Defendants wrongfully subtracted $320.83 from Bond's account balance even though Defendants did not actually pay out the $320.83 ACH debit from her account.

- Defendant's imposition of numerous improper overdraft and/or NSF Fees to Bond's account created a cumulative domino effect by reducing Bond's account balance over time, which resulted in additional overdraft, continuous overdraft, and NSF fees which would not have otherwise been incurred. For example, On April 14, 2015, Bond's account statement showed a balance of $309.89 and an ACH debit of $328.00 was presented for payment, resulting in a -$18.11 balance and a $35.00 overdraft fee. If just one of Defendant's improper prior overdraft fees were not imposed in the years prior, Bond would not have incurred an overdraft fee on April 14, 2015. This domino effect could not only influence this one transaction that was affected by the hundreds of dollars of inappropriate fees but also dozens of other subsequent overdraft fees that were assessed fairly. Plaintiff was constantly put in a financial hole that had a long term effect on her ability to pay for her various purchases.

72.    Defendants never notified Plaintiff that the Account could be assessed and/or charged overdraft fees on transactions even though there were sufficient funds in the Account to cover such transactions at the time they were executed.

73.    Plaintiff has also had her Electronic Transactions and Check Transactions reordered and otherwise manipulated by Defendants. If Defendants had not reordered and otherwise manipulated such transactions, Plaintiff would not have been charged as many overdraft fees.

74.    Defendants have breached their agreements with Plaintiff and have further violated the EFTA and Regulation E with respect to Plaintiff.

75.    Upon information and belief, the unfair overdraft fee practices and policies applied by Defendants to Plaintiff and the Account are representative of the practices and policies applied to other customers.

76.    Upon information and belief, the overdraft fees assessed and/or charged by Defendants to Plaintiff are representative of millions of dollars of overdraft fees that Defendants have wrongfully assessed and/or charged to accounts of other customers, including members of the Class.

## COUNT ONE

### (Violation of Massachusetts General Laws, Chapter 93A)

77.     M.G.L. c. 93A, § 2 provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." M.G.L. c. 93A, § 9 permits any consumer injured by a violation of M.G.L. c. 93A, § 2 to bring a civil action, including a class action, for damages and injunctive relief.

78.     Plaintiff reasserts and incorporates herein each and every allegation in the preceding paragraphs of this Complaint as if set forth fully herein.

79.     Plaintiff and the members of the Class are persons.

80.     Plaintiff and members of the Class are consumers.

81.     Defendants were and are business engaged in trade or commerce.

82.     Plaintiff and members of the Class entered into consumer transactions with the Defendants.

83.     Defendants made material misrepresentations to Plaintiff and members of the Class and Plaintiff and the Class relied on Defendants' misrepresentations.

84.     Defendants engaged in unfair methods of competition, unconscionable acts or practices, and/or unfair or deceptive acts or practices ("unfair and deceptive practices") in the conduct of trade or commerce.

85.     Defendants' deceptive acts or practices effected an injury on Plaintiff and the Class.

86.     Pursuant to M.G.L. c. 93A, § 9 , Plaintiff, on behalf of herself and members of the Class, seeks and order of this court: (i) enjoining Defendants from continuing to engage, use or employ any unfair and/or deceptive business acts or practices related to their assessment and/or

charging of overdraft and NSF fees as set forth in detail above; and (ii) disgorging and restoring all monies that may have been acquired by Defendants as a result of such unfair and/or deceptive acts or practices.

87.     Defendants' acts, practices and/or conduct were willful and knowing violations and invaded the rights of Plaintiff and the Class to be free from deceptive business practices.

88.     Plaintiff and members of the Class may be irreparably harmed and/or denied an effective complete remedy if such an order is not granted.

89.     The unfair and deceptive acts and practices of Defendants as described above, presents a serious threat to Plaintiff and members of the Class.

90.     Plaintiff made a demand for relief, in writing, to Defendants at least thirty (30) days prior to filing this Amended Complaint, as required by M.G.L. c. 93A, § 9.

91.     Based on the foregoing, Plaintiff and the other members of the Class are entitled to all remedies available pursuant to M.G.L. c. 93A, § 9 including, but not limited to, refunds, actual damages, or statutory damages in the amount of twenty-five dollars per violation, whichever is greater, double or treble damages, attorneys' fees and other reasonable costs.

92.     Pursuant to M.G.L. c. 231, § 6B, Plaintiff and other members of the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct.  The amount of damages suffered as a result is a sum certain and capable of calculation and Plaintiff and Class members are entitled to interest in an amount according to proof.

## COUNT TWO

### Breach of Contract

93.     Plaintiff repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

94.     Plaintiff and Defendants contracted for banking services to include, among other things, services related to Electronic Transactions and/or Check Transactions.

95.     Defendants have also contracted with other customers, including the members of the Class, for banking services to include, among other things, services related to Electronic Transactions and Check Transactions.

96.     Defendants have materially breached the specific terms of their agreements with Plaintiff and their agreements with other customers, including the members of the Class.

97.     Defendants materially breached the relevant agreements by instituting unfair overdraft fee practices and policies that were never accurately and sufficiently disclosed to Plaintiff or other customers, including the members of the Class.

98.     Defendants' material breaches of their agreements with Plaintiff and their agreements with other customers, including the members of the Class, included, without limitation, the following:

- Approving one-time debit card and point-of-sale (POS) transactions, including cash withdrawal transactions at automatic teller machines (ATMs) owned or controlled by Defendants (collectively referred to herein as "Electronic Transactions"), which triggered the assessment and/or charging of overdraft fees to customers;

- Reordering or otherwise manipulating Electronic Transactions and/or traditional checking account transactions in order to increase in the number of overdraft fees assessed and/or charged to customers;

- Reordering, manipulating, or failing to pay POS, Electronic Transactions and/or Check Transactions from lowest dollar amount to highest dollar

amount, in violation of Defendants' 2012 and 2013 Account Terms and Conditions, in order to increase the amount of overdraft fees assessed and/or charged to Plaintiff;

- Assessing and/or charging overdraft fees even when customers had sufficient funds in their accounts to pay the transactions;

- Failing to inform customers that Berkshire determined overdraft and assessed and/or charged overdraft fees based upon a customer's "available balance" (not "actual balance") and that "pre-authorization holds" would immediately reduce the customer's "available balance" when authorized;

- Assessing and/or charging overdraft fees in  instances where customers' accounts contained enough money to pay all items presented but Defendants' "held" and effectively removed the money for "pre-authorization" transactions, creating a negative "available balance"; then, Defendants charged customers additional overdraft fees when the same "held" transactions settled and/or were presented for payment, days later—a predatory practice termed "double-dipping";

- Failing to alert customers that a POS transaction would result in an overdraft fee and failing to provide customers with an opportunity to cancel such transaction;

- Failing to provide customers with accurate "available balance" versus "actual balance" information and with accurate and clear information regarding how the bank's internal "available balance" calculation is completed, which encouraged Electronic Transactions and Check Transactions even when Defendants knew an overdraft would occur based on the methodology used by Defendants in calculating the funds in customer accounts;

- Utilizing held funds on charges to drop the available balance without said charge being reflected in the account balance made available to Plaintiff, and, in turn, assessing and/or charging new overdraft fees into an account with a lower than displayed balance, generating new overdraft fees hidden by these holds;

99.     Plaintiff and the members of the Class have sustained damages, including monetary losses, as a direct and proximate result of Defendants' material breaches of the relevant agreements.

100.     Defendants are liable for the damages, including monetary losses, suffered by Plaintiff and the Class as a result of Defendants' breaches of the relevant agreements.

## COUNT THREE

### Breach of Duty of Good Faith & Fair Dealing

101.     Plaintiff repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

102.     Plaintiff and Defendants contracted for banking services to include, among other things, services related to Electronic Transactions and/or Check Transactions.

103.     Defendants have also contracted with other customers, including the members of the Class, for banking services to include, among other things, services related to Electronic Transactions and/or Check Transactions.

104.     The covenant of good faith and fair dealing is an element of the agreements between Plaintiff and Defendants, as well as the agreements between Defendants and their other customers.  In connection with the execution and performance of obligations under an agreement, the covenant of good faith and fair dealing means preserving the spirit – not merely the letter – of the bargained-for agreement.   Stated differently, the parties to an agreement are mutually obligated to comply with the substance of their agreement in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the execution and performance of obligations under an agreement.

105.     By and through their unfair and insufficiently disclosed overdraft fee practices and policies, as described herein, Defendants have breached the covenant of good faith and fair dealing with respect to Plaintiff and their other customers, including the members of the Class.

106.    Plaintiff and Defendants' other customers have performed all or substantially all of the obligations imposed upon them under the relevant agreements.

107.    Plaintiff and the members of the Class have sustained damages, including monetary losses, as a direct and proximate result of Defendants' breaches of the covenant of good faith and fair dealing.

108.    Defendants are liable for the damages, including monetary losses, suffered by Plaintiff and the Class as a result of Defendants' breaches of the covenant of good faith and fair dealing.

## COUNT FOUR

### Unconscionability

109.    Plaintiff repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

110.    Plaintiff and Defendants contracted for banking services to include, among other things, services related to Electronic Transactions and/or Check Transactions.

111.    Defendants have also contracted with other customers, including the members of the Class, for banking services to include, among other things, services related to Electronic Transactions and/or Check Transactions.

112.    Considering factors including Defendants' level of experience and sophistication in relation to Plaintiff and Defendants' other customers, including the members of the Class, the great disparity in the relative bargaining power between or amongst the parties, the inconspicuousness, vagueness, misleading nature, and/or incomprehensibility of the contractual language at issue, the oppressiveness of the contractual terms at issue, the commercial unreasonableness of the contractual terms at issue, the purpose and effect of the contractual

terms at issue, the allocation of the risks between or amongst the parties, and other public policy concerns, the relevant agreements are unconscionable and, therefore, unenforceable as a matter of law.

113.    More specifically, the terms and conditions of the relevant agreements are substantively and procedurally unconscionable to the extent that they permit or purport to permit acts or omissions by Defendants, which included, without limitation, the actions described above.

114.    Plaintiff and the members of the Class have sustained damages, including monetary losses, as a direct and proximate result of the unconscionability of the relevant agreements.

115.    Defendants are liable for the damages, including monetary losses, suffered by Plaintiff and the Class as a result of the unconscionability of the relevant agreements.

<u>**COUNT FIVE**</u>

**Violation of Electronic Funds Transfer Act
and Regulations Promulgated Thereunder**

116.    Plaintiff repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

117.    Defendants have violated the EFTA and Reg E by and through several acts and omissions, including, without limitation, the following: (i) failing to provide customers with a notice clearly and accurately describing Defendants' overdraft fee practices and policies and, thereby, failing to comply with 12 C.F.R. §§ 205.17(b)(1)(i) and (d); and (ii) assessing and/or charging—and continuing to assess and/or charge—overdraft fees to Plaintiff and the members of the Class in violation of 12 C.F.R. § 205.17(b)-(c).

118.     Based on Defendants' violations of EFTA and Reg E, Defendants are liable to Plaintiff and the Class for actual damages, statutory damages pursuant to 15 U.S.C. § 1693m, and reasonable attorneys' fees and costs.

## COUNT SIX

### Conversion

119.     Plaintiff repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

120.     Defendants have and continue to have a duty to maintain and preserve their customers' checking accounts to prevent the diminishment of such accounts through Defendants' own wrongful acts and/or omissions.

121.     Defendants have wrongfully assessed and/or charged overdraft fees to Plaintiff and the members of each the Class and have converted specific and readily identifiable funds from the accounts maintained by Plaintiff and the members of the Class in order to satisfy the overdraft fees.

122.     Defendants have, without proper authorization, assumed and exercised the right of ownership and control over funds from the accounts maintained by Plaintiff and the members of the Class.

123.     Defendants continue to retain the funds assessed and/or charged to Plaintiff and the members of the Class as overdraft fees unlawfully and without the consent of Plaintiff or the members of the Class.

124.     Defendants intend to permanently deprive Plaintiff and the members of the Class of the funds assessed and/or charged to them as overdraft fees.

125.     The funds assessed and/or charged as overdraft fees were properly owned by Plaintiff and the members of the Class, not by Defendants.

126.     Plaintiff and the members of the Class are entitled to the immediate possession or repossession of the funds assessed and/or charged to them as overdraft fees.

127.     Plaintiff and the members of the Class have sustained damages, including monetary losses, as a direct and proximate result of Defendants' wrongful conversion of the funds assessed and/or charged as overdraft fees.

128.     Based on Defendants' wrongful conversion of the funds assessed and/or charged to Plaintiff and the members of the Class as overdraft fees, Defendants are liable for damages, including all amounts wrongfully converted, and costs permitted by law.

## COUNT SEVEN

### Unjust Enrichment—As Alternative to Breach of Contract

129.     Plaintiff repeats and incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

130.     Should the relevant agreements between and/or amongst the parties be found void or unenforceable, Defendants will have unjustly retained a substantial pecuniary benefit at the expense of Plaintiff and the members of the Class, who have no adequate remedy at law.

131.     By and through their unfair overdraft fee practices and policies, as described herein, Defendants knowingly engaged in acts and/or omissions that were unfair, unconscionable, and oppressive with respect to Plaintiff and the members of the Class.

132.     By and through their unfair overdraft fee practices and policies, as described herein, Defendants knowingly received and retained wrongful benefits, including monetary income.

133.    Defendants have acted with conscious disregard for the rights of Plaintiff and the members of the Class.

134.    If Plaintiff and the members of the Class are not permitted to recover the full value of the funds retained by Defendants, Defendants will be unjustly enriched.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated, including the members of each proposed class, respectfully requests the following relief:

i.    An Order declaring that this action is a proper class action, certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, designated Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

ii.    Determine the damages sustained by Plaintiffs and the Class as a result of Defendants' violations of M.G.L. c. 93A, § 9(2) and/or common law, and award any actual damages proved or statutory damages in the amount of $25.00 per class member, whichever is greater, tripled; or disgorge all profits which Defendants made on improper overdraft fees charged to Plaintiff and the Class;

iii.    The issuance of a preliminary injunction enjoining Defendants from continuing to engage in the unlawful acts and/or omissions described herein, including, but not limited to, Defendants' violations of the EFTA and Reg E;

iv.    The issuance of a permanent injunction enjoining Defendants from continuing to engage in the unlawful acts and/or omissions described herein, including, but not limited to, Defendants' violations of the EFTA and Reg E, and ordering Defendants to provide their customers with corrective disclosures;

v.    A judgment awarding Plaintiff and the members of the Class compensatory, consequential, and statutory damages, as applicable;

vi.    A judgment awarding Plaintiff, the members of the Class restitution of all improper or excessive overdraft fees assessed and/or charged by Defendants;

vii.    A judgment awarding Plaintiff and the members of the Class actual damages;

viii.   A judgment awarding Plaintiff and members of the Class equitable monetary relief;

ix.   A judgment awarding Plaintiff and members of the Class reasonable attorneys' fees, costs, and expenses;

x.   An Order declaring that Defendants are obligated to pay both pre-judgment and post-judgment interest on any amounts awarded; and

xi.   An Order granting such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of all other members of the Class, hereby demands a trial by jury as to all issues.

Dated: July 15, 2016                          Plaintiff, Sandra Bond


                                              By Her Attorneys,


                                                /s/ **Jeffrey S. Morneau**
                                              Jeffrey S. Morneau, Esq. (BBO No. 643668)
                                              CONNOR, MORNEAU & OLIN, LLP
                                              273 State Street, Second Floor
                                              Springfield, Massachusetts 01103
                                              Tel:    (413) 455-1730
                                              Fax:    (413) 455-1594
                                              jmorneau@cmolawyers.com
                                              lkantany@cmolawyers.com



                                                /s/ **Angela Edwards**
                                              Angela Edwards, Esq. (BBO No. 565111)
                                              72 Canterbury Circle
                                              East Longmeadow, Massachusetts 01028
                                              Tel.:    (413) 525-3820
                                              angelaedwards@charter.net

**/s/ Lee S.Shalov**

Lee S. Shalov

McLaughlin & Stern, LLP

260 Madison Ave.

New York, NY 10016

Tel.:    (212) 448-1100

lshalov@mclaughlinstern.com