UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SANDRA BOND, individually | ) | |
| and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiff | ) | Civil Action |
| | ) | No. 3:16-cv-30050-MGM |
| v. | ) | |
| | ) | |
| BERKSHIRE BANK and | ) | |
| BERKSHIRE HILLS BANCORP, | ) | ORIGINAL FILED UNDER SEAL |
| | ) | |
| Defendants. | ) | |

**[CORRECTED] MEMORANDUM IN OPPOSITION TO PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iv

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS ................................................................................ 4

    I.     The Overdraft Practices at Issue. ........................................................ 4

         A.    The Bank's Courtesy Pay Service................................................. 4

         B.    The Bank's Use of Available Balance, Treatment of Authorized
              Debit Card Transactions, and Ordering of Payments. ............... 5

         C.    The Bank's "Customer-Centric" Approach to Overdrafts.......... 6

    II.    The Bank Has Used Many Approaches to Educate Customers About
        Overdrafts. ........................................................................................ 7

         A.    There Was No Uniform Contract in Effect Throughout the Putative
              Class Period. .............................................................................. 7

         B.    Many Customers Spoke With Bank Employees Concerning
              Overdrafts. ............................................................................... 10

         C.    The Bank Has Sent Customers Written Communications
              Concerning Overdraft Fees that Vary Depending on When They
              Maintained Their Accounts and Their Individual Banking Activity........ 11

         D.    Some Customers Use Account Management Tools the Bank
              Provides That Can Help Avoid or Reduce Overdraft Fees...................... 12

    III.   Evidence Concerning Plaintiff Sandra Bond and Her Husband Reveals
        Significant Individual Issues That Affect the Putative Class................ 13

         A.    Sandra Bond's Mismanagement of the Account ...................... 13

         B.    Dylan Bond's Contrasting Account Management Practices.................... 16

    IV.   Bank Employee and Expert Evidence Further Demonstrate Variations in
        Putative Class Members' Understandings and Experiences. ................ 17

i

ARGUMENT .................................................................................................... 18

I.      The Court Must Conduct a Rigorous Analysis To Determine Whether
        Plaintiff Has Carried Her Burden Under Rule 23. ................................................. 18

II.     Plaintiff Cannot Meet Her Burden to Establish Rule 23(a)(2)
        Commonality Under the Heightened Standard of *Wal-Mart Stores, Inc. v.
        Dukes* ................................................................................................................ 19

III.    Plaintiff Cannot Meet Her Burden to Establish Typicality under Rule
        23(a)(3). ............................................................................................................. 20

        A.      Issues unique to Bond's claims will sidetrack her trial ........................... 21

        B.      Bond is not typical of a class asserting claims under other states'
                laws. ....................................................................................................... 22

        C.      Plaintiff is not typical because her EFTA claim is time-barred. .............. 23

IV.     The Court Should Deny Certification Because Plaintiff Has Not Shown
        That Common Questions Will Predominate Over Individual Questions ............. 24

        A.      Individual issues predominate with respect to Plaintiff's Chapter
                93A claim (Count I) because it depends on a showing of causation. ....... 25

        B.      Individual issues predominate with respect to Plaintiff's claims for
                breach of contract (Count II) and for breach of the implied
                covenant of good faith (Count III) because they involve numerous
                contracts and extrinsic evidence. ........................................................... 29

                1.      Individual issues predominate because the breach of
                        contract claim implicates numerous, materially different
                        contracts. .................................................................................... 29

                2.      Individual issues predominate because extrinsic evidence is
                        relevant to Plaintiff's breach of contract and breach of
                        implied covenant claims. ............................................................. 31

                        a.      Plaintiff's claim for breach of contract requires
                                consideration of extrinsic evidence. .................................. 32

                        b.      Plaintiff's claim for breach of the implied covenant
                                of good faith requires consideration of extrinsic
                                evidence. ........................................................................... 33

                        c.      Certification is improper when a breach of contract
                                or breach of good faith claim requires consideration
                                of extrinsic evidence. ........................................................ 34

          d.      The extrinsic evidence in this case precludes predominance. ................................................................. 35

    C.      Individual issues predominate with respect to Plaintiff's claim for unjust enrichment (Count VII) because it requires consideration of individual equitable considerations. ........................................... 36

    D.      Individual issues predominate with respect to Plaintiff's claim for conversion (Count VI) because it requires consideration of the same individual questions inherent in Plaintiff's breach claim. ............... 36

    E.      Individual issues relating to the Bank's affirmative defenses predominate. ............................................................................. 37

    F.      Plaintiff's predominance argument relies on distinguishable and wrongly decided cases. ............................................................ 39

    G.      Individual issues of causation and damages predominate with respect to plaintiff's state law claims. ........................................ 41

         1.      Plaintiff's expert has not demonstrated that he can calculate damages in the "formulaic manner" he predicts. .......................... 41

         2.      Plaintiff's expert cannot reliably calculate damages based on common proof of reliance, causation or customer knowledge. ..................................................................... 42

         3.      Plaintiff's expert's proposed methodologies to calculate damages do not "fit" plaintiff's liability theories. ........................ 43

V.      Plaintiff Fails to Satisfy the Requirement of Superiority Under Rule 23(b)(3). .............................................................................. 44

CONCLUSION ............................................................................................ 45

# TABLE OF AUTHORITIES

Page

**Cases**

*Abla v. Brinker Restaurant Corp.*,
    279 F.R.D. 51 (D. Mass. 2011) ................................................................. 24

*Adams v. Kansas City Life Ins. Co.*,
    192 F.R.D. 274 (W.D. Mo. 2000) ............................................................ 34

*AIU Ins. Co. v. Mitsui O.S.K. Lines, Ltd.*,
    897 F. Supp. 724 (S.D.N.Y. 1995) ........................................................... 37

*Allapattah Servs., Inc. v. Exxon Corp.*,
    333 F.3d 1248 (11th Cir. 2003) ........................................................... 32, 34

*Allen-Wright v. Allstate Ins. Co.*,
    2008 WL 5336701 (E.D. Pa. Dec. 17, 2008) .......................................... 21

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) .................................................................................. 23

*Anderson v. U.S. Dep't of Hous. and Urban Dev.*,
    554 F.3d 525 (5th Cir. 2008) ................................................................... 22

*Avritt v. Reliastar Life Ins. Co.*,
    615 F.3d 1023 (8th Cir. 2010) ............................................................ 32, 34

*B&C Mgmt Vt., Inc. v. John*,
    122 A.3d 511 (Vt. 2015) .......................................................................... 33

*Beck v. Maximus*,
    457 F.3d 291 (3d Cir. 2006) .................................................................... 20

*Benchmark Grp., Inc. v. Penn Tank Lines, Inc.*,
    612 F. Supp. 2d 562 (E.D. Pa. 2009) ...................................................... 34

*Berger v. Home Depot USA, Inc.*,
    741 F.3d 1061 (9th Cir. 2014) ................................................................. 36

*BourgeoisWhite, LLP v. Sterling Lion, LLC*,
    71 N.E.3d 171 (Mass. App. Ct. 2017) ..................................................... 38

*Bowers v. Jefferson Pilot Fin. Ins. Co.*,
    219 F.R.D. 578 (E.D. Mich. 2004) .......................................................... 33

*Brooks v. Norwest Corp.*,
      103 P.3d 39 (N.M. Ct. App. 2004).............................................................. 39

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
      155 F.3d 331 (4th Cir. 1998) ..................................................................... 29

*Cadle Co. v. Hayes*,
      116 F.3d 957 (1st Cir. 1997)....................................................................... 37

*Cahaly v. Benistar Prop. Exch. Trust Co.*,
      864 N.E.2d 548 (Mass. App. Ct. 2007) ..................................................... 36

*Cambridge Plating Co. v. Napco, Inc.*,
      85 F.3d 752 (1st Cir. 1996).......................................................................... 21

*Carey v. Fitzpatrick*,
      17 N.E. 2d 882 (Mass. 1938) ..................................................................... 38

*Castano v. Am. Tobacco Co.*,
      84 F.3d 734 (5th Cir. 1996) ........................................................................ 26

*Chenensky v. N.Y. Life Ins. Co.*,
      2011 WL 1795305 (S.D.N.Y. Apr. 27, 2011)............................................. 33

*Comcast Corp. v. Behrend*,
      569 U.S. 27 (2013)............................................................................. 24, 43

*Compass Bank v. Snow*,
      823 So.2d 667 (Ala. 2001)................................................................... 35, 39

*Conway v. 287 Corporate Center Assocs.*,
      901 A.2d 341 (N.J. 2006)............................................................................ 33

*Cruz v. FXDirectDealer, LLC*,
      720 F.3d 115 (2d Cir. 2013)........................................................................ 23

*Cruz v. TMI Hosp., Inc.*,
      2015 WL 6671334 (D. Minn. Oct. 30, 2015) ............................................. 37

*Demmick v. Cellco P'ship*,
      2010 WL 3636216 (D.N.J. Sept. 8, 2010) .................................................. 26

*Dorn v. Astra USA*,
      975 F. Supp. 388 (D. Mass. 1997) ............................................................. 38

*Drake v. Allergan, Inc.*,
      63 F. Supp. 3d 382 (D. Vt. 2014)............................................................... 26

*Flores v. Diamond Bank*,
    2008 WL 4861511 (N.D. Ill. Nov. 7, 2008) ...................................................... 26

*Franze v. Equitable Assurance*,
    296 F.3d 1250 (11th Cir. 2002) ...................................................................... 23

*Friedman v. 24 Hour Fitness USA, Inc.*,
    2009 WL 2711956 (C.D. Cal. Aug. 25, 2009) .................................................. 26

*Gregurek v. United of Omaha Life Ins. Co.*,
    2009 WL 4723137 (C.D. Cal. Nov. 10, 2009) .................................................. 34

*Gutierrez v. Wells Fargo Bank, N.A.*,
    2008 WL 4279550 (N.D. Cal. Sep. 11, 2008) ............................................ 39, 40

*Hershenow v. Enterprise Rent-A-Car Co. of Boston*,
    840 N.E.2d 526 (Mass. 2006) ........................................................................ 25

*Hochstadt v. Boston Sci. Corp.*,
    708 F. Supp. 2d 95 (D. Mass. 2010) ............................................................... 20

*Hubert v. Melrose-Wakefield Hosp. Ass'n*,
    661 N.E.2d 1347 (Mass. App. Ct. 1996) ........................................................ 33

*In re Adelphia Recovery Trust*,
    634 F.3d 678 (2d Cir. 2011)............................................................................ 38

*In re Bank of Boston Corp. Secs. Litig.*,
    762 F. Supp. 1525 (D. Mass. 1991) .......................................................... 20, 23

*In re Celexa and Lexapro Mktg. & Sales Litig.*,
    2017 WL 3495694 (D. Mass. Aug. 15, 2017) ................................................. 36

*In re Celexa and Lexapro Mktg. & Sales Pracs. Litig.*,
    315 F.R.D. 116 (D. Mass. 2016).................................................................... 45

*In re Checking Account Overdraft Litig.*,
    307 F.R.D. 656 (S.D. Fla. 2015).................................................................... 40

*In re Citigroup, Inc. Capital Accumulation Plan Litig.*,
    652 F.3d 88 (1st Cir. 2011)............................................................................ 36

*In re Credit Suisse-AOL Sec. Litig.*,
    253 F.R.D. 17 (D. Mass. 2008)..................................................................... 20

*In re Currency Conversion Fee Antitrust Litig.*,
    230 F.R.D. 303 (S.D.N.Y. 2004) .................................................................. 26

*In re Dial Complete Mktg. & Sales Pracs. Litig.*,
  312 F.R.D. 36 (D.N.H. 2015) ...................................................................... 25, 36, 42, 43

*In re Flonase Antitrust Litig.*,
  610 F. Supp. 2d 409 (E.D. Pa. 2009) ............................................................... 23

*In re LifeUSA Holding, Inc.*,
  242 F.3d 136 (3d Cir. 2001)............................................................................. 45

*In re Light Cigarettes Mktg. Sales Pracs. Litig.*,
  271 F.R.D. 402 (D. Me. 2010)............................................................... 24, 25, 38

*In re Loestrin 24 Fe Antitrust Litig.*,
  261 F. Supp. 3d 307 (D.R.I. 2017)................................................................... 23

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008)......................................................................... 18, 23

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015)................................................................................ 25

*In re Packaged Ice Antitrust Litig.*,
   779 F. Supp. 2d 642 (E.D. Mich. 2011)........................................................... 23

*In re Paxil Litig.*,
  212 F.R.D. 539 (C.D. Cal. 2003) .................................................................... 45

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
  230 F.R.D. 61 (D. Mass. 2005)....................................................................... 21

*In re Relafen Antitrust Litig.*,
  221 F.R.D. 260 (D. Mass. 2004)..................................................................... 23

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
  150 F. Supp. 3d 593 (D.S.C. 2015)................................................................. 39

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
  2018 WL 1003548 (D.S.C. Feb. 22, 2018)............................................... 39, 40

*In re TJX Cos. Retail Sec. Breach Litig.*,
  246 F.R.D. 389 (D. Mass. 2007)..................................................................... 26

*In re Wilborn*,
  609 F.3d 748 (5th Cir. 2010) .......................................................................... 38

*Int'l Multifoods Corp. v. Com. Union Ins. Co.*,
  309 F.3d 76 (2d Cir. 2002)............................................................................. 33

*James B. Nutter & Co. v. Estate of Murphy,*
    88 N.E.3d 1133 (Mass. 2018) ........................................................ 32

*Jenson v. IPEX USA, Inc.,*
    2008 WL 5062657 (W.D. Wash. Oct. 27, 2008) ............................. 21

*Jim Ball Pontiac – Buick GMC, Inc. v. DHL Exp. (USA), Inc.,*
    2012 WL 370319 (W.D.N.Y. Feb. 3, 2012) ..................................... 34

*Kenneth R. ex rel. Tri-Cty. CAP, Inc./GS v. Hassan,*
    293 F.R.D. 254 (D.N.H. 2013) ........................................................ 19

*Krueger v. Nw. Mut. Life Ins. Co.,*
    2011 WL 2938273 (N.D. Fla. July 12, 2011) .................................. 34

*Mahon v. Ticor Title Ins. Co.,*
    683 F.3d 59 (2d Cir. 2012)............................................................... 23

*Maniscalco v. Brother Int'l (USA) Corp.,*
    709 F.3d 202 (3d Cir. 2013)............................................................. 23

*Marcus v. BMW of N. Am., LLC,*
    687 F.3d 583 (3d Cir. 2012)............................................................. 26

*Markarian v. Conn. Mut. Life Ins. Co.,*
    202 F.R.D. 60 (D. Mass. 2001)........................................................ 26

*McAnaney v. Astoria Fin. Corp.,*
    2007 WL 2702348 (E.D.N.Y. Sep. 12, 2007)................................... 23

*Metropolitan Life Ins. Co. v. Cotter,*
    984 N.E.2d 835 (Mass. 2013) .......................................................... 36

*Murtha v. City of Hartford,*
    35 A.3d 177 (Conn. 2011) ............................................................... 33

*Nye v. Ingersoll Rand Co.,*
    783 F. Supp.2d 751 (D.N.J. 2011) ................................................... 37

*Ortiz v. Fibreboard Corp.,*
    527 U.S. 815 (1999)......................................................................... 23

*Oscar v. BMW of N.A., LLC,*
    2012 WL 2359964 (S.D.N.Y. June 19, 2012) ................................. 26

*Pagliaroni v. Mastic Home Exteriors, Inc.,*
    2015 WL 5568624 (D. Mass. Sep. 22, 2015) .................................. 20

*Pardini v. Unilever United States, Inc.*,
  961 F. Supp. 2d 1048 (N.D. Cal. 2013); ....................................................... 23

*Parks Auto. Grp., Inc. v. Gen. Motors Corp.*,
  237 F.R.D. 567 (D.S.C. 2006) ..................................................................... 37

*Pellegrino Food Prods. Co. v. Am. Auto. Ins. Co.*,
  655 F. Supp. 2d 569 (W.D. Pa. 2008)........................................................... 33

*Prado-Steiman ex rel. Prado v. Bush*,
  221 F.3d 1266 (11th Cir. 2000) .................................................................. 23

*Puerto Rico Coll. of Dental Surgeons v. Triple S Mgmt. Inc.*,
  290 F.R.D. 19 (D.P.R. 2013) ................................................................. 19, 29

*Ramirez v. Baxter Credit Union*,
  2017 WL 1064991 (N.D. Cal. Mar. 21, 2017)............................................... 24

*Randall v. Rolls-Royce Corp.*,
  637 F.3d 818 (7th Cir. 2011) ...................................................................... 21

*Randle v. Spectran*,
  129 F.R.D. 386 (D. Mass. 1988).................................................................. 20

*Raposo v. Garelick Farms, LLC* ,
  293 F.R.D. 52 (D. Mass. 2013).................................................................... 19

*Robinson v. Wal-Mart Stores, Inc.*,
  253 F.R.D. 396 (S.D. Miss. 2008) ............................................................... 37

*Rodi v. S. New England Sch. of Law*,
  532 F.3d 11(1st Cir. 2008)......................................................................... 26

*Rose v. SLM Fin. Corp.*,
  254 F.R.D. 269 (W.D.N.C. 2008).......................................................... 29, 34

*Rothwell v. Chubb Life Ins. Co. of America*,
  191 F.R.D. 25 (D.N.H. 1998) .................................................................... 26

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
  601 F.3d 1159 (11th Cir. 2010) ........................................................... passim

*Schor v. FMS Fin. Corp.*,
  814 A.2d 1108 (N.J. App. Ct. 2002)............................................................ 33

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
  659 F.3d 234 (2d Cir. 2011)....................................................................... 21

*Shelley v. AmSouth Bank*,
  2000 WL 1121778 (S.D. Ala. July 24, 2000),
  *aff'd*, 247 F.3d 250 (11th Cir. 2001)..................................................................34, 38, 39

*Simington v. Lease Fin. Grp.*,
  2012 WL 6681735 (S.D.N.Y. Dec. 14, 2012) ................................................................. 22

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
  323 F.3d 32 (1st Cir. 2003)............................................................................................ 18

*Smith v. Wells Fargo Bank, N.A.*,
  158 F. Supp. 3d 91 (D. Conn. 2016)............................................................................... 26

*Spencer v. Hartford Fin. Servs. Grp., Inc.*,
  256 F.R.D. 284 (D. Conn. 2009)..................................................................................... 29

*Sprague v. Gen. Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998). ........................................................................................ 20

*Stratton v. Am. Med. Sec., Inc.*,
  266 F.R.D. 340 (D. Ariz. 2009) ................................................................................33, 34

*Swanson v. Lord & Taylor LLC*,
  278 F.R.D. 36 (D. Mass. 2011)...................................................................................... 20

*Tardiff v. Knox Cty.*,
  365 F.3d 1 (1st Cir. 2004).............................................................................................. 18

*Trifiro v. New York Life Ins. Co.*,
  845 F.2d 30 (1st Cir. 1988)............................................................................................ 26

*Uno Rests., Inc. v. Boston Kenmore Realty Corp.*,
  805 N.E.2d 957 (Mass. 2004) ........................................................................................ 34

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ..................................................................................... 36

*Walbridge v. Northeast Credit Union*,
  299 F. Supp. 3d 338 (D.N.H. 2018)............................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S 338 (2011)...........................................................................................18, 19, 37

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
  208 F.3d 288 (1st Cir. 2000).................................................................................18, 24, 25

*Wilson v. Amerada Hess Corp.*,
  773 A.2d 1121 (N.J. 2001)............................................................................................. 34

**Statutes and Regulations**

15 U.S.C. § 1693m ................................................................................................ 1, 23, 24

28 U.S.C. § 2072 .................................................................................................... 37

Mass. G. L. c. 93A ................................................................................................ 1, 3, 25

12 C.F.R. § 205.17 ................................................................................................ 5

**Other Authorities**

1 McLaughlin, *Class Actions* (14th ed.) .............................................. 19, 23, 25, 29

https://www.consumerfinance.gov/ask-cfpb/what-is-an-ach-en-1065/ .......................................... 4

Restatement (Second) of Contracts (1981) .................................................... 32, 33, 34

**Rules**

Fed. R. Civ. P. 23 ................................................................................................ passim

## INTRODUCTION

Plaintiff Sandra Bond ("Bond" or "Plaintiff"), the sole plaintiff in this action, alleges that Defendants Berkshire Bank ("the Bank" or "Berkshire") and its parent holding company, Berkshire Hills Bancorp, Inc.[1] (collectively, "Defendants") are liable for the Bank's assessment of overdraft fees on her personal checking account.  She asserts claims under Mass. G. L. c. 93A ("Chapter 93A"), state common law and equitable theories, and the Electronic Funds Transfer Act, 15 U.S.C. § 1693m ("EFTA").  In addition, she seeks certification of two classes:  a "Sufficient Funds Class" and an "EFTA Class."  Plaintiff's Memorandum of Law in Support of Motion for Class Certification ("Pl. Br.") at 12-13.  The Sufficient Funds Class would include 16 subclasses, requiring application of the substantive laws of six states to the various state law theories.  For the reasons explained below, Plaintiff has failed to meet her burden of establishing that all of the requirements for class certification have been met.

Contrary to the impression Plaintiff tries to create, the Bank goes to great lengths to educate its customers about its overdraft services, including its use of the available balance to assess overdraft fees.  It does so in many ways, including (1) conversations between Bank employees and customers at account opening and on numerous occasions thereafter; (2) written disclosures that have changed over time as the Bank seeks to continuously improve them and to ensure that they accurately reflect Bank practices; (3) various mailings to Bank customers who incur overdrafts, including overdraft notices and education letters sent to persons who frequently overdraw their accounts; (4) bank statements that disclose the amounts of overdraft fees customers incur each month; and (5) online banking screens, ATMs and a mobile app that display customers' available balances in real time.  The Bank also has at all times had a practice

---

[1] Berkshire Hills Bancorp, Inc. is a holding company that has no operations, and Plaintiff has alleged no facts on which it can be held liable for the acts of its subsidiary, Berkshire Bank.  Defendants intend to seek summary judgment for the holding company on that basis at an appropriate time.

of issuing refunds to customers who contact the Bank after experiencing overdraft fees, and fully 36% of the putative class have obtained refunds and explanations about how to avoid overdraft fees as a result of such contacts.  In addition, a survey conducted by the Bank's expert witness and other evidence reveals that consumers have a range of preferences and understandings about overdrafts, and that many consumers knowingly overdraw their accounts and find overdraft services to be a welcome convenience.

For these and other reasons, not only will Plaintiff's case fail on the merits, but she also cannot meet her burden of satisfying the requirements for class certification of Fed. R. Civ. P. ("Rule") 23.  The following briefly summarizes some of the deficiencies in Plaintiff's motion.

**Typicality/Adequacy.**  Bond fails to satisfy the typicality and adequacy requirements of Fed. R. Civ. P. 23(a)(3) and (4) for several reasons.  First, she is an outlier, having incurred more overdrafts and overdraft fees than 99.4% of the proposed class as a result of her mismanagement of her account.  She did not open the mail the Bank sent her, including her monthly statements (which disclosed her overdraft fees), 74 overdraft notices, or numerous overdraft education letters.  From 2010 until the summer of 2015, she did nothing to monitor her account.  Evidence unique to her concerning her account mismanagement will become a focus of the trial of her claims.  Second, Bond's state statutory claim arises under Massachusetts law.  She has no standing to assert claims based on the consumer protection statutes of other states.  Third, Bond's EFTA claim is barred by the statute's one-year statute of limitations.  Courts have held that EFTA claims are triggered when a bank first assesses a fee; later fees do not trigger new claims. Because Bond's EFTA claim first arose when she incurred fees in January, 2011, her claim is time-barred.  Each of these issues preclude findings of typicality or adequacy.

**Commonality/Predominance.**  Bond cannot establish the requirements of Rule 23(a)(2) commonality or Rule 23(b)(3) predominance.  She fails to satisfy these requirements for her claim under Chapter 93A because the statute requires a showing of causation, and her reliance-based theory of causation requires individualized proof.  Her claims for breach of contract and for breach of the implied covenant of good faith also are highly individualized.  There are three separate documents constituting the contract, and each document changed over time.  During the putative class period, there were nine materially different versions of the contract language at different points in time.  This multiplicity of contracts and their material variations injects additional individualized issues into the case, especially when one considers that different customers' accounts were opened at different times and spanned different periods.  Also, adjudication of the contract and implied covenant claims will require extrinsic evidence, including evidence concerning the many and varied oral communications class members had with Bank employees concerning the Bank's use of available balance and assessment of overdraft fees.  Similarly, Plaintiff's claims for unjust enrichment and conversion raise individualized issues concerning each class member's understanding, choices, and preferences, as well as their individual communications with Bank personnel.  Such evidence will also be relevant to Defendants' affirmative defenses, and further precludes a finding of predominance.

Plaintiff also has failed to show that causation and damages can be proven in "a formulaic manner" for all class members.  Her expert claims that he can develop a computer program to assess class-wide damages, but he has not yet done so and has not demonstrated that he will be able to do so.  He also cannot account for the many individualized issues relevant to causation, and he has not shown that his proposed methodology will be able to isolate alleged harm caused by the practices Plaintiff challenges.

**Superiority.**   Finally, Plaintiff cannot establish the superiority requirement of Rule 23(b)(3) because she cannot establish that a class action would be manageable.  Her brief devotes only a single, conclusory sentence to the issue of manageability.  Her Trial Plan demonstrates why a class action would be unmanageable.  It proposes 16 state law subclasses in addition to the EFTA class.  Because the nine variations of the contract language will be relevant to all 16 of the state law subclass claims, the class action Plaintiff proposes would be cumbersome at best.  Add in the mini-trials needed to resolve the many individualized fact issues pertaining to liability and damages, and it becomes clear that a class action would be unmanageable.

For these and other reasons discussed below, the Court should deny Plaintiff's motion.

## STATEMENT OF FACTS

### I.      The Overdraft Practices at Issue.

#### A.      The Bank's Courtesy Pay Service.

At all relevant times, Berkshire has offered its checking account customers an overdraft service titled "Courtesy Pay."  Declaration of Kristen Ricker ("Ricker Decl.") ¶ 7.[2]  Courtesy Pay allows customers to complete purchases that exceed the customer's available account balance. *Id.* ¶ 8.  As is standard in the industry, the Bank typically assesses an overdraft fee for each transaction paid that overdraws the account.  *Id.* ¶ 9; 74 Fed Reg. 5498-01, 5545.

Before July 1, 2010, customers were automatically enrolled in Courtesy Pay services for all transaction types (including checks and ACH,[3] debit card, and ATM transactions), unless they chose to opt out.  Ricker Decl. ¶ 9.  In 2009, the Federal Reserve Board introduced new

---

[2] Kristen Ricker is Berkshire's First Vice President Branch and Call Center Operations.  Ricker Decl. ¶ 3. Her declaration describes the many ways the Bank informs its customers about overdraft services and fees.  For more information, the Bank refers the Court to Ms. Ricker's declaration.
[3] An "ACH" transaction is an electronic fund transfer made between banks across the Automated Clearing House network.  ACH is used for many types of fund transfers, including merchant payments, online bill payments, and monthly debits for routine payments. *See* https://www.consumerfinance.gov/ask-cfpb/what-is-an-ach-en-1065/.

regulations affecting overdraft services for debit card transactions.  *Id.* ¶ 10.  The Regulation E ("Reg E") amendments, which took effect for new accounts on July 1, 2010 and for existing accounts on August 15, 2010, require banks to obtain affirmative consent from consumers before assessing overdraft fees on ATM and one-time debit card transactions.  12 C.F.R. § 205.17.  The amendments thus transformed an opt-out process into an opt-in one, ensuring consumer choice.

To comply with the amendments, Berkshire began to offer its customers a choice between (1) "standard" Courtesy Pay overdraft services, which cover check, ACH and other transactions not subject to the Reg E amendments, and (2) additional Courtesy Pay overdraft services, covering ATM and one-time debit card transactions.  Ricker Decl. ¶ 14.  As of the amendments' effective dates, if a customer does not opt in to Courtesy Pay for ATM and one-time debit card transactions, the Bank declines any such transactions that would overdraw the customer's account and does not assess an overdraft fee for the declined transactions.  *Id.* Customers who opt in can opt out at any time.  *Id.* ¶ 15.

**B.    The Bank's Use of Available Balance, Treatment of Authorized Debit Card Transactions, and Ordering of Payments.**

At all relevant times, Berkshire has paid items and assessed overdraft fees based on the customer's "available balance."  Ricker Decl. ¶ 19.  The available balance is reduced by "debit holds," the most common type of which are authorized debit card transactions*.  Id.* ¶¶ 19-20.

When a Bank customer makes a purchase with a debit card, the merchant sends an electronic request to the Bank to authorize the transaction. If the Bank authorizes the transaction, the Bank becomes obligated to pay the amount when the merchant presents it for payment (typically between one and three days later).  *Id.* ¶ 20; 74 Fed. Reg. 5498-01, 5546.  Because the Bank's binding obligation to the merchant arises when it authorizes the transaction, Berkshire –

like other banks[4] – deducts the amount of authorized transactions from the customer's available account balance, and uses that balance to determine whether later transactions cause overdrafts. Ricker Decl. ¶ 20.[5]  An authorized debit card transaction on its own cannot result in an overdraft fee, but it will reduce the customer's available balance to pay other items.  *Id.* ¶ 20, n.4.

C.      **The Bank's "Customer-Centric" Approach to Overdrafts**

Since its inception, Berkshire has sought to make its overdraft program "customer-centric."  Ricker Decl. ¶ 26.  Courtesy Pay is not the Bank's only service for customers concerned about being able to complete necessary transactions.  *Id.* ¶ 16.  At all relevant times, the Bank has offered alternative overdraft protection plans, which can be less expensive.  These include automatic transfers from linked savings accounts to avoid overdrafts, as well as lines of credit.  *Id.*  The Bank informs its customers that they "have choices" regarding overdrafts, and has sought to educate them about their options.  *Id.* ¶¶ 11-13, 37 & n.6.  Moreover, under its Courtesy Pay service, the Bank waives overdraft fees on transactions that fall below a specific *de minimis* amount, which has ranged from $4.50 to $10.00, and caps the number of overdraft fees that may be assessed to an account at five per business day.  *Id.* ¶¶ 27-28.

In addition, the Bank has adopted a posting order that Ms. Farrell, the bank regulatory consultant, described as "beneficial to consumers and does not act to increase overdraft fees."

---

[4] Lynn Farrell, a third-party bank regulatory consultant engaged by the Bank to review its overdraft program in 2015, testified at deposition that virtually all banks use customers' available balances to assess overdrafts, and have done so for the last 20 to 25 years. Deposition of Kathlyn Farrell ("Farrell Dep.") at 97:13-24 (Ex. 6 to Declaration of Joshua D. Dunlap ("Dunlap Decl."); *see also* Declaration of Dawne Cowhey ("Cowhey Decl.") ¶ 6.

[5] Because merchants often take several days to send a transaction to a bank for payment, and because a bank does not always know when the transaction actually occurred, a bank must adopt rules to sort and post the transactions presented for payment. *See* 74 Fed. Reg. 5498-01, 5547-48.  During the relevant period, the Bank has used two different operating systems for processing customers' transactions—the "OSI system," which was used until September 2012, and the "FIS system," which has been used since that date.  The Bank's payment ordering practices under these two systems, and the differences between them, are discussed in detail in the Ricker Declaration at ¶¶ 22-25.

Farrell Report at 4 (Pl. Br. Ex. 5).[6]  For example, since September 2012, the Bank has provided customers the benefit of posting all credits first, before any debits, regardless of when in the day those credits occurred. In addition, the Bank has posted debit transactions in the order received (under the OSI system) or in categories that tend to reduce the number of overdraft fees incurred (under the FIS system).  Ricker Decl. ¶¶ 22-25.[7]  Although Plaintiff claims that the Bank's overdraft fee revenue has increased over time, Pl. Br. at 3, that is only because the Bank has increased its customer base through several acquisitions of other financial institutions.  *See* Ricker Decl.  ¶ 50. The Bank's overdraft fee revenue on a monthly per account basis has actually decreased during the putative class period.  *See id.*  ¶ 25 & Ex. 3.

## II.     The Bank Has Used Many Approaches to Educate Customers About Overdrafts.

Berkshire has employed a number of approaches to inform and educate customers about its overdraft practices during the relevant time period, both when a customer opens a new account and thereafter.  Ricker Decl. ¶ 29.  These efforts have included a variety of written disclosures, which have changed over time, individual conversations between customers and bank employees, and various account management tools.  *Id.*

### A.     There Was No Uniform Contract in Effect Throughout the Putative Class Period.

There are three principal documents that constitute the agreement between the Bank and its personal checking customers: the "Terms & Conditions," the Courtesy Pay disclosure, and the Reg E Opt In Form.  Each of these documents has been amended numerous times throughout the

---

[6] Plaintiff suggests that Ms. Farrell found the Bank's overdraft fees to be at the "higher end" of fees charged by banks.  Pl. Br. at 3.  The cited reference, however, relates to "sustained overdraft fees," a separate fee assessed when a customer does not bring an overdrawn account to a positive status within a specified timeframe.  *See* Farrell Report at 5.  Sustained overdraft fees are not at issue in this case.
[7] Berkshire has never posted debits in high-to-low order by dollar amount.  Such high-to-low posting, which tends to increase overdraft fees, was the practice at issue in most of the overdraft cases Plaintiff cites. *See infra* Section IV.F.

putative class period, and these amendments have frequently changed the language governing the Bank's use of the available balance and the manner in which the Bank posts transactions.

Since well before May 2010, the Bank has provided its customers a copy of the Terms & Conditions when they open an account or, as in the case of Bond, when it acquired the bank where the account was opened. Ricker Decl. ¶¶ 31-32. At all relevant times, that document has explained that the contract consists of it, "along with any other documents we give you pertaining to your account(s) . . . ." *Id.* ¶ 64. One such "other document" is the Courtesy Pay Disclosure, which the Bank has also provided its customers since before May 2010. *Id.* ¶¶ 31-32. Starting in May 2010, in order to comply with the Reg E amendments, the Bank also began providing consumer checking customers an "Opt In Form," based on a model disclosure published by the Federal Reserve Board, by which customers can opt in to Courtesy Pay for ATM and one-time debit card transactions. *Id.* ¶ 32. This document also forms part of the contract and has changed over time.[8]

The language governing the Bank's use of the available balance and posting order has been revised three times in the Terms & Conditions, five times in the Courtesy Pay disclosure, and once in the Opt In Form. With one exception, these changes were not coordinated; rather, only one document was changed at a time. Taking the original language and all of the changes into account, there have been nine materially different versions of the contract governing the Bank's available balance and posting order practices.[9]

---

[8] At all times customers have been able to open accounts at Berkshire branches. Ricker Decl. ¶ 30. Since January 2015, customers have also been able to open checking accounts online. *Id.* The Bank provides all three disclosures to customers who open accounts in person or online. *Id.* ¶¶ 31, 33.

[9] A timeline showing the periods during which each version of the relevant contractual documents was in effect is attached hereto as Appendix A. A chart excerpting the relevant contract language from each of the nine contracts, with material changes shown in redline, is attached hereto as Appendix B. All of the relevant changes to the contractual language are explained in detail in the Ricker Declaration at ¶¶ 52-66

The various permutations of the relevant contract language are too extensive to describe in detail here, but some of the changes to the Courtesy Pay disclosure illustrate the variations at play. In 2010, the Courtesy Pay disclosure did not use the term "available balance," but did explain to customers that they could incur overdraft fees as a result of authorized transactions, which is a reference to debit holds. Ricker Decl. ¶ 60 ("An overdraft (negative) balance may result from such items as: . . . Payments authorized by you."). In May 2014, the Bank modified the Courtesy Pay disclosure to state that a customer would incur an overdraft fee if they "swipe[d] [their] debit card . . . in an amount that exceeds the amount of funds available in [their] account." *Id.* The March 2015 revision added a definition of "available balance": "The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft." *Id.* It also explained that "debit card transactions reduce your available balance at the time you authorize your purchase." *Id.* In November 2016, the Bank again revised the Courtesy Pay disclosure, and introduced examples showing the effect of authorized transactions on the customer's available balance. *Id.*

Like the Courtesy Pay disclosure, the Terms & Conditions' language concerning available balance and debit holds has also evolved over time, including the addition of an express definition of "available balance" in June 2015, and a substantial revision with examples of hypothetical transactions in October 2016. Ricker Decl. ¶ 65. Against this backdrop of changes to these two documents, the May 2010 version of the Bank's Opt In Form, included the following language taken verbatim from the Federal Reserve Board's model form: "An overdraft

---

and the Expert Report of Rebecca Kirk Fair ("Kirk Fair Rpt.") at ¶¶ 55-58 and Exs. 8-11. The Kirk Fair Report and Ms. Fair's deposition transcript ("Kirk Fair Dep.") are attached to the Declaration of Donald R. Frederico, submitted in support of the Bank's opposition to Plaintiff's motion to exclude Ms. Kirk Fair's testimony.

occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." *Id.* ¶ 55.  In March 2015, the Bank added the following language, which is still in use:

> If we are presented with an item drawn against your account, we will pay the item based on your available balance.  The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft. Debit card preauthorizations can reduce your account's available balance, which can result in overdraft fees if additional items are presented for payment.

*Id.* ¶ 57.

During the putative class period, the Bank has also made substantive changes to the contract language describing its posting order.  The 2010 Courtesy Pay disclosure contained the following language:  "Our policy is to pay items in the order they are received.  If they are received at the same time, we pay the smallest items first."  *Id.* ¶ 61.  The Bank removed the posting order language in May 2014, added new posting order language in October 2014, and made additional material changes in March 2015, June 2016, and November 2016.

*Id.*  The posting order description in the Terms & Conditions also evolved over time.  *Id.* ¶ 66.

### B.    Many Customers Spoke With Bank Employees Concerning Overdrafts.

Since May 2010, Bank employees have been required to discuss the Bank's overdraft services and options with customers who open accounts at a branch.  Ricker Decl. ¶ 32.[10] Although Bank employees are expected to follow certain protocols during these discussions, the conversations are unscripted and vary depending on the customer's individual needs and the questions the customer asks.  *Id.* ¶¶ 32, 37 & n.6.[11] These account-opening conversations often lead to discussions regarding the Bank's use of available balance to assess overdrafts.  Some customers choose to opt in to Courtesy Pay for ATM and one-time debit card transactions

---

[10] Customers who open accounts online are not required to have conversations with bank representatives at account opening, but they are required to open and agree that they read the Terms & Conditions, Courtesy Pay disclosure, and Opt In Form.  Ricker Decl. ¶ 33.
[11] Declaration of Samantha Tanner ("Tanner Decl.") ¶¶ 5-16; Declaration of Susan Gagne ('Gagne Decl.") ¶¶ 5-17.

because they want the service for emergencies or convenience; other customers choose not to opt in.  Tanner Decl. ¶¶ 12, 14; Gagne Decl. ¶¶ 12, 15.

In addition, many customers speak with Bank employees after experiencing overdrafts. The Bank has a long-standing policy of providing courtesy refunds when customers visit their local branches or call to inquire about their overdraft fees.   Ricker Decl. ¶¶ 48-49.[12]  In these exchanges, Bank employees generally explain how the overdrafts happened, why the fees were incurred, and how to avoid future fees.  These unscripted conversations often include discussion of the Bank's use of available balance and debit holds, as well as the Bank's posting order, if those practices affected the number of overdraft fees incurred.  In addition, Bank employees inform the customers that they can opt out of Courtesy Pay at any time, generally disclose alternative overdraft protection options (linked savings accounts or lines of credit).  *Id*.[13]

Bank employees also make outbound calls to customers who have incurred more than a threshold number of overdrafts, during which they explain the Bank's overdraft practices, options, and account management tools.  These discussions also vary depending on each customer's circumstances.  Ricker Decl. ¶ 42(b); Masterson Decl. ¶ 18.

## C. The Bank Has Sent Customers Written Communications Concerning Overdraft Fees that Vary Depending on When They Maintained Their Accounts and Their Individual Banking Activity.

In an effort to keep customers informed, the Bank has provided customers with multiple and varied written communications concerning overdrafts.  Ricker Decl. ¶ 34.

When a customer opts in to Courtesy Pay for ATM and one-time debit card transactions, the Bank mails a confirmation that informs the customer that he or she can opt out by contacting

---

[12] Of the approximately ▮▮▮▮ Berkshire customers who incurred at least one overdraft fee since August 2010, more than ▮▮▮▮ (▮▮%) have received at least one courtesy refund. Kirk Fair Rpt. ¶ 41.
[13] Tanner Decl. ¶¶ 22-31; Gagne Decl. ¶¶ 18-29; Declaration of Catherine Masterson ("Masterson Decl.") ¶ 4-17; Deposition of Linda Blondek ("Blondek Dep."), 30:15-31:10, 54:6-15 (Ex. 4 to Dunlap Decl.).

the Bank.[14]  *Id.* ¶ 39.  The Bank also sends every customer monthly statements, which identify

overdraft fees assessed to the customer's account.  *Id.* ¶ 40.  From September 2012 to present,

these statements have included notices for customers who incurred six or more overdraft fees

within the prior twelve months, asking them to contact the Bank to learn more about the

overdraft program and alternatives that could save them money.  *Id.*

During portions of the putative class period, the Bank also mailed overdraft notices to

customers each day they incurred overdraft fees.  These overdraft notices, which varied over

time, have generally informed customers of the overdraft fees they incurred, and listed the

transactions that resulted in the fees.  *Id.* ¶ 41.  In addition, the Bank sends letters to customers

who frequently overdraw their accounts.  *Id.* ¶ 42.  These overdraft education letters have varied

over time.  Generally, they have informed customers of the overdraft fees they have incurred,

described alternatives to Courtesy Pay, and invited the customers to contact the Bank.  *Id.*

### D.    Some Customers Use Account Management Tools the Bank Provides That Can Help Avoid or Reduce Overdraft Fees.

The Bank also makes available a variety of tools to help customers avoid overdrafts.  For

example, at all relevant times, the Bank has prominently displayed customers' available balances

on online banking screens and at ATMs.  Ricker Decl. ¶¶ 44, 45.  Since September 2012, the

online banking screens have also (1) displayed the following language: "The available balance is

the amount of funds you can use for withdrawal from this account without causing an overdraft";

and (2) displayed existing debit card authorization holds and demonstrated how such holds

reduced the customer's available balance.  *Id.* ¶ 44.

---

[14] From September 2012 to May 2013, after the Bank switched to a new operating system, it inadvertently failed to mail confirmation notices to customers who opted in.  Upon discovering the error, the Bank refunded all overdraft fees for ATM and one-time debit card transactions to affected customers.  Ricker Decl. ¶ 39.

Since March 2013, the Bank has offered a mobile banking app that displays the customer's available balance and any existing debit card holds. *Id.* ¶ 46.  In addition, the Bank's website includes information concerning the Bank's overdraft practices. *Id.* ¶ 43.  This information, which has varied over time, explains the Bank's use of available balance for purposes of assessing overdraft fees, and describes the Bank's posting order. *Id.*  Customers are also able to sign up for low balance alerts, which inform customers by email or text when their available balances dip below customer-determined thresholds. *Id.* ¶ 47.

III.   **Evidence Concerning Plaintiff Sandra Bond and Her Husband Reveals Significant Individual Issues That Affect the Putative Class.**

A.   **Sandra Bond's Mismanagement of the Account**

Plaintiff Sandra Bond is a resident of East Longmeadow, Massachusetts.  Deposition of Sandra Bond ("S. Bond. Dep.") at 11:12-16 (Ex. 4 to Dunlap Decl.).  She and her husband, Dylan Bond, opened a joint checking account at Woronoco Savings Bank in 2002.  Although the account was a joint account, it was used exclusively by Ms. Bond.  The account was converted to a Berkshire account when Berkshire acquired Woronoco in 2005.  Ricker Decl. ¶¶ 69-70.  When Reg E took effect in 2010, Bond opted in to Courtesy Pay for ATM and one-time debit card transactions by checking a box on the Bank's online system indicating her consent, and the Bank mailed her a confirmation. *Id.* ¶ 72.[15]

---

[15] When Bond's account was converted to a Berkshire account, Berkshire sent her a disclosure guide explaining the Bank's practices and containing a copy of the then-applicable Terms & Conditions.  Ricker Decl. ¶ 70.  Upon opting in to Courtesy Pay online on June 24, 2010, Bond was required by the Bank's system to view the 2010 version of the Opt In Form. *Id.* ¶¶ 38(c), 72.  The Bank also mailed Bond a copy of the updated Courtesy Pay disclosure in July 2015, and a copy of the updated Terms & Conditions in April 2017. *Id.* ¶¶ 35, 77-78.

Between July 2010 and March 2017, Bond incurred 250 overdraft fees on 154 separate days, totaling $8,168.  Kirk Fair Rpt. ¶ 10.[16]  During this period, the Bank mailed Bond an overdraft notice on 74 separate occasions, and another 10 notices for "NSF" fees.[17]  Cowhey Decl. ¶ 14. The Bank also mailed her overdraft education letters on at least eight occasions. Ricker Decl. ¶ 75.  In addition, on 30 occasions the Bank mailed Bond a monthly account statement that notified her that she had incurred more than six overdraft fees in the last twelve months and invited her to call.  Id. ¶ 76.

Rather than reviewing these mailings, Bond consistently threw them away without opening them.  S. Bond. Dep. at 27:24-28:3 ("Anything that has ever come from Berkshire Bank . . . I throw it in the trash. . . "), 136:5-8.  She does not recall "ever opening anything that Berkshire Bank" sent her.  Id. at 28:7-9.  Before the summer of 2015, she did not track or otherwise check her account balance, see id. at 115:10-116:8, 134:13-18, 158:3-7, even though she was enrolled in the Bank's online banking service (which displayed her available balance) and frequently logged in to online banking to pay bills.  Id. at 39:2-9; Ricker Decl. ¶ 79.  During this approximately five-year period, Bond made, on average, more than 30 debit card purchases per month, S. Bond. Dep. at 39:2-13, and overdrew her account more than 200 times.  Expert Report of Sonya Kwon ("Kwon Rpt."), Appx. C-1 (Ex. 1 to Dunlap Decl.).  At deposition, she testified that she did not believe she had any obligation to monitor her account.  S. Bond. Dep. at 26:21-27:3.  When asked what she did to make sure she had enough money in her account to

---

[16] Ms. Bond incurred at least an additional 29 overdraft fees before the start of the putative class period, with the first documented fee occurring in September 2007.  Ricker Decl. ¶¶ 71, 73.  Ms. Bond may have incurred overdraft fees before that date, but the Bank's records only extend back to September 2007.  Id.
[17] NSF fees are charged when the Bank returns (rather than pays) an overdraft check or ACH transaction. This typically occurs when a customer is not enrolled in Courtesy Pay or has exceeded the $750 Courtesy Pay coverage.  Ricker Decl. ¶ 9. Between July 2010 and March 2017, Bond incurred 45 insufficient funds (NSF) fees, totaling $1,491.  Kirk Fair Rpt. ¶ 10 & n.7.  Plaintiff does not challenge the Bank's assessment of NSF fees.

14

cover her payments, she answered "I don't make sure."  *Id.* at 42:2-5.  *See also id.* at 115:19-116:8 ("I don't really keep track.").

Despite overdrawing her account more than 200 times, Bond claims never to have done so intentionally.  *Id.* at 187:2-18.  Because she was not reading her monthly statements[18] or other mail the Bank sent her, and did not otherwise monitor her account, she went years without knowing that she had been charged thousands of dollars in overdraft fees.  *Id.* at 133:8-14 ("I probably saw one or two, but I was not necessarily paying attention to my account or looking at the statements, so I did not have any idea that it was to that extent").[19]

Bond does not recall opting in to Courtesy Pay for ATM and one-time debit card transactions, but does not dispute that she did so.  *Id.* at 195:10-197:1.  She also does not recall having seen or read the Terms & Conditions governing her account, the Courtesy Pay disclosure, or the Opt In Form.  *Id.* at 207:8-17, 62:23-63:4, 97:18-98:15, 193:12-198:13, 212:10-16.  She further admits that she did not rely on these disclosures.  *Id.* at 207:20-208:1, 213:5:8.

In or around June 2015, at a time when Bond was not home, her husband noticed several pieces of unopened mail from the Bank.  Deposition of Dylan Bond ("D. Bond. Dep.") at 47:24-49:21 (Ex. 3 to Dunlap Decl.).  In contrast to his wife's practice of throwing away all mail she received from the Bank without opening it, Mr. Bond opened the mail and discovered several overdraft notices.  He immediately drove to the Bank's East Longmeadow branch to inquire

---

[18] Throughout the class period, the monthly statements have clearly and consistently reported the overdraft fees the customer incurred during the covered period.  Bond complains that she incurred fees on days on which her monthly statement shows no negative balance.  However, available balances are determined on a daily or intra-day basis.  They are reported in real time online, at ATMs, and on the Bank's mobile app to advise customers of how much money is available at any given time for withdrawals, payments or purchases.  Because monthly statements are retrospective, there is little purpose to be served by showing all available balances throughout the entire reporting month, and doing so would likely confuse the account holder.  They therefore would not appear in a monthly statement.  Cowhey Decl. ¶¶ 7-10.

[19] For purposes of the class certification motion, the Bank assumes the truth of Bond's professed ignorance.  It nevertheless reserves the right to challenge the creditability of her testimony at trial.

about the overdraft fees.  *Id.*   The branch employees informed him that he could opt out of overdraft services for the joint account, and prepared an opt-out form for his signature.  Gagne Decl. ¶¶ 35-36; Blondek Dep. at 95:9-15.   He declined to sign it and never told his wife.  D. Bond Dep. at 98:14-99:3; S. Bond Dep. at 203:5-12.

After Mr. Bond told his wife about the fees, she began checking her account balance online every week to make sure she had sufficient funds for her purchases.  S. Bond Dep. at 144:15-146-8.  By doing so, she avoided overdraft fees for six consecutive months.  *Id.* at 152:23-157:18; Kwon Rpt., Appx. C-2.  Bond began incurring overdraft fees again in December 2015, including at least 17 fees *after* she filed her Complaint.  Ricker Decl. ¶ 73; Kwon Rpt., Appx. C-2.  Her account remains open and opted in to Courtesy Pay for ATM and one-time debit card transactions.  *Id.* ¶ 83.  When asked at deposition whether she wished to opt out, she responded "I don't know."  S. Bond Dep. at 203:13-204:1.

Bond has never attempted to contact the Bank concerning her overdraft fees or the Bank's overdraft practices, and has never requested a refund.  *Id.* at 63:5-16, 144:8-14; Ricker Decl. ¶ 82.  In addition, she never signed up for low balance alerts, Ricker Decl. ¶ 80, nor did she sign up for overdraft protection alternatives such as a linked savings account or line of credit, *id.* ¶ 81; S. Bond Dep., 101:19-102:10.

**B.     Dylan Bond's Contrasting Account Management Practices**

Sandra Bond's account management practices were starkly different from those of her husband, Dylan Bond, who is also a member of the proposed class.  Mr. Bond testified that, because the Berkshire account was in practice his wife's account, he did not use it or monitor it.  D. Bond Dep. at 23:19-24:16, 46:2-15.  He therefore was unaware that any overdraft fees had been assessed until he opened the mail containing the overdraft notices in the summer of 2015.

*Id*. at 46:7-47:2.  His doing so was consistent with his practice of opening the monthly statements he received for his own account held at a different bank, providing those statements to his accountant, and regularly checking the balance of that account online and through a mobile app to make sure he would not overdraw his account.  *Id.* at 28:15-29:4, 31:5-12, 32:6-24.

## IV.     Bank Employee and Expert Evidence Further Demonstrate Variations in Putative Class Members' Understandings and Experiences.

Given variations in their preferences and circumstances, in the written materials they received and reviewed, and in their conversations with Bank employees, customers not surprisingly had a wide variety of understandings and experiences concerning the Bank's overdraft practices.  Bank employees who assist customers with opening accounts and answer customer questions confirm such variations.  These employees also observe that customers make various choices regarding overdraft services based on the information the Bank provides them. Tanner Decl. ¶¶ 9, 13-14, 20-21; Gagne Decl. ¶¶ 9, 14-15, 27; Masterson Decl. ¶¶ 7, 13, 15-16.

Testimony from Rebecca Kirk Fair, an expert witness in the fields of economics and consumer behavior, also demonstrates the wide differences in customers' experiences.  Ms. Kirk Fair conducted a survey of debit card users who reside in the six states in which Berkshire operates branch offices.  The survey examined the respondents' understandings of account balances and expectations concerning overdrafts and fees based on the 2010 and 2015 versions of the Opt In Form, as well as respondents' behaviors with regard to their own debit cards and checking accounts.  Kirk Fair Rpt. ¶¶ 24-33.  In addition, Ms. Kirk Fair analyzed other academic and market research, evidence concerning Berkshire's account opening and overdraft practices, and evidence concerning Bond's checking account and overdraft history.  *Id.* ¶¶ 34-90.

From this research she concludes that customer understandings, choices and behaviors with respect to overdrafts vary widely, for a variety of reasons.  She also concludes that, based

on the totality of Bond's experiences, she is an outlier who is not representative of the putative

class.  Ms. Kirk Fair's opinions are discussed in detail in the Bank's opposition to Plaintiff's

motion to exclude her testimony (incorporated herein by reference) and in Sections III and IV.

## ARGUMENT

### I.     The Court Must Conduct a Rigorous Analysis To Determine Whether Plaintiff Has Carried Her Burden Under Rule 23.

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification

must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to

prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S 338, 350 (2011).  Plaintiff bears the burden of proof on

each element of Rule 23, and the court "must conduct a rigorous analysis . . . before certifying a

class."  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).  "[A]ctual, not

presumed, conformance" with Rule 23 is "indispensable."  *Wal-Mart*, 564 U.S. at 351.

The aim of the rigorous analysis is to predict what the trial will be like.  A district court

must "'formulate some prediction as to how specific issues will play out' in order to assess

whether the proposed class meets the legal requirements for certification."  *In re New Motor*

*Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 17 (1st Cir. 2008) (quoting *Waste Mgmt.*

*Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)).  The court must analyze both the

claims and defenses.  *Mowbray*, 208 F.3d at 295.

The court's "rigorous analysis will entail some overlap with the merits of the . . .

underlying claim.  That cannot be helped."  *Wal-Mart*, 564 U.S. at 351.  To adequately perform

its "predictive function," the court may "probe behind the pleadings."  *In re New Motor Vehicles*,

522 F.3d at 17.  The court should test disputed premises when class certification would be proper

on one premise but not another.  *Tardiff v. Knox Cty.*, 365 F.3d 1, 4-5 (1st Cir. 2004).

**II.     Plaintiff Cannot Meet Her Burden to Establish Rule 23(a)(2) Commonality Under the Heightened Standard of *Wal-Mart Stores, Inc. v. Dukes*.[20]**

In *Wal-Mart*, the Supreme Court raised the bar for satisfying Rule 23(a)(2).  Because every well-crafted class complaint "literally raises common questions," 564 U.S. at 349, Rule 23(a)(2) requires that the "claims must depend upon a common contention," *id.* at 350.  "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id.*; 1 McLaughlin, *Class Actions* § 4:7, at 649-50 (14th ed.).

Plaintiff pays lip-service to this standard, but then relies upon pre-*Wal-Mart* cases to suggest that the "threshold for commonality is not high."  Pl. Br. at 15.  In fact, courts in this Circuit have found the new standard "restrictive."  *Puerto Rico Coll. of Dental Surgeons v. Triple S Mgmt. Inc.*, 290 F.R.D. 19, 26 (D.P.R. 2013).  Plaintiff must show that her claims rest on a "common contention," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Raposo v. Garelick Farms, LLC* , 293 F.R.D. 52, 55 (D. Mass. 2013).  Plaintiff therefore must, among other things, "identify central questions whose answers will not vary by individual class members" and "show that dissimilarities in the proposed class do not impede the generation of common answers."  *Kenneth R. ex rel. Tri-Cty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 266-67 (D.N.H. 2013).

Plaintiff does not satisfy this restrictive standard here because liability can be determined only after consideration of the various contracts at issue and each customer's knowledge, choices and expectations.  Because Plaintiff invokes Rule 23(b)(3), which requires the moving party to show that common issues predominate over individual issues, the Bank will address the lack of commonality in the predominance argument set forth in Section IV below.

---

[20] The Bank does not contest Rule 23(a)(1) numerosity.

III.     **Plaintiff Cannot Meet Her Burden to Establish Typicality under Rule 23(a)(3).**

The typicality analysis "is designed to align the interest of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Hochstadt v. Boston Sci. Corp.*, 708 F. Supp. 2d 95, 103 (D. Mass. 2010). The "primary focus" of this inquiry "is the functional question of whether the putative class representative can fairly and adequately pursue the interests of the absent class members without being sidetracked by her own particular concerns." *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) (quotation marks omitted). Although Plaintiff need not show that her claims are identical in all respects to those of absent class members, *id.*, she must "necessarily present the claims of the absent plaintiffs" in presenting her own. *Pagliaroni v. Mastic Home Exteriors, Inc.*, 2015 WL 5568624, at *12 (D. Mass. Sep. 22, 2015) (quoting *Randle v. Spectran*, 129 F.R.D. 386, 391 (D. Mass. 1988)). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).

To satisfy the typicality requirement, therefore, the named Plaintiff must show that she is not "subject to unique defenses that would divert attention from the common claims of the class," *In re Bank of Boston Corp. Secs. Litig.*, 762 F. Supp. 1525, 1532 (D. Mass. 1991); *In re Credit Suisse*, 253 F.R.D. at 23. A "unique defense that is likely to become a major focus of the litigation," whether successful or not, will destroy typicality. *Beck v. Maximus*, 457 F.3d 291, 301 (3d Cir. 2006); *see Swanson v. Lord & Taylor LLC*, 278 F.R.D. 36, 40-41 (D. Mass. 2011).[21]

---

[21] The same is true of adequacy. "[T]he requirements of typicality and adequacy are intertwined." *Swanson*, 278 F.R.D. at 40-41. Both typicality and adequacy are lacking if the named plaintiff is subject to unique defenses. *Id.* at 41. Plaintiff fails the adequacy test for the same reasons she is not typical.

**A.      Issues unique to Bond's claims will sidetrack her trial.**[22]

Given Plaintiff's mismanagement of her own accounts, she will be subject to unique

defenses not applicable to other putative class members – for example, failure to mitigate.  "[A]

party cannot recover for harms that its own reasonable precautions would have avoided."

*Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 772 (1st Cir. 1996).  This defense precludes

certification here.  *See Allen-Wright v. Allstate Ins. Co.*, 2008 WL 5336701, at *4 (E.D. Pa. Dec.

17, 2008) (failure to mitigate defense rendered named plaintiff atypical); *Jenson v. IPEX USA,

Inc.*, 2008 WL 5062657, at *3-4 (W.D. Wash. Oct. 27, 2008) (same).[23]

If this case goes to trial, the Bank will present evidence that Bond mismanaged her

account.  That evidence will include (1) Bank records and Bank witness testimony concerning

the many notices sent to Bond and her failure to respond to them,  (2) Bond's admissions that she

did not open mail from the Bank or otherwise monitor her account,  (3) testimony from her

husband contrasting his management of his own account and Bond's failure to manage their joint

account, and (4) evidence that, after Bond learned that she had incurred large amounts of

overdraft fees and filed her complaint, she did not opt out of Courtesy Pay, but continued to

overdraw her account and incur overdraft fees.[24]  Indeed, the Bank's evidence will show that,

---

[22] Contrary to Plaintiff's assertion, *see* Pl. Br. at 19 & n.11, substituting another individual who has not
been subject to discovery would not be an appropriate means of remedying her lack of typicality.
Substitution "shouldn't be allowed just to give class action lawyers multiple bites at the certification
apple, when they have chosen, as should have been obvious from the start, patently inappropriate
candidates to be the class representatives."  *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 827 (7th Cir.
2011).  The case relied upon by Plaintiff, *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234
(2d Cir. 2011), is inapposite.  In that case, there was no evidence of inadequacy.  *Id.* at 253.

[23] Plaintiff may argue that the failure to mitigate defense goes solely to damages, and is therefore
irrelevant at class certification.  Individual damages proceedings need not preclude certification where
damages are "calculable according to a formula or template."  *In re Pharmaceutical Indus. Average
Wholesale Price Litig.*, 230 F.R.D. 61, 95 (D. Mass. 2005).  However, where, as here, damages
determinations would "necessitate individual jury trials in which defendants can assert defenses" based on
individualized facts, damages issues preclude certification.  *Id.*

[24] Although Plaintiff argues that "a high percentage of the overdraft fees collected by Berkshire were paid
by those with lower income," Trial Plan at 5, Sandra Bond of East Longmeadow, whose husband is an

21

during the proposed class period, Bond incurred more than 250 overdraft fees, totaling over $8,000, which placed her in the top 99.4% of the putative class.  Kirk Fair Rpt. ¶¶ 37.  The Bank's evidence will also show that, because many of the Bank's overdraft-related communications are based on overdraft frequency, Bond received large numbers of communications that, had she bothered to read them, would have informed her of the Bank's overdraft practices and how they affected her account.  Ricker Decl. ¶¶ 41-42.  Because, unlike Bond, most customers who overdraw their accounts monitor their accounts closely,[25] and almost all potential class members incurred far fewer overdraft fees than Bond, the trial of Bond's claims would look much different from a trial of claims of other class members.

In sum, Ms. Bond's exceptionally poor account management and failure to minimize fees will occupy center stage at trial.  This fact alone precludes a finding of typicality.

**B.      Bond is not typical of a class asserting claims under other states' laws.**

In her motion, Bond asserts for the first time statutory consumer protection claims under the laws of Connecticut, New Jersey, New York, and Vermont.  Pl. Br. at 13.  Because she has not asserted these claims in her complaint, she cannot have them certified now.  *Anderson v. U.S. Dep't of Hous. and Urban Dev.*, 554 F.3d 525, 528-29 (5th Cir. 2008); *Simington v. Lease Fin. Grp.*, 2012 WL 6681735, at *1 (S.D.N.Y. Dec. 14, 2012).  Even if she could seek certification of claims not pleaded in the Complaint, however, she would not be a typical class representative for these claims because she lacks standing to pursue them.

A plaintiff "may not invoke the power of the federal courts to seek relief" on behalf of a class with respect to claims for which she lacks standing.  *In re New Motor Vehicles*, 522 F.3d

---

investment adviser, and who with her husband owns a second home in Vermont, does not place herself in that group.  S. Bond Dep. at 13:2-8, 225:5-10; D. Bond Dep. at 12:19-13:23, 15:9-17.

[25] Ms. Kirk Fair's survey showed that 70% of overdrafters checked their balances within the week before they submitted their responses.  Kirk-Fair Rpt., Ex. D.6.b.

13-14; *see In re Bank of Boston Corp. Secs. Litig.*, 762 F. Supp. at 1531.  For this reason, named

plaintiffs cannot pursue certification of claims under the consumer protection statutes of states in

which they do not reside and in which they have suffered no injury.  *Prado-Steiman ex rel.*

*Prado v. Bush*, 221 F.3d 1266, 1279-80 (11th Cir. 2000); *Pardini v. Unilever United States, Inc.*,

961 F. Supp. 2d 1048, 1061 (N.D. Cal. 2013); *In re Flonase Antitrust Litig.*, 610 F. Supp. 2d

409, 418-19 (E.D. Pa. 2009); 1 McLaughlin, *Class Actions*, § 4:28, at 879-81.

 Bond is a Massachusetts resident, asserting claims against a Massachusetts bank for an

account in Massachusetts.  Compl. ¶¶ 17-18.  Because her injury has no connection to any state

other than Massachusetts, she cannot pursue claims under other states' statutes.  *See, e.g.*, *Cruz v.*

*FXDirectDealer, LLC*, 720 F.3d 115, 122-24 (2d Cir. 2013) (New York statute); *Maniscalco v.*

*Brother Int'l (USA) Corp.*, 709 F.3d 202, 210 (3d Cir. 2013) (New Jersey statute).[26]

### C. Plaintiff is not typical because her EFTA claim is time-barred.

 A plaintiff whose claim is time-barred has no standing, and therefore cannot bring claims

on behalf of a class.  *Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002);

*McAnaney v. Astoria Fin. Corp.*, 2007 WL 2702348, at *5-6 (E.D.N.Y. Sep. 12, 2007); 1

McLaughlin, *Class Actions* § 4:18, at 734.  EFTA has a one-year statute of limitations. 15 U.S.C.

§ 1693m(g).  Most courts that have addressed the issue have found that this statute of limitations

---

[26] Plaintiff argues that a named plaintiff may assert claims under the laws of states other than where the named plaintiff was injured. Pl. Br. at 19, n.12.  However, most of the cases she cites hold only that the standing analysis should be "defer[red] . . . to the class certification stage" rather than dealt with on a motion to dismiss.  *In re Loestrin 24 Fe Antitrust Litig.*, 261 F. Supp. 3d 307, 359 (D.R.I. 2017).  The court in *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 268-70 (D. Mass. 2004), went further and deferred the standing analysis until after class certification.  It did so based on an overbroad reading of *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).  Those cases held that standing issues could be deferred until after the class certification inquiry because the defense related to absent class members, not the named plaintiffs.  *See Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64-65 (2d Cir. 2012); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 653-57 (E.D. Mich. 2011).  Here, however, where it is the standing of a named plaintiff that is at issue, standing should be addressed at class certification.  *See In re Bank of Boston Corp. Secs. Litig.*, 762 F. Supp. at 1531.

is triggered when a financial institution first assesses a fee.  *See Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 349-50 (D.N.H. 2018) (citing cases).  Subsequent fees do not constitute separate occurrences that are independently actionable.  *Id.*  After the Reg E amendments took effect, Bond first incurred overdraft fees on ATM and one-time debit card transactions in January 2011, Cowhey Decl. ¶ 13, and the Complaint was not filed until March 2016.  Her EFTA claim is time-barred.[27]

## IV.   The Court Should Deny Certification Because Plaintiff Has Not Shown That Common Questions Will Predominate Over Individual Questions.

To certify a class under Rule 23(b)(3), the Court must find that common questions of law or fact predominate over individual questions.  The predominance requirement tests whether proposed classes are "sufficiently cohesive to warrant adjudication by representation."  *In re Light Cigarettes Mktg. Sales Pracs. Litig.*, 271 F.R.D. 402, 416 (D. Me. 2010).  That is, based on a pragmatic evaluation of the relevant issues, *Abla v. Brinker Restaurant Corp.*, 279 F.R.D. 51, 57 (D. Mass. 2011), the court must find a "sufficient constellation of common issues bind[ing] class members together."  *Mowbray*, 208 F.3d at 296.  Common issues do not predominate "[i]f after adjudication of the class-wide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims."  *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) (internal quotation marks omitted).

The predominance analysis requires examining the elements of each cause of action.  *See In re Light Cigarettes*, 271 F.R.D. at 416-420.  It also includes consideration of damages issues.  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 37-38 (2013).  The damages theory must be tied to

---

[27] Even if the Court finds her to be typical, Plaintiff's proposed EFTA class must be limited to one year prior to the filing of her complaint.  15 U.S.C. § 1693m(g); *Ramirez v. Baxter Credit Union*, 2017 WL 1064991, at *8 (N.D. Cal. Mar. 21, 2017) (striking class allegations).

the theory of liability, and a plaintiff must show that it is subject to calculation by a methodology

applicable to the class as a whole.  *See In re Dial Complete Mktg. & Sales Pracs. Litig.*, 312

F.R.D. 36, 77 (D.N.H. 2015) (citing *In re Nexium Antitrust Litig.*, 777 F.3d 9, 18 (1st Cir. 2015)).

The Court also must consider the defenses at issue.  *Mowbray*, 208 F.3d at 295; *see In re Light

Cigarettes*, 271 F.R.D. at 420-21; 1 McLaughlin, *Class Actions* § 3:12, at 452.[28]

**A.     Individual issues predominate with respect to Plaintiff's Chapter 93A claim (Count I) because it depends on a showing of causation.**

Plaintiff asks this Court to certify claims under Chapter 93A, which prohibits "[u]nfair

methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

commerce."  M.G.L. ch. 93A, § 2.  Plaintiff's Chapter 93A claim rests on the theory that she

should not have been charged overdraft fees because the Bank did not adequately explain its use

of the available balance.  In support, she asserts that the Bank "made material misrepresentations

to Plaintiff," and that she and the putative class members "relied on" those "misrepresentations,"

causing injury.  Compl. ¶¶ 83, 85.[29]  Her claim cannot be certified because it requires a showing

of detrimental reliance, an inherently individualized question.

To prevail, Plaintiff must prove her injury was caused by the allegedly deceptive practice.

M.G.L. ch. 93A, § 9; *see Hershenow v. Enterprise Rent-A-Car Co. of Boston*, 840 N.E.2d 526,

533-35 (Mass. 2006).  Reliance is "not an essential element of a [Chapter 93A] claim,"

*Hershenow*, 840 N.E.2d at 534 n.20, but reliance may nevertheless "constitute[] an 'essential

---

[28] Defendants do not contest predominance for the EFTA claim because Plaintiff disavows seeking actual damages.

[29] The entire complaint is suffused with the contention that Berkshire's disclosures were deceptive, which demonstrates that she is asserting a reliance-based liability theory.  *See id.* ¶ 3 ("Defendant's Opt-In form unfairly and deceptively failed to disclose…"); *id.* ¶ 6 ("Defendants' unfair and deceptive 2012 and 2013 Account 'Terms and Conditions' mirrored the Overdraft Opt-In form and further misrepresented to customers…"); *id.* ¶ 56 ("Defendants did not clearly and accurately describe and, in fact, misrepresented their overdraft policies."); *see also id.* ¶¶ 5, 7, 9-10, 12, 31, 32, 43, 48, 64-65, 72, 87, 98.  Her motion continues to emphasize the allegedly "inaccurate and misleading" nature of the disclosures.  Pl. Br. at 7.

link' in the chain of causation that does have to be proven under Chapter 93A." *In re TJX Cos. Retail Sec. Breach Litig.*, 246 F.R.D. 389, 398 (D. Mass. 2007). *See Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 33 n.1 (1st Cir. 1988). Reliance is part of the causal chain in claims of deception. *See Rodi v. S. New England Sch. of Law*, 532 F.3d 11, 19 (1st Cir. 2008); *In re TJX Cos.*, 246 F.R.D. at 398. If a plaintiff was aware of the relevant information or would not have altered her behavior even had she been aware, the alleged misrepresentations could not be the "but for" cause of her alleged harm. *In re TJX Cos.*, 246 F.R.D. at 398.[30]

This causation requirement renders class certification inappropriate here. Many courts have denied class certification under state unfair trade practices statutes because of the causation inquiry. *See, e.g.*, *Marcus*, 687 F.3d at 607-08; *Oscar v. BMW of N.A., LLC*, 2012 WL 2359964, at *6 (S.D.N.Y. June 19, 2012); *Demmick v. Cellco P'ship*, 2010 WL 3636216, at *16-17 (D.N.J. Sept. 8, 2010); *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 305-06, 311; *Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60, 69 (D. Mass. 2001) ("the total mix of information made available to each purchaser was distinctive, if not unique, and the question of causation must be decided with regard to each purchaser").[31]

---

[30] Demonstrating causation under the various state statutes mentioned for the first time in Plaintiff's class certification motion requires similar showings. **Connecticut:** *Smith v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 91, 101-03 (D. Conn. 2016). **New Jersey:** *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 606 (3d Cir. 2012). **New York:** *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 311 (S.D.N.Y. 2004). **Vermont:** *Drake v. Allergan, Inc.*, 63 F. Supp. 3d 382, 393 (D. Vt. 2014).

[31] Plaintiff cites two EFTA cases to suggest that proof of reliance does not defeat predominance. *See* Pl. Br. at 23 n.16. Notably, however, both cases were decided on the basis that detrimental reliance was not likely to be part of the case. *Friedman v. 24 Hour Fitness USA, Inc.*, 2009 WL 2711956, at *10-11 (C.D. Cal. Aug. 25, 2009); *Flores v. Diamond Bank*, 2008 WL 4861511, at *3 (N.D. Ill. Nov. 7, 2008). Further, they are inconsistent with prior decisions from within the First Circuit, as well as from other circuits, that reliance defeats any showing of predominance. *See Rothwell v. Chubb Life Ins. Co. of America,* 191 F.R.D. 25, 31 (D.N.H. 1998) (agreeing with "majority view that certification generally is inappropriate when individual reliance is an issue"); *see also Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 341-42 (4th Cir. 1998); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996); Fed. R. Civ. P. 23, Advisory Committee Notes to 1966 Amendments ("a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made . . . .").

The same result pertains here.  Putting aside that the facts do not support a finding of misrepresentation or other deceptive acts or practices, or any conduct that rises to the level of a 93A violation, to support causation Plaintiff would have to establish that she and all other Massachusetts class members (1) were misled by the Bank's disclosures, and (2) would not have opted in, or would not have engaged in overdraft transactions, had the disclosures not misled them.  These issues are individualized, requiring determinations concerning what information each customer received and reviewed, what each customer understood, why each customer opted in and overdrew his or her account, and whether each customer would have made different choices with different disclosures. These determinations cannot be made on a class-wide basis.

Determining who relied on what can be done only by examining each customer's particular circumstances, as illustrated by the facts relating to Bond and the expert testimony of Ms. Kirk Fair.  Bond would have difficulty proving reliance because she does not remember opting in or reading the relevant disclosures.  Kirk Fair Rpt. ¶¶ 36, 47.  In fact, she testified that she had "not relied on" them.  S. Bond Dep. at 207:20-208:1, 213:5:8, 195:5-9.

Many absent class members would not be able to prove causation because they understood the Bank's available balance practice.  Ms. Kirk Fair's survey is instructive on this point.  She presented two groups of survey respondents with the Bank's Opt In Form – one group with the 2010 form, and the other group with the 2015 form.  Kirk Fair Rpt. ¶ 27.  The former does not use the term "available balance," while the latter does.  *Id.*  Eighty-five percent of respondents in *both groups* understood that the amount of an authorized debit card transaction is immediately deducted from their account.  *Id.* ¶ 30.  More than half of both groups also understood that the Bank could approve a subsequent transaction that would overdraw their available balance.  *Id.*  Of these, more than 80% understood that the Bank would assess an

overdraft fee for that transaction.  *Id.*  Extrapolating these consumer responses to putative absent

class members,[32] many customers would be unable to prove causation because, having read the

Bank's disclosures, they understood the relevant practices.

Further, Plaintiff's claim will necessarily implicate customers' knowledge gained from

individual conversations with Bank employees.  Again, the evidence will vary by class member.

Unlike customers who opened their accounts at Berkshire after 2010, Bond did not have a Bank

employee explain the Bank's overdraft services at account opening.  Kirk Fair Rpt. ¶ 35.

Because she enrolled in Courtesy Pay online, she had no conversations with a Bank employee at

the time she enrolled.  Ricker Decl. ¶ 72.  Similarly, because she never requested a refund,

inquired about her overdraft fees, or responded to the Bank's invitations to contact the Bank

about her fees, she lacked the benefit of conversations with customer service representatives.

Many putative class members had very different experiences.  Employees explain the

Bank's available balance and posting order practices to customers at account opening and

thereafter.  Ricker Decl. ¶¶ 32, 48-49; Tanner Decl. ¶¶ 12, 26; Gagne Decl. ¶¶ 12, 22; Masterson

Decl. ¶ 8. The details of these myriad and diverse conversations would be directly relevant to

what customers knew and relied upon when they chose to enroll (or remain enrolled) in Courtesy

Pay.  Kirk Fair Rpt. ¶¶ 62-65, 86.

The inquiry would become even more complex because class members would have to

demonstrate that they relied on the Bank's disclosures not only when they opted in but also when

they overdrew their accounts.  Although Bond claims never to have intentionally overdrawn her

account, many other customers no doubt did so.  Ms. Kirk Fair's survey revealed that many

consumers would choose to proceed with a transaction, even though they understood they would

---

[32] Ms. Kirk Fair's "target population" for her survey was recent debit card users who reside in the six
states in which Berkshire operates, a sample representative of the actual and potential users of Berkshire
overdraft services. Kirk Fair. Rpt., App. D at D-2.

be assessed an overdraft fee for completing it.  Kirk Fair Rpt. ¶ 30.  Indeed, Ms. Kirk Fair's survey reveals that 51-57% of overdrafters report knowingly overdrawing their accounts on at least some occasions, and 22-30% report knowingly overdrawing their accounts *every time they incurred a fee*.  *Id.* ¶ 44.  Moreover, an earlier survey that the Bank conducted showed that 72% of frequent overdrafters understood that they were using the Courtesy Pay service.  Of these, 55% used the service for emergencies, and 34% used it for convenience.  *Id.* ¶ 79.

In short, many people understand the Bank's use of available balance and choose to overdraw their accounts for a variety of reasons.  *Id.* ¶¶ 77-80.  The state statutory claims of these customers would fail for lack of causation.  To determine whose claims would fail and whose would survive would necessitate individual inquiries into each person's understanding, conversations with Bank employees, and reasons for overdrawing the account.  Such inquiries would require thousands of mini-trials, and preclude a finding of predominance.

> **B.** **Individual issues predominate with respect to Plaintiff's claims for breach of contract (Count II) and for breach of the implied covenant of good faith (Count III) because they involve numerous contracts and extrinsic evidence.**

> **1.** **Individual issues predominate because the breach of contract claim implicates numerous, materially different contracts.**

A plaintiff "simply cannot advance a single collective breach of contract action on the basis of multiple different contracts."  *Broussard*, 155 F.3d at 340*.  See, e.g., Sacred Heart Health Sys., Inc.*, 601 F.3d at 1175; *Puerto Rico Coll. of Dental Surgeons*, 290 F.R.D. at 28-29; *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 304 (D. Conn. 2009); *Rose v. SLM Fin. Corp.*, 254 F.R.D. 269, 272 (W.D.N.C. 2008); 1 McLaughlin, *Class Actions* § 5:56 at 1597-99.  Here, the multiple, materially differing contracts mean that individual issues predominate because the outcome of any single claim would depend on which contract governed.

The following examples illustrate this point.  Customers who opened accounts between July 2010 and May 2014 received:

- A Courtesy Pay disclosure that disclosed that "[a]n overdraft (negative) balance may result from such items as: . . . Payments authorized by you."  Ricker Decl. ¶ 60.a;

- An Opt In Form that stated: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." *Id.* ¶ 55; and

- Terms & Conditions that did not specifically address the Bank's available balance practice.  *Id.* ¶¶ 65, 66.

Customers who opened accounts between May 2014 and March 2015 received the same Opt In Form and Terms & Conditions, but a different Courtesy Pay disclosure that stated:

- "An overdraft (negative) balance may result from such items as: . . . Payments authorized by you.  Although there are many reasons why your account may become overdrawn, most overdrafts result from the following: . . . You write a check, swipe your debit card or initiate an electronic funds transfer in an amount that exceeds the amount of funds available in your account."

*Id.* ¶ 60.b.  Customers who opened accounts between March 2015 and June 2015 received the same Terms & Conditions, but:

- A new Courtesy Pay disclosure that stated:

  "The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft."  *Id.* ¶ 60.c; and

  "When a transaction is 'posted,' the dollar value of that transaction is added to or subtracted from the balance of your account.  For example, POS (Point of Sale) debit card transactions reduce your available balance at the time you authorize your purchase.  *Id.* ¶ 61.c.

- A new Opt In Form that stated:

  "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.  If we are presented with an item drawn against your account, we will pay the item based on your available balance.  The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft." *Id.* ¶ 57.

30

Customers who opened accounts between June 2016[33] and October 2016 received the same Opt

In Form, a revised Courtesy Pay disclosure, and new Terms and Conditions that stated:

> "An overdraft occurs when you do not have enough money in your account to
> cover a transaction, but we pay it anyway.  The available balance is the amount of
> funds you can use for withdrawal from your account without causing an overdraft.
> . . . Sometimes funds in your account are not available to cover your checks and
> other items, and it may appear that you have enough funds in your account to
> cover a debit but still get an overdraft fee on the debit.  This can occur when your
> account balance included funds that were not available at the time we processed
> the debit.  Funds subject to a hold . . . are not available funds."  *Id.*¶ 65;

The outcome of the breach of contract claim for each customer within the putative class would

vary depending on which contract or contracts applied to his or her relationship with the Bank.

Also, because many customers' accounts were opened during multiple time periods, there are

several permutations of these groupings. Add to this mix the potential for class members to

question whether they saw any contracts or contract revisions, and the number of individualized

issues become legion.

> ### 2.    Individual issues predominate because extrinsic evidence is relevant to Plaintiff's breach of contract and breach of implied covenant claims.

The complication introduced by the numerous, varied contracts at issue in this case is

multiplied by the fact that Plaintiff seeks to prove breach of what is, at most, ambiguous contract

language.  No extrinsic evidence would be necessary if Plaintiff pointed to a breach of

unambiguous language.  For example, if the contracts had all stated that "Berkshire Bank will

assess overdraft fees based on your ledger balance,"[34] and the facts showed that Berkshire

instead used customers' available balances, then a court may need to know little more to

determine breach.  That case is not this case.  Because the contract does not refer to "ledger

---

[33] Additional material changes throughout the class period, including between June 2015 and June 2016, are not included here but are shown in Appendix B.

[34] "Ledger balance" is a customer's balance not including any debit or deposit holds. Cowhey Decl. ¶ 5. None of the disclosures in this case use the term "ledger balance."  Nor do they use the Plaintiff's phrase, "actual balance." *Id.* ¶ 11.

balance," Plaintiff can prevail only if she can establish an ambiguity that must be construed in her favor, or that the Bank violated an implied covenant of good faith and fair dealing. Under either theory, extrinsic evidence is admissible.[35]

        **a.**    **Plaintiff's claim for breach of contract requires consideration of extrinsic evidence.**

Extrinsic evidence concerning the parties' course of dealings, course of performance, written disclosures, and individual conversations with Bank employees will be admissible to resolve any ambiguity in the Bank's various contracts. This is so even though the contracts are form contracts. *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1262 (11th Cir. 2003) (extrinsic evidence relevant to breach of good faith claim relating to form dealer contract); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1030 (8th Cir. 2010) (in case involving form annuity policies, "the existence of two or more reasonable interpretations opens the door for extrinsic evidence about what each party intended when it entered the contract."). The laws of the six states at issue permit consideration of extrinsic evidence to interpret ambiguous contracts.

Massachusetts takes the most restrictive stance, but even its approach may allow for extrinsic evidence. Massachusetts follows the Restatement (Second) of Contracts § 211 (1981). *See James B. Nutter & Co. v. Estate of Murphy*, 88 N.E.3d 1133, 1139 (Mass. 2018). That section provides that a standardized agreement "is interpreted wherever reasonable as treating alike all those similarly situated, without regard to their knowledge or understanding." In delimiting the scope of this principle, however, the Reporter's Note to Comment (b) instructs that, "[w]hen an employee of the dominant party explains a term in a standardized agreement to the other party, parol evidence may be admitted to show the explanation." Although the Massachusetts courts have not addressed this precise issue, other states that have adopted Section

---

[35] The Bank submits that the relevant contracts unambiguously permitted it to assess overdraft fees based on customers' available balances, and intends to so argue at summary judgment.

211 rely on the Reporter's Note to admit certain types of extrinsic evidence to resolve

ambiguities in form contracts. *See Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340, 353 (D. Ariz.

2009); *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 582 (E.D. Mich. 2004).

Courts applying the laws of other states Plaintiff invokes here liberally consider extrinsic

evidence, even in the context of form contracts. In these states, the doctrine that an ambiguous

contract should be construed against the drafter is a rule of last resort and does not preclude

consideration of extrinsic evidence. *Pellegrino Food Prods. Co. v. Am. Auto. Ins. Co.*, 655 F.

Supp. 2d 569, 576-78 (W.D. Pa. 2008); *Chenensky v. N.Y. Life Ins. Co.*, 2011 WL 1795305, at *3

(S.D.N.Y. Apr. 27, 2011); *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 88 n.7 (2d

Cir. 2002); *Schor v. FMS Fin. Corp.*, 814 A.2d 1108, 1112-13 (N.J. App. Ct. 2002). [36]

This approach makes sense. As the Restatement recognizes, "[w]here the parties have

attached the same meaning to a promise or agreement or a term thereof, it is interpreted in

accordance with that meaning." Restatement (Second) of Contracts § 201(1). If the Bank

explains the contract and the customer accepts the Bank's explanation, it would be unreasonable

to exclude that evidence. "[T]he primary search is for a common meaning of the parties, not a

meaning imposed on them by the law," much less a meaning "contrary to their understanding."

*Id.* § 201, cmt. c. *See Conway v. 287 Corporate Center Assocs.*, 901 A.2d 341, 347 (N.J. 2006);

*Hubert v. Melrose-Wakefield Hosp. Ass'n*, 661 N.E.2d 1347, 1351 (Mass. App. Ct. 1996).

> **b.    Plaintiff's claim for breach of the implied covenant of good faith requires consideration of extrinsic evidence.**

Extrinsic evidence also will be relevant to putative class members' claims for breach of

the implied covenant of good faith, which focuses on the parties' reasonable expectations. Under

the Restatement, "[g]ood faith performance . . . emphasizes faithfulness to an agreed common

---

[36] The law of the other relevant states is consistent with these cases. *See, e.g.*, *Murtha v. City of Hartford*, 35 A.3d 177, 185 (Conn. 2011); *B&C Mgmt Vt., Inc. v. John*, 122 A.3d 511, 514-15 (Vt. 2015).

purpose and consistency with the justified expectations of the other party."  Restatement

(Second) of Contracts § 205, cmt. a (1981).  To determine whether the Bank thwarted any

customer's justified expectation will require consideration of evidence regarding what that

customer reasonably expected.  *Allapattah Servs., Inc.*, 333 F.3d at 1262; *Benchmark Grp., Inc.*

*v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 583 (E.D. Pa. 2009); *Uno Rests., Inc. v. Boston*

*Kenmore Realty Corp.*, 805 N.E.2d 957, 964-65 (Mass. 2004); *Wilson v. Amerada Hess Corp.*,

773 A.2d 1121, 1130 (N.J. 2001).  If a customer expected, as a result of conversations with Bank

employees or other information, that the Bank would assess overdraft fees based on her available

balance, that customer cannot prevail on a claim for breach of the implied covenant.

### c.   Certification is improper when a breach of contract or breach of good faith claim requires consideration of extrinsic evidence.

Courts regularly deny class certification if extrinsic evidence, such as conversations

between customers and sales representatives, will be necessary to resolve an ambiguity in a

contract or to adjudicate a claim for breach of the implied covenant, including in cases involving

form contracts.  *See Sacred Heart Health Sys., Inc.,* 601 F.3d at 1176–77 ("Even the most

common of contractual questions – those arising, for example, from the alleged breach of a form

contract – do not guarantee predominance if individualized extrinsic evidence bears heavily on

the interpretation of the class members' agreements."); *Avritt,* 615 F.3d at 1030-32; *Adams v.*

*Kansas City Life Ins. Co.*, 192 F.R.D. 274, 280-82 (W.D. Mo. 2000).[37]

For these reasons, courts have denied class certification in overdraft cases. *See Shelley v.*

*AmSouth Bank*, 2000 WL 1121778, at *11 (S.D. Ala. July 24, 2000) (certification of contract

claim denied because determining liability would require individual "assessments of what each

---

[37] *See, e.g.*, *Jim Ball Pontiac – Buick GMC, Inc. v. DHL Exp. (USA), Inc.*, 2012 WL 370319, at *6
(W.D.N.Y. Feb. 3, 2012); *Stratton,* 266 F.R.D. at 353; *Rose*, 254 F.R.D. at 274; *Krueger v. Nw. Mut. Life
Ins. Co.*, 2011 WL 2938273, at *6 (N.D. Fla. July 12, 2011); *Gregurek v. United of Omaha Life Ins. Co.*,
2009 WL 4723137, at *7 (C.D. Cal. Nov. 10, 2009).

depositor understood to be the defendant's policies, which in turn requires assessments of such things as what information each depositor was given in addition to the written documents and what each depositor did do or would have done once armed with sufficient awareness of the defendant's actual policies"), *aff'd*, 247 F.3d 250 (11th Cir. 2001); *Compass Bank v. Snow*, 823 So.2d 667, 677 (Ala. 2001) (certification denied because "plaintiff customers' breach-of-contract claims will require individual inquiry into each plaintiff's reasonable contemplation as to the Compass defendants' practice, . . . or any oral statements made to the plaintiff customers . . .").

        **d.**      **The extrinsic evidence in this case precludes predominance.**

The extrinsic evidence relevant to the claims of each putative class member in this case would vary widely.  Putative class members will have a wide range of expectations based, *inter alia*, on variations in the contract language, individual account management and monitoring practices, written notices, and education letters received, and individual conversations between Bank representatives and customers.  *See* Kirk Fair Rpt. ¶¶ 52-90.  Evidence of the understandings customers derive from the Bank's varied disclosures and the extensive conversations with Bank representatives would bear directly on any putative class member's claims.  A customer who understood the Bank's practices after a conversation with a Bank representative at account opening would be hard-pressed to prove that the Bank breached its contract or the implied covenant of good faith.  Such a customer would be in a different position from one who did not initially understand the Bank's available balance practice, but learned of it when he or she spoke with a Bank employee after incurring an overdraft fee.  Both of these customers would be differently situated from one who claims never to have understood the Bank's available balance practice at any time – like Plaintiff Bond.  The claims of customers who knowingly incurred overdraft fees would raise still different issues.  The individual issues

that would need to be tried to determine each putative class member's claims would overwhelm the common issues and preclude class certification.

> ### C. Individual issues predominate with respect to Plaintiff's claim for unjust enrichment (Count VII) because it requires consideration of individual equitable considerations.

Plaintiff asserts a claim for unjust enrichment, which would require individual proof.  An unjust enrichment claims requires a plaintiff to "establish not only that the defendant received a benefit, but also that such a benefit was unjust, a quality that turns on the reasonable expectations of the parties." *Metropolitan Life Ins. Co. v. Cotter*, 984 N.E.2d 835, 850 (Mass. 2013) (quotation marks omitted).  "[C]ommon questions will rarely, if ever, predominate an unjust enrichment claim" because resolving such a claim involves adjudicating "individualized facts" regarding whether the circumstances of each particular claim would result in inequity. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009).  *See Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014).  These individual equitable considerations preclude a finding of predominance in this case.  *In re Celexa and Lexapro Mktg. & Sales Litig.*, 2017 WL 3495694, at *9 (D. Mass. Aug. 15, 2017); *In re Dial*, 312 F.R.D. at 62-63.

> ### D. Individual issues predominate with respect to Plaintiff's claim for conversion (Count VI) because it requires consideration of the same individual questions inherent in Plaintiff's breach claim.

"Conversion consists of a wrongful exercise of dominion or control over the personal property of another." *Cahaly v. Benistar Prop. Exch. Trust Co.*, 864 N.E.2d 548, 559 (Mass. App. Ct. 2007).  Because conversion requires "wrongful" interference with Plaintiff's ownership rights, there can be no claim for conversion if the Bank acted in accordance with the law or the contract.  *See In re Citigroup, Inc. Capital Accumulation Plan Litig.*, 652 F.3d 88, 92 (1st Cir. 2011).  The determination of the "wrongfulness" of the Bank's practices will turn on the same

individualized facts that will inform Plaintiff's other claims.  *See Cruz v. TMI Hosp., Inc.*, 2015 WL 6671334, at *10 (D. Minn. Oct. 30, 2015); *Robinson v. Wal-Mart Stores, Inc.*, 253 F.R.D. 396, 402 (S.D. Miss. 2008).

> **E.    Individual issues relating to the Bank's affirmative defenses predominate.**

Berkshire's affirmative defenses will also generate individualized questions that preclude class certification.  Berkshire has asserted several affirmative defenses that place in issue individual consumers' knowledge and acceptance of Berkshire's practices.  At trial, the Bank will be entitled to present evidence to support these defenses.[38]  The Bank has already described the individual proof it would present at trial in support of its mitigation of damages defense.  *See* Section III.A, *supra.*  The defense of accord and satisfaction also illustrates this point.

Accord and satisfaction requires an agreement between the parties, supported by consideration, to settle a dispute.  *Cadle Co. v. Hayes*, 116 F.3d 957, 962 (1st Cir. 1997).  "[A]n accord will be created only where both parties intended to enter into it." *AIU Ins. Co. v. Mitsui O.S.K. Lines, Ltd.*, 897 F. Supp. 724, 727 (S.D.N.Y. 1995); *see Nye v. Ingersoll Rand Co.*, 783 F. Supp.2d 751, 762 (D.N.J. 2011).  This defense thus requires an inherently individualized inquiry. *See, e.g.*, *Parks Auto. Grp., Inc. v. Gen. Motors Corp.*, 237 F.R.D. 567, 571 (D.S.C. 2006).

The Bank bases its accord and satisfaction defense, in part, on the many occasions when its employees have agreed to provide refunds of overdraft fees to customers who called to inquire or complain. In an effort to find a compromise acceptable to the customer, Bank employees often agree to reverse some fees, and customers agree to pay the remainder, with the understanding that any other fees after that date will not be refunded.  As part of any refund, employees are also instructed to make sure that the customer understands and agrees to the

---

[38] The Rules Enabling Act, 28 U.S.C. § 2072 and the Due Process Clause preserve Berkshire's right to introduce evidence supporting its defenses for any individual's claim.  *Wal-Mart*, 564 U.S. at 367; *Sacred Heart Health Sys.*, 601 F.3d at 1176.

Bank's policies, and to explain that no further refunds will be given if the same behavior that caused the reversed overdraft fee is repeated. Employees often make notations to that effect in customers' files. Each of these conversations is unique and require highly individualized proof. Tanner Decl. ¶¶ 24-30; Gagne Decl. ¶¶ 20-28; Masterson Decl. ¶¶ 9-13.

Other defenses raise issues about each plaintiff's knowledge, which again are individualized. For example, the defense of voluntary payment provides that "money voluntarily paid under a claim of right, with full knowledge of the facts on the part of the one making the payment, cannot be recovered . . . ." *Carey v. Fitzpatrick*, 17 N.E. 2d 882, 883 (Mass. 1938). The waiver defense involves an "intentional relinquishment of a known right." *BourgeoisWhite, LLP v. Sterling Lion, LLC*, 71 N.E.3d 171, 176 (Mass. App. Ct. 2017). Ratification involves intentionally accepting benefits under a contract, acquiescing in that contract, and recognizing the validity of that contract by acting upon it. *Dorn v. Astra USA*, 975 F. Supp. 388, 393 (D. Mass. 1997). The Bank will be able to forward substantial evidence in support of these defenses, including evidence that many customers intentionally choose to overdraw their account and incur fees. Kirk Fair Rpt. ¶¶ 44, 78-80.

Because these defenses raise individual issues, courts often deny class certification where they are raised. As the Eleventh Circuit has observed, "[t]he risk of voluminous and individualized extrinsic proof runs particularly high," even in cases involving a claimed breach of a form contract, "where a defendant raises substantial affirmative defenses to breach." *Sacred Heart Health Sys.*, 601 F.3d at 1177 (ratification and waiver).[39] Courts have relied on such defenses in denying certification in overdraft cases. *Shelley*, 2000 WL 1121778, at *11.

---

[39] *See, e.g.*, *In re Adelphia Recovery Trust*, 634 F.3d 678, 693 (2d Cir. 2011) (ratification); *In re Wilborn*, 609 F.3d 748, 756 (5th Cir. 2010) (waiver and estoppel); *In re Light Cigarettes*, 271 F.R.D. at 421 (denying certification based in part on individual issues relating to voluntary payment doctrine and noting that "the individual inquiries" raised by affirmative defenses "weigh[ed] against" predominance).

**F.      Plaintiff's predominance argument relies on distinguishable and wrongly decided cases.**

Plaintiff relies on class certification decisions in two other overdraft cases and in several cases decided by a single judge in an overdraft fees MDL in the Southern District of Florida (MDL 2036).  Pl. Br. at 22.[40]  She fails to cite several overdraft case decisions that deny class certification, and the cases she relies on are both distinguishable and wrongly decided.

At least one federal court and two state courts applying the Rule 23 standards have denied class certification in overdraft cases on grounds of predominance.  These courts found that individualized issues relating to customer expectations and knowledge (often derived from individual communications), course of performance, and causation precluded certification of claims for, *inter alia*, breach of contract and breach of the implied covenant of good faith. *Shelley*, 2000 WL 1121778, at *1, 11; *Brooks v. Norwest Corp.*, 103 P.3d 39, 54 (N.M. Ct. App. 2004); *Compass Bank*, 823 So.2d at 677, 679.

Although Plaintiff correctly points out that three other federal courts have granted class certification in overdraft cases, those decisions are distinguishable for several reasons.  None of the cases involved a single, atypical class representative who incurred hundreds of overdraft fees as a result of careless account management.  *Cf. Gutierrez v. Wells Fargo Bank, N.A.*, 2008 WL 4279550 (N.D. Cal. Sep. 11, 2008) (class representative incurred four fees).  Indeed, one of the cases involved 23 named plaintiffs, and defendant did not raise the typicality arguments Berkshire raises here.  *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 2018 WL 1003548, at *13 (D.S.C. Feb. 22, 2018).  Further, the courts emphasized that there was a single contract at issue that did not vary materially during the class period.  *See, e.g.*, *In re Checking Account*

---

[40] Nine of the eleven overdraft cases cited by Plaintiff were issued by the single judge in MDL 2036.  One of the other cases Plaintiff cites referred to these repetitive decisions as an "echo chamber."  *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 150 F. Supp. 3d 593, 613 n. 7 (D.S.C. 2015)

*Overdraft Litig.*, 307 F.R.D. 656, 676 (S.D. Fla. 2015).  In contrast, this case involves nine different versions of the relevant contract covering different portions of the class period.

Moreover, *Gutierrez* and all of the MDL 2036 decisions on which Plaintiff relies challenged practices very different from those challenged here.  Plaintiffs in the *Gutierrez* and *In re Checking Account* challenged the banks' practices of posting debits from high-to-low by dollar amount, which tends to increase overdraft fees.  Berkshire has never posted debits high-to-low and, indeed, to the extent it has posted debits by dollar amount under certain defined circumstances, it has always done so from low-to-high, which minimizes overdraft fees.  Ricker Decl. ¶¶ 22-25.  Moreover, the class periods in those cases pre-dated the effective dates of the 2010 amendments to Reg E.  Thus, unlike this case, there were no opt in forms or disclosures in issue, and no evidence of account-opening conversations concerning opt in elections.

The court in the remaining case, *In re TD Bank*, placed too much reliance on the existence of a form contract, a mistake this Court should not repeat.  Unlike many form contract cases, Berkshire does not present its customers with a take-it-or-leave-it proposition.   Rather, customers choose from a menu of services.  They can have a checking account that (1) includes overdraft services for all types of transactions, (2) includes overdraft services for all types of transactions except ATM and one-time debit card transactions, or (3) includes no overdraft services.  Moreover, customers do not receive overdraft services for ATM and one-time debit card transactions (and therefore do not incur overdraft fees for them) unless they affirmatively choose such services after receiving relevant disclosures and, when opening accounts at a branch, speaking with Bank representatives.  Further, customers can change their choices, opting in to and out of overdraft services, whenever and as often as they like.  Thus, customers can have checking accounts at Berkshire Bank without any overdraft services or with overdraft services

for all transactions except ATM and one-time debit card transactions, and most do.[41]  For this

reason alone, overdraft service agreements are not contracts of adhesion.

Finally, the many ongoing interactions between the Bank and its customers result in a far

more dynamic customer relationship than the relationships a consumer may have with other

types of service providers who rely on form contracts.  The extensive written and oral

communications that take place between the Bank and its customers addressing overdrafts and

available balance at account opening and throughout the banking relationship require highly

individualized inquiries into each class member's claim, defeating predominance.

### G.    Individual issues of causation and damages predominate with respect to plaintiff's state law claims.

In arguing she can establish the fact of injury and the amount of damages on a class-wide

basis, Plaintiff relies on the expert opinion testimony of Dr. Jesse David.  Pl. Br. at 24-25.  Dr.

David, an economist, purports to be able to calculate damages for each class member under

Plaintiff's theories on a class-wide basis using customer transactional data produced by the Bank.

Expert Report of Jesse David ("David Rpt.") ¶¶ 14, 20 (Pl. Br. Ex. 19).  Because Dr. David has

not demonstrated that he can reliably determine damages for any of Plaintiff's theories based on

common proof, his expert opinions do not satisfy Plaintiff's burden.

### 1.    Plaintiff's expert has not demonstrated that he can calculate damages in the "formulaic manner" he predicts.

Dr. David claims that he can determine in a "formulaic manner on a class-wide basis . . .

which customers sustained damages as a result of Berkshire's allegedly improper practices and

the amount of those damages."  David Rpt. ¶ 20.  He defines "formulaic manner" to mean

"expressed in computer code that would be applicable to any number . . . of accounts" as

---

[41] *See, e.g.*, Cowhey Decl. ¶ 16 (only ■■% of eligible Berkshire consumer checking accounts have opted
in to Courtesy Pay for ATM and one-time debit card transactions).

opposed to manual review. Deposition of Jesse David ("David Dep.") at 22:16-23:2 (Ex. 5 to Dunlap Decl.).  Yet he has done the opposite.  He has performed a manual review of Bond's account data, but has not created the promised computer code, and has not run any computer program on Bond's data to show that he will be able to calculate damages for all putative class members formulaically.  *Id.* at 37:2-14, 39:7-19.  He also did not calculate total damages for Bond across all of her damages theories, or even under any single theory for which she now seeks certification.  *Id.* at 42:2-22.  As the Bank's data expert, Sonya Kwon, explains: "[w]ithout testing his proposed methodologies on any of the actual data, Dr. David cannot know all the data challenges that may present themselves. As a result, his opinion that his approach can be reliably applied to the entire class…is completely unreliable and speculative."  Kwon Rpt. ¶ 18.  *See also id.* ¶¶ 30-36, 42-47.[42]

Dr. David's "trust me" opinion does not satisfy Plaintiff's burden to establish that damages can be calculated based on common proof.  *See In re Dial*, 312 F.R.D. at 78 (denying certification where plaintiffs' damages methodologies "set forth little detail concerning the 'significant conceptual, implementation or data issues that would be encountered' if their approach were adopted") (citations omitted).  It therefore does not support class certification.

### 2.    Plaintiff's expert cannot reliably calculate damages based on common proof of reliance, causation or customer knowledge.

As previously discussed, the issues of reliance, causation and customer knowledge each bear on the Bank's liability in this case.  *See* Section IV, *supra*.  Dr. David concedes he cannot address these issues based on common proof.  *See generally* Kwon Rpt. ¶¶ 19-23.  For example, he cannot identify instances where a customer intentionally overdrew her account and knowingly

---

[42] Plaintiff cites Dr. David's experience in another overdraft matter, *Trombley v. National City*, as a basis for his opinions in this case.  Pl. Br. at 24.  Such reliance is misplaced. The analysis Dr. David conducted in *Trombley* is critically different from the analysis he claims he can do here.  Kwon Rpt. ¶ 18 & n.12

incurred a fee, and admits that his methodologies could identify such a fee as improper and count it as damages.  David Dep. at 78:20-80:22.  Similarly, his computer programs cannot determine the reasons any customer opted in to overdraft services, or what information each customer relied on in doing so.  *Id.* at 81:13-83:25.  Nor can Dr. David identify on a class-wide basis whether, and if so when, any customer was informed or otherwise became aware that overdraft fees were assessed on a customer's available balance, or that the available balance was reduced by authorized debit card transactions.  In his words: "I have no basis to provide any opinions about what anybody knew at any point in time." *Id*. at 80:3-5.  His proposed testimony therefore would do nothing to resolve the individualized issues this case presents.  Kwon Rpt. ¶ 21.

### 3. Plaintiff's expert's proposed methodologies to calculate damages do not "fit" plaintiff's liability theories.

"[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Comcast*, 569 U.S. at 35; *In re Dial*, 312 F.R.D. at 77.  Dr. David's damages methodologies do not "fit" Plaintiff's liability theories, because they do not isolate harm caused by the challenged practices.  Plaintiff contests the Bank's assessment of overdraft fees based on a customer's "available balance" rather than the customer's "ledger balance," for the period starting July 1, 2010.  Pl. Br. at 4-5, 13.  Dr. David's damages calculations, however, are not tied to this theory.  For example, for the portion of the class period the Bank was using the OSI system, Dr. David offers one damages methodology.  David Rpt. ¶¶ 21-22.  After manually reviewing Bond's transactional data for all days during the OSI period, he identified a single day with allegedly improper fees, April 2, 2012.  David Dep. at 114:13-115:9.  The fees he identified, however, did not result from the Bank's practice of assessing fees based on available balance.  In fact, there were no debit holds affecting Bond's account on April 2, 2012, and her ledger balance and available balance that day were the same.  *Id*. at 117:19-24.

43

*See also* Kwon Rpt. ¶¶ 37-41. Under *Comcast,* this mismatch between Plaintiff's theory and her expert's opinion precludes class certification.[43]

## V.      Plaintiff Fails to Satisfy the Requirement of Superiority Under Rule 23(b)(3).

In addition to predominance, a party seeking class certification under Rule 23(b)(3) must establish "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Because of "the likely difficulties in managing" this case as a class action, *id.* 23(b)(3)(D), Plaintiff is unable to satisfy the superiority requirement.  In her brief, Plaintiff devotes only one, conclusory sentence to the issue of manageability.  Pl. Br. at 35.  She provides no support for her bare statement that "this case does not present any manageability issues."  This failure alone should preclude class certification.

Plaintiff will likely rely on her proposed Trial Plan to establish manageability.  Such reliance would be unwarranted for at least two reasons.  First, the premise underlying the entire plan is that the Bank's contracts with its customers were limited to the Terms & Conditions and were uniform.  As explained in Section IV.A above, the contracts consisted not only of the Terms & Conditions, but also of the Courtesy Pay disclosure and the Opt In Form, each of which changed during the proposed class period.  There was no single contract governing all class members' claims.  Rather, as previously explained, there were nine relevant versions of the underlying contract, each of which applied during a different portion of the proposed class period.  A finder of fact adjudicating the claims of the proposed state-law class would have the very difficult job of interpreting and applying all nine to the class members' claims.

---

[43] Several of the methodologies set forth in Dr. David's report relate to theories that are not referenced in Plaintiff's complaint or motion for class certification.  *See* David Rpt. ¶¶ 31-32 (damages due to exceeding $750 Courtesy Pay limit), 33-34 (continuous overdraft fees), 39-40 (damages due to ordering of POS credits).  Moreover, for certain theories referenced in his report, Dr. David was unable to identify a single example of an allegedly improper fee based on his manual review. *Id.* ¶¶ 38, 40.

Second, rather than demonstrate manageability, the Trial Plan does just the opposite.  It proposes 16 state law subclasses: two for the breach of contract claim, three for the implied covenant claim, three for the conversion claim, three for the unjust enrichment claim, and five for the state statutory claims.  The EFTA claim would add yet a 17th grouping.  Given that the nine versions of the contract will almost certainly be relevant to each of the state law claims, it quickly becomes apparent that the proposed class action would be completely unmanageable. *See, e.g.*, *In re Paxil Litig.*, 212 F.R.D. 539, 546 (C.D. Cal. 2003).

Finally, the same individualized issues that defeat predominance defeat superiority. Adjudication of the Plaintiff's claims and the Bank's defenses would require individual mini-trials concerning each class member's understandings, choices, preferences, and interactions with the Bank.  It cannot be accomplished on a class-wide basis.  *See, e.g.*, *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 148 & n.13 (3d Cir. 2001) (class action not superior because individual adjudications relating to causation and defenses and application of differing state laws would make trying plaintiff's claims in a class action a "thoroughly unwieldy endeavor"); *In re Celexa and Lexapro Mktg. & Sales Pracs. Litig.*, 315 F.R.D. 116, 130-31 (D. Mass. 2016).

## CONCLUSION

For all of the above reasons, Plaintiff's Motion for Class Certification should be denied.


Dated: September 4, 2018

> Defendants, by their attorneys,
>
> /s/ Donald R. Frederico
> Donald R. Frederico, Esq. (BBO No. 178220)
> PIERCE ATWOOD LLP
> 100 Summer Street
> Boston, Massachusetts 02110
> (617) 488-8100

45

Lucus R. Ritchie, Esq. (pro hac vice)
Joshua D. Dunlap (BBO No. 672312)
PIERCE ATWOOD LLP
254 Commercial Street
Portland, ME 04101
(207) 791-1100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 4, 2018, I electronically filed the foregoing

[Corrected] Memorandum in Opposition to Plaintiff's Motion for Class Certification in redacted

form using the Court's CM/ECF system.  I understand that notice of this filing will be sent to all

parties by operation of the Court's electronic filing system.  Parties may access this filing

through the Court's system.  In addition, pursuant to an agreement with all counsel of record, I

caused an unredacted version of the foregoing document to be served by electronic mail to the

following:

Lee S. Shalov (pro hac vice)
Wade C. Wilkinson (pro hac vice)
Jason S. Giaimo (pro hac vice)
**McLAUGHLIN & STERN LLP**
260 Madison Ave.
New York, New York 10016
Tel: (212) 448-1100
lshalov@mclaughlinstern.com
wwilkinson@mclaughlinstern.com
jgiaimo@mclaughlinstern.com

Angela M. Edwards (BB No. 565111)
**Law Offices of Angela Edwards**
72 Canterbury Circle
East Longmeadow, Mass. 01028
Tel: (413) 525-3820
angelaedwards@charter.net

Jeffrey S. Morneau, Esq. (BB No. 643668)
**CONNOR, MORNEAU & OLIN, LLP**
273 State Street, Second Floor
Springfield, Massachusetts 01103
Tel: (413) 455-1730
Fax: (413) 455-1594
jmorneau@cmolawyers.com

/s/ Donald R. Frederico
Donald R. Frederico, Esq. (BBO No. 178220)
PIERCE ATWOOD LLP

47

100 Summer Street, Suite 2250
Boston, Massachusetts 02110
(617) 488-8100

*Attorney for Defendants*