EXHIBIT 1

*Confidential*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **SANDRA BOND, individually and on behalf of all others similarly situated,** | |
| Plaintiffs, | Case No. 16-30050-MGM |
| v. | |
| **BERKSHIRE BANK and BERKSHIRE HILLS BANCORP,** | |
| Defendants. | |

## EXPERT REPORT OF REBECCA KIRK FAIR

### February 27, 2018

*Confidential*

# TABLE OF CONTENTS

I.   **Introduction** ........................................................................................................................**3**

   A.  Qualifications ...............................................................................................................3

   B.  Background ...................................................................................................................3

       *a. Parties Involved* ......................................................................................................*3*

       *b. Claims Relevant to My Opinion* ............................................................................*6*

   C.  Assignment ..................................................................................................................7

II.   **Summary of Opinions** ...................................................................................................**7**

III.  **Approach to Evaluating Consumer Decision Making** ...............................................**9**

   A.  Analytical Framework .................................................................................................9

   B.  Methodology ..............................................................................................................12

IV.  **Survey of Debit Card Users** .......................................................................................**12**

V.   **Sandra Bond Is Not a Typical Representative of the Proposed Class** ...................**17**

VI.  **Analysis of Consumer Decision Making in the Market for a Checking Account and Debit Card** .........................................................................................................................**24**

   A.  The Process of Opening an Account and Learning about the At-Issue Services and Fees is Highly Individualized ..............................................................................................25

       *a. Information Received* ...........................................................................................*25*

       *b. Information Processing* ........................................................................................*32*

   B.  Relevant Communication and Information Processing after Opening an Account and Prior to Availing of Overdraft Services Is Highly Individualized ................................34

       *a. Available Information* ..........................................................................................*34*

       *b. Information Processing* ........................................................................................*37*

   C.  Customers' Reasons for and Circumstances of an Overdraft Are Highly Individualized ............39

   D.  Relevant Communication and Customer Behavior after an Overdraft Is Highly Individualized .. 41

       *a. Available Information about Overdrafts and Alternatives to Overdraft Services* ................. *41*

       *b. Information Processing* ........................................................................................*45*

   E.  Customers' Post-Overdraft Behavior Is Highly Individualized .................................45

VII.  **Rebuttal of Dr. David's Report** ...............................................................................**46**

*Confidential*

## I.   Introduction

### A.   Qualifications

1.  I am a Managing Principal with Analysis Group, Inc., a consulting firm headquartered in Boston, Massachusetts. I have a Master of Business Administration degree in finance and applied economics from the MIT Sloan School of Management in Boston, Massachusetts. My curriculum vitae is attached as Appendix A.

2.  Over my twenty-year career at Analysis Group, I have conducted economic analyses and consulted in a broad range of cases involving surveys, processing and statistical analysis of large datasets, measuring damages and potential for consumer confusion, and assessing class certification issues, including the issues of typicality, commonality, and representativeness in the assessment of both damages and liability.

3.  I have worked on over 200 intellectual property, false advertising, class certification, and antitrust litigations. I have served as an expert witness in matters involving economic analysis, statistical sampling, breach of contract damages, trade dress, trademarks, consumer behavior, and confusion. I served as an expert and supported others in testimony for government agencies and for defendants in cases brought against them by government agencies in the assessment of consumer confusion with respect to product and pricing disclosures. I have also supported numerous experts in analyses related to banking fees and competition among financial institutions.

4.  I have extensive experience in survey development and administration and analysis of data on consumer behavior. I have served as an expert witness and supported experts in matters involving the design and implementation of consumer surveys. I have designed and have implemented on-line, mall-intercept, and telephone surveys using a variety of methodologies. Over the course of these assignments, I have developed expertise in sampling from large databases, defining and soliciting target sample populations, and carrying out statistical analysis with large volumes of survey data. I also have experience in the evaluation of surveys related to consumer perception and understanding, feature value, and marketing procedures in connection with class certification, intellectual property, consumer protection, antitrust, and trademark matters. A list of cases in which I have testified in the past four years is attached as Appendix B.

### B.   Background

#### a.   *Parties Involved*

5.  Berkshire Bank (the "Bank"), one of the defendants in this matter, provides customers with a variety of banking products and services, including personal checking accounts. Berkshire Bank currently

*Confidential*

operates branches in Massachusetts, Vermont, New York, Connecticut, New Jersey, and Pennsylvania.[1]

6.  Since at least 2006, Berkshire Bank has offered to its customers a "discretionary overdraft service" called Courtesy Pay.[2] Prior to the implementation of the overdraft amendments to "Regulation E" (Reg. E) on July 1, 2010, Berkshire Bank customers were automatically enrolled in Courtesy Pay until they formally opted out of the service (if they chose to do so).[3] Under the Courtesy Pay service (prior to July 1, 2010), Berkshire Bank would cover the payment of items such as checks, point-of-sale (POS) transactions, ATM transactions, and electronic funds transfers which exceeded the customer's available account balance, up to a $750 limit, rather than decline the transaction.[4] If the customer's available balance was insufficient to cover the transaction, the Bank generally assessed an overdraft fee for paying the item.[5] This service was provided at the discretion of Berkshire Bank and only applied to eligible accounts.[6]

7.  The Reg. E overdraft amendments, which went into effect on July 1, 2010 for new accounts and on August 15, 2010 for existing accounts, required banks to obtain consumers' affirmative consent (opt in) for overdraft services for ATM and one-time debit card transactions.[7] In order to comply with

---

[1]  First Amended Complaint, *Sandra Bond, individually and on behalf of all others similarly situated, Plaintiffs v Berkshire Bank and Berkshire Hills Bancorp, Defendants*, United States District Court District of Massachusetts Western Division, Case No. 16-30050-MGM, July 15, 2016 ("Complaint"), ¶36; Berkshire Bank, "Overview," available at https://www.berkshirebank.com/about-us/news-room/overview, accessed on February 21, 2018.

[2]  Declaration of Kristen Ricker, February 23, 2018, ("Ricker Declaration"), ¶7.

[3]  Ricker Declaration, ¶¶8-9; Defendants' Answers and Objection to Plaintiffs' First Set of Interrogatories, *Sandra Bond, individually and on behalf of all others similarly situated, Plaintiffs v Berkshire Bank and Berkshire Hills Bancorp, Defendants*, United States District Court District of Massachusetts Western Division, Case No. 16-30050-MGM. ("Defendants' Answers and Objection to Plaintiffs' First Set of Interrogatories"), p. 10.

[4]  Ricker Declaration, ¶¶8-9; Defendants' Answers and Objection to Plaintiffs' First Set of Interrogatories, p. 10.

[5]  Ricker Declaration, ¶9.

[6]  To be eligible, accounts were required to be open for at least 30 days and maintained in "good standing." Specifically: "(A) Continuing to make deposits consistent with your past practices, (B) You are not in default on any loan obligation to us, and if there are any loans with the Bank, they must be current for 60 days or more. (C) You bring your account to a positive balance (not overdrawn) at least once every thirty (30) days, and (D) Your account is not the subject of any legal or administrative order or levy." Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," October 4, 2006 (BB0000074-075). *See also,* Ricker Declaration, ¶9.

[7]  One-time or "everyday" debit card transactions are non-recurring transactions as opposed to recurring transactions such as gym membership or Netflix subscription payments. Although existing Berkshire Bank customers could opt-in prior to August 15, 2010, their opt-in election did not go into effect until August 15, 2010. Berkshire Bank, "Procedure: Reg. E - Opt-In," October 27, 2012 (BB0001011-015 at 011); Berkshire Bank, "Executive Summary REG E Changes Overview: What, Who, Which, When and How?" (BB-EM-0051886-890 at 886).

*Confidential*

Reg. E, banks were required to provide an electronic or written notice to consumers describing the bank's overdraft services, provide consumers an opportunity to affirmatively consent (opt in) to overdraft services for ATM and one-time debit card transactions, obtain the consumers' affirmative consent, and deliver a confirmation of the consent to the consumer, including a statement of the right to revoke consent.[8]

8. After the implementation of the Reg. E overdraft amendments in 2010, Berkshire Bank customers were only automatically enrolled in Courtesy Pay with regards to automatic bill payments, checks, and other transactions made using a checking account number.[9] Customers were not enrolled in Courtesy Pay for ATM and everyday debit card transactions unless they opted in;[10] the service continued to be provided at the discretion of Berkshire Bank and only provided to eligible accounts.[11]

9. Sandra Bond, the named Plaintiff in this matter, opened a joint account with her husband, Dylan Bond, at Woronoco Savings Bank, East Longmeadow, Massachusetts in August 2002.[12] This account transitioned into a Berkshire Bank account when Woronoco Savings Bank was acquired by Berkshire Bank in August 2005.[13] Sandra Bond has incurred overdrafts and the associated fees since at least September 24, 2007.[14]

10. Sandra Bond "chose to opt in to Berkshire Bank's Courtesy Pay services for ATM and one-time debit card transactions on June 24, 2010" through the bank's website.[15] Between July 2010 and March

---

[8]   *See* 12 C.F.R. § 205.17.

[9]   Berkshire Bank, "New Overdraft Rules for Debit and ATM Cards," May 5, 2010 (BB0000096); Defendants' Answers and Objection to Plaintiffs' First Set of Interrogatories, p. 11.

[10]  Customers maintained the ability to opt out of overdraft service for all transaction types as well as just debit card and ATM transactions. Berkshire Bank, "New Overdraft Rules for Debit and ATM Cards," May 5, 2010 (BB0000096); Defendants' Answers and Objection to Plaintiffs' First Set of Interrogatories, p. 11.

[11]  Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," September 10, 2012 (BB0000078-079).

[12]  Ricker Declaration, ¶69; Woronoco Savings Bank, August 2, 2002 (BB-BOND-0000573). *See also*, Deposition of Sandra Bond, September 25, 2017 ("Sandra Bond Deposition"), pp. 85:14-86:2.

[13]  Ricker Declaration, ¶70; *See* also, Woronoco Savings Bank, "Conversion Weekend, Account Changes Access and Information" (BB0000720-735).

[14]  Ricker Declaration, ¶71; Bond Monthly Statement, October 15, 2007, (BB-BOND-0000006-009 at 007).

[15]  Ricker Declaration, ¶72. Plaintiff's damages expert, Dr. Jesse David also states that Sandra Bond "has been enrolled in Berkshire's Courtesy Pay program since prior to July 1, 2010 and 'was opted in' to Berkshire's ATM/POS option for Courtesy Pay on June 24, 2010." Expert Report of Jesse David, Ph.D., December 8, 2017 ("David Report"), ¶11.

*Confidential*

2017,[16] 250 overdraft fees, totaling $8,168, were charged to Ms. Bond's account.[17] According to the complaint, Sandra Bond "brings this action on behalf of all Berkshire Bank customers in the United States who were charged one or more overdraft fees on or after July 1, 2010."[18] In what follows, "relevant accounts" in any given period will refer to Berkshire Bank consumer checking accounts with at least one overdraft fee incurred *in that period*.

### b.   Claims Relevant to My Opinion

11. The Plaintiff claims that Berkshire Bank "consistently misrepresented and failed to disclose adequately [its] overdraft rules, regulations, and policies to [its] customers."[19] In particular, the complaint in this case alleges that Berkshire Bank did not properly disclose the following practices:

a.   The use of available balance to assess overdrafts and levy overdraft fees. Specifically, the Plaintiff claims that Berkshire Bank "unfairly and deceptively failed to disclose" that it "used an artificial, internal, and hidden calculation to determine customer's 'available balance' and used customer's 'available balance' rather than 'actual balance' when determining overdrafts and assessing overdraft fees."[20] However, the complaint and the Plaintiff's damages expert, Dr. Jesse David, concede that the "available balance" practice was disclosed by Berkshire Bank starting in 2015[21] and I understand from counsel that the Bank maintains that its practice was disclosed throughout the relevant period.

---

[16]   Given that the proposed class period does not have an ending date (see below), and given available data, my analyses cover July 2010 (beginning of the proposed class period) to March 2017.

[17]   Expert Report of Sonya Kwon, February 27, 2018 ("Kwon Report"), Appendix C-1 "Fees by Year." Between July 2010 and March 2017, 45 insufficient funds (NSF) fees, totaling $1,491, were also charged to Bond's account. Kwon Report, Appendix C-1 "Fees by Year." NSF fees are charged when the Bank rejects a transaction for exceeding the customer's available balance. This typically occurs when a customer is not enrolled in Courtesy Pay or has exceeded the $750 Courtesy Pay coverage limit. Ricker Declaration, ¶¶8-9. In his report, Plaintiff's damages expert Dr. Jesse David states that "[b]etween July 2010 and March 2017, [Sandra Bond] paid approximately 249 separate overdraft fees to Berkshire, totaling approximately $8,130 plus 12 continuous overdraft fees, totaling approximately $420.17. During this period, [Sandra Bond] also paid approximately 44 'insufficient funds' ('NSF') fees, totaling $1,459, which were charged when Berkshire rejected a transaction due to insufficient funds in Plaintiff's account (rather than accepting the transaction and charging an overdraft fee)." David Report, ¶11.

[18]   Complaint, ¶27. Of the ███ Berkshire Bank consumer checking accounts existing between July 2010 and March 2017, ████ (or █%) incurred at least one overdraft fee. Kwon Report, Appendix D-1 "Fees by Account."

[19]   Complaint, ¶9. More generally, see ¶¶2-16.

[20]   Complaint, ¶3.

[21]   Complaint, ¶16; David Report ¶¶25, 37. *See also*, Deposition of Jesse David, January 16, 2018 ("David Deposition"), p. 228:13-24.

*Confidential*

b.  The order in which transactions are posted to a customer's account. Specifically, the Plaintiff alleges that Berkshire Bank misrepresented to customers that transactions would be paid "from smallest to largest."[22]

12. The Plaintiff also alleges that Berkshire Bank failed to adhere to Regulation E, particularly with regards to the opt-in process for ATM and everyday debit card transactions,[23] and that Berkshire Bank breached certain terms of its agreements with customers (breach of contract) and the covenant of good faith (breach of duty of good faith & fair dealing).[24]

### C.  Assignment

13. I have been retained by Berkshire Bank to evaluate:

a.  Whether Sandra Bond is a typical representative of the proposed class;

b.  Whether the claims of the proposed class can be analyzed on a common, class-wide basis; and

c.  Whether Dr. David's damages methodology can be used to evaluate potential damages on a class-wide basis.

14. In undertaking this assignment, I utilized my expertise in conducting and interpreting qualitative and quantitative research about consumer perceptions, understandings, intentions, and behavior. I applied my expertise and experience in the review and evaluation of materials produced in connection with this matter, as well as my extensive expertise in developing, testing, and analyzing surveys. A complete list of all documents I reviewed in conjunction with this report is provided in Appendix C.[25]

15. Analysis Group is being compensated at a rate of $725 per hour for my time on this case. Part of the work conducted in connection with this assignment was performed under my direction by others at Analysis Group, Inc., whose hourly rates range from $310 to $550. No compensation is contingent on the nature of my findings or on the outcome of this litigation.

## II.   Summary of Opinions

16. Given my experience and expertise, my research conducted in this case, my analyses of the research and evidence produced in this matter, and my review of relevant published literature and other publicly available materials, I conclude that Sandra Bond is not representative of the proposed class and that one would need to evaluate the circumstances and experiences of each individual member of the proposed class to assess the potential for liability and damages. The report and methodology

---

[22]  Complaint, ¶8-9.

[23]  Complaint, ¶54-62.

[24]  Complaint, ¶¶12; 93-108.

[25]  In particular, I was given access to all documents produced in this matter.

*Confidential*

proposed by Dr. David do not resolve the individualized issues present in this matter, and ignore that some proposed class members would have been worse off in his but-for world.[26]

a.  The primary research I conducted demonstrates that banking customers exhibit a variety of perceptions, understandings, and expectations with respect to the at-issue services and fees. Furthermore, my survey demonstrates that debit card users exhibit a range of banking behaviors related to monitoring account balances and accessing of overdraft services. The results of my survey are also consistent with third-party and Berkshire Bank market research conducted in the normal course of business that illustrate wide differences in consumer understandings, preferences, and behaviors vis-à-vis account monitoring, communications with their financial institutions, and overdraft services.

b.  Sandra Bond is not a typical representative of the proposed class. Ms. Bond is an outlier with respect to the frequency at which she has used the Courtesy Pay service and the number of overdraft fees she has incurred. As discussed in more detail below, Ms. Bond incurred more overdraft fees (between July 2010 and March 2017) than 99% of relevant accounts and more than 60 times the number of fees incurred by the median proposed class member. As a result of her frequent overdrafts, Ms. Bond was contacted by Berkshire Bank more often and with a larger variety of communications concerning overdrafts than most other customers. Further, my survey results and the research available to me through production also indicate that Sandra Bond's perceptions, understandings, expectations, and resulting behaviors are not representative of the proposed class. As a result of these and other unique variations discussed herein, it is not appropriate to use Sandra Bond's experiences and understandings of the Bank's overdraft practices as representative of every member of the proposed class.

c.  The claims of injury to the proposed class cannot be analyzed on a common, class-wide basis. Proposed class members varied greatly in the information they received and the disclosures to which they were exposed at account opening and throughout their tenure at Berkshire Bank. Individualized inquiry is therefore necessary to evaluate what information was available to each proposed class member across the life cycle of their banking relationship with Berkshire Bank. Furthermore, as my survey, third-party survey evidence, and case materials indicate, and as academic literature has consistently found, proposed class members would have attended to the Bank's practices and disclosures differently and would have varied perceptions and understandings of its disclosures and practices. Inquiry at the individual level would also be

---

[26]  As discussed in Section VII below, Dr. David's but-for world is the one where the Bank uses "actual" balance instead of available balance and a different payment order of items.

necessary to understand proposed class members' choices with respect to their spending decisions and their use of Courtesy Pay during the proposed class period and whether and how each customer would have altered his or her use of Courtesy Pay in a but-for world.

d.  Dr. David's methodology cannot be used to evaluate potential damages stemming from the allegations in this case on a class-wide basis. His approach does not attempt to address consumer understandings of Berkshire Bank's disclosures and practices or measure or account for the understandings, actions, or experiences of the proposed class members in a world with different disclosures. Furthermore, Dr. David's approach to the Plaintiff's transaction ordering claims is one-sided, as it does not adjust for fees that consumers would have experienced in his but-for world but did *not* experience in the actual world. Dr. David acknowledges that some class members may experience more overdraft fees in his but-for world, which suggests that the interests of the proposed class members are not aligned.

## III.   Approach to Evaluating Consumer Decision Making

### A.   Analytical Framework

17. In order to evaluate the issues in this case, it is important to understand the decision-making process underlying a consumer's consideration to opt into or out of overdraft services and whether and how often to use them.[27] This process would be similar to a standard decision-making process, usually associated with a high-involvement purchase, outlined in marketing literature. Figure 1 outlines such a model, consisting of five stages: problem recognition, information search, evaluation of alternatives, purchase decision, and post-purchase behavior.

18. In the first stage, consumers "recognize a problem or need triggered by internal or external stimuli."[28] In this case, consumers may recognize the need for a new bank account or for help managing their finances. Next, consumers receive or seek out relevant information from various sources such as personal references, commercial or public sources, or their own experiences with a product or service.[29] The amount of influence over consumers' decisions differs between sources based on the

---

[27] Unless explicitly noted, I use the phrase "overdraft services" to refer to all Courtesy Pay services offered by the Bank, including those subject to the Reg. E opt-in requirement (ATM and everyday debit card transactions).

[28] Kotler, P. and K.L. Keller, *Marketing Management,* 14th ed., Upper Saddle River, NJ: Pearson, 2012 ("Kotler and Keller 2012"), p. 167.

[29] This stage is also referred to as the "purchase deliberation." "Information search should constitute the major part of the duration [of purchase deliberation], but comparison of alternatives and price negotiation would be included in the continually evolving information search and deliberation process." Putsis, W.P. and N. Srinivasan, "Buying or Just Browsing? The Duration of Purchase Deliberation," *Journal of Marketing Research*, Vol. 31, No. 3, August 1994, pp. 393-402 ("Putsis and Srinivasan 1994"), p. 393.

*Confidential*

product category and the individuals' characteristics.[30] As described in detail in this report, consumers receive information on overdraft services through a variety of methods (e.g., mail, on-line, bank representatives) and at various points in time throughout their relationship with a bank.

19. In the third and fourth stages, consumers form judgments on the product or service after which they may form an intention to buy, or in this case, open a bank account or opt into and use or not use overdraft services.[31] Finally, after "purchasing," that is, opting into and using overdraft services, consumers evaluate their experiences with the product or service. Their level of satisfaction with the product or service will determine whether or not they will seek more information about the service and whether they ultimately decide to keep or discard it, or in this case, opt out or stop using overdraft services or close the account.[32]

20. Each stage of the consumer buying process is complex and individualized depending on a consumer's characteristics and needs, as well as external factors.[33] Moreover, while this model captures the "full range of considerations" that may arise during high-involvement decisions, how consumers proceed through this process varies - "consumers don't always pass through all five stages - they may skip or reverse some."[34]

---

[30] Kotler and Keller 2012, p. 167. The process of collecting information is impacted by incentives to search, consumer's assumptions, and price and quality uncertainty among other factors. Information gathered during the search process affects both the decision to purchase or not and, if yes, what to purchase. Putsis and Srinivasan, 1994, p. 394.

[31] Kotler and Keller 2012, pp. 168-171.

[32] Kotler and Keller 2012, p. 172. Consumer preferences in a given situation are dependent on how a consumer approaches the task of making a choice. "Due to limited processing capacity, consumers often do not have well-defined existing preferences, but construct them using a variety of strategies contingent on task demands." Bettman, J.R., M.F. Luce, and J.W. Payne, "Constructive Consumer Choice Process," *Journal of Consumer Research*, Vol. 25, No. 3, December 1998, pp. 187-217, p. 187.

[33] Situational influences such as the purchase task, social surroundings, physical surroundings, temporal effects, and antecedent states have an impact on the ultimate purchase decision. Kerin, R.A., S.W. Hartley, E.N. Berkowitz, and W. Rudelius, *Marketing*, 8th ed., New York, NY: McGraw Hill, 2006, p. 125.

[34] Kotler and Keller 2012, p. 166. The "choice processes may unfold in different ways, depending on the knowledge structures present," specifically, the amount of experience and existing knowledge a customer has as well as the types of information present at each stage of the choice. Bettman, J.R. and C.W. Park, "Effects of Prior Knowledge and Experience and Phase of the Choice Process on Consumer Decision Processes: A Protocol Analysis," *Journal of Consumer Research*, Vol. 7, No. 3, December 1980, pp. 234-248, p. 234.

*Confidential*

**Figure 1**
**Five-Stage Model of the Consumer Buying Process[35]**



21. The decision process related to the issues in this case includes some or all of the following steps, although which steps are followed and how they are followed will vary from customer to customer:

    a.  Learning about the at-issue overdraft services prior to or at the time of opening an account and making the decision to opt in (problem recognition / information search / purchase decision);

    b.  Receiving and processing relevant communication after opening an account prior to taking advantage of overdraft services (information search / evaluation of alternatives);

    c.  Choosing to use overdraft services (purchase decision);

    d.  Seeking, receiving, and processing information after using overdraft services (information search / post-purchase behavior);

    e.  Choosing to continue using overdraft services, discontinue use, or opt out of overdraft services or close the account (post-purchase behavior).

22. As I will discuss in Section VII below, proposed class members' experiences at each node of this path are highly individualized.

---

[35]   Kotler and Keller 2012, p. 166.

### B.  Methodology

23. In addressing my assignment, I applied this five stage framework to understand the proposed class members' understandings, perceptions, expectations, and behavior associated with overdraft services and fees. To evaluate each stage in the framework, I conducted a survey, reviewed additional relevant market research conducted in the normal course of business, and examined the observable variation in proposed class member experiences through the evidence produced in this case. Such analyses allowed me to assess both whether liability or damages could be determined on a class-wide basis and whether Sandra Bond's experiences with Berkshire Bank and its overdraft services are typical of the experiences of other proposed class members. Such research is also relevant to determining whether Dr. David's methodology can be reliably used to address the damages claimed in this matter.

## IV.  Survey of Debit Card Users

24. As part of my assignment, I was asked to evaluate the extent to which the perceptions, understandings, expectations, and behavior of actual and prospective Berkshire Bank customers can be evaluated on a class-wide basis and whether Sandra Bond is representative of the proposed class members. Market research and survey data are highly informative of such issues, in particular, when used in conjunction with secondary data on the proposed class members' banking histories. Thus, in addition to evaluating research conducted by others in the normal course of business, I conducted a double-blind on-line survey of recent debit card users who reside in the six states in which Berkshire Banks operates, a sample representative of the actual and potential users of Berkshire Bank overdraft services. My survey examined respondents' understandings of their account balances, expectations about authorization to overdraw an account, expectations regarding associated fees, and preferences regarding proceeding with such transactions. Additionally, I assessed respondents' actual behavior with respect to their existing debit cards and checking accounts.

25. A critical step in designing a survey is defining the relevant target population (individuals a researcher is interested in studying) because responses of members of the relevant population may be systematically different from responses of nonmembers.[36] Given that debit card holders are those who decide whether or not to opt into overdraft services associated with Reg. E and are potential "purchasers" of the at-issue services and would be subject to the alleged issues, the target population

---

[36] Diamond, S.S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359-423 ("Diamond 2011"), p. 377. *See also*, Barber, W.G., "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. S.S. Diamond and J.B. Swann, American Bar Association, 2012, pp. 27-49 ("Barber 2012"), pp. 27-28.

in my study includes people who live in the United States, are at least 18 years old, have used a debit card in the past twelve months, and reside in a state where Berkshire Bank operates.[37,38]

26. In implementing my survey, I followed the design guidelines for a reliable survey design as outlined in the *Reference Manual on Scientific Evidence*.[39] Throughout my survey, I minimize the possibility of noise and bias affecting the survey results by presenting clear questions and answer choices, asking balanced questions, and rotating answer options, among other best practices.[40] A complete description of my survey and the associated materials is provided as Appendix D.[41]

27. To evaluate consumer perceptions and understandings with respect to the allegations and expectations as to transactions and fees, I provided respondents with one of two versions of Berkshire Bank's Reg.

---

[37] As discussed above in Section I.B.a above, Berkshire Bank has branches in Massachusetts, New York, Connecticut, Vermont, New Jersey and Pennsylvania. Respondents who did not indicate one of these states in response to question S4 ("What state do you live in?") were excluded from the survey.

[38] To ensure representativeness of the sample, I also implemented survey start quotas, so that all respondents who were qualified to take the survey based on the preliminary questions about age, gender, and employment (i.e., those respondents who were asked question S6 "In the past 12 months, which of the following, if any, have you used?") were matched on age and gender distribution, according to the U.S. census, to the six states where Berkshire Bank operates.

[39] *See* Diamond 2011.

[40] Jacoby, J., "Are Closed-Ended Questions Leading Questions?" in *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. S.S. Diamond and J.B. Swann, American Bar Association, 2012, pp. 261-284, ("Jacoby 2012"), pp. 274-275.

[41] The survey was administered on-line. The survey panel was provided by SSI and was fielded from January 29 through February 1, 2018. Respondents who were pretested were excluded from taking the survey. Potential respondents were invited to participate through two standard channels used by SSI to recruit survey respondents – their SSI accounts and affiliate partners. SSI has more than 17+ million qualified market research panel participants in over 90+ countries and works to "ensure [their panelists] are properly incentivized, engaged in honest practices." Survey Sampling International, "Survey Panels and Respondent Experience," https://www.surveysampling.com/knowledge-center/panels-respondent-experience/, accessed January 22, 2018; Survey Sampling International, "Consumer Online Panel," https://www.surveysampling.com/audiences/consumer-online/, accessed January 22, 2018. Panel members were provided customary SSI incentive structures, equivalent to approximately between $0.20 and $2 per respondent, depending on their specific recruitment method and demographic group.

*Confidential*

E Opt-In Form (2010[42] and 2015[43]) and asked a series of open and closed-ended questions.[44] These questions examined respondents' understandings of available balance, overdraft services, and overdraft fees.

28. Specifically, I presented respondents with the following hypothetical scenario: "Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store." I then asked respondents the open-ended question: "When you leave the store, how much money is in your account?" (Q1).

29. In the next question, I asked respondents to further imagine that after making the $80 purchase at the grocery store, "you consider withdrawing $40 from the ATM using the same debit card." I then ask "Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank?" (Q2). If a respondent indicated that the $40 withdrawal would be allowed I then asked him or her: "Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?" (Q3) and then "Thinking again about the same scenario, given the $80 transaction that occurred that day, would you or would you not try to withdraw the $40?" (Q4).

30. The results of my survey demonstrate varied understandings and expected actions among debit card customers regardless of which Berkshire Bank form was presented to them (2010 or 2015 Reg. E Opt-In Form). Further, I find that there is little to no difference in the array of understandings and

---

[42] This form does not explicitly reference the term "available balance" or the effect of debit card authorizations on available balance. The form states: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." Berkshire Bank, "New Overdraft Rules for Debit and ATM Cards," (BB0000097); according to Kristen Ricker, this form was used in 2010. Ricker Declaration, ¶56.

[43] Berkshire Bank, "Overdraft Rules for Debit and ATM Cards," March 12, 2015 (BB0000104). This form explicitly defines the term "available balance" and the effect of debit card authorizations on customers' available balance for purposes of assessing overdraft fees. The form states "If we are presented with an item drawn against your account, we will pay the item based on your available balance. The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft. Debit card preauthorizations can reduce your account's available balance, which can result in overdraft fees if additional items are presented for payment." The complaint and Dr. David acknowledge that Berkshire Bank discussed available balance in its disclosures starting in 2015. Complaint, ¶16; David Report ¶¶25, 37; David Deposition, p. 228:13-24. I understand from counsel that Berkshire Bank maintains that its use of the available balance in assessing overdraft fees was disclosed in a variety of ways before 2015. For ease of administration, my survey used only the two Reg. E Opt-In Forms, and was not designed to address consumer perceptions based on the numerous other communications the Bank provided its customers concerning the Bank's overdraft services.

[44] Open-ended questions require a respondent to give an answer in their own words while close-ended questions require respondents to select an answer from an explicit set of responses. Diamond 2011, pp. 391-392.

expected actions between respondents who viewed the 2010 Reg. E Opt-In Form and those who viewed the 2015 Reg. E Opt-In Form. Such results indicate that explicitly defining the term "available balance" and the effect of debit card authorizations on available balance when describing overdraft services at account opening does not impact customer understandings and expected behavior. Specifically, I find that, after having reviewed one of the Reg. E forms, respondents offer a variety of expected outcomes and behaviors for the attempted withdrawal of $40.[45]

    a.  85% of respondents in the 2010 group and 85% of respondents in the 2015 group believed that they would have $20 in their account after making an $80 purchase at the grocery store while other respondents indicated a variety of other amounts.

    b.  51% of respondents in the 2010 group and 57% of respondents in the 2015 group believed that the subsequent $40 transaction would have gone through while 46% and 39% respectively thought that the transaction would be declined.

    c.  Of respondents who believed that the transaction would be allowed, 81% in the 2010 group and 83% in the 2015 group thought that an overdraft fee would be levied while 18% in the 2010 group and 17% in the 2015 group did not think an overdraft fee would be levied.[46]

    d.  Of respondents who believed that the transaction would be allowed, some indicated that they would proceed with the $40 transaction (14% in the 2010 group and 16% in the 2015 group), while some indicated they would not proceed with the $40 transaction (83% in the 2010 group and 80% in the 2015 group).

31. Following the questions associated with the hypothetical scenario, I asked respondents a series of questions related to their Reg. E opt-in status, reasons for opting in, recent overdraft experience, and how recently they monitored their checking account balance and the tools they used to do so.[47] I found extensive variation in responses to my questions assessing actual experiences and behaviors associated with respondents' checking accounts and overdraft services. These responses show variation in experiences and behaviors associated with opting into overdraft services for ATM withdrawals and non-recurring debit card transactions as well as reasons for doing so. The results also highlight differences in the rate at which respondents availed themselves of overdraft services in the

---

[45]  Exhibit D.2A.

[46]  Based on the answers to question Q3 ("Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?").

[47]  I also asked respondents about recent survey experience relating to overdraft fee disclosures and any awareness of any lawsuits related to overdraft fee disclosures in order to further ensure that the respondents who inform my results are not biased by recent survey exposure or relevant litigation awareness.

*Confidential*

past 12 months and their awareness of having done so, and how recently and through which channel they checked their balance. In particular:

    a.  Respondents opted into (or remained opted into) overdraft services for ATM withdrawals and non-recurring debit card transactions for a variety of reasons, such as to use the services only in case of an important payment (13% in the 2010 group and 8% in the 2015 group), because of a bank employee or bank website recommendation (6% in the 2010 group and 4% in the 2015 group), to cover transactions on a regular basis (3% in the 2010 group and 3% in the 2015 group), or by accident (3% in the 2010 group and 2% in the 2015 group).[48]

    b.  Respondents reported monitoring their account balance through on-line banking (68% in the 2010 group and 71% in the 2015 group), mobile banking (33% in the 2010 group and 29% in the 2015 group), information from an ATM (16% in the 2010 group and 13% in the 2015 group), monthly statements in the mail (15% in the 2010 group and 12% in the 2015 group), and calling the bank (13% in the 2010 group and 11% in the 2015 group).[49]

32. Additionally, I evaluated the results of this survey in the context of research conducted by Berkshire Bank and other industry participants in the normal course of business. I considered the findings of an on-going telephone survey of frequent overdrafters (defined as Berkshire Bank customers who incurred 30 or more overdraft or NSF fees in the previous 12 months) conducted by Berkshire Bank Call Center employees as part of an overdraft education program. In particular, I reviewed data collected between February and March 2016.[50] This survey asked three questions relevant to understanding Berkshire Bank customers' expectations regarding the use of overdraft services, reasons for using overdraft services, and account management habits.[51] The results, which I discuss in more detail below, highlight variation in understandings, expectations, objectives, and behaviors. I also examined an on-line study of banking customers conducted by Novantas in 2014 which asked eleven key questions on overdraft behaviors and preferences, including use of overdraft services, opting into overdraft services for ATM and everyday debit card transactions, managing accounts, and receiving and/or seeking information related to accounts.[52]

---

[48] Exhibit D.4A.

[49] Other methods included inquiring at a bank branch, low balance alerts (e.g., email or text message alerts), and balancing a checkbook. Exhibit D.6A.

[50] Ricker Declaration, ¶42.

[51] Ricker Declaration, ¶42 and Exhibit 25, Berkshire Bank, "OD Education Survey Summary," (BB-EM-0033807).

[52] Novantas, "Understanding Consumer Choice: A Review of Consumer Overdraft Behaviors," October 2015. The Novantas study is based on an on-line survey of 1,724 consumers in the United States in December 2014.

*Confidential*

33. The results of my survey and these studies conducted by Berkshire Bank and Novantas highlight considerable variation in consumers' preferences, expectations, objectives, and behavior with respect to using overdraft services and monitoring their checking accounts. Such findings are hardly surprising given the array of behaviors and outcomes observed in the account data produced in this matter. As I discuss in more detail below, the results of my survey and those conducted in the normal course of business emphasize the need for individualized inquiry to assess the allegations in this matter. The studies also demonstrate that Sandra Bond is not representative of the proposed class.

## V.   Sandra Bond Is Not a Typical Representative of the Proposed Class

34. According to the complaint, the Plaintiff "asserts claims that are typical of the members of the Class, all of whom were customers of Defendants that were improperly assessed and/or charged one or more overdraft fees due to Defendants' unfair overdraft fee practices and policies."[53] However, in examining the available information about the Plaintiff, it appears that Sandra Bond differs in important ways from most of the proposed class. These variations between Ms. Bond and other proposed class members include, without limitation, the circumstances of Sandra Bond's account opening and Courtesy Pay opt-in, the number of overdraft fees she incurred, the type and volume of disclosures and other information she was provided, and her use and understanding of the Courtesy Pay service. In addition, Sandra Bond's personal practices of throwing away all information the Bank mailed to her and not tracking her account balance (for most of the class period) or otherwise monitoring her account differs from the practices of other proposed class members. In fact, even a simple comparison of Sandra Bond and her husband, with whom she shares a joint bank account at Berkshire Bank and who is also a member of the proposed class, demonstrates that Sandra Bond cannot stand as the sole representative for the proposed class. As a result, it is not appropriate to summarize her experiences and understandings of the disclosures and overdraft practices and to extrapolate them to every member of the proposed class.

35. First, Sandra Bond's account opening and overdraft opt-in experiences are not representative of all class members. Ms. Bond opened her account at Woronoco Savings Bank in 2002,[54] and thus was subject to account opening procedures and disclosures different from those used with customers who

---

[53]   Complaint, ¶32. However such claims may not be reflective of the entire proposed class. The results of a survey conducted by Novantas found that: "Many of the proposed prescriptive controls would run counter to consumer choice revealed in the survey research, and would likely reduce the availability of overdraft options for consumers who want and rely on them most, causing many to turn increasingly to less regulated alternatives." Novantas, "Understanding Consumer Choice: A Review of Consumer Overdraft Behaviors," October 2015, p. 6.

[54]   Ricker Declaration, ¶69; Woronoco Savings Bank, August 2, 2002 (BB-BOND-0000573). *See also*, Sandra Bond Deposition, pp. 85:14-86:2.

initially opened their accounts at Berkshire Bank. For example, Ms. Bond's experience varies from those customers who opened their accounts at a Berkshire branch after May 2010 and had a Berkshire Bank customer service representative verbally explain the Bank's overdraft services and options to them and answer any questions they asked during the account opening process.[55]

36.   Sandra Bond's Courtesy Pay opt-in experience is also unique and not representative of the class. Ms. Bond does not recall "physically opting in," reading the relevant disclosures, or receiving a confirmation notice confirming her opt-in.[56] Nevertheless, she testified that she does not dispute the Bank's records indicating that she opted in through the bank's website in June 2010.[57] The circumstances of Ms. Bond's opt-in differ from many other customers who opted in through different channels (branch, telephone) and had personal conversations with Bank employees about the Bank's overdraft services,[58] as well as those customers who opted in on-line and recall reading and understanding the relevant disclosures. In contrast to Ms. Bond's experience, my survey found that 62-63% of recent overdrafters recall opting into overdraft services for "ATM withdrawals and non-recurring debit card transactions" and 30% recall not opting into such services (92%-93% recall either opting in or not opting in, see Exhibit D.4B).[59] Sandra Bond also differs from those within the proposed class who are enrolled in Courtesy Pay but have not opted into overdraft services for ATM and everyday debit card transactions (only 38-45% of accounts with at least one overdraft or NSF fee in a given 12 month period are opted into overdraft services for ATM and everyday debit card transactions).[60]

---

[55]   As discussed in Section VI below such discussions were not scripted and customers varied in their understanding of the explanations involved.

[56]   Sandra Bond Deposition, pp. 195:10-23, 197:7-201:2.

[57]   Sandra Bond Deposition, pp. 196:19-197:1.

[58]   Declaration of Catherine Masterson, February 20, 2018 ("Masterson Declaration"), ¶4; Declaration of Samantha Tanner, February 16, 2018, ("Tanner Declaration"), ¶18.

[59]   A 2013 PEW study found that 41% of overdrafters did recall opting into overdraft services. The PEW Charitable Trusts, "Overdrawn, Persistent Confusion and Concern about Bank Overdraft Practices," June 2014, p. 5. That said, academic literature supports the notion that recall becomes less accurate as the time since the event increases and, in particular, that it is more difficult to recall minor purchases and events that can be confused with other similar incidents. Tourangeau, R., L.J. Rips, and K. Rasinski, "The Role of Memory in Survey Responding," *The Psychology of Survey Response*, 10th edition, New York, NY, Cambridge University Press, 2009, Chapter 3, pp. 82-85. *See also*, Neter, J. and J. Waksberg, "A Study of Response Errors in Expenditure Data from Household Interviews," *Journal of the American Statistical Association*, Vol. 59, No. 305, 1964, pp. 18-55, at 18; Bradburn, N.M., L.J. Rips, and S.K. Shevell, "Answering Autobiographical Questions: The Impact of Memory and Inference on Surveys," *Science*, Vol. 236, No. 4798, 1987, pp. 208-216, at p. 209.

[60]   Berkshire Bank, "Overdraft Monitoring Reports," November 8, 2016 (BB-ED-0000542-556 at 542-548), October 27, 2016 (BB-EM-0059629-643 at 629-635), September 2, 2016 (BB-EM-0034225-239 at 225-231), March 4, 2016 (BB-EM-0060425-440 at 425-431), August 17, 2015 (BB-EM-0061311-322 at 311-317), July 2, 2015 (BB-EM-0060659-670 at 659-665), and April 8, 2015 (BB-EM-0077983-994 at 983-989). The same

37. Second, the number of times Sandra Bond used the Bank's Courtesy Pay services and incurred overdraft fees is much higher than that of the vast majority of other proposed class members. Sandra Bond incurred 250 overdraft fees between July 2010 and March 2017, totaling approximately $8,168 in fees,[61] with up to 85 fees in just one year, 2013 (see Exhibits 1 and 2). In contrast, only ▮% of the ▮▮▮ relevant accounts incurred as many or more overdraft fees than Sandra Bond between July 2010 and March 2017 (see Exhibit 1).[62] The mean and median number of fees incurred is ▮ and ▮, respectively, with ▮% incurring 25 or fewer fees (see Exhibit 1).

38. Sandra Bond's frequent reliance on Berkshire Bank's overdraft services also distinguishes her from the proposed class she purports to represent with respect to the nature and extent of communications she would have received from the bank. In particular, as discussed in more detail in Section V.D.a below, many communications were triggered by the frequency and number of overdraft and NSF fees a customer incurred. For example, certain overdraft mailings were sent (or information within monthly account statements was included) after a customer incurred six or more overdraft or NSF fees in a 12 month period (Berkshire Bank mailed Sandra Bond at least eight such overdraft education letters as well as more than 30 statement messages).[63]

39. In contrast *at least* ▮% of Berkshire accounts with one or more overdraft or NSF fees between July 2010 and March 2017 would not have received an overdraft education letter, as they incurred five or fewer overdraft or NSF fees during this entire period of 81 months (see Exhibit 3). In fact, that percentage is likely higher, as ▮▮▮% of such accounts had five or fewer fees in any calendar year between 2011 and 2016 (see Exhibit 4).

40. Similarly, while Sandra Bond incurred overdraft or NSF fees on 200 days between July 2010 and March 2017, only ▮% of Berkshire accounts with one or more overdraft or NSF fees during that period incurred fees on 150 or more days and ▮% of such accounts incurred fees on 25 or fewer days (with mean and median 11 and 3 days respectively, see Exhibit 5). These statistics highlight how Sandra Bond further differed from the rest of the proposed class in terms of relevant communications

---

reports indicate that of *all* Berkshire Bank consumer checking accounts ▮▮▮% had overdraft activity within the 12 months leading to each report and ▮▮▮% were opted into Courtesy Pay for non-recurring debit card and ATM transactions at the time of the report.

[61] Kwon Report, Appendix C-1 "Fees by Year"; Between September 2007 and December 31, 2017, Sandra Bond incurred 329 overdraft/NSF fees on 231 separate days, totaling $10,664, including 17 overdraft fees incurred on 15 separate days, totaling $595, *after* Sandra Bond filed her complaint in this case on March 21, 2016. Ricker Declaration ¶¶73 and footnote 15.

[62] Here and elsewhere, amounts may slightly differ from those that can be inferred from the exhibits due to rounding.

[63] Ricker Declaration, ¶¶41-42, 74-76.

she received because, at certain points during the relevant period, Berkshire Bank mailed customers a notice on each day that they incurred an overdraft or NSF fee.[64]

41. Third, Sandra Bond's behavior differs substantially from that of many other proposed class members, as she has never contacted Berkshire Bank to inquire about her overdraft fees.[65] In contrast, after seeing mailed communications from Berkshire Bank in June 2015 (which were overdraft notices), Sandra Bond's husband, Dylan Bond, opened all of them and immediately went to the bank branch to inquire about the overdrafts.[66] Berkshire Bank customers who experience overdraft fees frequently speak with Bank employees about overdraft fees.[67] In fact, of the ▮▮▮▮ Berkshire Bank accounts that incurred at least one overdraft or NSF fee between July 2010 and March 2017, ▮% subsequently obtained a refund.[68] According to Berkshire Bank's records, Ms. Bond never requested a refund of any overdraft fees.[69]

42. As discussed in more detail in Sections VI.D.a below, obtaining a refund generally involves the customer speaking with a branch or Call Center representative. Before providing a refund, representatives are instructed to educate customers about the Bank's practices, the reasons for the individual customer's overdraft, and how to avoid future fees. These educational conversations are unscripted and vary by individual customer and bank employee.[70]

43. Deposition testimony highlights other critical differences between customers' banking practices, even within the same household (i.e., between Sandra Bond and Dylan Bond). While Sandra Bond consistently threw away mailed communications from Berkshire Bank without opening them including monthly statements and overdraft notices,[71] her husband would open the statements he received for his separate account with a different bank and give them to his accountant.[72]  Further,

---

64  Ricker Declaration, ¶¶34-51.

65  Ricker Declaration, ¶82; Sandra Bond Deposition, p. 139:11-14; Declaration of Susan Gagne, February 21, 2018, ("Gagne Declaration"), ¶32.

66  Deposition of Dylan Bond, September 26, 2017 ("Dylan Bond Deposition"), p. 47:24-48:15. "The only record of [Sandra] Bond contacting the Bank is of her calling the Call Center on September 23, 2014 to change her phone number." Ricker Declaration, ¶82.

67  Masterson Declaration, ¶4; Tanner Declaration, ¶22.

68  Kwon Report, Appendix D-5 "Refund Statistics."

69  Ricker Declaration, ¶82.

70  Ricker Declaration, ¶49; Masterson Declaration, ¶¶5-6. *See also*, Tanner Declaration, ¶¶26-29.

71  Sandra Bond Deposition, pp. 27:24-28:9, 136:5-8.

72  Dylan Bond Deposition, pp. 28:18-29:9. Mr. Bond was describing his practices with respect to an account he held at a different bank. He testified that, before 2015, he had not looked at account statements from the Bonds'


charged a "handful" of overdraft fees totaling "a couple hundred dollars maybe."[84] In contrast, as discussed in Section VI.C below, my survey, as well as surveys conducted by Novantas and Berkshire Bank, found that many consumers *intentionally* overdraw their accounts and knowingly incur a fee, often for emergency purchases or convenience. Indeed, my survey found that of customers who have been charged an overdraft fee in the last 12 months, 51%-57% knew that at least some of the times they were charged a fee they did not have enough money in their account, and 22%-30% responded that *every time* they were charged a fee, they knew they did not have enough money to cover their purchase (see Exhibit D.5B).

45. Fourth, Sandra Bond's continued use of overdraft services, despite accumulating overdraft fees for several years, distinguishes her from infrequent overdrafters, including those who incurred an overdraft fee only once. According to the previously cited 2013 PEW study, 19% of overdrafters discontinued overdraft services and 28% of overdrafters closed their checking accounts in response to overdraft fees (34% reported doing so in a similar 2012 study).[85] In contrast, Sandra Bond's account remains open and enrolled in Courtesy Pay services for ATM and everyday debit card transactions.[86] Sandra Bond also did not avail herself of other options to access additional funds, such as linking her account to a savings account or line of credit,[87] like some of the other account holders.[88]

46. Further, the circumstances concerning Sandra Bond's continued opt-in are unique, and demonstrate why her experience cannot be extrapolated to the proposed class. When Dylan Bond visited his local branch in June 2015 to inquire about overdraft fees charged to his and his wife's account, he was presented with the option to opt out of Courtesy Pay by a Berkshire Bank branch representative, but

---

[84]   Sandra Bond Deposition, pp. 34:23-35:10.

[85]   The PEW Charitable Trusts*, "*Overdrawn, Persistent Confusion and Concern about Bank Overdraft Practices," June 2014, pp. 10 and 14.

[86]   Ricker Declaration, ¶83.

[87]   Ricker Declaration, ¶¶80, 81; Gagne Declaration, ¶ 35.

[88]   "As of January 2018, Berkshire Bank customers had enrolled ▮▮▮ consumer checking accounts in the Bank's automatic transfer service, while another ▮▮▮ consumer checking accounts had been enrolled in the Reddi-Cash protection service." Ricker Declaration, footnote 3.

chose not to.[89] Dylan Bond did not inform his wife of the option to opt out of overdraft services[90] and Sandra Bond continued to utilize the service.[91] Sandra Bond testified that she did not learn about the option to opt out until her deposition, and when asked whether she wanted to opt out of overdraft services at that time, she responded "I don't know."[92]

47. Fifth, Sandra Bond likely differs from many proposed class members on what she is able to recall. In her deposition testimony, Sandra Bond failed to recall important details regarding her banking decisions and experiences. In addition to not recalling opting in to Courtesy Pay for ATM and everyday debit card transactions, Sandra Bond did not recall seeing or reading several relevant disclosures or other banking documents. For example, she testified that she did not recall seeing the Courtesy Pay disclosure,[93] the Account Terms and Conditions,[94] the Reg. E Opt-In Form,[95] a document notifying her of the conversion of her checking account from Woronoco Savings Bank to Berkshire Bank,[96] a letter from Berkshire Bank notifying Sandra and Dylan Bond about recent overdrafts,[97] or a Berkshire Bank document sent to existing customers in 2010 explaining the regulatory change requiring customers to opt in if they wanted to receive overdraft services for ATM

---

[89]   Dylan Bond Deposition, pp. 95:3-97:4; Gagne Declaration, ¶ 36. Catherine Masterson states that during conversations with existing customers about Berkshire's overdraft services, "when a customer appears to be misusing the Courtesy Pay service, [she] may tell the customer that Courtesy Pay is not a good option for him or her." Masterson Declaration, ¶8. Furthermore, if contacted by a Berkshire customer, Call Center representatives will "inform the customer that he or she can opt out of Courtesy Pay at any time" and will "generally disclose alternative overdraft protection options such as a linked savings account or Reddi-Cash, and explain that these alternatives may be less expensive than Courtesy Pay." Masterson Declaration, ¶14. *See also*, Tanner Declaration, ¶27.

[90]   Dylan Bond Deposition, pp. 98:14-99:3; Sandra Bond Deposition, p. 203:5-12.

[91]   Since the date of Mr. Bond's visit to the Berkshire branch in June 2015, Sandra Bond has incurred 20 additional overdraft fees on 18 separate days, totaling $700.  See Ricker Declaration footnote 17.

[92]   Sandra Bond Deposition, pp. 203:13-204:1. Note that according to Catherine Masterson, Assistant Manager of the Berkshire Bank Call Center, "[s]ometimes, after being educated (or re-educated) about Courtesy Pay and the Bank's overdraft practices, customers will opt out of Courtesy Pay for ATM and one-time debit card transactions. Many, however, choose to remain opted in. Even repeat callers, who have incurred several overdraft fees and requested overdraft fee refunds on several occasions, often elect to keep Courtesy Pay." Masterson Declaration, ¶13.

[93]   Sandra Bond Deposition, p. 98:6-8.

[94]   Sandra Bond Deposition, p. 207:8-19.

[95]   Sandra Bond Deposition, pp. 212:10-213:8.

[96]   Sandra Bond Deposition, pp. 89:21-92:10.

[97]   Sandra Bond Deposition, pp. 142:6-144:14.

*Confidential*

and everyday debit card transactions.[98] Her lack of recall is not surprising since Sandra Bond does not recall "ever opening anything that Berkshire Bank sent" her, let alone any specific documents.[99]

48. Finally, while Sandra Bond may have utilized overdraft services in a manner similar to some small share of account holders, there is reason to believe that she is not typical even among those account holders. Research has found that typical users of overdraft services tend to have poor credit and lack ready access to less-expensive credit products such as credit cards.[100] Sandra Bond has had access to credit cards since at least 2010, including credit cards for Target, T.J. Maxx, Amazon, Macy's, Old Navy, Gap, and J. Crew, yet continually accessed overdraft services with her Berkshire Bank debit card.[101] Meanwhile, the 2013 PEW study found that consumers who have a credit card are 34% less likely to pay an overdraft fee.[102]

49. Based on the above examination of the record and evidence from market studies, I conclude that Sandra Bond's experience is not typical of the proposed class, and that it is not appropriate to summarize her experiences and understandings and to extrapolate to every member (or even most members) of the proposed class.

## VI.  Analysis of Consumer Decision Making in the Market for a Checking Account and Debit Card

50. In this section, I discuss the various stages of the consumer decision process related to the at-issue services and fees as outlined in Section III.A above. As discussed below, proposed class members differ substantially in the form, amount, and content of information they received and in how they perceive, understand, and act upon the information available to them. There was no uniform agreement that applied across the class period – instead, there were multiple agreement documents, each of which changed significantly on numerous occasions. There were also numerous individualized written and oral communications between Bank representatives and members of the proposed class. The combination of these factors created widely varying experiences. Exhibit 6 summarizes various communications from Berkshire Bank to proposed class members that were either available to the proposed class members or were explicitly provided to them before and at

---

[98]   Sandra Bond Deposition, pp. 193:9-196:18.

[99]   Sandra Bond Deposition, pp. 27:24-28:9.

[100]   Clarke, R.L. and T.J. Zywicki, "Payday Lending, Bank Overdraft Protection, and Fair Competition at the Consumer Financial Protection Bureau," *Review of Banking and Financial Law*, 2013-2014, pp. 235-281 at p. 246-247.

[101]   Sandra Bond Deposition, pp. 45:19-46:2. At least the T.J. Maxx and Amazon credit cards were general purpose credit cards that could be used with any merchant, and it was Sandra Bond's practice to use those cards at merchants other than T.J. Maxx and Amazon (p. 47:14:22).

[102]   The PEW Charitable Trusts*,* "Overdrawn, Persistent Confusion and Concern about Bank Overdraft Practices," June 2014, p. 3.

*Confidential*

account opening, and prior to and after overdraft occurrences. Exhibit 7 illustrates the numerous points of diversion among the proposed class members by showing just two examples of the numerous paths a class member could have traversed prior to and during the proposed class period. Given the vast heterogeneity in terms of account agreement documents, communications, attention, understandings, and behaviors, individual inquiry is necessary to determine whether any particular customer understood the Bank's practices and intended to access Courtesy Pay services or whether the customer's understandings and behavior would have differed in a but-for world.

**A.    The Process of Opening an Account and Learning about the At-Issue Services and Fees is Highly Individualized**

51. During the class period, consumers opening an account have been provided different information and materials. In addition, even when presented with identical information when opening an account, customer understandings and the resulting choices vary by individual. In this section, I first discuss the variety of information received by consumers prior to and at account opening and then discuss the various potential consumer reactions.

*a.    Information Received*

52. Customers' understandings of how Berkshire Bank's overdraft services work and whether and to what extent overdrafts would occur are influenced by both the information the customers access prior to opening an account and documents and additional information from bank employees when opening an account. Because both the materials and information communicated varied, individual customers' understandings and outcomes would vary as well. An individual inquiry would be required to determine any particular customer's understandings, intentions, or preferences and whether any given customer would have made different decisions given different disclosures and communicated information.

53. Indeed, although Berkshire Bank has always disclosed the overdraft practices at issue in this case, the language used within the Bank's disclosures has varied significantly over time.[103] Disclosures received at account opening also differed by channel and by individual customer and bank employee (if the account was opened in a physical branch). In what follows, I discuss some of the information consumers received at account opening over time with particular emphasis on the three disclosures that discuss overdraft services, as well as customer conversations.[104] The three primary documents

---

[103] In this Section VI.A, "disclosures" mainly refer to the various account agreements and forms that provide customers with information concerning the Bank's overdraft services.

[104] A more comprehensive summary of the various types, forms, and channels of information available or provided to Berkshire Bank customers prior to or at account opening is included in Exhibit 6.

*Confidential*

referencing overdraft services that have been provided at account opening to customers during the proposed class period are the Courtesy Pay Disclosure, the Berkshire Bank Account Terms and Conditions, and the Reg. E Opt-In Form.[105]

54. Below I discuss four considerations regarding the information customers received at account opening that highlight the need for individualized inquiry to assess liability and damages in this matter. First, the three key disclosures varied substantially in how available balance and payment order were discussed over time (see Exhibits 8-11).

55. The Courtesy Pay Disclosure has gone through at least nine different versions since the inception of Courtesy Pay and has had at least five distinct definitions of available balance and at least six distinct statements pertaining to payment order of items (in terms of disclosed details):[106]

   a. From October 2006 until May 2014, the Courtesy Pay Disclosure defined overdrafts as negative balance which results from "A) The payment of checks, ATM, POS, and other electronic funds transfers, or other withdrawal requests; B) Payments authorized by you; C) The return, unpaid, of items deposited by you; D) Our Fees/Charges; E) The deposit of items which according to our Funds Availability Policy, are treated as not yet 'available' or finally paid." The same document stated that Berkshire Bank's "policy is to pay items in the order they are received. If they are received at the same time, we pay the smallest items first."[107]

   b. In May 2014, the language pertaining to the payment order of items was removed and additional detail on how an overdraft could occur was added: "Although there are many reasons why your account might become overdrawn, most overdrafts result from the following: a) You write a check, swipe your debit card or initiate an electronic funds transfer in an amount that exceeds the amount of funds available in your account . . . ."[108]

---

[105] Ricker Declaration, ¶32; Berkshire Bank, "Procedure: Overdrafts/Courtesy Pay," October 27, 2012 (BB-ED-0007512-516). Customers who opened an account *prior* to May 2010 were presented only with versions of the first two of these forms at account opening, though they may have received the third one during the implementation of Reg. E changes in 2010. Ricker Declaration, ¶31; Berkshire Bank, "Detailed Branch Flow," April 30, 2010 (BB0000593). Even though these customers opened their accounts prior to the proposed class period, they may belong to the proposed class as defined above.

[106] *See* Exhibits 8-11. I count the absence of explicit language pertaining to payment order as a distinct statement.

[107] Ricker Declaration, ¶¶60-61; Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," October 4, 2006 (BB0000074-075); "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," February 11, 2010 (BB0000076-077); "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," September 10, 2012 (BB0000078-079); Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," June 6, 2013 (BB0000080-081, at 080).

[108] Ricker Declaration, ¶61; Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," May 5, 2014 (BB0000082-083). Other revisions (e.g., pertaining to eligibility for Courtesy Pay and possible number of overdraft fees per day) were made to the Courtesy Pay Disclosure form in September 2012 and June 2013. Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," September 10, 2012

*Confidential*

c.   In October 2014, a new version of payment order language appeared on the form: "When processing items drawn on your account, our policy is to pay them according to the transaction type, and then the dollar amount. We pay POS debit card and teller transactions prior to check and ACH transactions. We pay the smallest items first within each transaction type."[109]

d.   As of March 2015, the form described "available balance" as "the amount of funds you can use for withdrawal from your account without causing an overdraft" and included more information regarding funds that were considered unavailable or subject to a hold. This form also included a section titled "PAYMENT ORDER OF ITEMS" offering more details on posting order, including transaction types. Among other things, the disclosure states: "We pay items in the following order: Non-returnable items are posted by transaction type in the order they are presented (time stamped). Non-returnable items include: ATM and POS debit card transactions, in-person withdrawals and checks cashed at a Berkshire Bank branch, internal transfers to other Berkshire Bank accounts, payments and transfers initiated via Online Banking, returned deposited items, and wire transfers. ACH debits that you have preauthorized then post lowest to highest dollar amount. Finally, checks not presented in-person at a Berkshire Bank branch post lowest to highest dollar amount."[110]

e.   In June 2016, the disclosure language relating to available balance and posting order was again revised.[111]

f.   As of November 2016, the form stated: "Berkshire Bank uses the available balance when we process transactions to your account. The available balance is the amount of funds you can use for withdrawal from your account without creating an overdraft. It includes all cleared and all known pending (not yet cleared) card or other debit transactions and any holds on your balance which could include funds held to comply with court orders or other legal obligations." The disclosure then provides customers with an example of how an overdraft could occur and specifically highlighted that "withdrawal transactions reduce your available balance at the time

---

(BB0000078-079, at 078); Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," June 6, 2013 (BB0000080-081, at 080).

[109]  Ricker Declaration, ¶61; Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," October 2014 (BB0000084-085, at 084).

[110]  Ricker Declaration, ¶¶60-61; Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," March 2015 (BB0000086-088, at 086). This form was distributed to all existing Berkshire Bank customers in July 2015. Deposition of Deborah A. Stephenson, September 7, 2017 ("Stephenson Deposition"), pp. 56:18-57:5.

[111]  Ricker Declaration, ¶¶60-61; Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," June 27, 2016 (BB0000089-091).

*Confidential*

you authorize your purchase" and that "the amount of funds in your account available for other transactions will be reduced by the amount of the authorization hold." As to the posting order, the November 2016 form was revised substantially to provide additional detail. It disclosed that the Bank posts credits first, followed by debits in a specified order by transaction type, and then overdraft fees.[112]

56. The Account Terms and Conditions form has gone through at least eight versions since January 2010 and has had at least three distinct definitions of available balance and at least four distinct statements pertaining to payment order of items:[113]

    a. The version used starting in January 2010 stated that Berkshire Bank "may, at [the bank's] discretion, honor withdrawal requests that overdraw your account. However, the fact that [the bank] may honor withdrawal requests that overdraw the account does not obligate [the bank] to do so later."[114] Additionally, the document indicated that Berkshire Bank would charge a fee associated with overdrafts.[115]

    b. In July 2014, a new section titled "PAYMENT ORDER OF ITEMS" was added. This section mentioned that Berkshire Bank's "policy is to pay items in the order they are received. If they are received at the same time, we pay the smallest items first. More than one overdraft fee may be charged against the account per day."[116]

    c. In June 2015, the form described "available balance" as "the amount of funds you can use for withdrawal from your account without causing an overdraft. Sometimes funds in your account are not available to cover your checks and other items, and it may appear that you have enough funds in your account to cover a debit but still get an overdraft fee on the debit. This can occur when your account balance included funds that were not available at the time we processed the

---

[112] The full description is reproduced in the Ricker Declaration and Exhibit 11. *See* Ricker Declaration, ¶¶60-61; Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," November 29, 2016 (BB0000092-095, at 092-093).

[113] See Exhibits 8-11.

[114] Ricker Declaration, ¶64 and Exhibit 62A.

[115] Ricker Declaration, ¶64 and Exhibit 62A. This document was revised in September 2010, July 2011 and September 2013. Berkshire Bank, "Terms and Conditions of Your Account," Revised September 2010 (BB0000015-020, at 015); Berkshire Bank, "Terms and Conditions of Your Account," Revised July 2011 (BB0000024-029, at 024). The September 2013 version of the Account Terms and Conditions also stated that the customer must opt in in order to receive overdraft services on one-time debit card transactions and ATM withdrawals. Berkshire Bank, "Terms and Conditions of Your Account," Revised September 2013 (BB0000033-039, at 033).

[116] Ricker Declaration, ¶66; Berkshire Bank, "Terms and Conditions of Your Account," Revised July 2014 (BB0000043-049, at 045).

*Confidential*

debit. Funds subject to a hold, dispute or legal process are not available funds."[117] The document was also revised to provide details regarding Berkshire Bank's use of transaction groups in determining the payment order of items.[118]

    d.   In October 2016, additional explanations and examples regarding available balance were introduced including, for example, "[on] debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase… Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold."[119] Further, the updated form offered more detail on payment order by transaction type and the fees associated with overdrafts.[120,121]

57.   In addition to the Courtesy Pay Disclosure and the Account Terms and Conditions, the Reg. E Opt-In Form has been used by Berkshire Bank since the rollout of Reg. E in May 2010. In May 2010, the Reg. E Opt-In Form was drafted based on the model form published in federal regulations and mailed to existing checking account customers who had debit cards.[122] They were instructed to opt in if they wanted to continue using overdraft services for ATM and everyday debit card transactions. They could opt in by mail (by signing and returning the mailed form), by stopping by a Berkshire Bank branch, by calling the Berkshire Bank Call Center, or by submitting the authorization form on-line at

---

[117] Ricker Declaration, ¶65; Berkshire Bank, "Terms and Conditions of Your Account," Revised June 2015 (BB0000053-059, at 053).

[118] The form also mentioned that "[t]he order in which [the customer] make[s] withdrawals from [his or her] account may not be the same as the order in which those transactions are posted." Berkshire Bank, "Terms and Conditions of Your Account," Revised June 2015 (BB0000053-059, at 053, 055); Ricker Declaration, ¶66.

[119] Ricker Declaration, ¶65; Berkshire Bank, "Terms and Conditions of Your Account," Revised October 2016 (BB0001107-114, at 108).

[120] Ricker Declaration, ¶66; Berkshire Bank, "Terms and Conditions of Your Account," Revised October 2016 (BB0001107-114, at 110).

[121] The Terms and Conditions form changed again in April 2017; Berkshire Bank, "Terms and Conditions of Your Account," Revised April 2017 (BB0001099-1106). The April 2017 form was sent to all existing customers. Ricker Declaration, ¶35; Berkshire Bank, "Terms and Conditions of Your Account," April 4, 2017, (BB0001091-098).

[122] Ricker Declaration, ¶¶ 37, 55. *See also* Berkshire Bank, "Executive Summary REG E Changes Overview: What, Who, Which, When and How?" (BB-EM-0051886-890 at 887); Berkshire Bank, "Detailed Branch Flow," April 30, 2010 (BB0000593). In addition to the Reg. E Opt-In Form, existing checking account customers who had debit cards received education materials which explained the regulatory change with their June/July 2010 monthly statement. Furthermore, during summer 2010, a reminder email was sent to customers who had not yet made a Reg. E election and for whom Berkshire Bank had an email address on file. In late summer 2010, Berkshire Bank also conducted a series of outbound, unscripted calls to customers who had not made Reg. E elections. Ricker Declaration, ¶37; Berkshire Bank, "Decision Time! Overdraft Protection," (BB0000719).

*Confidential*

berkshirebank.com.[123] At the same time, starting in May 2010, *new* customers were presented a Reg. E Opt-In Form at account opening and asked if they wanted to opt in.[124]

58. The Reg. E Opt-In Form had at least nine distinct versions with at least two distinct definitions of available balance since its inception.[125]

   a. The May 2010 form included the following language taken verbatim from the Federal Reserve Board's Model Form A-9: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway."[126]

   b. In March 2015, the following language was added to the form: "If we are presented with an item drawn against your account, we will pay the item based on your available balance. The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft.  Debit card preauthorizations can reduce your account's available balance, which can result in overdraft fees if additional items are presented for payment."[127]

59. Second, in addition to written disclosures, numerous individual oral communications would have varied as well. The corporate protocol and requirements for the in-person procedure(s) at account opening have evolved over time and the specific approach taken by even by the same service representative likely differed among customers.

   a. Prior to May 10, 2010 (prior to the use of Reg. E related disclosures), customer service representatives were not instructed or required to talk about overdrafts at the time of account

---

[123] Berkshire Bank, "New Overdraft Rules for Debit and ATM Cards," May 5, 2010 (BB0000096). For existing customers who chose to make their Reg. E election at a branch or through the Call Center, customer service representatives engaged in non-scripted conversations which provided the customer with all the available options. Ricker Declaration, ¶38. Existing Berkshire Bank customers could opt in via a "microsite" available during the initial implementation of Reg. E (May 2010 - early 2011). Ricker Declaration, ¶38; Microsite Reg. E Opt-In Screens, May 6, 2010, (BB0000001-014). From early 2011 through September 2012, customers could not opt into or out of overdraft services on-line. After September 2012, customers enrolled in Berkshire Bank's on-line banking services could make opt-in or opt-out decisions on-line. Ricker Declaration, ¶38.

[124] Berkshire Bank, "New Overdraft Rules for Debit and ATM Cards," May 5, 2010 (BB0000096); Berkshire Bank, "Detailed Branch Flow," April 30, 2010 (BB0000593).

[125] *See* Exhibits 8-11.

[126] Ricker Declaration, ¶55; Berkshire Bank, "New Rules for Debit and ATM Cards," (BB0000097).

[127] Ricker Declaration, ¶57. Berkshire Bank, "Overdraft Rules for Debit and ATM Cards," March 12, 2015 (BB0000104). The Reg. E Opt-In Form changed six more times between May 2010 and March 2015 with respect to ability to opt in on-line, dollar amount of overdraft fees, maximum number of overdraft fees per day, continuous overdraft fees, and the opt out procedure. Berkshire Bank, "New Overdraft Rules for Debit and ATM Cards," August 14, 2010 (BB0000097); Berkshire Bank, "New Overdraft Rules for Debit and ATM Cards," May 11, 2011 (BB0000098); Berkshire Bank, "New Overdraft Rules for Debit and ATM Cards," June 6, 2013 (BB0000099); Berkshire Bank, "Overdraft Rules for Debit and ATM Cards," April 15, 2014 (BB0000102); Berkshire Bank, "Overdraft Rules for Debit and ATM Cards," May 9, 2014 (BB0000103).

*Confidential*

opening.[128] Customers were automatically enrolled into the Courtesy Pay service once their accounts were eligible.[129]

b.  As of May 10, 2010 (after the implementation of Reg. E), a customer service representative walks the customer through Courtesy Pay and the opt-in requirement for overdraft services on ATM and everyday debit card transactions.[130] The main goal of such conversations is to educate the customer.[131] Although representatives are trained to engage in these conversations,[132] these conversations are unscripted ("free-form") and vary based on the individual branch employee and customer ("each conversation is different").[133] If the customer indicates that he or she wants to opt into Courtesy Pay services for ATM and everyday debit card transactions, the customer service representative presents the customer with the Reg. E Opt-In Form.[134] The customer can then opt in. Until 2012, the customer would sign a paper form, and since 2012, customers have been opting in by signing the form electronically.[135]

60.  Third, the channels that could be used to open an account and opt into at-issue services have varied over time. Customers have always been able to opt in at a branch during the account opening process (as described above), and since January 2015, customers can also open an account on-line.[136] Customers opening an account on-line are provided the Courtesy Pay Disclosure, the Account Terms

---

[128]  Ricker Declaration, ¶31.

[129]  Deposition of Kristin Ricker, October 24, 2017 ("Ricker Deposition"), p. 15:11-22; Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," October 4, 2006 (BB0000074-075). *See* Section I.B.a for a discussion of the eligibility requirements associated with Courtesy Pay.

[130]  Ricker Deposition, pp. 28:23-29:5, 208:23:209:3; Ricker Declaration, ¶32. The bank representative is also instructed to discuss other overdraft options such as a linked savings account or line of credit. Ricker Declaration, ¶32. Eligible customers would still be automatically enrolled in Courtesy Pay for check, recurring debit card, and other electronic fund transfers or withdrawals. Ricker Deposition, pp. 15:11-17:14; Berkshire Bank, "Courtesy Pay, A Discretionary Overdraft Service, Disclosure," September 10, 2010 (BB0000078-079).

[131]  Ricker Declaration, ¶32.

[132]  Ricker Declaration, ¶37; Berkshire Bank, "Reg. E Opt-In - Making Good Choices," March 31, 2010 (BB0000655-671).

[133]  Tanner Declaration, ¶9; Ricker Declaration, ¶32. *See also*, Deposition of Theresa Wituszynski, October 25, 2017 ("Wituszynski Deposition"), pp. 38:5-39:1. These conversations can include explanation of the customer's available balance, and that a debit card authorization will reduce the available balance. Tanner Declaration, ¶12.

[134]  Ricker Declaration, ¶32; Ricker Deposition, pp. 28:23-29:7. *See also*, Berkshire Bank, "Procedure: Overdrafts/Courtesy Pay," October 27, 2012 (BB-ED-0007512-516 at 512).

[135]  Ricker Declaration, ¶32. Since 2017, customers opening an account in a physical branch have received a printed-out copy of the Reg. E Opt-In Form at the end of the account opening process.

[136]  Ricker Declaration, ¶30; Ricker Deposition, p. 78:10-15.

*Confidential*

and Conditions, and the Reg. E Opt-In Form during the account opening process.[137] After being provided the Reg. E Opt-In Form, customers are able to authorize the payment of overdrafts on ATM and every day debit card transactions by checking a box on the screen.[138]

61. Fourth, additional variation in proposed class members' experiences at the time of account opening would be particularly pronounced for proposed class members like Sandra Bond whose original account was held by a different bank and was subsequently acquired by Berkshire Bank. Such customers would have received communications and had interactions that were unique to those acquired branches.[139]

    a. For example, Woronoco Savings Bank customers were likely given relevant Woronoco Savings Bank Disclosures at the time of account opening. These disclosures would have reflected the practices of Woronoco Savings Bank and likely differed from the disclosures offered by Berkshire Bank and other banks or branches eventually acquired by Berkshire Bank.

    b. Further, acquired customers were sent "disclosure guides" including the most up-to-date Berkshire Bank disclosures at the time the account was converted to a Berkshire account.[140] These materials varied across the acquired banks and branches. Further, existing and future Berkshire Bank customers would not have been sent such materials.[141]

    c. Additional variation occurred depending on whether the acquisition took place before or after the implementation of Courtesy Pay in 2006 (or earlier) and Reg. E in 2010.[142]

            *b. Information Processing*

62. As the experiences of Sandra and Dylan Bond and academic research suggest, proposed class members would likely respond to even identical disclosures received at account opening in different

---

[137] Ricker Declaration, ¶33. The Courtesy Pay disclosure is also included in the package of materials mailed to customers who open a new account on-line. Ricker Declaration, ¶33.

[138] Ricker Declaration, ¶33; Ricker Deposition, pp. 76:24-87:14.

[139] Between 2005 and 2017 Berkshire Bank acquired Woronoco Savings Bank (2005), Factory Point National Bank (2007), Rome Savings Bank (2011), Legacy Banks (2011), Connecticut Bank & Trust (2012), Beacon Federal (2013), 20 branches of Bank of America (2013), Hampden Bank (2015), Commerce Bank (2017), and First Choice (2017). Ricker Declaration, ¶50.

[140] Ricker Declaration, ¶51.

[141] For example, Sandra Bond was sent the information found in Berkshire Bank, "Conversion Weekend, Account Changes, Access and Information" (BB0000720-735). Other disclosures would have been sent to customers of other acquired banks. Sandra Bond Deposition, Exhibit 16 ("Welcome to Berkshire Bank, a Helpful Guide for Bank of America Customer Transitioning to Berkshire Bank"), p. 5. *See also*, Ricker Declaration, ¶51.

[142] Ricker Declaration, ¶¶ 50, 51. *See also*, Deposition of Ashlee Picard-Flores, June 22, 2017 ("Picard-Flores Deposition"), p. 37:8-11.

manners depending on their characteristics, prior experiences, and resulting preconceptions.[143] As Kristen Ricker, Vice President of Branch and Call Center Operations at Berkshire Bank observes "what one customer may understand [from the disclosures] another may not."[144] Similarly, Samantha Tanner, Assistant Vice President and Branch Officer at Berkshire Bank's North Adams, Massachusetts branch states that after bank representatives show the Reg. E Opt-In Form to customers at account opening and explain Berkshire Bank's overdraft practices, "some customers need more elaboration regarding the Bank's overdraft services, while others already understand overdrafts from prior experience" and that as a result "some customers understand [Berkshire Bank's overdraft services and fees] better than others."[145]

63. The existence of such variation is supported by third-party research. For example, the previously discussed Novantas survey of United States banking customers found that of the banking customers who incurred at least one overdraft in the previous 12 months, 81% found account opening disclosures and processes to be clear, 17% found them to be unclear or wished the banker had spent more time reviewing how the account worked, and 2% "did not care" and "just wanted to get through the paperwork."[146]

64. Ms. Bond's testimony suggests that she falls in the third category. At her deposition, she could not recall any discussions with Woronoco Savings Bank representatives or reading any disclosures at account opening and testified that she "honestly probably didn't really understand anything" and "was just signing [the account agreement stating] that I was opening up a checking account at Woronoco Savings Bank."[147] In contrast to this experience, and as illustrated in Exhibit 7, a customer could research Berkshire Bank on-line prior to opening an account, read some or all forms provided at account opening, and ask clarifying questions to better understand his or her Berkshire Bank account.

65. Ultimately, to determine whether any given proposed class member did not understand Courtesy Pay and whether his or her behaviors would have changed in a but-for world, one needs to examine each

---

[143] Kotler and Keller 2012, p. 162.

[144] Ricker Deposition, p. 33:12-14.

[145] Tanner Declaration, ¶¶8-9, 13. In her declaration, Susan Gagne, Assistant Vice President and Branch Officer at Berkshire Bank's East Longmeadow, Massachusetts branch also states that "[e]ven after I explain the Bank's practices, it is my experience that customers still have varying levels of understanding" and that "[d]epending on the customer, I may try to explain the Bank's policies a second time, in a different way, if they do not seem to understand." Gagne Declaration, ¶14.

[146] Novantas, "Understanding Consumer Choice: A Review of Consumer Overdraft Behaviors," October 2015, p. 19.

[147] Sandra Bond Deposition, p. 88:4-18.

*Confidential*

individual customer experience to know how the information received was interpreted and how it influenced decisions.

**B. Relevant Communication and Information Processing after Opening an Account and Prior to Availing of Overdraft Services Is Highly Individualized**

66. The information and materials pertaining to overdraft services available to proposed class members after opening an account and before their first overdraft varied over time and across customers. Again, even if presented with identical information, customer interpretations, understandings, and the resulting choices would vary by individual.

*a. Available Information*

67. The array of disclosures received by or available to proposed class members after opening their accounts and before experiencing their first overdraft is presented in Exhibit 6.

68. As described in more detail in my Exhibit, after opting into Berkshire Bank's overdraft services, many customers received additional or updated disclosures and information relevant to overdraft services and fees, but the procedures and disclosures varied over time and across customers. For example, customers who opted into overdraft services for ATM and everyday debit card transactions after the implementation of the Reg. E overdraft amendments in 2010 were mailed a "Reg. E Opt-In Confirmation Notice."[148] The confirmation notice included, among other things, information about opting out of the service.[149] All customers with accounts in July 2015 were mailed an updated Courtesy Pay Disclosure and all customers with accounts in April 2017 were sent an updated Account Terms and Conditions. Customers would not normally be mailed periodic updates otherwise.[150]

69. During all relevant times, customers who accessed Berkshire Bank ATMs would be presented with a physical notice at the machine stating "Courtesy Overdraft Protection is available at this ATM. Transactions may be approved that overdraw the account and fees may be incurred."[151]

70. Beyond specific disclosures, potential class members are presented with a history of settled transactions, shown in the order in which they were settled through monthly statements, on-line

---

[148] Ricker Declaration, ¶39. Those opting in on-line via the "microsite" available during the initial implementation of the Reg. E changes (May 2010 - early 2011) had the option to only receive their confirmation notice via email. Ricker Declaration, ¶39; Microsite Reg. E Opt-In Screens, May 6, 2010, (BB0000001-014).

[149] Reg. E Opt-In Confirmation Notices, (BB0001166-167). After the transition to a new operating system from September 2012 until May 2013, Berkshire Bank failed to send confirmation letters after customers had opted in via Reg. E. Berkshire Bank reimbursed all of these customers for overdraft fees incurred during this period and resulted in approximately $⬛⬛⬛ refunded to the affected customers. Ricker Declaration, ¶39.

[150] Ricker Declaration, ¶35; Stephenson Deposition, pp. 56:18-57:5.

[151] Ricker Declaration, ¶45; Berkshire Bank, "ATM Notice," (BB0001033).

*Confidential*

banking, and mobile banking. On-line banking, mobile banking, and Berkshire Bank ATMs also prominently display customers' available balances.[152,153] Additionally, beginning in September 2012, Berkshire Bank displayed the following language on customers' on-line banking balance pages: "available balance is the amount of funds you can use for withdrawal from this account without causing an overdraft" (see Figure 2 below).[154] The webpage listed all debit card holds, demonstrated how the holds reduced the available balance, and displayed transactional details regarding authorized debit card transactions.[155] Proposed class members may or may not have accessed such information and individual inquiry is required to evaluate their exposure to such information (e.g., depending on whether or not they checked their balance on-line, as discussed in the next section[156]).

---

[152] Ricker Declaration, ¶¶44-46; Ricker Deposition, pp. 155:5-156:8; Sandra Bond Deposition, Exhibit 8 (BB0000703) and Ricker Declaration, Exhibit 35 (BB0001170).

[153] As of January 2018, ▮▮▮▮ Berkshire Bank customers were enrolled in on-line banking. ▮% of these customers logged into their account during January 2018 and did so an average of ▮ times during the month. Ricker Declaration, ¶44. As of January 2018, ▮▮▮▮ Berkshire customers were enrolled in mobile banking. Ricker Declaration, ¶46.

[154] Ricker Declaration, ¶44.

[155] Ricker Declaration, ¶44; Ricker Deposition, pp. 98:19-99:2.

[156] My survey found that debit card holders generally and overdrafters specifically vary greatly with respect to how recently and through which channel they checked their account balance. *See* Exhibits D.6A and D.6B.

*Confidential*

**Figure 2**
**Screenshot of Berkshire Bank's On-line Banking Services**
**Shown to Sandra Bond at Deposition[157]**



71. The information available to proposed class members has also not been limited to what is directly provided by Berkshire Bank. While some bank customers rely solely on the paperwork and disclosures provided, others may rely on a bank employee to provide them with an overview of their

---

[157]   Sandra Bond Deposition, Exhibit 8 (BB0000703).

*Confidential*

account or consult third party sources (e.g., friends, family, or internet) during each stage of the customer experience.[158] For example, information about overdraft services was also available on Berkshire Bank webpages, which varied in form and content throughout the proposed class period.[159] Of note, a 2013 Gallup study found that there is a large amount of heterogeneity in the channels of inquiry preferred by retail banking customers at the various stages of their consumer experience.[160] For example:

   a.   When learning about products and services, 37% of retail banking customers preferred to do so in-person at a branch, 10% preferred to do so over the phone, 13% preferred to do so by mail, and 38% preferred to do so on-line.

   b.   When requesting specific account information (e.g., balance inquiry, transaction history, or check images), 30% prefer to do so in-person at a branch, 17% prefer to do so over the phone, and 43% preferred to do so on-line.

   c.   When inquiring about a fee or service charge, 46% prefer to do so in-person, 41% prefer to do so over the phone, and 10% prefer to do so on-line.

*b.   Information Processing*

72.   Even to the extent that proposed class members were exposed to identical information about Berkshire Bank's overdraft services and fees after opening their account, they would likely vary in terms of how and what information they choose to review and how they understand, remember, and use such information. Sandra Bond's deposition testimony highlights that one needs to assess the exposure to, attention to, and understanding of relevant information to evaluate the potential impact on consumer outcomes relevant to the at-issue services and fees. When shown a screenshot of Berkshire Bank's on-line banking services at her deposition (see Figure 2 above), Sandra Bond claimed that (1) she did not remember seeing the sentence at the top of the screen which defined available balance and that (2) rather than looking to the "available balance" displayed in bold on the screen as the amount of money in her account, she would instead refer to the "starting balance"

---

[158] Novantas, "Understanding Consumer Choice: A Review of Consumer Overdraft Behaviors," October 2015, p. 20.

[159] Ricker Declaration, ¶43. For example, the "Courtesy Pay" webpage available in 2016 differed from the one available in 2012 with the 2016 page containing more detailed information. Berkshire Bank, "Courtesy Pay Overdraft Protection Solution," 2012 (BB0001068-069); Berkshire Bank, "Courtesy Pay Overdraft Protection Solution," 2016 (BB0001086-087). Additionally, the disclosures available to customers via on-line banking during a certain timeframe may have varied from the paper disclosures available during the same time period. Ricker Deposition, pp. 27:10-18.

[160] Yu, D. and J.H. Fleming, "How Customers Interact With Their Banks," *Gallup News*, May 7, 2013, available at http://news.gallup.com/businessjournal/162107/customers-interact-banks.aspx, accessed on December 4, 2017.

*Confidential*

displayed in regular font.[161] However, after having read the screen's top-line sentence at deposition, Sandra Bond admitted that had she read the sentence earlier, she "would have understood that Berkshire Bank uses the available balance to assess overdraft fees."[162]

73. The extent to which proposed class members access specific information sources further emphasizes the need to evaluate at the individual level the processing and understanding of available information. According to the Berkshire Bank telephone survey, frequent overdrafters checked their balance via on-line banking (█%), mobile banking (█%), checkbook register (█%), telephone inquiries (█%), ATM inquiry (█%), branch visits (█%), review of bank statements (█%), review of overdraft and NSF notices (█%), and banking alerts (█%).[163] Similarly, my survey found the methods by which potential Berkshire Bank debit card and checking account customers checked their balance also varied from using on-line banking to balancing a checkbook (see Exhibit D.6A).[164]

74. Third-party research and the results of my survey also provide insights into the heterogeneity of how often banking customers check their account balance. According to the previously discussed 2014 Novantas on-line survey of banking consumers, 45%, 38%, and 1% of overdraft events involved consumers who monitor their balance via on-line banking more than ten times a month, fewer than ten times a month but at least one time a month, and not at all respectively.[165] My survey found that debit card holders generally and overdrafters specifically varied greatly with respect to how recently they checked their account balance (from "Today" to within the past 12 months) and which method they used (including e.g., on-line and mobile banking, see Exhibit D.6A and D.6B).

75. Further, even proposed class members who access and are therefore exposed to the same information would likely vary in how much attention they pay and how they understand the information. Academic research underscores the complexity of consumer perception, "the process by which [consumers] select, organize, and interpret information inputs."[166] Consumer information processing

---

[161] Sandra Bond Deposition, pp. 171:5-173:17.

[162] Sandra Bond Deposition, pp. 175:17-176:10. Sandra Bond also recognized at deposition that in the on-line banking screen exemplar, the term "available balance" and associated amount were both shown in bold, while other items (e.g., "starting balance") were not. Sandra Bond Deposition, pp. 173:24-174:6.

[163] Frequent overdrafters are defined as customers who incurred and overdraft or NSF fee more than 30 times in a rolling year. Ricker Declaration, ¶42 and Exhibit 25, Berkshire Bank, "OD Education Survey Summary," (BB-EM-0033807).

[164] My survey is discussed in more detail in Appendix D.

[165] Novantas, "Understanding Consumer Choice: A Review of Consumer Overdraft Behaviors," October 2015, p. 6. The remaining overdraft events involved consumers who did not have access to on-line banking tools to monitor their accounts.

[166] Kotler and Keller 2012, pp. 161-162.

*Confidential*

is highly individualized, with the amount and influence of information varying with a consumer's characteristics.[167] Perception depends not only on the physical stimuli presented and the stimuli's relationship to the surrounding environment, but also on the prior experiences and resulting preconceptions of individual consumers.[168] Consumers exhibit selective attention (the process of screening out stimuli), selective distortion (the tendency to interpret information in a way that fits preconceptions), and selective retention (mostly retaining information that supports one's attitudes and beliefs).[169] As a result, perception varies based on an individual's learning experiences, emotions, and memories, as well as his or her cultural, social, and personal characteristics.[170] Finally, perception will differ based on an individual's level of involvement. For example, less involved or less motivated consumers seek out less information, mostly learn information at random, do very little information processing, and may fail to link messages received to their needs.[171]

76. Individualized inquiry would be necessary to assess the extent to which proposed class members accessed specific information, how they understood that information, and whether and how that information may have influenced their actions. Further, whether their attention to or understanding of the at-issue services and fees and resulting outcomes would have differed in a but-for world would also need to be examined at the individual level.

### C. Customers' Reasons for and Circumstances of an Overdraft Are Highly Individualized

77. Even to the extent proposed class members are exposed to or seek out identical information through identical channels and understand that information identically at the time of processing it, proposed class members likely vary greatly in terms of their reasons for signing up for overdraft services and for using them, including unintentional use. This heterogeneity demonstrates the difficulty of

---

[167] Kotler and Keller 2012, p. 167. "[P]erception is selective. People are not aware of everything that is going on around them." Balcetis, E. and D. Dunning, "See What You Want to See: Motivational Influences on Visual Perception, *Journal of Personality and Social Psychology*, Vol. 91, No. 4, 2006, pp. 612-625, p. 612. *See also*, Solomon, M.R., *Consumer Behavior*, 9th ed., Upper Saddle River, NJ: Pearson, 2011 ("Solomon 2011"), p. 76-77.

[168] Kotler and Keller 2012, p. 162. *See also*, Bar, M., "The Proactive Brain: Using Analogies and Association to Generate Predictions," *TRENDS in Cognitive Science*, Vol. 11, No. 7, 2007, pp. 280-289.

[169] Kotler and Keller 2012, p. 162. Additionally, "perceptual vigilance" and "adaptions" may impact how much a consumer is aware of certain information. "Consumers are likely to be aware of stimuli that relate to their current needs." Similarly, "the process of adaption occurs when consumers no longer pay attention to a stimulus because it is so familiar." Solomon 2011, p. 76.

[170] Kotler and Keller 2012, pp. 151-159, 163-166.

[171] Assael, H., *Consumer Behavior: A Strategic Approach,* Houghton Mifflin Company, 2004, pp. 98, 104-106.

*Confidential*

assessing liability and damages on a class-wide basis and highlights possible conflicts regarding preferred but-for outcomes among proposed class members.

78. According to the previously cited 2014 Novantas study, consumers opt into debit card overdraft coverage for various reasons: to hedge against the possibility of insufficient funds when an important payment is due (59%), because signing up was free but they were not planning on using it (14%), to use it as a form of short-term credit (13%), due to a banker's recommendation (13%), or because they were confused by the opt-in process (1%).[172] Similarly, my survey found substantial heterogeneity with respect to the reasons why recent debit card users generally and overdrafters specifically opted into or kept overdraft services, including, for example, that signing up was free, to cover transactions on a regular basis, because either a bank employee or the bank's website recommended it, just in case they did not have money for an important payment, or by accident (see Exhibit D.4A and D.4B).[173]

79. More generally, proposed class members vary in their level of awareness when using overdraft services, whether used intentionally or not. Those proposed class members who use overdraft services intentionally also vary by the purpose for which they use such services. For example, of ▮ frequent overdrafters (i.e., those who incurred more than 30 overdrafts in a rolling year period) surveyed on the phone by Berkshire Bank as part of its overdraft education program and asked about their awareness of using Courtesy Pay, ▮% knew they were using Courtesy Pay. Of ▮ frequent overdrafters asked about their reasons for using the service in the same survey, ▮% were mostly using the service for emergency and/or convenience (▮% for emergencies, ▮% for convenience, ▮% due to a math/accounting error, and ▮% due to an automatic deduction).[174] My survey also found heterogeneity with respect to whether and how often recent overdrafters knew that they did not have enough money in their account when availing themselves of overdraft services (see Exhibit D.5B).

80. Studies conducted by third parties come to similar conclusions. The 2014 Novantas study found that 66% of overdrafts occurred when banking customers knew they had a low balance (36% wanting the payment to go through regardless and 30% hoping a deposit would clear first), 26% of overdrafts occurred when customers did not accurately monitor the account balance (18% not knowing the account was low and 8% not coordinating with a joint account holder), and 8% of overdrafts occurred due to bank error or another issue.[175] Other reasons for having overdrafts may include forgetting

---

[172] Novantas, "Understanding Consumer Choice: A Review of Consumer Overdraft Behaviors," October 2015, p. 6.

[173] My survey is discussed in more detail in Appendix D.

[174] Ricker Declaration, Exhibit 25, Berkshire Bank, "OD Education Survey Summary," (BB-EM-0033807).

[175] Novantas, "Understanding Consumer Choice: A Review of Consumer Overdraft Behaviors," October 2015, p. 5.

*Confidential*

about a scheduled payment or miscalculating the timing of a bank's transaction processing.[176]
Intentional use of overdraft services also varies in terms of the type of transaction involved, such as
utility or rent payments, purchasing groceries, or purchasing medication, and involves both household
needs (e.g., bill payments and groceries) and smaller discretionary payments.[177] Individual inquiry is
necessary to determine the reasons behind proposed class members' unique overdraft behaviors,
including identification of instances in which the customer intentionally overdrew his or her account
knowing a fee would be charged.

**D.  Relevant Communication and Customer Behavior after an Overdraft Is Highly
Individualized**

81. As with the previous stages of consumer experience (e.g., prior to, at, or after opening an account),
after experiencing an overdraft proposed class members likely had largely varying experiences in the
information and materials they received or had to access to pertaining to overdraft services and fees.
Again, even when presented with identical information, customer understandings and resulting
behavior vary by individual.

*a.  Available Information about Overdrafts and Alternatives to Overdraft Services*

82. Throughout the entirety of the proposed class period, customers have been able to access information
about overdraft services and fees through a variety of channels. Berkshire Bank also affirmatively
reaches out to customers in a variety of ways to inform them of their overdraft activity. This
communication has varied over time, in format, by channel, and by individual overdraft history.

83. First, Berkshire Bank customers receive monthly account statements with information about settled
transactions and overdraft fees.[178] Monthly mailed account statements list individual overdraft fees
and summaries for the relevant month and year-to-date.[179]

---

[176]  CFPB, "Consumer voices on overdraft programs," November 2017, p. 17. The study involved qualitative
interviews of 88 "recent overdrafters" defined as consumers who experienced more than one overdraft or NSF or
payed more than $50 in overdraft or NSF fees in the previous two years. CFPB, "Consumer Voices on Overdraft
Programs," November 2017, p. 8.

[177]  Novantas, "Understanding Consumer Choice: A Review of Consumer Overdraft Behaviors," October 2015, p.
13.

[178]  Here and until the end of this section, unless noted otherwise, I use the term "overdraft fees" to include both
overdraft and NSF fees.

[179]  Ricker Declaration, ¶40. The previously cited 2013 PEW study found that consumers learned about their
overdrafts from various bank communications such as account statement (31%), mailed notice (27%), an email
(13%), a text message (8%), a phone call (6%), an ATM (6%), and a bank teller (6%). The PEW Charitable
Trusts, "Overdrawn, Persistent Confusion and Concern about Bank Overdraft Practices," June 2014, p. 9.

*Confidential*

84. Second, in addition to monthly account statements, Berkshire Bank overdrafters received various other communications, which varied greatly over time and ranged from one-time overdraft notices in the mail to educational phone calls:

   a. Until May 2010, Berkshire Bank would send notices to customers by mail each day they incurred one or more overdraft fees.[180] From 2010 through September 2012, Berkshire Bank would send letters to customers after six or more overdrafts in a rolling 12 month period. These letters included information about alternatives to Courtesy Pay and encouraged customers to visit a branch or contact the Call Center to learn more.[181]

   b. In September 2012, Berkshire Bank began to include a similar notice on a customer's statement (after six overdraft occurrences in a rolling 12 month period) and discontinued the separate mailing.[182]

   c. In July 2013, Berkshire Bank started sending overdraft education letters once a quarter to customers who had 15 or more overdrafts in the year to date.[183] Beginning in spring 2014, these letters were provided after 20 overdraft fees incurred in the year to date.[184]

   d. In November 2013, Berkshire Bank reinstated overdraft notices mailed to customers each day they incurred one or more overdraft fees.[185] These notices included information regarding the amounts associated with any holds as well the transactions that incurred overdraft fees.[186]

---

[180] Ricker Declaration, ¶41. *See*, for example, Berkshire Bank, "Insufficient Funds/Uncollected Funds Notice," December 31, 2009 (BB0000530-531).

[181] Ricker Declaration, ¶ 42. *See*, for example, Bond Excessive Overdraft Notice, August 14, 2012 (BB-BOND-0000570).

[182] Specifically the notice stated: "we want to ensure that you are fully aware & informed of alternatives that are available to you which may save you money on your total overdraft fees. Call us at 800-773-5601 for details." Ricker Declaration, ¶40; *See*, for example, Bond Summary of Account Balance," December 15, 2012 (BB-BOND-0000359-362 at 362). *See also*, Email from Sharon Simmons to David Jourdan, "FW: OD Fees Notice," August 22, 2012 (BB-EM-0041870-871); Berkshire Bank, "Retail Banking, Procedure: Reg. E - Opt In," October 27, 2012 (BB0001011-015 at 011); Email from Sharon Simmons to David Jourdan, "Excessive OD usage monitoring," July 10, 2013 (BB-EM-0039729).

[183] Ricker Declaration, ¶42. *See*, for example, Berkshire Bank, Letter to Dylan and Sandra Bond, January 1, 2016 (BB-BOND-0000572). *See also*, Email from Sharon Simmons to Kristen Ricker and Dawne Cowhey, "Excessive OD Usage Monitoring," January 13, 2014 (BB-EM-0010344).

[184] Ricker Declaration, ¶42.

[185] Ricker Declaration, ¶41.

[186] Ricker Declaration, ¶41; *See*, for example, Berkshire Bank, "Online OD/IF Notice," November 29, 2013 (BB0000524). *See also*, Email from Sharon Simmons to Kristen Ricker and Dawne Cowhey, "Print & Mail OD/NSF/UAF notices," November 27, 2013 (BB0000533).

Beginning April 2014, customers were sent overdraft notices which no longer listed the hold amounts but would still detail the transactions which incurred overdraft fees.[187]

e.  In spring 2014, Berkshire Bank started a formal "Customer Overdraft Education Program" aimed at educating frequent overdrafters about why they were incurring fees as well as the alternative options available to them.[188]

    a)  As part of this program, education letters were sent to customers after they reached 20 overdraft fees in the current calendar year.[189] These letters highlighted the linked savings account and overdraft protection line of credit options available to customers and again invited customers to stop by a branch or call the Berkshire Bank Call Center with any additional questions.[190] Beginning in February 2016, one letter is sent after 6 or more overdraft fees in rolling 12 month period, and another after 20 or more overdraft fees in a rolling 12 month period.[191]

    b)  Additionally, after 50 overdraft fees a customer would receive a phone call during which a Bank employee asked questions regarding the customer's overdrafts and account management.[192] This phone call addressed potential lower fee alternatives such as Reddi-Cash line of credit and linking to another account as well as balance tracking options (e.g. on-line/mobile banking, alerts, ATM inquiry, and telephone banking).[193] Beginning in February 2016, calls are made after 30 overdraft fees in a rolling 12 month period.[194]

---

[187] Ricker Declaration, ¶41. *See*, for example, Berkshire Bank, "Online OD/IF Notice," April 15, 2014 (BB0000522).

[188] Ricker Declaration, ¶42; Berkshire Bank, "Call Center Procedure: Overdraft Education," July 7, 2014 (BB-EM-0032948-949).

[189] Ricker Declaration, ¶42; Berkshire Bank, "Call Center Procedure: Overdraft Education," July 7, 2014 (BB-EM-0032948-949 at 948).

[190] *See*, for example, Berkshire Bank, Educational Letter, January 29, 2016 (BB-BOND-0000572).

[191] Ricker Declaration, ¶42.

[192] Ricker Declaration, ¶42; Masterson Declaration, ¶18; Berkshire Bank, "Call Center Procedure: Overdraft Education," July 7, 2014 (BB-EM-0032948-949). *See also*, Email from Colleen Casucci to Kristen Ricker, "OD Education Survey Questions.xlsx," January 28, 2015 (BB-EM-0035983-984 at 984) for the Overdraft Education Survey Questions.

[193] Ricker Declaration, ¶42; *See also,* Email from Colleen Casucci to Kristen Ricker, "OD Education Survey Questions.xlsx," January 28, 2015 (BB-EM-0035983-984 at 984).

[194] Ricker Declaration, ¶42.

85. Third, Berkshire Bank customers can seek out additional information regarding their overdrafts and/or available balance by stopping by a branch or by calling the Berkshire Bank Call Center.[195] These personal conversations are highly individualized.[196] Call Center and branch employees are instructed to review the customer's transaction history with the customer and then explain why an overdraft fee was incurred, but there is no script for these conversations.[197,198] In some cases, at the discretion of Berkshire Bank supervisors, customers are reimbursed for the incurred overdraft fee.[199] According to Kristin Ricker, "Berkshire Bank has a long-standing policy of providing one or more courtesy refunds when a customer visits his or her local branch or calls the Bank to complain or otherwise inquire about an overdraft fee." However, bank representatives have discretion over whether or not to offer a refund and, if so, in what amount. Before issuing a refund for an overdraft, it is Berkshire Bank's policy to educate the customer regarding the Bank's overdraft policies.[200] The manner in which these educational conversations occur depends on how the customer contacts the bank (via secure messaging, e-mail, phone, or in-person). Regardless of the channel of communication, the conversations are unscripted. As Catherine Masterson notes, "no two conversations are the same."[201] Berkshire Bank representatives are given a "Conversation Guide"

---

[195] Ricker Deposition, pp. 139:6-18, 180:6-19; Masterson Declaration, ¶4. *See also*, Blondek Deposition, pp. 30:15-20, 54:10-14, 58:1-14.

[196] These experiences are individualized in part because the level of understanding pertaining to overdraft services of customers who visit a branch or call the Bank Call Center varies significantly. Tanner Declaration, ¶25; Gagne Declaration, ¶22; Masterson Declaration, ¶7.

[197] Ricker Declaration, ¶49; Ricker Deposition, p. 139:6-18; *See also,* Tanner Declaration, ¶26; Masterson Declaration, ¶5; Blondek Deposition, pp. 30:15-20, 54:10-14, 58:1-14.

[198] Customers can reach the Berkshire Call Center through multiple channels including "phone, secure messages through online banking, unsecure messages sent through the Bank's website, or unsecure text messages." Masterson Declaration, ¶3. If a customer sends a secure message through on-line banking, a Call Center representative will respond via secure message in a similar fashion to how they would respond over the phone. However, if a customer sends an unsecure message through the Bank's website, the representative will not "provide any account-specific information in the response," but will give the customer general information about the Bank's overdraft practices, encourage them to visit a local branch, and "offer to call the customer directly at a time convenient for the customer." The Bank's response to receiving a text message from a customer is to call the customer. Masterson Declaration, ¶5.

[199] *See* for example*, Berkshire Bank, "Retail Banking, Procedure: Service Fees Rebating/Reversing," August 1, 2013 (BB0000858-860 at 858). Statistics on refunds to proposed class members are discussed in Section VI.E below.

[200] Ricker Declaration, ¶49. Some Call Center representatives have a "general rule … to provide a single courtesy refund to a customer." Tanner Declaration, ¶28; Masterson Declaration, ¶10. Linda Blondek, the assistant branch manager who communicated with Dylan Bond in 2015, testified that the branch would refund based on each customer situation for "good customer service." Blondek Deposition, p. 28:19-24.

[201] Masterson Declaration, ¶6.

*Confidential*

which outlines that the representative should "educate the customer" with "information on why the fee was charged."[202] However, even when engaging in such conversations, bank representatives are able to educate some, but not all, customers depending on the customer's actions.[203] According to Susan Gagne, Assistant Vice President at Berkshire Bank's East Longmeadow Branch, Dylan Bond is an example of a customer who did not wish to be educated. Conversely, other customers are willing to be educated and avail themselves of alternative overdraft options.[204] Even for those customers who are willing to be educated, their level of understanding varies.[205]

### b.  Information Processing

86. As discussed in the academic literature, people vary in how they process even identical information.[206] Individualized inquiry is necessary to understand what information was received, sought out, processed, and considered after an overdraft occurred and ultimately how such information was understood by the proposed class members.

### E.  Customers' Post-Overdraft Behavior Is Highly Individualized

87. In addition to being exposed to varying information about at-issue services and fees and likely understanding it in a variety of ways, potential class members varied greatly in their overdraft behavior after the initial overdraft. As shown in Exhibit 1, ██ of relevant accounts between July 2010 and March 2017 had only one overdraft fee,[207] ██% had between two and five fees, and ██% had between 6 and 25 fees.

88. Similarly, as shown in Exhibit 5, of the Berkshire accounts with at least one overdraft or NSF fee between July 2010 and March 2017, ██% had only one day with overdraft or NSF fees, ██% had two to five such days, and ██% had between 6 and 25 such days. Further, ██% of Berkshire Bank accounts with at least one overdraft or NSF fee between July 2010 and March 2017 received a refund of an overdraft or NSF fee and did not incur an overdraft or NSF fee following the refund.[208]

---

[202]  Ricker Declaration, ¶49; "Conversation Guide - Overdraft/NSF/UAF Fees," (BB-EM-0078441).

[203]  Masterson Declaration, ¶¶8, 16; Tanner Declaration, ¶26; Gagne Declaration, ¶22.

[204]  Gagne Declaration, ¶¶24, 37.

[205]  Masterson Declaration, ¶¶8, 16; Tanner Declaration, ¶26; Gagne Declaration, ¶22.

[206]  See, for example, Kotler and Keller 2012, pp. 151-167.

[207]  ██% of all Berkshire Bank accounts over this period had at least one overdraft fee. Kwon Report, Appendix D-1 "Fees by Account."

[208]  Kwon Report, Appendix D-5 "Refund Statistics."

*Confidential*

89. Third-party research supports the notion that behavior following an overdraft experience among bank customers is highly variable. According to the 2013 PEW study, in response to overdraft fees, 19% of overdrafters discontinued overdraft services and 28% of overdrafters closed their checking account (34% reported doing so in a similar 2012 study).[209] Consistent with these findings, Berkshire customers make a variety of decisions regarding whether to remain opted into Courtesy Pay for ATM and everyday debit card transactions after incurring an overdraft fee. Some choose to opt out of Courtesy Pay for these types of transactions; however, others remain opted in.[210]

90. The extent of varied actions provides further evidence that one cannot assess customer understandings or but-for outcomes or but-for overdraft fees absent inquiry at the individual level. In fact, available evidence suggests an implicit acceptance, for at least some proposed class members, of the at-issue services and fees.

## VII.   Rebuttal of Dr. David's Report

91. In his report, the Plaintiff's damages expert Dr. Jesse David states that he was asked by counsel to "review and analyze data produced by Berkshire regarding the named Plaintiff's accounts and transactions and to determine whether there exist formulaic methods to assess direct damages and consequential damages on a class-wide basis using such data."[211] Dr. David then claims to have come up with such a method that "could be implemented in a formulaic manner on a class-wide basis for any number of account holders and business days" and "will be able to determine … which customers sustained damages as a result of Berkshire's allegedly improper practices and the amount of those damages."[212] To demonstrate his approach, Dr. David applies it to transaction data associated with Sandra Bond's account and purports to identify different examples of "allegedly improper overdraft fees charged to Plaintiff Bond."[213]

92. I understand from counsel that Defendants' Expert Sonya Kwon has been asked to review Dr. David's methodology and to opine on its technical application. I have been asked by counsel to opine on the general appropriateness and relevance of Dr. David's methodology given the Plaintiff's theory of the case. Dr. David's methodology cannot be used to evaluate potential damages stemming from

---

[209] The PEW Charitable Trusts, "Overdrawn, Persistent Confusion and Concern about Bank Overdraft Practices," June 2014, pp. 1 and 10.

[210] Tanner Declaration, ¶ 30; Masterson Declaration, ¶ 13; Gagne Declaration, ¶ 27.

[211] David Report, ¶14. Dr. David also explained the term "formulaic manner" to mean that a methodology could be "expressed in computer code that would be applicable to any number of transactions or account course…. [a]s opposed to a manual or individual review." David Deposition, pp. 22:16-23:2.

[212] David Report, ¶20.

[213] David Report, ¶22.

*Confidential*

proposed class members' understandings, misunderstandings, or confusion about the at-issue services on either an individual or a class-wide basis. Neither does Dr. David provide any support that a methodology exists that could do so on a class-wide basis.

93.  In reviewing Dr. David's Report and his testimony, I have identified three major flaws with his methodology. First, Dr. David's approach does not address the Plaintiff's allegations as stated in the complaint pertaining to proposed class members' misunderstandings or confusion regarding the at-issue services and fees. To support these allegations, the Plaintiff needs to demonstrate, at the class-wide basis, that consumers were misled and that their outcomes (including fees incurred) would have been different absent such confusion, that is, in a world with alternative disclosures and presumably alternative consumer understandings. However, Dr. David does nothing to analyze customers' understandings of the at-issue disclosures or practices, let alone determine how those understandings and resulting behaviors would have differed in the but-for world.

94.  Dr. David admitted at his deposition that he "didn't do any analysis of what account holders might have understood," and he has not "tried to analyze what consumers were aware [of] at different points in time."[214] For example, he did not "do anything to analyze whether any customers were confused or misled concerning transaction ordering based on the bank's disclosures" in his "Period 3" analysis and that he did not try to address the question of whether one can determine in a formulaic way "whether a particular customer would have made the same transactions he made in the actual world, had the bank provided the customer additional or different disclosures."[215] Rather than attempting to analyze customers' behavior under different disclosures, Dr. David's methodologies instead assume different but-for world practices such as using "actual" balance instead of available balance and a different payment order of items.[216]

---

[214]  David Deposition, pp. 133:16-23, 147:23-148:11.

[215]  David Deposition, pp. 82:24-83:14; 230:24-231:3. Dr. David also stated that, based on the data he has seen, he does not think he could even "identify, in any formulaic way, instances where an account holder … intentionally used the courtesy pay service" (pp. 78:20-79:12).

[216]  David Report, pp. 9-16. In his deposition, Dr. David also confirmed that he's "comparing the actual world fees charged by the bank on a given day to the fees that [he] believe[s] would've resulted under plaintiff's proposed reordering of transactions." David Deposition, p. 152:17-25. Dr. David neither "tried to" nor "thought about" how to "determine in a formulaic way, based on any information [he has] seen, what information each customer relied on to make his or her decision to opt in to overdraft services," and saw nothing in the transactional data he has reviewed thus far that informs that question (p. 84:2-25). He also testified that he had neither determined in a formulaic way, nor seen data that would inform the question of customers' understandings regarding the use of available balance in determining overdraft fees, such as "when a customer became aware that the bank assessed overdraft fees based on available balance" (p. 85:1-19).

*Confidential*

95. Furthermore, because the class varies widely in a number of key components (e.g., type of information received and how such information was likely processed by each proposed class member), I do not believe that Dr. David's approach could be modified to capture each proposed class member's understandings and actions and be implemented in a formulaic manner on a class-wide basis. Even Dr. David himself has reservations as to whether such a modification would be feasible.[217]

96. Second, Dr. David's approach is one-sided. In particular, the proposed adjustments to banking practices implied by his ordering methodology would have generated instances where overdraft fees for customers who were *not* charged in the actual world *would have been* charged in *his* but-for world. Dr. David did not dispute such a possibility and admitted at his deposition that "[t]here could be more fees, less [sic] fees... a different amount of fees for some people, same for others,"[218] and that "it's also possible that some customers might incur more fees under plaintiff's proposed reordering than in the actual world."[219] However, despite being aware of such possibilities, (e.g., "more fees in the but-for world than the actual world on any given day") Dr. David admitted he had not "dealt with those" and did not account for "negative damages."[220]

97. Third, because Dr. David's approach allows for some class members to become worse off in his but-for world (relative to their situation in the actual world), such an approach creates potential conflicts among proposed class members.[221]

---

[217] Dr. David acknowledged that he had not tried to address and had "no idea" or "opinion" about whether one can determine in a formulaic way "whether a particular customer would have made the same transactions he made in the actual world, had the bank provided the customer additional or different disclosures." David Deposition, pp. 82:24-83:14. He admitted that he had seen "no data source that would inform" how one could "determine in a formulaic way the particular reason or reasons a customer opted in to overdraft service," and that based on the data he had so far, he could not do so (p. 81:13-19).

[218] David Deposition, p. 154:13-24.

[219] David Deposition, p. 155:8-12.  For example, Dr. David's report describes Sandra Bond's transactions from October 18, 2013, which, under Plaintiffs' re-ordering methodology would result in one fewer overdraft charges. David Report, pp. 14-16; David Deposition, p. 162:6-10. However, when this same reordering methodology is applied to a different, hypothetical set of transactions, Dr. David agreed that "there would be three additional overdraft fees assessed using plaintiff's ordering methodology as compared with the bank's actual practice" (pp. 168:16-170:4). Dr. David also acknowledged that it is possible that Plaintiff's proposed ordering could generate an overdraft fee on a day in which no overdraft fee was incurred by a proposed class member in the actual world (p. 159:6-13).

[220] David Deposition, pp. 160:1-10, 158:13-17 ("Q. . . . [W]hat do you do when the number that you calculate is more . . . than the actual world fees. A. I don't do anything.").

[221] Dr. David's deposition testimony raises additional concerns about the accuracy and reliability of his analyses. Dr. David admitted in his deposition that he had not accounted for the potential impact of merchant error in his calculations or tried to develop an approach to identify such errors on a formulaic basis using the transactional data. David Deposition, p. 147:8-21. He also acknowledged that he did not have "complete familiarity" with all

*Confidential*

Rebecca Kirk Fair

February 27, 2018

---

of the terms that he had seen (p. 23:8-16), that "there's some generality [or lack of specificity] remaining at this point" (pp. 23:8-24:6), and that he sometimes was not even sure whether a certain transaction is a deposit or a withdrawal and which transactions were point-of-sale or associated with a debit card (p. 48:2-12). Dr. David also conceded that his damages calculations for Sandra Bond did not address all of Plaintiffs' theories, and that he had determined total alleged damages for Plaintiff Bond under at most one of Plaintiffs' damages theories (p. 42:2-14). I also note that Dr. David's approach assumes without support that consumers would have made the same transactions in his but-for world, including in his "consequential damages" analysis which endows proposed class members with additional money to spend in Dr. David's but-for world. David Report, ¶¶23-24. However, economic principles suggest that consumer spending exhibits income "elasticity" (*See*, for example, Mankiw, G.N., *Principles of Microeconomics*, 7th ed., Stamford, CT: Cengage Learning, 2015, pp. 97-98). Thus, proposed class members might have exhibited a different pattern of spending in Dr. David's but-for world. Although Dr. David acknowledges this possibility (p. 258:4-16), he does nothing to account for it.

*Confidential*

**Exhibit 1**
**Cumulative Overdraft Activity**
**Berkshire Bank Consumer Accounts**
*July 2010 - March 2017* [1]



**Notes:**
[1] Proposed class period is from July 2010 to the present.

[2] Percentages reflect the number of Berkshire Bank accounts that incurred a given number of overdraft fees between July 2010 and March 2017 as a percentage of accounts that incurred at least one overdraft fee during that period. Insufficient funds (NSF) and continuous overdraft fees are not included.

[3] Of the ███████ Berkshire Bank accounts existing between July 2010 and March 2017, ██████ (██%) incurred at least one overdraft fee.

**Sources:**
[1] Expert Report of Sonya Kwon, February 27, 2018, Appendix C-1 "Fees by Year" and Appendix D-1 "Fees by Account."

[2] First Amended Complaint, *Sandra Bond, individually and on behalf of all others similarly situated, Plaintiffs v Berkshire Bank and Berkshire Hills Bancorp, Defendants*, United States District Court District of Massachusetts Western Division, Case No. 16-30050-MGM, July 15, 2016, ¶27.

*Confidential*

**Exhibit 2**
**Percentage of Berkshire Bank Consumer Accounts with Overdraft Activity**
*July 2010 - March 2017[1]*



**Notes:**

[1] Proposed class period is from July 2010 to the present.

[2] Percentages reflect the proportion of Berkshire Bank accounts that incurred a given number of overdraft fees during a calendar year (partial years for 2010 and 2017) out of all the accounts that incurred at least one overdraft fee during the same year (partial years for 2010 and 2017). Insufficient funds (NSF) and continuous overdraft fees are not included.

[3] Of the ▮▮▮▮▮ Berkshire Bank accounts existing between July 2010 and March 2017, ▮▮▮▮ (▮▮%) incurred at least one overdraft fee.

[4] Sandra Bond incurred zero overdraft fees between July-December 2010, 20 fees in 2011, 60 fees in 2012, 85 fees in 2013, 51 fees in 2014, 22 fees in 2015, 11 fees in 2016, and one fee between January-March 2017.

**Sources:**

[1] Expert Report of Sonya Kwon, February 27, 2018, Appendix C-1 "Fees by Year," Appendix D-1 "Fees by Account," and Appendix D-2 "Fees by Account and Year."

[2] First Amended Complaint, *Sandra Bond, individually and on behalf of all others similarly situated, Plaintiffs v Berkshire Bank and Berkshire Hills Bancorp, Defendants*, United States District Court District of Massachusetts Western Division, Case No. 16-30050-MGM, July 15, 2016, ¶27.

*Confidential*

**Exhibit 3**
**Cumulative Overdraft and/or NSF Activity**
**Berkshire Bank Consumer Accounts**
*July 2010 - March 2017*[1]



**Notes:**

[1] Proposed class period is from July 2010 to the present.

[2] Percentages reflect the number of Berkshire Bank accounts that incurred a given number of overdraft and/or insufficient funds (NSF) fees between July 2010 and March 2017 as a percentage of accounts that incurred at least one overdraft or NSF fee during that period. Continuous overdraft fees are not included.

[3] Of the ███████ Berkshire Bank accounts existing between July 2010 and March 2017, ██████ (█ %) incurred at least one overdraft or NSF fee.

**Sources:**

[1] Expert Report of Sonya Kwon, February 27, 2018, Appendix C-1 "Fees by Year" and Appendix D-1 "Fees by Account."

[2] First Amended Complaint, *Sandra Bond, individually and on behalf of all others similarly situated, Plaintiffs v Berkshire Bank and Berkshire Hills Bancorp, Defendants*, United States District Court District of Massachusetts Western Division, Case No. 16-30050-MGM, July 15, 2016, ¶27.

*Confidential*

**Exhibit 4**
**Percentage of Berkshire Bank Consumer Accounts with Overdraft and/or NSF Activity**
*July 2010 - March 2017[1]*



**Notes:**

[1] Proposed class period is from July 2010 to the present.

[2] Percentages reflect the proportion of Berkshire Bank accounts that incurred a given number of overdraft and/or insufficient funds (NSF) fees during a calendar year (partial years for 2010 and 2017) out of all the accounts that incurred at least one overdraft or NSF fee during the same year (partial years for 2010 and 2017). Continuous overdraft fees are not included.

[3] Of the ▮▮▮▮ Berkshire Bank accounts existing between July 2010 and March 2017, ▮▮▮▮ %) incurred at least one overdraft or NSF fee.

[4] Sandra Bond incurred zero overdraft and NSF fees between July-December 2010, 20 fees in 2011, 64 fees in 2012, 105 fees in 2013, 69 fees in 2014, 25 fees in 2015, 11 fees in 2016, and one fee between January-March 2017.

**Sources:**

[1] Expert Report of Sonya Kwon, February 27, 2018, Appendix C-1 "Fees by Year," Appendix D-1 "Fees by Account," and Appendix D-2 "Fees by Account and Year."

[2] First Amended Complaint, *Sandra Bond, individually and on behalf of all others similarly situated, Plaintiffs v Berkshire Bank and Berkshire Hills Bancorp, Defendants*, United States District Court District of Massachusetts Western Division, Case No. 16-30050-MGM, July 15, 2016, ¶27.

*Confidential*

**Exhibit 5**
**Total Number of Days Berkshire Bank Consumer Accounts Had Overdraft and/or NSF Activity**
*July 2010 - March 2017*[1]



**Notes:**

[1] Proposed class period is from July 2010 to the present.

[2] Percentages reflect the number of Berkshire Bank accounts that incurred an overdraft and/or insufficient funds (NSF) fee on a given number of days between July 2010 and March 2017 as a percentage of accounts that incurred at least one overdraft or NSF fee during that period. Continuous overdraft fees are not included.

[3] Of the ████ Berkshire Bank accounts existing between July 2010 and March 2017, ████ (██%) incurred at least one overdraft or NSF fee.

**Sources:**

[1] Expert Report of Sonya Kwon, February 27, 2018, Appendix C-3 "Days of Fees by Year," Appendix D-1 "Fees by Account," and Appendix D-3 "Days of Fees by Account."

[2] First Amended Complaint, *Sandra Bond, individually and on behalf of all others similarly situated, Plaintiffs v Berkshire Bank and Berkshire Hills Bancorp, Defendants* , United States District Court District of Massachusetts Western Division, Case No. 16-30050-MGM, July 15, 2016, ¶27.

**Exhibit 6**
**Communications, Available or Provided to Proposed Class Members, Regarding the At-Issue Services and Fees**

| | *Prior to* Account Opening | *At the Time of* Berkshire Bank Account Opening | *After* Opening an Account, *Prior to* Overdraft Activity | *After* Overdraft Activity | Content and/or Form Varied Over Proposed Class Period / Among Proposed Class Members[1] |
|---|---|---|---|---|---|
| **Available to Proposed Class Members[2]** | | | | | |
| Conversation with Call Center Representative[3] | All | All | All | All | X |
| Conversation with Local Branch Representative[4] | All | All | All | All | X |
| ATM Display and Notice[5] | | | All | All | |
| Mobile Banking Application[6] | | | Some | Some | |
| Online Banking Screens[7] | | | All | All | X |
| Website Disclosures[8] | All | All | All | All | X |
| **Provided to Proposed Class Members[2]** | | | | | |
| Account Terms & Conditions[9] | | All | | | X |
| *2017 Update [10]* | | Some | Some | Some | |
| Conversation with Berkshire Bank Representative at Account Opening[11] | | Some | | | X |
| Disclosure Guide[12] | | Some | | | X |
| Courtesy Pay Disclosure[13] | | All | | | X |
| *2015 Update [14]* | | Some | Some | Some | |
| Outbound Customer Calls[15] | | | | Some | X |
| Monthly Account Statements[16] | | | All | All | X |
| Overdraft Letters[17] | | | | Some | X |
| Overdraft Notices[18] | | | | Some | X |
| Reg. E Election Confirmation Notice[19] | | | Some | Some | X |
| Reg. E Opt-In Form[20] | | Some | Some | Some | X |
| *2010 Reg. E Roll-Out Communication [21]* | | | Some | Some | X |

*Confidential*

**Exhibit 6**
**Communications, Available or Provided to Proposed Class Members, Regarding the At-Issue Services and Fees**

**Notes & Sources:**

[1] For example, even at the same point in time, two different proposed class members who contacted the Berkshire Call Center may have received different information depending on the representative they conversed with and the specific questions they asked. Declaration of Catherine Masterson, February 20, 2018, ("Masterson Declaration"), ¶6.

[2] "All" indicates that the channel was available/provided to all proposed class members at that specific customer stage. "Some" indicates that the channel was available/provided to only some proposed class members at that specific customer stage.

[3] Masterson Declaration, ¶¶3 and 4; Declaration of Kristen Ricker, February 23, 2018, ("Ricker Declaration"), ¶48.

[4] Ricker Declaration, ¶48.

[5] Ricker Declaration, ¶45.

[6] Ricker Declaration, ¶46.

[7] Ricker Declaration, ¶44.

[8] Ricker Declaration, ¶43.

[9] Ricker Declaration, ¶¶31-33 and 62-66.

[10] Berkshire Bank mailed a copy of the current Account Terms & Conditions to all customers with open and active accounts in April 2017. Ricker Declaration, ¶35.

[11] As of May 10, 2010, Berkshire Bank requires its employees to discuss overdraft services with customers opening a checking account in person at a Berkshire Bank branch. These conversations are unscripted. Ricker Declaration, ¶32.

[12] Berkshire Bank only mails disclosure guides to customers from acquired banks or branches. Ricker Declaration, ¶51.

[13] Ricker Declaration, ¶¶31-33 and 58-61.

[14] Berkshire Bank revised the Courtesy Pay disclosure in April 2015. This version of the disclosure was mailed to all customers with open and active accounts in July 2015. Ricker Declaration, ¶35.

[15] Ricker Declaration, ¶42; Masterson Declaration, ¶18.

[16] Ricker Declaration, ¶40.

[17] Ricker Declaration, ¶42.

[18] Ricker Declaration, ¶41.

[19] Ricker Declaration, ¶39.

[20] Customers who had opened accounts with a linked debit card at Berkshire Bank prior to May 10, 2010 were mailed a copy of the Reg. E Opt-In Form during the summer of 2010. Since May 10, 2010, the form has been presented to new customers at account opening. Ricker Declaration, ¶¶32-33, 37, and 52-57.

[21] The 2010 Reg. E roll-out communication was disseminated via mail, email, and phone calls during the summer of 2010. Ricker Declaration, ¶37.

**Exhibit 7**
**Potential Berkshire Bank Customer Experiences Over Time**

*Confidential*



| Sandra Bond | | Alternative Experience and Behavior | |
|---|---|---|---|
| **Experience** | **Behavior/Perception** | **Experience** | **Behavior/Perception** |
| Opens Joint Account at Woronoco Savings Bank (August 2002) | "honestly probably didn't really understand" original agreement she signed with Woronoco Savings Bank / Husband acknowledges that "his wife did not understand how to handle the account" | Researches Services Offered by Local Banks | Reads about Berkshire Bank Courtesy Pay service online / Calls Berkshire Bank Call Center to ask about opening a new account |
| Transitions to Berkshire Bank Account (August 2005) | Does not remember seeing document from Berkshire Bank notifying her of account conversion / Does not recall reading the Account Terms & Conditions from Berkshire Bank | Opens Berkshire Bank Account (April 2015) | Reads some or all forms provided at account opening thoroughly / Has a conversation with Bank representative to better understand overdraft services and fees |
| Opts into Courtesy Pay (June 2010)[1] | Does not recall "physically opting in" to receive overdraft services / Does not remember viewing the Reg. E Opt-In Form or other documents pertaining to overdraft services | Opts into Courtesy Pay (April 2015)[1] | Knowingly opts into Courtesy Pay for ATM and everyday debit card transactions / Reads the confirmation notice received in the mail |
| Heavy Overdraft Activity | Averages over 43 overdraft and NSF fees per year and incurs over $9,500 in fees (July 2010 – March 2017) | Low Overdraft Activity | After first overdraft, visits Bank and gets fee refunded / Averages 3-4 overdraft fees per year to make payments when needed |
| Poor Account Management | Throws out monthly statements, overdraft notices, and other forms without opening them / Does not check account balance prior to July 2015 / Does not contact Berkshire Bank to inquire into assessed overdraft fees or overdraft protection services / Was unaware she could opt out of overdraft services and remains uncertain whether she would like to opt out | Excellent Account Management | Opens monthly account statements every month / Checks account balance online once a week / Occasionally visits Bank to receive clarification on overdraft fees / Decides to opt out of Courtesy Pay to avoid incurring additional fees |

**Exhibit 7**
**Potential Berkshire Bank Customer Experiences Over Time**

*Confidential*

**Note:**
[1] Sandra Bond, who opted into overdraft services on June 24, 2010, received the Reg. E Opt-In Form effective May 5, 2010, which stated: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway" (BB0000097). Someone opening an account in April 2015 would have received the Reg. E Opt-In Form effective March 12, 2015, which stated: "If we are presented with an item drawn against your account, we will pay the item based on your available balance. The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft. Debit card preauthorizations can reduce your account's available balance, which can result in overdraft fees if additional items are presented for payment" (BB0000104).

**Sources:**
[1] Declaration of Catherine Masterson, February 20, 2018, ¶¶3 and 9-13.
[2] Declaration of Kristen Ricker, February 23, 2018, ¶¶15, 32, 39-40, 43-44, 46, 48-49, 55, 57, 69-70, 72, and 82.
[3] Declaration of Samantha Tanner, February 16, 2018, ¶¶8-12, 15, 19, 23, 28, and 30.
[4] Deposition of Linda Blondek, October 12, 2017, Exhibit 3 (BB-BOND-0003643-661 at BB-BOND-0003648).
[5] Deposition of Sandra Bond, September 25, 2017, p. 6:19-20, pp. 27:24-28:9, pp. 85:14-86:1, p. 88:4-7, pp. 89:21-92:10, p. 104:4-10, p. 105:10-13, pp. 105:24-106:16, pp. 115:10-116:8, p. 134:13-18, p. 139:11-14, p. 136:5-8, pp. 142:6-144:14, pp. 157:15-158:7, pp. 193:9-196:18, pp. 197:7-199:21, pp. 203:13-204:1, p. 207:8-19, and pp. 212:10-213:8.
[6] Expert Report of Sonya Kwon, February 27, 2018, Appendix C-1 "Fees by Year."
[7] Woronoco Savings Bank, August 2, 2002 (BB-BOND-0000573).
[8] Woronoco Savings Bank, "Conversion Weekend, Account Changes Access and Information" (BB0000720-735).

**Exhibit 8**
**Variation in Language Pertaining to Available Balance in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form[1]**

| | Number of Versions | Number of Distinct Definitions[2] | Earliest Version | | Latest Version | |
|---|---|---|---|---|---|---|
| | | | Date | Language Pertaining to Available Balance | Date | Language Pertaining to Available Balance |
| **Courtesy Pay Disclosure[3]** | 9 | 5 | October 2006 | "An overdraft (negative) balance may result from such items as: A) The payment of checks, ATM, POS, and other electronic funds transfers, or other withdrawal requests; B) Payments authorized by you; C) The return, unpaid, of items deposited by you; D) Our Fees/Charges; E) The deposit of items which according to our Funds Availability Policy, are treated as not yet 'available' or finally paid." | November 2016 | "Berkshire Bank uses the available balance when we process transactions to your account. The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft. It includes all cleared and all known pending (not yet cleared) card or other debit transactions and any holds on your balance which could include funds held to comply with court orders or other legal obligations. Funds subject to a hold, dispute or legal process are not available funds. When a transaction is 'posted,' the dollar value of that transaction is added to or subtracted from the balance of your account." |
| **Account Terms & Conditions[4]** | 8 | 3 | January 2010 | "You understand that we may, at our discretion, honor withdrawal requests that overdraw your account." | April 2017 | "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft. If an item is presented without sufficient available funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF). The order in which you make withdrawals from your account may not be the same as the order in which those transactions are posted..." |
| **Reg. E Opt-In Form[5]** | 9 | 2 | May 2010 | "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." | March 2015 | "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. If we are presented with an item drawn against your account, we will pay the item based on your available balance. The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft. Debit card preauthorizations can reduce your account's available balance which can result in overdraft fees if additional items are presented for payment." |

Notes:
[1] Since May 10, 2010, these three forms have been presented to new customers at account opening.
[2] A definition of available balance is counted as a distinct definition in terms of disclosed details.
[3] Berkshire Bank released versions of the Courtesy Pay Disclosure in October 2006, February 2010, September 2012, June 2013, May 2014, October 2014, March 2015, June 2016, and November 2016. A distinct definition of available balance was included in the versions released in October 2006, May 2014, March 2015, June 2016, and November 2016.
[4] Berkshire Bank released versions of the Account Terms & Conditions in January 2010, September 2010, July 2011, September 2013, July 2014, June 2015, October 2016, and April 2017. A distinct definition of available balance was included in the versions released in January 2010, June 2015, and October 2016.
[5] Berkshire Bank released versions of the Reg. E Opt-In Form in May 2010, August 2010, May 2011, October 2012, June 2013, February 2014, April 2014, May 2014, and March 2015. A distinct definition of available balance was included in the versions released in May 2010 and March 2015.

Sources:
[1] Declaration of Kristen Ricker, February 23, 2018, ¶¶31-33, 52-66, and Exhibit 62A.
[2] Berkshire Bank Courtesy Pay Disclosures (BB0000074-095).
[3] Berkshire Bank Account Terms and Conditions (BB0000015-059, BB0001107-114, BB0001091-106).
[4] Berkshire Bank Reg. E Opt-In Forms (BB0000096-104).

*Confidential*

**Exhibit 9**
**Variation in Language Pertaining to Payment Order of Items in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form[1]**

| | Number of Versions | Number of Distinct Statements[2] | Earliest Version | | Latest Version | |
|---|---|---|---|---|---|---|
| | | | Date | Language Pertaining to Payment Order of Items | Date | Language Pertaining to Payment Order of Items |
| **Courtesy Pay Disclosure[3]** | 9 | 6 | October 2006 | "Our policy is to pay items in the order they are received. If they are received at the same time, we pay the smallest items first." | November 2016 | "When we process multiple transactions in a single business day, we may post items in any order. We generally group transactions in categories by type of transaction and post in the order they are presented (time stamped)…We pay Debit items in the following order: Wire transfers, ATM and POS debit card transactions, in-person withdrawals and checks cashed at a Berkshire Bank branch, internal transfers to other Berkshire Bank accounts, payments and transfers initiated via Online Banking, and returned deposited items; ACH debits that you have preauthorized then post lowest to highest dollar amount; Checks not presented in-person at a Berkshire Bank branch post lowest to highest dollar amount…" |
| **Account Terms & Conditions[4]** | 8 | 4 | January 2010 | No relevant language | April 2017 | "When we process multiple transactions in a single business day, we may post items in any order. We generally group transactions in categories by type of transaction and post in the order they are presented (time stamped)…We pay Debit items in the following order: Wire transfers, ATM and POS debit card transactions, in-person withdrawals and checks cashed at a Berkshire Bank branch, internal transfers to other Berkshire Bank accounts, payments and transfers initiated via Online Banking, and returned deposited items; ACH debits that you have preauthorized then post lowest to highest dollar amount; Checks not presented in-person at a Berkshire Bank branch post lowest to highest dollar amount…" |
| **Reg. E Opt-In Form[5]** | 9 | 1 | May 2010 | No relevant language | March 2015 | No relevant language |

**Notes:**

[1] Since May 10, 2010, these three forms have been presented to new customers at account opening.

[2] For the purposes of this exhibit, the absence of language pertaining to payment order of items is counted as a distinct statement (in terms of disclosed details).

[3] Berkshire Bank released versions of the Courtesy Pay Disclosure in October 2006, February 2010, September 2012, June 2013, May 2014, October 2014, March 2015, June 2016, and November 2016. A distinct statement pertaining to payment order of items was included in the versions released in October 2006, May 2014, October 2014, March 2015, June 2016, and November 2016.

[4] Berkshire Bank released versions of the Account Terms & Conditions in January 2010, September 2010, July 2011, September 2013, July 2014, June 2015, October 2016, and April 2017. A distinct statement pertaining to payment order of items was included in the versions released in January 2010, July 2014, June 2015, and October 2016.

[5] Berkshire Bank released versions of the Reg. E Opt-In Form in May 2010, August 2010, May 2011, October 2012, June 2013, February 2014, April 2014, May 2014, and March 2015. Since none of these versions included language pertaining to payment order of items, the absence of language pertaining to payment order of items in the version released in May 2010 is counted as a distinct statement.

**Sources:**

[1] Declaration of Kristen Ricker, February 23, 2018, ¶¶31-33, 52-66, and Exhibit 62A.

[2] Berkshire Bank Courtesy Pay Disclosures (BB0000074-095).

[3] Berkshire Bank Account Terms and Conditions (BB0000015-059, BB0001107-114, BB0001091-106).

[4] Berkshire Bank Reg. E Opt-In Forms (BB0000096-104).

*Confidential*

**Exhibit 10**

**Select Changes in Language Pertaining to Available Balance in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form Over Time**[1]

*Courtesy Pay Disclosure* [2]

| | |
|---|---|
| *October 2006* | Disclosure included the following language:<br><br>"An overdraft (negative) balance may result from such items as: A) The payment of checks, ATM, POS, and other electronic funds transfers, or other withdrawal requests; B) Payments authorized by you; C) The return, unpaid, of items deposited by you; D) Our Fees/Charges; E) The deposit of items which according to our Funds Availability Policy, are treated as not yet 'available' or finally paid." |
| *May 2014* | Disclosure language was revised to state the following:<br><br>"An overdraft (negative) balance may result when you do not have enough money in your account to cover a transaction. Although there are many reasons why your account might become overdrawn, most overdrafts result from the following: a) You write a check, swipe your debit card or initiate an electronic funds transfer in an amount that exceeds the amount of funds available in your account; b) You deposit a check or other item into your account and the item is returned unpaid, which causes a negative balance in your account once your balance is reduced by the amount of the returned check; c) You have inadequate funds in your account when we assess a fee or service charge; or d) You initiate a transaction before funds deposited into your account are 'available' or 'finally paid' according to our Funds Availability Policy. For example, if you deposit a check into your account, the proceeds of that check may not be available to you for up to seven days after you deposit the check. If you do not have sufficient funds in your account—independent of the check—to cover the transaction, you will incur an overdraft." |
| *March 2015* | The following language was added:<br><br>"The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft."<br><br>"When a transaction is 'posted,' the dollar value of that transaction is added to or subtracted from the balance of your account. For example, POS (Point of Sale) debit card transactions reduce your available balance at the time you authorize your purchase. Overdraft fees (if applicable) are assessed on POS debit card transactions at the time a POS becomes final, which in some cases may take several days."<br><br>"When we determine that funds in your account are subject to a hold, dispute, or legal process, then these funds are not available to cover your checks and other items. Holds include deposit holds, holds related to cash withdrawals, and authorization holds we place on the account for debit card transactions." |
| *June 2016* | The following language in red was removed:<br><br>"When a transaction is 'posted,' the dollar value of that transaction is added to or subtracted from the balance of your account. <span style="color:red">For example, POS (Point of Sale) debit card transactions reduce your available balance at the time you authorize your purchase. Overdraft fees (if applicable) are assessed on POS debit card transactions at the time a POS becomes final, which in some cases may take several days.</span>" |

*Confidential*

**Exhibit 10**

**Select Changes in Language Pertaining to Available Balance in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form Over Time[1]**

| | |
|---|---|
| *November 2016* | Disclosure language was revised to state the following:<br><br>"Berkshire Bank uses the available balance when we process transactions to your account. The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft. It includes all cleared and all known pending (not yet cleared) card or other debit transactions and any holds on your balance which could include funds held to comply with court orders or other legal obligations. Funds subject to a hold, dispute or legal process are not available funds."<br><br>Examples illustrating how different transactions reduce the customer's available balance were also added, including the following example discussing debit card point of sale (POS), ATM card, or other electronic withdrawals:<br><br>"These withdrawal transactions reduce your available balance at the time you authorize your purchase. Overdraft fees (if applicable) are assessed on these debit transactions at the time the payment becomes final, which in some cases may take several days. If your account does not have a sufficient available balance, the posting order can impact the number of overdraft fees you incur. Merchants may request a temporary authorization hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This authorization hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three business days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the authorization hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the authorized hold amount, that transaction will be an insufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase." |

*Confidential*

**Exhibit 10**

**Select Changes in Language Pertaining to Available Balance in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form Over Time[1]**

<u>*Account Terms & Conditions* [3]</u>

| | |
|---|---|
| *January 2010* | Disclosure included the following language: |
| | "You understand that we may, at our discretion, honor withdrawal requests that overdraw your account." |
| *June 2015* | The following language was added: |
| | "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft." |
| | "Sometimes funds in your account are not available to cover your checks and other items, and it may appear that you have enough funds in your account to cover a debit but still get an overdraft fee on the debit. This can occur when your account balance included funds that were not available at the time we processed the debit. Funds subject to a hold, dispute or legal process are not available funds." |
| *October 2016* | The following language was added: |
| | "On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, which may be more than the actual amount of your purchase. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three business days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it." |
| | Examples regarding available balance were also added at this time. |

<u>*Reg. E Opt-In Form* [4]</u>

| | |
|---|---|
| *May 2010* | Disclosure included the following language: |
| | "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." |
| *March 2015* | The following language was added: |
| | "If we are presented with an item drawn against your account, we will pay the item based on your available balance. The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft. Debit card preauthorizations can reduce your account's available balance, which can result in overdraft fees if additional items are presented for payment." |

**Exhibit 10**

**Select Changes in Language Pertaining to Available Balance in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form Over Time[1]**

**Notes:**

[1] Since May 10, 2010, these three forms have been presented to new customers at account opening.

[2] Berkshire Bank also released versions of the Courtesy Pay Disclosure in February 2010, September 2012, June 2013, and October 2014. However, any changes to those versions did not involve language pertaining to available balance.

[3] Berkshire Bank also released versions of the Account Terms & Conditions in September 2010, July 2011, September 2013, July 2014, and April 2017. However, any changes to those versions did not involve language pertaining to available balance.

[4] Berkshire Bank also released versions of the Reg. E Opt-In Form in August 2010, May 2011, October 2012, June 2013, February 2014, April 2014, and May 2014. However, any changes to those versions did not involve language pertaining to available balance.

**Sources:**

[1] Declaration of Kristen Ricker, February 23, 2018, ¶¶31-33, 52-66, and Exhibit 62A.

[2] Berkshire Bank Courtesy Pay Disclosures (BB0000074-095).

[3] Berkshire Bank Account Terms and Conditions (BB0000015-059, BB0001107-114, BB0001091-106).

[4] Berkshire Bank Reg. E Opt-In Forms (BB0000096-104).

*Confidential*

**Exhibit 11**

**Select Changes in Language Pertaining to Payment Order of Items in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form Over Time[1]**

*Courtesy Pay Disclosure* [2]

| | |
|---|---|
| *October 2006* | Disclosure included the following language:<br><br>"Our policy is to pay items in the order they are received. If they are received at the same time, we pay the smallest items first." |
| *May 2014* | Language pertaining to payment order of items was removed |
| *October 2014* | The following language was added:<br><br>"When processing items drawn on your account, our policy is to pay them according to the transaction type, and then the dollar amount. We pay POS debit card and teller transactions prior to check and ACH transactions. We pay the smallest items first within each transaction type." |
| *March 2015* | Disclosure language was revised to state the following:<br><br>"The order in which you make withdrawals from your account may not be the same as the order in which those transactions are posted. For example, when you write a check to pay a merchant, the merchant may not present the check to us for payment until several days later. Sometimes funds in your account are not available to cover your checks and other items, and it may appear that you have enough funds in your account to cover a debit but still get an overdraft fee on the debit. This can occur when your account balance included funds that were not available at the time we processed the debit. Funds subject to a hold, dispute or legal process are not available funds. When a transaction is 'posted,' the dollar value of that transaction is added to or subtracted from the balance of your account. For example, POS (Point of Sale) debit card transactions reduce your available balance at the time you authorize your purchase. Overdraft fees (if applicable) are assessed on POS debit card transactions at the time a POS becomes final, which in some cases may take several days. We pay items in the following order: Non-returnable items are posted by transaction type in the order they are presented (time stamped). Non-returnable items include: ATM and POS debit card transactions, in-person withdrawals and checks cashed at a Berkshire Bank branch, internal transfers to other Berkshire Bank accounts, payments and transfers initiated via Online Banking, returned deposited items, and wire transfers. ACH debits that you have preauthorized then post lowest to highest dollar amount. Finally, checks not presented in person at a Berkshire Bank branch post lowest to highest dollar amount. We may give preference to any fees, charges, checks, debits or other items payable to us. However, if for some reason we must manually post your payments, items presented for payment may be paid in an order we select. If you are expecting a credit to your account by ACH, you should not schedule a debit to occur on the same day as your ACH credit may not be received until after your debit, resulting in an overdraft. For example, an ACH withdrawal transaction may be held for up to two business days before it posts to your account. If you overdraw your account, the order in which transactions are paid by the Bank may affect the total amount of overdraft fees you incur. We may change our posting order at any time, but we will notify you if such a change may affect you adversely. On your account statement we do not necessarily report debits and credits in the order that we posted them to your account." |
| *June 2016* | The following language was removed:<br><br>"For example, POS (Point of Sale) debit card transactions reduce your available balance at the time you authorize your purchase."<br><br>Also, the position of the following language in <span style="color:red">red</span> was shifted:<br><br>"Non-returnable items include: <span style="color:red">Wire transfers</span>, ATM and POS debit card transactions, in person withdrawals and checks cashed at a Berkshire Bank branch, internal transfers to other Berkshire Bank accounts, payments and transfers initiated via Online Banking, and returned deposited items." |

*Confidential*

**Exhibit 11**

**Select Changes in Language Pertaining to Payment Order of Items in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form Over Time[1]**

*November 2016*                     The following language was added:

"When we process multiple transactions in a single business day, we may post items in any order. We generally group transactions in categories by type of transaction and post in the order they are presented (time stamped). The following are the most common categories and types: Deposits that have become available to you post first; We then may charge for any debt owed to us. In most cases, fees related to transactions would be assessed the day of the transaction and would be deducted from the available balance after the transaction is completed. You will not be charged an overdraft fee on items presented to us that are less than $4.49; We pay Debit items in the following order: Wire transfers, ATM, and POS debit card transactions, in-person withdrawals and checks cashed at a Berkshire Bank branch, internal transfers to other Berkshire Bank accounts, payments and transfers initiated via Online Banking, and returned deposited items; ACH debits that you have preauthorized then post lowest to highest dollar amount; Checks not presented in-person at a Berkshire Bank branch post lowest to highest dollar amount; We then typically assess any Overdraft Fee, NSF Return Item Fee (Insufficient Funds), UAF Overdraft Fee (Uncollected/Unavailable Funds Fee) on the day the debit caused the overdraft or returned item. More than one overdraft fee may be charged against the account per day, not to exceed 5 per day. Continuous OD (overdraft) fees are assessed on the fifth business day that the balance has been overdrawn. The fee would be deducted from the available balance at that time; Service charges that will be assessed at the end of your statement cycle may include a Monthly Maintenance Service Charge, Below Minimum Balance Maintenance Fee, Returned Mail Fee or Regulation D Violation Fee (If applicable). We may give preference to any fees, charges, checks, debits or other items payable to us. However, if for some reason we must manually post your payments, items presented for payment may be paid in an order we select."

*Confidential*

**Exhibit 11**

**Select Changes in Language Pertaining to Payment Order of Items in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form Over Time[1]**

*Account Terms & Conditions [3]*

| | |
|---|---|
| *January 2010* | No relevant language |
| *July 2014* | The following language was added: |
| | "Our policy is to pay items in the order they are received. If they are received at the same time, we pay the smallest items first. More than one overdraft fee may be charged against the account per day." |
| *June 2015* | Disclosure language was revised to state the following: |
| | "The law permits us to pay items (such as checks or drafts) drawn on your account in any order. To assist you in handling your account with us, we are providing you with the following information regarding how we process the items that you write. When a transaction is 'posted,' the dollar value of that transaction is added to or subtracted from the balance of your account. For example, POS (Point of Sale) debit card transactions reduce your available balance at the time you authorize your purchase. Overdraft fees (if applicable) are assessed on POS debit card transactions at the time a POS becomes final, which in some cases may take several days. We pay items in the following order: Non-returnable items are posted by transaction type in the order they are presented (time stamped). Non-returnable items include: ATM and POS debit card transactions, in-person withdrawals and checks cashed at a Berkshire Bank branch, internal transfers to other Berkshire Bank accounts, payments and transfers initiated via Online Banking, returned deposited items, and wire transfers. ACH debits that you have preauthorized then post lowest to highest dollar amount. Finally, checks not presented in-person at a Berkshire Bank branch post lowest to highest dollar amount. We may give preference to any fees, charges, checks, debits or other items payable to us. However, if for some reason we must manually post your payments, items presented for payment may be paid in an order we select. If you are expecting a credit to your account by ACH, you should not schedule a debit to occur on the same day as your ACH credit may not be received until after your debit, resulting in an overdraft. For example, an ACH withdrawal transaction may be held for up to two business days before it posts to your account. If you overdraw your account, the order in which transactions are paid by the Bank may affect the total amount of overdraft fees you incur. We may change our posting order at any time, but we will notify you if such a change may affect you adversely. On your account statement we do not necessarily report debits and credits in the order that we posted them to your account." |
| *October 2016* | Disclosure language was revised to state the following: |
| | "When we process multiple transactions in a single business day, we may post items in any order. We generally group transactions in categories by type of transaction and post in the order they are presented (time stamped). The following are the most common categories and types: Deposits that have become available to you post first. We then may charge for any debit owed to us. In most cases, fees related to transactions would be assessed the day of the transaction and be deducted from the available balance after the transaction is completed. We pay Debit items in the following order- Wire transfers, ATM and POS debit card transactions, in-person withdrawals and checks cashed at a Berkshire Bank branch, internal transfers to other Berkshire Bank accounts, payments and transfers initiated via Online Banking, and returned deposited items. ACH debits that you preauthorized then post lowest to highest dollar amount. Checks not presented in-person at a Berkshire Bank branch post lowest to highest dollar amount. We then typically assess any Overdraft Fee, NSF Return Item Fee (Insufficient Funds), UAF Overdraft Fee (Uncollected/Unavailable Funds Fee) on the day the debit caused the overdraft or returned item. More than one overdraft fee may be charged against the account per day, not to exceed 5 per day. Continuous OD (overdraft) fees are assessed on the fifth business day that the balance has been overdrawn. The fee would be deducted from the available balance at that time. We may give preference to any fees, charges, checks, debits or other items payable to us. However, if for some reason we must manually post your payments, items presented for payment may be paid in an order we select." |

*Reg. E Opt-In Form [4]*

| | |
|---|---|
| *May 2010* | No relevant language |

*Confidential*

**Exhibit 11**

**Select Changes in Language Pertaining to Payment Order of Items in Courtesy Pay Disclosure, Account Terms & Conditions, and Reg. E Opt-In Form Over Time[1]**

**Notes:**

[1] Since May 10, 2010, these three forms have been presented to new customers at account opening.

[2] Berkshire Bank also released versions of the Courtesy Pay Disclosure in February 2010, September 2012, and June 2013. However, any changes to those versions did not involve language pertaining to payment order of items.

[3] Berkshire Bank also released versions of the Account Terms & Conditions in September 2010, July 2011, September 2013, and April 2017. However, any changes to those versions did not involve language pertaining to payment order of items.

[4] Berkshire Bank also released versions of the Reg. E Opt-In Form in August 2010, May 2011, October 2012, June 2013, February 2014, April 2014, May 2014, and March 2015. However, any changes to those versions did not involve language pertaining to payment order of items.

**Sources:**

[1] Declaration of Kristen Ricker, February 23, 2018, ¶¶31-33, 52-66, and Exhibit 62A.

[2] Berkshire Bank Courtesy Pay Disclosures (BB0000074-095).

[3] Berkshire Bank Account Terms and Conditions (BB0000015-059, BB0001107-114, BB0001091-106).

[4] Berkshire Bank Reg. E Opt-In Forms (BB0000096-104).

*Confidential*

**APPENDIX A**

**CURRICULUM VITAE**

*Confidential*

## REBECCA  KIRK  FAIR
**Managing Principal**

Phone: 617 425 8256          111 Huntington Avenue
Fax: 617 425 8001          14th Floor
rebecca.kirkfair@analysisgroup.com          Boston, MA 02199

Ms. Kirk Fair has conducted economic analysis and managed case teams in support of academic experts in a broad range of cases, including intellectual property, false advertising, tax, class certification, and major antitrust litigation.  She has also supported the FTC and parties in a variety of merger investigations. Ms. Kirk Fair has supported academic experts in prominent antitrust cases involving allegations of multinational and domestic cartels in the technology, consumer products, and finance industries, as well as allegations of monopolization and price fixing in both the financial services and IT industries. In particular, she has assisted with quantitative analyses and market research examining the consistency of plaintiffs' claims in the defense of multiple class certification matters in the financial services industry for payment card clients and several major brokerage houses. In *Discover v. MasterCard* and *American Express v. Visa, MasterCard, and Issuing Banks*, she oversaw multiple analyses in support of experts assessing damages and market equilibrium.

Ms. Kirk Fair has extensive experience in the development, administration, and analysis of surveys in antitrust, false advertising, and intellectual property matters, as well as strategy cases. She has supported the design and implementation of online, mall-intercept, and telephone surveys using a variety of methodologies, including conjoint and experimental designs. She has also served as an expert witness, testifying in arbitration, deposition, and at trial in matters involving the design and implementation of consumer surveys, as well as the evaluation of plaintiffs' surveys and statistical sampling and analyses. In addition, she has served as an expert witness in matters involving corporate valuation, patent infringement (analyzing both lost profits and reasonable royalty damages), breach of contract damages, and trademarks. Ms. Kirk Fair has supported academic experts in undertaking analyses of and surveys related to consumer perception, feature value, and marketing procedures in connection with IP and antitrust disputes, as well as fraudulent claims suits and trademark matters. She has been invited to speak in front of the American Bar Association, the New York State Bar Association, and the Canadian Bar Association on survey, consumer protection, and competition issues.

## SELECTED  CONSULTING  EXPERIENCE

**Merger Analyses and Antitrust Litigation**

- ▪ ***Large price-fixing cases in IT manufacturing industries***
  Assisted in quantitative analysis and industry research to evaluate competition, pricing, and outputs in connection with two separate international price-fixing investigations in IT manufacturing industries.

- ▪ ***Large price-fixing cases in various sectors of the financial service industry***
  Assisted in quantitative analysis and market research to examine consistency of plaintiffs in multiple class certification matters.

- ▪ ***WEX acquisition of EFS***
  Supported both parties through the second request and the FTC's inquiry into the potential unilateral and coordinated effects of the merger of two of the country's largest fleet card companies. The transaction was consummated.

*Confidential*

- **GO Computer v. Microsoft**
  Supported Professor Catherine Tucker of MIT in an analysis of competition amongst operating systems and computing platforms.
- **Zimmer's Acquisition of Biomet**
  Supported Biomet in its second request compliance and an analysis of product comparability, substitution rates, and customer loyalty using transaction and market data.
- **Archipelago/NYSE Merger**
  Supported Professor Robert Pindyck of MIT in his economic analysis on behalf of the parties, related to ease of entry, order internalization, and technological advancements. The transaction was consummated.
- **Microsoft litigations in various forums**
  Economic analysis on behalf of Microsoft in numerous competitor and consumer litigations on issues of competition, pricing, and damages. Supported survey design and research related to server software. Developed and critiqued damages models related to computer security, software pricing, and product development.

**Class Certification Litigation**

- **Dahl, et al. v. Kohlberg Kravis Roberts & Co., et al.**
  Worked with the JDG in support of numerous experts on issues of class certification and damages for group and individual private equity firms in matter alleging collusion.

- **Financial Exchange Cartel Litigation**
  Supported multiple experts on issues of class certification, marketplace analyses, and damages models for the defendant in a matter alleging collusion related to a financial instrument exchange platform.

- **Air Cargo Litigations**
  Evaluated industry dynamics, transaction data, and damages exposure for several Air Cargo defendants, including an evaluation of impact of plea agreements. Marketplace analysis included comparison of pricing patterns in areas covered and excluded from plea agreements.

- **Antitrust Litigation in the Transportation Sector**
  Casework included assisting with settlement negotiations and developing affirmative analyses in connection with ongoing class certification proceedings, on behalf of the defendants.

- **Auto Parts Litigation**
  Supported affirmative and rebuttal analyses for an indirect purchaser class action in an auto filters cartel case. Analyzed wholesale and retail transaction data, evaluated pass-through, and calculated firm and product profitability.

- **Light Cigarettes Marketing Litigations**
  Worked with plaintiffs in class action lawsuits in California, Massachusetts, and Missouri filed against the makers of "light" cigarettes. Supported marketing expert Joel Steckel to conduct conjoint analyses of consumer preference of light tobacco and nicotine in connection with a damages analysis.

*Confidential*

- ▪ *MasterCard Litigations*
  Assisted in economic analysis on behalf of MasterCard in government and consumer litigations, including several class actions. Supported design and analysis of consumer survey regarding the use of various payment methods. Supported counsel in all phases of trial, including the development of direct testimony, trial demonstratives, and cross-examination questions.

**Survey-related Litigation**

- ▪ *Large patent infringement suits in online retail industry*
  Assisted in the design, implementation, and analysis of a survey to demonstrate that patented technologies provided substantial value to online retailers. In a similar ongoing matter, demonstrated the consumer impact of a copyrighted feature that provides functionality to a consumer electronics product.

- ▪ *Commercial litigation and damages case in online retail industry*
  Assisted in the assessment of the impact on consumer purchase behavior and price recall of allegedly misleading measures, including advertising language, in a commercial litigation and damages case. Supported field experiments, lab experiments, and analysis to assess consumer interpretation of comparison pricing language.

- ▪ *Antitrust and intellectual property litigations on behalf of Microsoft*
  Assisted Microsoft in various IP and antitrust matters in the assessment of the impact on consumer behavior, product adoptions, and functionality usage. Matters involved desktop media, browser, office productivity, and security software, as well as server software. Supported lab experiments, qualitative interviews, and web-scraping studies to assess consumer behavior and usage amongst end-customers and IT professionals.

- ▪ *Trademark infringement matter of athletic apparel company*
  Supported marketing expert Joel Steckel in a trademark infringement case in which an athletic apparel company claimed that a sports drink maker infringed on its trademark and diluted its brand.

- ▪ *Trademark dispute in music services*
  Developed, designed, and launched a pilot study in a trademark dispute to evaluate respondent perception by customer segment.

- ▪ *Trademark infringement matter of a candy company*
  Supported marketing expert Joel Steckel in a trademark infringement case in front of the TTAB in which a candy company was trying to bar entry of a foreign competitor that had infringed on its trademark and may have diluted its brand.

- ▪ *Trademark infringement matter between two apparel companies*
  Supported marketing expert Joel Steckel in designing and implementing a reverse confusion survey in a trademark infringement case in which an apparel company claimed that an athletic company infringed on its design mark.

- ▪ *Antitrust case in the credit card industry*
  Supported marketing expert John Hauser in rebutting an opposing expert's survey by showing that small methodological improvements to the original survey lead to substantial differences in results, in a case involving credit card payment procedures.

- ***Fox Broadcasting Company et al. v. DISH Network LLC et al.***
  Supported marketing expert John Hauser in designing and implementing two surveys pertaining to use of television services, as well as in analyzing an array of industry data. After more than two years of litigation, a California federal judge found that Analysis Group client DISH's Hopper DVR does not infringe Fox's copyrights.

- ***Berlex Laboratories, Inc. v. Biogen, Inc.***
  Supported expert witness in the determination of a reasonable royalty-related damages claim in a patent infringement case in the pharmaceutical industry. Assisted in the design and analysis of a market research survey of multiple sclerosis patients for use in damages model. (United States District Court, District of Massachusetts)

- ***Trademark infringement matter in the food industry***
  Supported marketing expert Joel Steckel in designing a forward confusion and two reverse confusion surveys and implementing the forward confusion survey in a trademark infringement case in which an author / speaker claimed that the title of his book was inappropriately used in a TV commercial of a packaged food product.

- ***Confusion matter in the entertainment industry***
  Supported marketing expert Joel Steckel in a trademark infringement case in which a TV company used a name for its show (and a company featured in the show) that was similar to the name of an existing company; assisted with design of forward and reverse confusion surveys.

## Intellectual Property and Commercial Litigation

- ***MBIA Insurance v. Credit Suisse Securities***
  Supported expert witness Antoinette Schoar in a rebuttal report of Joseph Stiglitz, evaluating the relationship between economic and contractual incentives in mortgage-backed securities. Supported expert witness Arnold Barnett in a rebuttal report, evaluating statistical relationship between a sample of loans on prediction of overall loan performance.

- ***Front-Loading Washers***
  Supported conjoint study and economic analysis in support of multiple damages analyses, in product defect litigations against several manufacturers of front-loading washing machines. (Multiple jurisdictions)

- ***T-Netix, Inc. v. MCI WorldCom Communications, Inc. and Global Tel*Link Corp.***
  Supported expert witness in all aspects of expert report preparation and deposition testimony in the estimation of lost profits and reasonable royalty damages from alleged infringement of patents related to prison phone systems. (United States District Court, Eastern District of Texas, Marshall Division)

- ***Burst.com v. Microsoft Corp.***
  Assisted in an analysis of both patent and trade secrets damages and antitrust damages in a case involving software used for streaming media. Responded to plaintiff's claim of lost profits damages and unjust enrichment arising from the misappropriation of trade secrets. (United States District Court, District of Maryland)

*Confidential*

- **Gary Kosseff v. James Ciocia et al.**
  Supported expert witness in the determination of fair market value of assets sold in a private transaction. Assisted expert in assessment and valuation of comparable companies and rebuttal testimony. (The Court of Chancery of the State of Delaware in and for New Castle County)

- **Adelson, et al., v. Adelson**
  Assisted in the valuation of a family business involving COMDEX. Assisted expert and counsel in deposition and trial testimony. (Massachusetts Superior Court, Middlesex County)

- **KX Industries, L.P. and Koslow Technologies Corporation v. Culligan Water Technologies, Inc., and Plymouth Products Inc.**
  Assisted expert in all aspects of report preparation, deposition preparation, and trial preparation in the estimation of damages stemming from lost profits, royalties, and price erosion claims in patent infringement claim pertaining to water filtration products. (United States District Court, District of Delaware)

- **Plastics Research Corporation, Inc. v. Brite Millwork, Inc.**
  Assisted in the development of a damages model to calculate lost profits, reasonable royalty, and price erosion damages from alleged infringement of a patent related to injection molded lattice products. (United States District Court, Eastern District of Michigan, Southern Division)

- **Molten Metal Equipment Innovation, Inc. v. Metaullics**
  Supported expert witness in the determination of lost profits, reasonable royalty, and prejudgment interest covering a patent directed to submersible molten metal pumps. (United States District Court, Northern District of Ohio)

- **Fonar Corporation v. Magnetic Resonance Plus, Inc.**
  Supported expert witness in a product tying evaluation of the imaging market to assess the competitive nature of service contracts. (United States District Court, Southern District of New York)

**Transfer Pricing Litigation**

- **Glaxo Americas, et al. v. Internal Revenue Service**
  Supported expert in econometric analysis and evaluation of pharmaceutical marketing in the pharmaceutical industry. Case settled. (United States Tax Court)

- **AstraZeneca, et al. v. Her Majesty's Revenue and Customs**
  Supported consulting expert team on pharmaceutical valuation and licensing issues. Case settled. (United States Tax Court)

## SELECTED PRESENTATIONS AND SPEAKING ENGAGEMENTS

"Practical Issues in Counseling at the Intersection of IP and Antitrust," New York State Bar Association Antitrust Law Section Meeting, January 25, 2018

"Legal Challenges to State Laws Prohibiting Surcharges on Credit Card Transactions: Implications for the Industry," American Bar Association, July 14, 2016

"The Use of Survey Evidence in Class Litigation," California Bar Association, May 25, 2016

"The Next Frontiers: Social Media and Other Cutting Edge Issues in Advertising and Marketing," Canadian Bar Association Competition Law Fall Conference, October 2, 2015

*Confidential*

"Is False Advertising Anticompetitive," American Bar Association Antitrust Section Spring Meeting, Washington D.C., April 17, 2015

"Antitrust Enforcement and the Bazaarvoice Case," New York State Bar Association Antitrust Law Section panel, May 21, 2014

"Branding & Brands in Law, Accounting & Marketing," The Kenan Institute, University of North Carolina, April 12, 2012

"Calculating and Presenting Damages in Patent Infringement Matters," February 2, 2010

"Reverse Payments – Balancing IP and Antitrust Concerns," Boston Bar Association, May 20, 2009

Discussion and guided case study analysis on strategic planning and financial analysis with an emphasis on the use of historical financial data in monitoring a public company, DirectWomen Board Institute, February 22, 2008

"Survey Analysis Report," First Annual Business Technology Outlook, North Dallas Chamber of Commerce, October 24, 2007

"Patent Holding Company Panel," Streaming Media East Show, New York City, May 15, 2007

"Innovative Application of Economic Methods," Analysis Group seminar on patent damages, March 2007

"Data & Discovery – The Economist's Perspective," Analysis Group seminar, May 10, 2005


## PUBLICATIONS

"Estimating Lost Sales Damages in Antitrust Cases: Can't Count on Success," with Aaron Yeater, *The Witness Chair*, Issue 71, Winter 2018.

"The Ability to Achieve Lost Sales as a Consideration in Damages Analyses," with Aaron Yeater, chapter in *Lost Profits Damages: Principles, Methods, and Applications*, eds. Everett P. Harry, III and Jeffrey H. Kinrich, 2017.

"Managing Multiple Expert Witnesses: Best Practices and Pitfalls," with Laura Comstock, Andrea Okie, and Carletta Wong, *American Bar Association Section of Litigation, The Woman Advocate*, August 17, 2017.

"Survey And Real-World Data: A Winning Combination," with Peter Simon, Kristina Shampanier, and Riddhima Sharma, *Law360*, July 14, 2017.

"What Consumers Really Think About Reference Price Labels," with Joel Steckel, Kristina Shampanier, Laura O'Laughlin, and Jesse Shea, *Law360*, March 21, 2017.

"Ensuring Validity and Admissibility of Consumer Surveys," with Laura O'Laughlin, *American Bar Association Section of Litigation Consumer Litigation Newsletter*, Winter 2017.

"Antitrust Enforcement in Two-Sided Markets," with Juliette Caminade, Federico Mantovanelli, and David Toniatti, *American Bar Association Section of Antitrust Law Economics Committee Newsletter,* Winter 2016.

"3 Questions to Ask When Using Surveys in Litigation," with Laura O'Laughlin, *Law360,* May 15, 2015.

"Is It Worth Anything? Using Surveys in Intellectual Property Cases," with Joel Steckel and Rene Befurt, *white paper*, 2013.

*Confidential*

"Tools for Handling Mortgage-Based FCA Claims," with David Mishol, *Law360*, September 26, 2012.

"Digital Media Patents for Profit," with Dan Rayburn and Almudena Arcelus, *Streaming Media Magazine: Industry Sourcebook 2007*.


**PROFESSIONAL AFFILIATIONS**

ABA (American Bar Association)

      Section of Antitrust Law

      Section of Intellectual Property Law

American Marketing Association (AMA)

Women's Competition Network (WCN)


**EDUCATION**

M.B.A.      Sloan School of Management, Massachusetts Institute of Technology, Cambridge, MA

B.A.      Economics (with honors), Middlebury College, Middlebury, VT

*Confidential*

**APPENDIX B**

**TESTIMONY IN THE PAST FOUR YEARS**

*Confidential*

**LITIGATION EXPERIENCE INVOLVING EXPERT TESTIMONY BY DEPOSITION AND/OR IN COURT**

- ▪ ***PersonalWeb Technologies, LLC et al., v. International Business Machines Corporation***
  Expert witness of behalf of International Business Machines Corporation in a patent litigation.   Submitted an expert report conducting a survey designed to evaluate the frequency at which the at-issue feature is used.   Testified at deposition. (Northern District of California).

- ▪ ***Yeti Coolers, LLC v. RTIC Coolers, LLC, et al.***
  Expert witness on behalf of RTIC Coolers in a trademark and trade dress dispute. Submitted an expert report conducting an *Eveready* survey to calculate likelihood of consumer confusion. Reviewed and evaluated the plaintiff's expert report, including two surveys related to likelihood of confusion. Testified at deposition. (Western District of Texas – Austin Division)

- ▪ ***Sterling Jewelers, Inc. v. Artistry Ltd***.
  Expert witness on behalf of Sterling in a trademark dispute.  Submitted an expert report evaluating lost profits and unjust enrichment due to the potential for confusion between customers of Sterling's Artistry Diamonds line and customers of distributor Artistry, Ltd. Testified at deposition.  (Northern District of Ohio – Eastern Division)

- ▪ ***U.S. and the States of California, Illinois, North Carolina and Ohio v. DISH Network, LLC***
  Expert witness on behalf of Dish. Submitted an expert report evaluating the sampling methodology and statistical analysis put forth by plaintiffs' expert witness. Testified at two depositions and at trial.  (Central District of Illinois – Springfield Division)

- ▪ ***Smartphone Technologies LLC v. Research in Motion Corp., et al.***
  Expert witness on behalf of Apple, Inc. in a patent infringement case. Reviewed and evaluated the plaintiff's expert reports in connection with an online survey. Testified at deposition. (Eastern District of Texas – Tyler Division)

- ▪ ***John A. Gentile et al. v. Pasquale David Rosette and Douglas Bachelor***
  Expert witness in a fair value dispute for a privately held software company. Analyzed the effect of debt conversion on minority stockholders in both an affirmative and a rebuttal report. Testified at deposition and at trial. (The Court of Chancery of the State of Delaware in and for New Castle County)

*Confidential*

**APPENDIX C**

**MATERIALS CONSIDERED**

*Confidential*

<div align="center">

**Materials Considered**

</div>

**Legal Documents**

Defendants' Answers and Objection to Plaintiffs' First Set of Interrogatories, *Sandra Bond, individually and on behalf of all others similarly situated, Plaintiffs v Berkshire Bank and Berkshire Hills Bancorp, Defendants*, United States District Court District of Massachusetts Western Division, Case No. 16-30050-MGM.

First Amended Complaint, *Sandra Bond, individually and on behalf of all others similarly situated, Plaintiffs v Berkshire Bank and Berkshire Hills Bancorp, Defendants*, United States District Court District of Massachusetts Western Division, Case No. 16-30050-MGM, July 15, 2016.

**Depositions, Declarations, and Expert Reports**

Declaration of Catherine Masterson, February 20, 2018.

Declaration of Kristen Ricker, February 23, 2018.

Declaration of Samantha Tanner, February 16, 2018.

Declaration of Susan Gagne, February 21, 2018.

Deposition of Ashlee Picard-Flores, June 22, 2017.

Deposition of Dawne Cowhey, October 23, 2017.

Deposition of Deborah A. Stephenson, September 7, 2017.

Deposition of Dylan Bond, September 26, 2017.

Deposition of Jesse David, January 16, 2018.

Deposition of Kathlyn Farrell, December 19, 2017.

Deposition of Kristin Ricker, October 24, 2017.

Deposition of Linda Blondek, October 12, 2017.

Deposition of Sandra Bond, September 25, 2017.

Deposition of Theresa Wituszynski, October 25, 2017.

Expert Report of Jesse David, Ph.D., December 8, 2017.

Expert Report of Sonya Kwon, Ph.D., February 27, 2018.

**Case Documents**

| | |
|---|---|
| BB-BOND-0000006-009. | BB-BOND-0000573. |
| BB-BOND-0000359-362. | BB-BOND-0003643-661. |
| BB-BOND-0000570. | BB-BOND-0005268. |
| BB-BOND-0000572. | BB-ED-0000542-556. |

*Confidential*

BB-ED-0007512-516.

BB-EM-0010344.

BB-EM-0032948-949.

BB-EM-0033807.

BB-EM-0034225-239.

BB-EM-0035983-984.

BB-EM-0039729.

BB-EM-0041870-871.

BB-EM-0051886-890.

BB-EM-0056963-964.

BB-EM-0059629-643.

BB-EM-0060425-440.

BB-EM-0060659-670.

BB-EM-0061311-322.

BB-EM-0077983-994.

BB-EM-0078441.

BB0000001-014.

BB0000015-020.

BB0000024-029.

BB0000033-039.

BB0000043-049.

BB0000053-059.

BB0000074-075.

BB0000076-077.

BB0000078-079.

BB0000080-081.

BB0000082-083.

BB0000084-085.

BB0000086-088.

BB0000089-091.

BB0000092-095.

BB0000096.

BB0000097.

BB0000098.

BB0000099.

BB0000102.

BB0000103.

BB0000104.

BB0000522.

BB0000524.

BB0000530-531.

BB0000533.

BB0000593.

BB0000655-671.

BB0000703.

BB0000719.

BB0000720-735.

BB0000858-860.

BB0001011-015.

BB0001033.

BB0001068-069.

BB0001086-087.

BB0001091-098.

BB0001099-1106.

BB0001107-114.

BB0001166-167.

BB0001170.

## Books and Other Publicly Available Sources

12 C.F.R, § 205.

Assael, H., *Consumer Behavior: A Strategic Approach*, Boston, MA: Houghton Mifflin Company, 2004.

Balcetis, E. and D. Dunning, "See What You Want to See: Motivational Influences on Visual Perception, *Journal of Personality and Social Psychology*, Vol. 91, No. 4, 2006, pp. 612-625.

Bar, M., "The Proactive Brain: Using Analogies and Association to Generate Predictions," *TRENDS in Cognitive Science*, Vol. 11, No. 7, 2007, pp. 280-289.

Barber, W.G., "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. S.S. Diamond and J.B. Swann, American Bar Association, 2012, pp. 27-49.

Berkshire Bank, "Overview," available at https://www.berkshirebank.com/about-us/news-room/overview, accessed on February 21, 2018.

Bettman, J.R., M.F. Luce, and J.W. Payne, "Constructive Consumer Choice Process," *Journal of Consumer Research*, Vol. 25, No. 3, December 1998, pp. 187-217.

Bettman, J.R. and C.W. Park, "Effects of Prior Knowledge and Experience and Phase of the Choice Process on Consumer Decision Processes: A Protocol Analysis," *Journal of Consumer Research*, Vol. 7, No. 3, December 1980, pp. 234-248.

Bradburn, N.M., L.J. Rips, and S.K. Shevell, "Answering Autobiographical Questions: The Impact of Memory and Inference on Surveys," *Science*, Vol. 236, No. 4798, 1987, pp. 208-216.

CFPB, "Consumer Voices on Overdraft Programs," November 2017.

Clarke, R.L. and T.J. Zywicki, "Payday Lending, Bank Overdraft Protection, and Fair Competition at the Consumer Financial Protection Bureau," *Review of Banking and Financial Law*, 2013-2014, pp. 235-281.

Diamond, S.S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359-423.

Gelb, G.M. and B.D. Gelb, "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *The Trademark Reporter*, Vol. 97, No. 5, September-October, 2007, pp. 1073–1088.

Jacoby, J., "Are Closed-Ended Questions Leading Questions?" in *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. S.S. Diamond and J.B. Swann, American Bar Association, 2012, pp. 261-284.

Kerin, R.A., S.W. Hartley, E.N. Berkowitz, and W. Rudelius, *Marketing*, 8th ed., New York, NY: McGraw Hill, 2006.

Kotler, P. and K.L. Keller, *Marketing Management*, 14th ed., Upper Saddle River, NJ: Pearson, 2012.

Confidential

Krosnick, J.A., C.M. Judd, and B. Wittenbrink, "The Measurement of Attitudes," *Handbook of Attitudes and Attitude Change*, eds. D. Albarracin, B.T. Johnson, and M.P. Zanna, Erlbaum, 2005, pp. 21-76, pp. 43-46.

Mankiw, G.N., *Principles of Microeconomics*, 7th ed., Stamford, CT: Cengage Learning, 2015.

Miller, J., "Online Marketing Research," *The Handbook of Marketing Research: Uses, Misuses, and Further Advances*, eds. R. Grover and M. Vriens, Sage Publications, 2006, Chapter 7.

Neter, J. and J. Waksberg, "A Study of Response Errors in Expenditure Data from Household Interviews," *Journal of the American Statistical Association*, Vol. 59, No. 305, 1964, pp. 18-55.

Netzer, O. and V. Srinivasan, "Adaptive Self-Explication of Multiattribute Preferences," *Journal of Marketing Research*, Vol. 48, February 2011, pp. 140-156.

Novantas, "Understanding Consumer Choice: A Review of Consumer Overdraft Behaviors," October 2015.

Oppenheimer, D.M., T. Meyvis, and N. Davidenko, "Instructional Manipulation Checks: Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology*, Vol. 45, 2009, pp. 867-872.

The PEW Charitable Trusts, "Overdrawn, Persistent Confusion and Concern about Bank Overdraft Practices," June 2014.

Putsis, W.P. and N. Srinivasan, "Buying or Just Browsing? The Duration of Purchase Deliberation," *Journal of Marketing Research*, Vol. 31, No. 3, August 1994, pp. 393-402.

Sawyer, A.G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, No. 4, March 1975, pp. 20-30.

Shimp, T.A., E.M. Hyatt, and D.J. Snyder, "A Critical Appraisal of Demand Artifacts in Consumer Research," *Journal of Consumer Research*, Vol. 18, No. 3, December 1991, pp. 273-283.

Simonson, I. and R. Kivetz, "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. S.S. Diamond and J.B. Swann, American Bar Association, 2012, pp. 243-244.

Solomon, M.R., *Consumer Behavior*, 9th ed., Upper Saddle River, NJ: Pearson, 2011.

Sudman, S., N.M. Bradburn, and N. Schwartz, *Thinking About Answers: The Application of Cognitive Processes to Survey Methodology*, Jossey-Bass Publishers, 1996, pp. 100-129.

Survey Sampling International, "Consumer Online Panel," https://www.surveysampling.com/audiences/consumer-online/, accessed January 22, 2018.

Survey Sampling International, "Survey Panels and Respondent Experience," https://www.surveysampling.com/knowledge-center/panels-respondent-experience/, accessed January 22, 2018.

*Confidential*

Tourangeau, R., L.J. Rips, and K. Rasinski, "The Role of Memory in Survey Responding," *The Psychology of Survey Response*, 10th edition, New York, NY: Cambridge University Press, 2009.

Yu, D. and J.H. Fleming, "How Customers Interact With Their Banks," *Gallup News*, May 7, 2013, available at http://news.gallup.com/businessjournal/162107/customers-interact-banks.aspx, accessed on December 4, 2017.

*Confidential*

**APPENDIX D**

**SURVEY DESIGN, IMPLEMENTATION, AND RESULTS**

*Confidential*

### A.   Survey Design and Implementation

#### a.   *Target Population*

1.   As part of my assignment, I was asked to evaluate the extent to which the perceptions, understandings, expectations, and behaviors of actual and prospective Berkshire Bank customers can be evaluated on a class wide basis and whether Sandra Bond is sufficiently representative of the proposed class members. To do so I conducted a double-blind on-line survey of recent debit card users who reside in the six states in which Berkshire Bank operates, a sample representative of the actual and potential users of Berkshire Bank overdraft services. My survey examined respondents' understandings of their account balances, expectations about authorization to overdraw an account, expectations regarding associated fees, and preferences regarding proceeding with such transactions. Additionally, I assessed respondents' actual behavior with respect to their existing debit and checking accounts. This research helps to inform the extent to which one can assess the potential liability and damages, if any, from the allegations in this matter.

2.   The target population or "universe" of a survey consists of all the individuals a researcher is interested in studying.[1] Defining the relevant target population is a critical step in designing a survey because responses of members of the relevant population may be systematically different from responses of nonmembers.[2] Given the allegations in this matter relate to disclosure materials associated with checking and specifically debit card services, the appropriate target population is prospective and past purchasers of such products and services.[3]

3.   Debit card holders are those who decide whether or not to opt into overdraft services associated with Reg E. and are therefore potential "purchasers" of the at-issue services and would be subject to the alleged deception. Therefore, the target population in my study includes people who live in the United States, are at least 18 years old, have used a debit card in the past twelve

---

[1]   Diamond, S.S., "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, The National Academies Press, 2011, pp. 359-423 ("Diamond 2011"), p. 377.

[2]   Diamond 2011, p. 377-379. See also Barber, W.G., "The Universe," in *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. S.S. Diamond and J.B. Swann, American Bar Association, 2012, pp. 27-49 ("Barber 2012"), pp. 27-28.

[3]   Diamond 2011, p. 376; Barber 2012, p. 36.

*Confidential*

months and reside in a state where Berkshire Bank operates.[4,5,6] The complete set of screening questions as well as the rest of the survey script is presented as Appendix D.A. Survey screenshots are presented as Appendix D.B.

#### b.   Survey Design

4.   My survey examined recent debit card users' understandings of their account balances, expectations about authorization to overdraw an account, expectations regarding associated fees, and preferences regarding proceeding with such transactions. Additionally, I assessed respondents' actual behavior with respect to their existing debit and checking accounts including, amongst others, their monitoring of bank balances and their experience with overdrafts.

#### 1.   Survey Stimuli

5.   The context in which a product or service is evaluated provides consumers with information they use in forming judgement. Similarly, the context and design of a stimulus in a survey provides respondents with information when faced with a question about that stimulus.[7] Good survey stimuli should also be "meaningful and realistic"[8] relative to the questions being asked. My survey stimuli (which are modified versions of Berkshire Bank's actual Reg. E Opt-In Forms presented to customers) match the selection environment for the at-issue Berkshire Bank services during different times in the proposed class period.

---

[4]   Berkshire Bank currently operates branches in Connecticut, Massachusetts, New Jersey, New York, Pennsylvania, and Vermont. Berkshire Bank, "Overview," available at https://www.berkshirebank.com/about-us/news-room/overview, accessed on February 21, 2018. Respondents who did not indicate one of these states in response to question S4 ("What state do you live in?") were excluded from the survey.

[5]   Per best practices, I excluded respondents who might have specialized knowledge or insight related to issues examined in the survey in order to minimize bias. The excluded respondents were ones who work or have family who work in a financial services firm or bank or a marketing, market research, or advertising agency. *See,* for example, Gelb, G.M. and B.D. Gelb, "Internet Surveys for Trademark Litigation: Ready or Not, Here They Come," *The Trademark Reporter*, Vol. 97, No. 5, September-October, 2007, pp. 1073–1088, p. 1083.

[6]   To ensure representativeness of the sample, I also implemented survey start quotas, so that all respondents who were qualified to take the survey based on the preliminary questions about age, gender, and employment (i.e., those respondents who were asked question S6 "In the <u>past 12 months</u>, which of the following, if any, have you used?") were matched on age and gender distribution, according to U.S. census, to the six states where Berkshire Bank operates.

[7]   Sudman, S., N.M. Bradburn, and N. Schwartz, *Thinking About Answers: The Application of Cognitive Processes to Survey Methodology*, Jossey-Bass Publishers, 1996, pp. 100-129, p. 100.

[8]   Netzer, O. and V. Srinivasan, "Adaptive Self-Explication of Multiattribute Preferences," *Journal of Marketing Research*, Vol. 48, February 2011, pp. 140-156, p. 147.

*Confidential*

6. The stimuli in my survey reflect the Reg. E Opt-In Forms as they were presented to customers at account opening during the proposed class period. Specifically, I selected two versions of Berkshire Bank's Reg. E Opt-In Form (2010 and 2015) to use as the basis for my stimuli.[9] The two versions differed in their discussion of available balance. The 2010 Reg. E Opt-In Form is described in the complaint as deceptive due to an alleged lack of proper disclosure regarding available balance.[10] The 2015 form explicitly defines available balance and the effect of debit card authorizations on customers' available balance for purposes of assessing overdraft fees as the complaint and Dr. David both acknowledge.[11] The stimuli, as well as the original disclosure forms on which they are based, are presented in Appendix D.C.[12] By using both the 2010 and 2015 Reg. E Form as stimuli, I am able to not only assess consumer understandings, perceptions, and expectations, but I can also assess if explicit reference to the term "available balance" and the effect of debit card authorizations on available balance in the disclosures makes a difference to consumer understandings, perceptions, or behaviors, as implied by the Plaintiffs. If the Plaintiffs' assertions are correct, I would observe differences between responses of those who were presented with the 2015 form as opposed to those who were presented with the 2010 form.

### 2.   Additional Design Considerations

7. It is widely acknowledged in the survey field that clarity of the survey questions is critical for the reliability of the resulting data. As the *Reference Manual on Scientific Evidence* emphasizes: "[w]hen unclear questions are included in a survey, they may threaten the validity of the survey by systematically distorting responses if respondents are misled in a particular direction, or by inflating random error if respondents guess because they do not understand the

---

[9]   Berkshire Bank, "New Overdraft Rules for Debit and ATM Cards," (BB0000097); according to Kristen Ricker, this form was used in 2010. Declaration of Kristen Ricker, February 23, 2018, ¶56. Berkshire Bank, "Overdraft Rules for Debit and ATM Cards," March 12, 2015 (BB0000104).

[10]  Specifically, this form does not explicitly reference the term "available balance" or the effect of debit card authorizations on available balance. Complaint, ¶¶1-6.

[11]  Complaint, ¶16; Expert Report of Jesse David, Ph.D., December 8, 2017 ("David Report"), ¶¶25, 37; Deposition of Jesse David, January 16, 2018 ("David Deposition"), p. 228:13-24.

[12]  The stimuli used in the survey differed from the original Berkshire Bank forms in the following ways. To anonymize the forms, I changed "Berkshire Bank" to "Bank XYZ" throughout, the color of the text in the Berkshire Bank header at the top of the forms from green to blue, the leaf symbol to a triangle, and "Berkshire Bank: America's Most Exciting Bank" to "Bank XYZ: America's Bank." I also modified the phone number to 123-456-7890 within the forms. Additionally, I removed the statement "(refer to Courtesy Pay Disclosure for details)" from the sentence "We have standard overdraft practices that come with your account (refer to Courtesy Pay Disclosure for details)" on the 2015 form and removed the date from the 2015 form (the 2010 form was not dated).

question."[13] Throughout my survey, I minimize the possibility of noise and bias affecting the survey results by presenting clear questions and answer choices, asking balanced questions, and rotating answer options.[14]

8. For example, all closed-ended questions in the main part of the survey are presented as a clear and concise set of choices, in which response options were rotated across respondents. Further, randomly rotating the order of affirmative/negative answer options across respondents minimized the possibility of bias due to order effects.[15] For example, some respondents were presented with "The $40 withdrawal would be allowed" followed by "The $40 withdrawal would be declined" and others were presented with these answer options in the opposite order. "Unsure / No opinion" is anchored to always appear last. The order of affirmative/negative answer options was held consistent across questions for each respondent.

9. I avoided forced guessing by offering an "Unsure / No opinion" option for every question in the main part of the survey.[16] Further, I used balanced questions, such as "Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?" By placing an equal emphasis on the positive and negative statements, I avoided steering the respondent to a particular answer.[17]

10. I took additional steps to minimize the possibility of "demand artifacts"—situations in which the methodology and/or survey suggest to respondents that they should provide a particular response that is "demanded" by the survey.[18] Properly designed surveys attempt to avoid

---

[13] Diamond, p. 388.

[14] Jacoby, J., "Are Closed-Ended Questions Leading Questions?" in *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. S.S. Diamond and J.B. Swann, American Bar Association, 2012, pp. 261-284 ("Jacoby 2012"), pp. 274-275. "When the question itself or the response options provided with the question are weighted more in one direction rather than another, the question is a leading question. Failure to be balanced assumes many different forms," (p. 274). Examples of a failure to be balanced include "failure to provide options representing opponent's argument(s) or position(s)" and "failure to give comparable explicit emphasis to the affirmative, negative, and neutral positions," (pp. 274-275).

[15] Krosnick, J.A., C.M. Judd, and B. Wittenbrink, "The Measurement of Attitudes," *Handbook of Attitudes and Attitude Change*, eds. D. Albarracin, B.T. Johnson, and M.P. Zanna, Erlbaum, 2005, pp. 21-76, pp. 43-46; Diamond 2011, pp. 395-396.

[16] "[T]he survey can … reduce guessing by providing 'don't know' or 'no opinion' options as part of the question… By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply. Respondents are more likely to choose a 'no opinion' option if it is mentioned explicitly by the interviewer than if it is merely accepted when the respondent spontaneously offers it as a response." Diamond 2011, p. 390.

[17] For a discussion of balanced questions, see Jacoby 2012, p. 275.

[18] Sawyer, A.G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, No. 4, March 1975, pp. 20-30 ("Sawyer 1975"); Shimp, T.A., E.M. Hyatt, and D.J. Snyder, "A Critical Appraisal of Demand Artifacts in Consumer Research," *Journal of Consumer Research*, Vol. 18, No. 3,

*Confidential*

demand artifacts. As articulated in the *Reference Manual on Scientific Evidence*, "the survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses."[19]

11. In addition to formulating questions as discussed above, I mitigated the potential for demand artifacts in three ways. First, I used a blind methodology in which respondents and staff members (interviewers at the pretest discussed below) at the survey panel, administered by Survey Sampling International ("SSI"), were blind to the study's purpose and sponsorship.[20] The survey invitation and screening questions were designed to avoid any indications to respondents as to the survey's purpose or sponsor. Second, I implemented the survey on the Internet, avoiding interviewer bias.[21] Third, prior to launching the full survey, I pretested the survey to ensure that the stimuli were visible and clear, that respondents understood the questions, and that respondents were not able to guess the purpose of the survey.[22] Pretest moderator instructions are presented in Appendix D.D. Finally, to ensure whether respondents are paying attention during the survey, I implemented an attention-check multiple-choice question, known as "instructional manipulation check" [23] within the screening portion of the survey.

---

December 1991, pp. 273-283, p. 281 ("Shimp et al. 1991"); Simonson, I. and R. Kivetz, "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," *Trademark and Deceptive Advertising Surveys: Law, Science and Design*, eds. S.S. Diamond and J.B. Swann, American Bar Association, 2012 ("Simonson and Kivetz 2012"), pp. 243-244.

[19]   Diamond 2011, p. 411.

[20]   Diamond 2011, p. 374 and pp. 410-411, "[A]ny potential bias is minimized by having interviewers and respondents blind to the purpose and sponsorship of the survey."

[21]   "In-depth interviews in the interpretivist tradition are particularly susceptible to demand-type artifacts. The same individual often interviews numerous participants, and though in strict naturalistic-inquiry terms the researcher has no a priori agenda or hypotheses (Lincoln and Guba 1985), it is only human to have expectations about the research outcome or to form expectations during the course of the research." Shimp et al. 1991, p. 281. See also Miller, J., "Online Marketing Research," *The Handbook of Marketing Research: Uses, Misuses, and Further Advances*, eds. R. Grover and M. Vriens, Sage Publications, 2006, Chapter 7, p. 3.

[22]   In the pretest, conducted on January 25, 2018 on ten respondents from the target population, one respondent found the font on the stimulus too small and hard to read. In order to address this issue, I added the language "You can click on the image to view a larger version in a pop-up window. You can then zoom to enlarge it further" before the initial review of the stimuli by the respondents to highlight to them the pop-up and zoom functionalities. Pretest respondents did not report any other issues with the clarity of the survey and could not guess the purpose or sponsor of the study.

[23]   Oppenheimer, D.M., T. Meyvis, and N. Davidenko, "Instructional Manipulation Checks: Detecting Satisficing to Increase Statistical Power," *Journal of Experimental Social Psychology*, Vol. 45, 2009, pp. 867-872, p. 867. I asked the following in question S7: "For quality control purposes, please select "Second" from the list below." Respondents who did not select "Second" were terminated.

*Confidential*

       *c.   Survey Administration*

12. My survey was administered, per best practices, as follows. As discussed the survey was first pretested to ensure that the stimuli were visible and clear, and that respondents were able to understand the questions without guessing the purpose of the survey.

13. The survey was then administered online. The survey panel was provided by SSI and was fielded from January 29 through February 1, 2018.[24]

14. Before beginning the main part of the survey, the survey platform detected the type of electronic device survey respondents were using to access the survey. If the respondent was using a device other than a desktop, laptop computer, or tablet device, the respondent was instructed: "Sorry, your device cannot be used for this survey. Please close this window and go to a desktop, laptop computer, or tablet device to take the survey to maximize your window. Once you are at one of these devices, click on the same link to take the survey." Respondents using desktop, laptop computers, or tablet devices were asked to answer screening questions described below to determine if they qualified to participate.[25]

15. Specifically, after clicking on the link to the survey, respondents were directed to a landing page with the following instructions: "Thank you for your participation in our study. All your answers will remain confidential. Please try to answer all questions to the best of your ability. We are interested in your opinions and reactions. There are no right or wrong answers and we will not try to sell you anything based on your answers. Please do not consult any outside sources (e.g., internet or phone) while taking the survey. If you do not know, do not recall, are unsure, or have no opinion, please do not try to guess and simply select the 'No Opinion / Don't Know / Don't Recall / Unsure' options. The 'Back' button on your browser has been disabled

---

[24] Potential respondents were invited to participate through two standard channels used by SSI to recruit survey respondents – their SSI accounts and affiliate partners. SSI has more than 17+ million qualified market research panel participants in over 90+ countries and works to "ensure [their panelists] are properly incentivized, engaged in honest practices." Survey Sampling International, "Survey Panels and Respondent Experience," https://www.surveysampling.com/knowledge-center/panels-respondent-experience/, accessed January 22, 2018; Survey Sampling International, "Consumer Online Panel," https://www.surveysampling.com/audiences/consumer-online/, accessed January 22, 2018. Panel members were provided customary SSI incentive structures, equivalent to between $0.20 and $2 per respondent, depending on their specific recruitment method and demographic group.  Respondents who participated in the pretest were excluded from taking the survey.

[25] "In a carefully executed survey, each potential respondent is questioned or measured on the attributes that determine his or her eligibility to participate in the survey." Diamond 2011, p. 386.

for the duration of the survey. Please do not use it while taking the survey." Respondents were then asked to select their age range, gender, and state of residence.[26]

16. Respondents were then asked a series of additional qualification questions regarding their employment, recent payment methods, as well as an instructional manipulation test. Respondents who reported being employed by or having a family member employed by (i) a financial services firm or bank, or (ii) a marketing, marketing research, or advertising agency were excluded from the survey.[27] I limited my sample to the respondents who had, in the past twelve months, used a debit card. I also screened out respondents that failed the instructional manipulation test. Exhibit D.1 presents summary statistics regarding the screening process.

17. Qualifying respondents were randomly assigned to either the 2010 or 2015 group. Respondents in the 2010 group viewed the Berkshire Bank Reg. E Opt-In Form effective August 14, 2010. Respondents in the 2015 group viewed the Berkshire Bank Reg. E Opt-In Form effective March 12, 2015.[28] The respondents in both groups were then asked a series of questions relating to their perception of the Reg. E Opt-In Form they viewed. Specifically, I presented respondents with the following hypothetical scenario: "Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store." I then asked respondents the open-ended question: "When you leave the store, how much money is in your account?"[29]

18. In the next question, I asked respondents to further imagine that after making the $80 purchase at the grocery store, "you consider withdrawing $40 from the ATM using the same debit card. Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank?" If a respondent indicated that the $40

---

[26]   Only respondents whose age range and gender matched those previously recorded by SSI were allowed to continue.

[27]   Additionally, prior to being asked the key screening questions (starting at S6 of the survey), the sample was matched on age and gender distribution, according to U.S. census, to the six states where Berkshire Bank operates. *See* Appendix D.A.

[28]   See also my discussion of my survey stimuli in Section A.b.1 of this appendix.

[29]   Q1 asked respondents: "Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. When you leave the store, how much money is in your account?"

*Confidential*

withdrawal would be allowed I then asked them "Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?" and also "Thinking again about the same scenario, given the $80 transaction that occurred that day, would you or would you not try to withdraw the $40?"[30]

19. Finally, I asked respondents a series of follow-up questions related to their own banking practices. Specifically I explored their Reg. E opt-in status, reasons for opting in, recent overdraft experience, and how recently they monitored their checking account balance and the tools they used to do so [31] I also asked respondents about recent survey experience relating to

---

[30]   Q2 asked respondents: "Imagine, again, that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. You once again have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. On the way home from the grocery store, you consider withdrawing $40 from the ATM using the same debit card. Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank?" Q3 asked respondents: "Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?" Only respondents who selected "The $40 withdrawal would be allowed" in response to Q2 were asked Q3. Q4 asked respondents: "Thinking again about the same scenario, given the $80 transaction that occurred that day, would you or would you not try to withdraw the $40?" Only respondents who selected "The $40 withdrawal would be allowed" in response to Q2 were asked Q4.

[31]   F1 asked respondents: "Many banks offer overdraft services for ATM withdrawals and non-recurring debit card transactions. That means that the bank will allow your ATM withdrawal or non-recurring debit card transaction to go through even if you don't have enough money in your account. Banks typically charge an "overdraft fee" each time such a situation occurs.  Which of the following best describes your experience with overdraft services?"

F2 asked respondents: "You indicated that you have opted into/continued to have overdraft services for ATM and non-recurring debit card transactions in the past 12 months. If you recall, why did you choose to opt in/ keep it?" Only respondents who selected "I have opted into overdraft services in the past 12 months," or "I opted into overdraft services earlier than in the past 12 months and continued to have overdraft services over the past 12 months," in F1 were asked F2.

F3 asked respondents: "If you recall, in the past 12 months, have you or have you not been charged an overdraft fee in your checking account?"

F4 asked respondents: "You indicated that you have been charged an overdraft fee in your account in the past 12 months. Which of the following best describes how that occurred?" Only respondents who selected "I have been charged an overdraft fee in my checking account in the past 12 months" were asked F4.

F5 asked respondents: "It is possible to check the balance of your checking account. Banks often allow you to do so via online and mobile banking, low balance alerts, monthly statements received in the mail, information from an ATM, by calling or stopping by a bank branch, or balancing your checkbook. In the past 12 months, have you or have you not checked the balance of your checking account using one of these or any other method?"

F6 asked respondents: "You indicated that you checked the balance of your checking account in the past 12 months. If you recall, when was the last time you checked the balance of your checking account?" Only respondents who selected "I have checked the balance of my checking account in the past 12 months" in F5 were asked F6.

*Confidential*

overdraft fee disclosures and awareness of any lawsuits related to overdraft fee disclosures in order to further ensure that the respondents who inform my results are not biased by recent survey exposure or relevant litigation awareness.[32] These questions were asked at the end of the survey to avoid signaling to the respondents to the purpose or sponsor of the survey before they had completed the main questionnaire. Appendix D.A presents the full questionnaire (including programmer instructions). Appendix D.B presents screenshots of the survey as it was viewed by respondents.

**B.   Survey Results**

20.  The results of my survey demonstrate varied perceptions, understandings, and expected actions amongst debit card customers regardless of which Berkshire Bank forms were presented to them (2010 or 2015 Reg. E Opt-In Forms). Further, I find that there is little to no difference in the array of perceptions, understandings, and expected actions between respondents who viewed the 2010 Reg. E Opt-In Form and those who viewed the 2015 Reg. E Opt-In Form, which indicates that explicitly referencing the term "available balance" and the effect of debit card authorizations on available balance when describing overdraft services at account opening does not impact customer perceptions, understandings, and behavior.

21.  As part of my quality control process, I limited my respondents to those who provided a number between -200 and 200 or chose "Unsure / No opinion" when asked question Q1 "… When you leave the store, how much money is in your account?" I collected responses until at least 150 such respondents were sampled for each group.  My final sample analyzed for the survey includes 151 respondents in the 2010 group and 156 respondents in the 2015 group. Results for this sample are presented in Exhibits D.2A-D.6A. I also analyzed a subset of "overdrafters" (37 respondents in the 2010 group and 30 respondents in the 2015 group) who specified that they had been charged an overdraft fee in their checking account in the past 12 months per question F3. Results for this subsample are presented in Exhibits D.2B-D.6B.[33]

---

F7 asked respondents: "If you recall, what method(s) did you use to check the balance of your checking account in the past 12 months?" Only respondents who selected "I have checked the balance of my checking account in the past 12 months" in F5 and did not select "Don't recall / Unsure" in F6 were asked F7.

[32]  F8 asked respondents: "In the past three months, have you or have you not participated in a survey concerning overdraft fee disclosures?"

F9 asked respondents "Are you aware or are you not aware of any lawsuits regarding overdraft fee disclosures?"

[33]  Results do not differ qualitatively between the sample and subsample. I also analyzed the entire set of respondents who completed the survey irrespective of what their answers were in Q1. Those results did not differ qualitatively either.

*Confidential*

22. I found that the majority of respondents in both groups (85% in the 2010 group and 85% in the 2015 group) believed that they would have $20 in their account after making an $80 purchase at the grocery store.[34] This distribution of responses in both groups implies that consumers interpret the phrase "money in your account" similarly to "available balance."[35]

23. When asked whether or not a subsequent $40 transaction would be allowed or declined, respondents had varied expectations.  51% of respondents in the 2010 group and 57% of respondents in the 2015 group believed that the subsequent $40 transaction would have gone through while 46% and 39% respectively thought that the transaction would be declined.[36] Further, respondents who thought the transaction would be allowed had differing expectations with respect to overdraft fees.  Of respondents who believed that the transaction would be allowed, 81% in the 2010 group and 83% in the 2015 group thought that an overdraft fee would be levied while 18% in the 2010 group and 17% in the 2015 group did not think an overdraft fee would be levied.[37] Finally, when asked if he/she would proceed with the subsequent $40 transaction, respondents indicated they would behave differently regardless of whether they expected an overdraft fee. Of respondents who believed that the transaction would be allowed, some indicated that they would proceed with the $40 transaction (14% in the 2010 group and 16% in the 2015 group), while some indicated they would not proceed with the $40 transaction (83% in the 2010 group and 80% in the 2015 group). The results above are summarized in Exhibit D.2A.

24. As is apparent in my survey results presented in more detail in Exhibits D.2A and D.3A, the distribution of responses to questions Q1-Q4 varied across respondents, but the array of responses was largely similar between the 2010 and 2015 group. The similarity of the results between the two groups indicates that explicitly referencing the term "available balance" and

---

[34] Based on the answers to question Q1 ("Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. When you leave the store, how much money is in your account?").

[35] The 2015 Reg. E Opt-In Form defines available balance as "amount of funds you can use for withdrawal from your account without causing an overdraft."

[36] Based on the answers to question Q2 ("Imagine, again, that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. You once again have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. On the way home from the grocery store, you consider withdrawing $40 from the ATM using the same debit card. Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank?").

[37] Based on the answers to question Q3 ("Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?").

*Confidential*

the effect of debit card authorizations on available balance when describing overdraft services at account opening does not impact customer understandings and expected behaviors.

25. I also found extensive variation in responses to questions F1-F7 of my survey, which relate to actual respondent experiences and behaviors associated with respondents' checking accounts and overdraft services. These responses show variation in experiences and behaviors associated with opting into overdraft services for ATM withdrawals and non-recurring debit card transactions as well as reasons for doing so (Exhibit D.4A), taking advantage of overdraft services in the past 12 months and awareness of doing so (Exhibit D.5A), and how recently and through which channel they check their balance (Exhibit D.6A).

26. Respondents opted into (or remained opted into) overdraft services for ATM withdrawals and non-recurring debit card transactions for a variety of reasons, such as to use the services only in case of an important payment (13% in the 2010 group and 8% in the 2015 group), because of a bank employee or bank website recommendation (6% in the 2010 group and 4% in the 2015 group), to cover transactions on a regular basis (3% in the 2010 group and 3% in the 2015 group), or by accident (3% in the 2010 group and 2% in the 2015 group).[38]

27. Similarly, there is a wide array of account monitoring behavior observed amongst respondents. Respondents reported monitoring their account balance through online banking (68% in the 2010 group and 71% in the 2015 group), mobile banking (33% in the 2010 group and 30% in the 2015 group), information from an ATM (16% in the 2010 group and 14% in the 2015 group), monthly statements in the mail (15% in the 2010 group and 12% in the 2015 group), and calling the bank (13% in the 2010 group and 11% in the 2015 group).[39]

---

[38] Exhibit D.4A.

[39] Other methods included inquiring at a bank branch, low balance alerts (e.g., email or text message alerts), and balancing a checkbook. Exhibit D.6A.

*Confidential*

**Exhibit D.1**
**Berkshire Bank Survey Results**
*Survey Response Statistics*

| Status | N | % of Total |
|---|---|---|
| Completed Survey | 320 | 55.5% |
| *Used for Analysis [1]* | 307 | 53.2% |
| *Overdrafters [2]* | 67 | 11.6% |
| Screened Out of Survey, due to: | 215 | 37.3% |
| *Age or Gender [3]* | 28 | 4.9% |
| *State of Residence [4]* | 14 | 2.4% |
| *Employment [5]* | 26 | 4.5% |
| *Not using a debit card in the past 12 months [6]* | 146 | 25.3% |
| *Failed instructional manipulation check [7]* | 1 | 0.2% |
| Self-Termination | 42 | 7.3% |
| **Total - Clicked on Survey Link** | 577 | 100.0% |

**Notes:**

[1] Respondents who completed the survey but did not either enter a value between [-200, 200] or select "Unsure / No Opinion" in response to Q1 ("Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. When you leave the store, how much money is in your account?") were excluded from the primary analysis of survey results.

[2] Respondents who selected "I have been charged an overdraft fee in my checking account in the past 12 months" in response to F3 ("If you recall, in the past 12 months, have you or have you not been charged an overdraft fee in your checking account?") are designated as "overdrafters" in the analysis of the survey sub-sample.

[3] Respondents who indicated that they were under 18 or that they preferred not to indicate their age or gender were screened out of the survey. Additionally, respondents who indicated an age or gender which did not match the value the panel company had on file were screened out of the survey.

[4] Respondents who indicated that they lived in a state other than Connecticut, Massachusetts, New Jersey, New York, Pennsylvania, or Vermont were screened out of the survey.

[5] Respondents who indicated that they or their family members were employed by "A financial services firm or bank," or "A marketing, market research, or advertising agency" were screened out of the survey.

[6] Respondents who did not select "A debit card" in response to S6 ("In the past 12 months, which of the following, if any, have you used?") were screened out of the survey.

[7] Respondents who did not select "Second" in response to S7 ("For quality control purposes, please select 'Second' from the list below.") were screened out of the survey.

*Confidential*

**Exhibit D.2A**
**Berkshire Bank Survey Results - All Respondents Used for Analysis**
*Scenario Questions*

| | 2010 Group | | | 2015 Group | | |
|---|---|---|---|---|---|---|
| | # | % of Total | % of Asked | # | % of Total | % of Asked |
| *Q1. ... When you leave the store, how much money is in your account?* [1] | | | | | | |
| $20 | 129 | 85.4% | 85.4% | 132 | 84.6% | 84.6% |
| $100 | 1 | 0.7% | 0.7% | 4 | 2.6% | 2.6% |
| Other[2] | 13 | 8.6% | 8.6% | 10 | 6.4% | 6.4% |
| Unsure / No opinion | 8 | 5.3% | 5.3% | 10 | 6.4% | 6.4% |
| *Q2. ... do you think that a $40 withdrawal would be allowed or declined by the bank?* [3] | | | | | | |
| The $40 withdrawal would be allowed | 77 | 51.0% | 51.0% | 89 | 57.1% | 57.1% |
| The $40 withdrawal would be declined | 70 | 46.4% | 46.4% | 61 | 39.1% | 39.1% |
| Unsure / No opinion | 4 | 2.6% | 2.6% | 6 | 3.8% | 3.8% |
| *Q3. ... do you think that a $40 withdrawal would or would not result in an overdraft fee?* [4] | | | | | | |
| The $40 withdrawal would result in an overdraft fee | 62 | 41.1% | 80.5% | 74 | 47.4% | 83.1% |
| The $40 withdrawal would not result in an overdraft fee | 14 | 9.3% | 18.2% | 15 | 9.6% | 16.9% |
| Unsure / No opinion | 1 | 0.7% | 1.3% | 0 | 0.0% | 0.0% |
| Not asked[5] | 74 | 49.0% | | 67 | 42.9% | |
| *Q4. ... would you or would you not try to withdraw the $40?* [6] | | | | | | |
| I would try to withdraw the $40 | 11 | 7.3% | 14.3% | 14 | 9.0% | 15.7% |
| I would not try to withdraw the $40 | 64 | 42.4% | 83.1% | 71 | 45.5% | 79.8% |
| Unsure / No opinion | 2 | 1.3% | 2.6% | 4 | 2.6% | 4.5% |
| Not asked[7] | 74 | 49.0% | | 67 | 42.9% | |
| **Total Respondents in Group Asked Q3 and Q4** | **77** | **51.0%** | **100.0%** | **89** | **57.1%** | **100.0%** |
| **Total Respondents in Group** | **151** | **100.0%** | | **156** | **100.0%** | |

**Notes:**

[1] Based on the answers to Q1 ("Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. When you leave the store, how much money is in your account?").

[2] "Other" responses ranged from -$10 to $200. The most popular "Other" responses were $50 and $200, with three respondents each.

[3] Based on the answers to Q2 ("Imagine, again, that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. You once again have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. On the way home from the grocery store, you consider withdrawing $40 from the ATM using the same debit card. Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank?").

[4] Based on the answers to Q3 ("Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?").

[5] Only respondents who selected "The $40 withdrawal would be allowed" in Q2 were asked Q3.

[6] Based on the answers to Q4 ("Thinking again about the same scenario, given the $80 transaction that occurred that day, would you or would you not try to withdraw the $40?").

[7] Only respondents who selected "The $40 withdrawal would be allowed" in Q2 were asked Q4.

*Confidential*

**Exhibit D.2B**
**Berkshire Bank Survey Results - Overdrafters Only**
*Scenario Questions*

| | 2010 Group | | | 2015 Group | | |
|---|---|---|---|---|---|---|
| | # | % of Total | % of Asked | # | % of Total | % of Asked |
| *Q1. … When you leave the store, how much money is in your account?* [1] | | | | | | |
| $20 | 27 | 73.0% | 73.0% | 22 | 73.3% | 73.3% |
| $100 | 1 | 2.7% | 2.7% | 1 | 3.3% | 3.3% |
| Other[2] | 9 | 24.3% | 24.3% | 5 | 16.7% | 16.7% |
| Unsure / No opinion | 0 | 0.0% | 0.0% | 2 | 6.7% | 6.7% |
| *Q2. … do you think that a $40 withdrawal would be allowed or declined by the bank?* [3] | | | | | | |
| The $40 withdrawal would be allowed | 23 | 62.2% | 62.2% | 20 | 66.7% | 66.7% |
| The $40 withdrawal would be declined | 14 | 37.8% | 37.8% | 10 | 33.3% | 33.3% |
| Unsure / No opinion | 0 | 0.0% | 0.0% | 0 | 0.0% | 0.0% |
| *Q3. … do you think that a $40 withdrawal would or would not result in an overdraft fee?* [4] | | | | | | |
| The $40 withdrawal would result in an overdraft fee | 19 | 51.4% | 82.6% | 15 | 50.0% | 75.0% |
| The $40 withdrawal would not result in an overdraft fee | 4 | 10.8% | 17.4% | 5 | 16.7% | 25.0% |
| Unsure / No opinion | 0 | 0.0% | 0.0% | 0 | 0.0% | 0.0% |
| Not asked[5] | 14 | 37.8% | | 10 | 33.3% | |
| *Q4. … would you or would you not try to withdraw the $40?* [6] | | | | | | |
| I would try to withdraw the $40 | 8 | 21.6% | 34.8% | 6 | 20.0% | 30.0% |
| I would not try to withdraw the $40 | 15 | 40.5% | 65.2% | 13 | 43.3% | 65.0% |
| Unsure / No opinion | 0 | 0.0% | 0.0% | 1 | 3.3% | 5.0% |
| Not asked[7] | 14 | 37.8% | | 10 | 33.3% | |
| **Total Respondents in Group Asked Q3 and Q4** | **23** | **62.2%** | **100.0%** | **20** | **66.7%** | **100.0%** |
| **Total Respondents in Group** | **37** | **100.0%** | | **30** | **100.0%** | |

**Notes:**

[1] Based on the answers to Q1 ("Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. When you leave the store, how much money is in your account?").

[2] "Other" responses ranged from $19 to $200. The most popular "Other" responses were $80 and $200, with two respondents each.

[3] Based on the answers to Q2 ("Imagine, again, that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. You once again have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. On the way home from the grocery store, you consider withdrawing $40 from the ATM using the same debit card. Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank?").

[4] Based on the answers to Q3 ("Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?").

[5] Only respondents who selected "The $40 withdrawal would be allowed" in Q2 were asked Q3.

[6] Based on the answers to Q4 ("Thinking again about the same scenario, given the $80 transaction that occurred that day, would you or would you not try to withdraw the $40?").

[7] Only respondents who selected "The $40 withdrawal would be allowed" in Q2 were asked Q4.

*Confidential*

**Exhibit D.3A**

**Berkshire Bank Survey Results - All Respondents Used for Analysis**

*Scenario Questions - Answer Combinations*

| Q1. … When you leave the store, how much money is in your account? [1] | Q2. … do you think that a $40 withdrawal would be allowed or declined by the bank? [2] | Q3. … do you think that a $40 withdrawal would or would not result in an overdraft fee? [3] | Q4. … would you or would you not try to withdraw the $40? [4] | 2010 Group | | 2015 Group | |
|---|---|---|---|---|---|---|---|
| | | | | # | % of Total | # | % of Total |
| $20 | Not allowed | | | 67 | 44.4% | 56 | 35.9% |
| $20 | Allowed | Fee | Withdrawal | 3 | 2.0% | 5 | 3.2% |
| $20 | Allowed | No fee | Withdrawal | 1 | 0.7% | 1 | 0.6% |
| $20 | Allowed | Fee | No withdrawal | 52 | 34.4% | 54 | 34.6% |
| $20 | Allowed | No fee | No withdrawal | 5 | 3.3% | 10 | 6.4% |
| $100 | Not allowed | | | 0 | 0.0% | 0 | 0.0% |
| $100 | Allowed | Fee | Withdrawal | 1 | 0.7% | 1 | 0.6% |
| $100 | Allowed | No fee | Withdrawal | 0 | 0.0% | 1 | 0.6% |
| $100 | Allowed | Fee | No withdrawal | 0 | 0.0% | 0 | 0.0% |
| $100 | Allowed | No fee | No withdrawal | 0 | 0.0% | 1 | 0.6% |
| All Other Combinations | | | | 22 | 14.6% | 27 | 17.3% |
| **Total Respondents in Group** | | | | **151** | **100.0%** | **156** | **100.0%** |

**Notes:**

[1] Based on the answers to Q1 ("Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. When you leave the store, how much money is in your account?").

[2] Based on the answers to Q2 ("Imagine, again, that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. You once again have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. On the way home from the grocery store, you consider withdrawing $40 from the ATM using the same debit card. Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank?").

[3] Based on the answers to Q3 ("Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?"). Only respondents who selected "The $40 withdrawal would be allowed" in Q2 were asked Q3.

[4] Based on the answers to Q4 ("Thinking again about the same scenario, given the $80 transaction that occurred that day, would you or would you not try to withdraw the $40?"). Only respondents who selected "The $40 withdrawal would be allowed" in Q2 were asked Q4.

*Confidential*

**Exhibit D.3B**

**Berkshire Bank Survey Results - Overdrafters Only**

*Scenario Questions - Answer Combinations*

| Q1. … When you leave the store, how much money is in your account? [1] | Q2. … do you think that a $40 withdrawal would be allowed or declined by the bank? [2] | Q3. … do you think that a $40 withdrawal would or would not result in an overdraft fee? [3] | Q4. … would you or would you not try to withdraw the $40? [4] | 2010 Group | | 2015 Group | |
|---|---|---|---|---|---|---|---|
| | | | | # | % of Total | # | % of Total |
| $20 | Not allowed | | | 13 | 35.1% | 10 | 33.3% |
| $20 | Allowed | Fee | Withdrawal | 3 | 8.1% | 1 | 3.3% |
| $20 | Allowed | No fee | Withdrawal | 0 | 0.0% | 0 | 0.0% |
| $20 | Allowed | Fee | No withdrawal | 11 | 29.7% | 7 | 23.3% |
| $20 | Allowed | No fee | No withdrawal | 0 | 0.0% | 4 | 13.3% |
| $100 | Not allowed | | | 0 | 0.0% | 0 | 0.0% |
| $100 | Allowed | Fee | Withdrawal | 1 | 2.7% | 1 | 3.3% |
| $100 | Allowed | No fee | Withdrawal | 0 | 0.0% | 0 | 0.0% |
| $100 | Allowed | Fee | No withdrawal | 0 | 0.0% | 0 | 0.0% |
| $100 | Allowed | No fee | No withdrawal | 0 | 0.0% | 0 | 0.0% |
| All Other Combinations | | | | 9 | 24.3% | 7 | 23.3% |
| **Total Respondents in Group** | | | | **37** | **100.0%** | **30** | **100.0%** |

**Notes:**

[1] Based on the answers to Q1 ("Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. When you leave the store, how much money is in your account?").

[2] Based on the answers to Q2 ("Imagine, again, that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. You once again have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. On the way home from the grocery store, you consider withdrawing $40 from the ATM using the same debit card. Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank?").

[3] Based on the answers to Q3 ("Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?"). Only respondents who selected "The $40 withdrawal would be allowed" in Q2 were asked Q3.

[4] Based on the answers to Q4 ("Thinking again about the same scenario, given the $80 transaction that occurred that day, would you or would you not try to withdraw the $40?"). Only respondents who selected "The $40 withdrawal would be allowed" in Q2 were asked Q4.

*Confidential*

**Exhibit D.4A**
**Berkshire Bank Survey Results - All Respondents Used for Analysis**
*Reg. E Opt-In*

| | 2010 Group | | 2015 Group | |
|---|---|---|---|---|
| | # | % of Total | # | % of Total |
| *F1. ... Which of the following best describes your experience with overdraft services?* [1] | | | | |
| I have opted into overdraft services in the past 12 months | 17 | 11.3% | 16 | 10.3% |
| I opted into overdraft services earlier than in the past 12 months and continued to have overdraft services over the past 12 months | 31 | 20.5% | 22 | 14.1% |
| I opted into overdraft services earlier than in the past 12 months but I have not had overdraft services in the past 12 months | 19 | 12.6% | 25 | 16.0% |
| I have never opted into overdraft services | 70 | 46.4% | 79 | 50.6% |
| Don't recall / Unsure | 14 | 9.3% | 14 | 9.0% |
| *F2. ... If you recall, why did you choose to opt in [/ keep it]?* [2] | | | | |
| I was planning to use it to cover transactions on a regular basis (e.g., right before a paycheck) | 5 | 3.3% | 5 | 3.2% |
| I was not planning to use it but signed up [/kept it] just in case I would not have money for an important payment | 20 | 13.2% | 13 | 8.3% |
| Signing up [/Keeping it] was free | 26 | 17.2% | 19 | 12.2% |
| The bank employee recommended it | 5 | 3.3% | 4 | 2.6% |
| The bank's website recommended it | 4 | 2.6% | 3 | 1.9% |
| I signed up [/kept it] accidentally without realizing it | 5 | 3.3% | 3 | 1.9% |
| Other | 2 | 1.3% | 1 | 0.6% |
| Don't recall / Unsure | 0 | 0.0% | 2 | 1.3% |
| Not asked [3] | 103 | 68.2% | 118 | 75.6% |
| **Total Respondents in Group** | **151** | **100.0%** | **156** | **100.0%** |

**Notes:**

[1] Based on the answers to F1 ("Many banks offer overdraft services for ATM withdrawals and non-recurring debit card transactions. That means that the bank will allow your ATM withdrawal or non-recurring debit card transaction to go through even if you don't have enough money in your account. Banks typically charge an 'overdraft fee' each time such a situation occurs. Which of the following best describes your experience with overdraft services?").

[2] Based on the answers to F2 ("You indicated that you have opted into [/continued to have] overdraft services for ATM and non-recurring debit card transactions in the past 12 months. If you recall, why did you choose to opt in [/ keep it]?"). Respondents were able to select more than one option in response to F2.

[3] Respondents who did not select "I have opted into overdraft services in the past 12 months" or "I opted into overdraft services earlier than in the past 12 months and continued to have overdraft services over the past 12 months" in F1 were not asked F2.

*Confidential*

**Exhibit D.4B**
**Berkshire Bank Survey Results - Overdrafters Only**
*Reg. E Opt-In*

| | 2010 Group | | 2015 Group | |
|---|---|---|---|---|
| | # | % of Total | # | % of Total |
| *F1. ... Which of the following best describes your experience with overdraft services?* [1] | | | | |
| I have opted into overdraft services in the past 12 months | 11 | 29.7% | 11 | 36.7% |
| I opted into overdraft services earlier than in the past 12 months and continued to have overdraft services over the past 12 months | 7 | 18.9% | 5 | 16.7% |
| I opted into overdraft services earlier than in the past 12 months but I have not had overdraft services in the past 12 months | 5 | 13.5% | 3 | 10.0% |
| I have never opted into overdraft services | 11 | 29.7% | 9 | 30.0% |
| Don't recall / Unsure | 3 | 8.1% | 2 | 6.7% |
| *F2. ... If you recall, why did you choose to opt in [/ keep it]?* [2] | | | | |
| I was planning to use it to cover transactions on a regular basis (e.g., right before a paycheck) | 2 | 5.4% | 3 | 10.0% |
| I was not planning to use it but signed up [/kept it] just in case I would not have money for an important payment | 8 | 21.6% | 4 | 13.3% |
| Signing up [/Keeping it] was free | 6 | 16.2% | 5 | 16.7% |
| The bank employee recommended it | 2 | 5.4% | 3 | 10.0% |
| The bank's website recommended it | 3 | 8.1% | 1 | 3.3% |
| I signed up [/kept it] accidentally without realizing it | 3 | 8.1% | 2 | 6.7% |
| Other | 2 | 5.4% | 0 | 0.0% |
| Don't recall / Unsure | 0 | 0.0% | 1 | 3.3% |
| Not asked [3] | 19 | 51.4% | 14 | 46.7% |
| **Total Respondents in Group** | **37** | **100.0%** | **30** | **100.0%** |

**Notes:**

[1] Based on the answers to F1 ("Many banks offer overdraft services for ATM withdrawals and non-recurring debit card transactions. That means that the bank will allow your ATM withdrawal or non-recurring debit card transaction to go through even if you don't have enough money in your account. Banks typically charge an 'overdraft fee' each time such a situation occurs. Which of the following best describes your experience with overdraft services?").

[2] Based on the answers to F2 ("You indicated that you have opted into [/continued to have] overdraft services for ATM and non-recurring debit card transactions in the past 12 months. If you recall, why did you choose to opt in [/ keep it]?"). Respondents were able to select more than one option in response to F2.

[3] Respondents who did not select "I have opted into overdraft services in the past 12 months" or "I opted into overdraft services earlier than in the past 12 months and continued to have overdraft services over the past 12 months" in F1 were not asked F2.

*Confidential*

**Exhibit D.5A**
**Berkshire Bank Survey Results - All Respondents Used for Analysis**
*Overdraft Experience*

| | 2010 Group | | 2015 Group | |
|---|---|---|---|---|
| | # | % of Total | # | % of Total |
| *F3. ... in the past 12 months, have you or have you not been charged an overdraft fee in your checking account?* [1] | | | | |
| I have been charged an overdraft fee in my checking account in the past 12 months | 37 | 24.5% | 30 | 19.2% |
| I have not been charged an overdraft fee in my checking account in the past 12 months | 106 | 70.2% | 123 | 78.8% |
| Don't recall / Unsure | 8 | 5.3% | 3 | 1.9% |
| *F4. ... Which of the following best describes how that occurred?* [2] | | | | |
| Every time I was charged an overdraft fee in the past 12 months I knew that I did not have enough money in my account | 8 | 5.3% | 9 | 5.8% |
| Some, but not all, of the times I was charged an overdraft fee in the past 12 months I knew that I did not have enough money in my account | 11 | 7.3% | 8 | 5.1% |
| Every time I was charged an overdraft fee in the past 12 months I did not know that I did not have enough money in my account | 15 | 9.9% | 13 | 8.3% |
| Don't recall / Unsure | 3 | 2.0% | 0 | 0.0% |
| Not Asked[3] | 114 | 75.5% | 126 | 80.8% |
| **Total Respondents in Group** | **151** | **100.0%** | **156** | **100.0%** |

Notes:

[1] Based on the answers to F3 ("If you recall, in the past 12 months, have you or have you not been charged an overdraft fee in your checking account?").

[2] Based on the answers to F4 ("You indicated that you have been charged an overdraft fee in your account in the past 12 months. Which of the following best describes how that occurred?").

[3] Respondents who did not select "I have been charged an overdraft fee in my checking account in the past 12 months" in F3 were not asked F4.

*Confidential*

**Exhibit D.5B**
**Berkshire Bank Survey Results - Overdrafters Only**
*Overdraft Experience*

| | 2010 Group | | 2015 Group | |
|---|---|---|---|---|
| | # | % of Total | # | % of Total |
| *F3. … in the past 12 months, have you or have you not been charged an overdraft fee in your checking account?* [1] | | | | |
| I have been charged an overdraft fee in my checking account in the past 12 months | 37 | 100.0% | 30 | 100.0% |
| I have not been charged an overdraft fee in my checking account in the past 12 months | 0 | 0.0% | 0 | 0.0% |
| Don't recall / Unsure | 0 | 0.0% | 0 | 0.0% |
| *F4. … Which of the following best describes how that occurred?* [2] | | | | |
| Every time I was charged an overdraft fee in the past 12 months I knew that I did not have enough money in my account | 8 | 21.6% | 9 | 30.0% |
| Some, but not all, of the times I was charged an overdraft fee in the past 12 months I knew that I did not have enough money in my account | 11 | 29.7% | 8 | 26.7% |
| Every time I was charged an overdraft fee in the past 12 months I did not know that I did not have enough money in my account | 15 | 40.5% | 13 | 43.3% |
| Don't recall / Unsure | 3 | 8.1% | 0 | 0.0% |
| Not Asked[3] | 0 | 0.0% | 0 | 0.0% |
| **Total Respondents in Group** | **37** | **100.0%** | **30** | **100.0%** |

**Notes:**

[1] Based on the answers to F3 ("If you recall, in the past 12 months, have you or have you not been charged an overdraft fee in your checking account?").

[2] Based on the answers to F4 ("You indicated that you have been charged an overdraft fee in your account in the past 12 months. Which of the following best describes how that occurred?").

[3] Respondents who did not select "I have been charged an overdraft fee in my checking account in the past 12 months" in F3 were not asked F4.

*Confidential*

**Exhibit D.6A**
**Berkshire Bank Survey Results - All Respondents Used for Analysis**
*Monitoring Balance*

| | 2010 Group | | 2015 Group | |
|---|---|---|---|---|
| | # | % of Total | # | % of Total |
| *F5. ... In the past 12 months, have you or have you not checked the balance of your checking account ... ? [1]* | | | | |
| I have checked the balance of my checking account in the past 12 months | 140 | 92.7% | 146 | 93.6% |
| I have not checked the balance of my checking account in the past 12 months | 7 | 4.6% | 6 | 3.8% |
| Don't recall / Unsure | 4 | 2.6% | 4 | 2.6% |
| *F6. ... when was the last time you checked the balance of your checking account? [2]* | | | | |
| Today | 52 | 34.4% | 60 | 38.5% |
| Within the past seven days but not today | 59 | 39.1% | 65 | 41.7% |
| Within the past 30 days but not within the past seven days | 21 | 13.9% | 16 | 10.3% |
| Within the past six months but not within the past 30 days | 5 | 3.3% | 4 | 2.6% |
| Within the past 12 months but not within the past six months | 3 | 2.0% | 0 | 0.0% |
| Don't recall / Unsure | 0 | 0.0% | 1 | 0.6% |
| Not Asked[3] | 11 | 7.3% | 10 | 6.4% |
| *F7. ... what method(s) did you use to check the balance of your checking account in the past 12 months? [4]* | | | | |
| Balancing a checkbook | 15 | 9.9% | 21 | 13.5% |
| Information from an ATM | 24 | 15.9% | 21 | 13.5% |
| Online banking | 103 | 68.2% | 111 | 71.2% |
| Mobile banking | 50 | 33.1% | 46 | 29.5% |
| Low balance alerts (e.g., email or text message alerts) | 10 | 6.6% | 6 | 3.8% |
| Monthly statements received in the mail | 22 | 14.6% | 19 | 12.2% |
| Calling the bank | 19 | 12.6% | 17 | 10.9% |
| Inquiring at a bank branch | 10 | 6.6% | 3 | 1.9% |
| Other | 0 | 0.0% | 1 | 0.6% |
| Don't recall / Unsure | 0 | 0.0% | 0 | 0.0% |
| Not Asked[5] | 11 | 7.3% | 11 | 7.1% |
| **Total Respondents in Group** | **151** | **100.0%** | **156** | **100.0%** |

**Notes:**

[1] Based on the answers to F5 ("It is possible to check the balance of your checking account. Banks often allow you to do so via online and mobile banking, low balance alerts, monthly statements received in the mail, information from an ATM, by calling or stopping by a bank branch, or balancing your checkbook. In the past 12 months, have you or have you not checked the balance of your checking account using one of these or any other method?").

[2] Based on the answers to F6 ("You indicated that you checked the balance of your checking account in the past 12 months. If you recall, when was the last time you checked the balance of your checking account?").

[3] Respondents who did not select "I have checked the balance of my checking account in the past 12 months" in F5 were not asked F6.

[4] Based on the answers to F7 ("If you recall, what method(s) did you use to check the balance of your checking account in the past 12 months?"). Respondents were able to select more than one answer in response to F7.

[5] Respondents who did not select "I have checked the balance of my checking account in the past 12 months" in F5 were not asked F7. Respondents who selected "Don't recall / Unsure" in F6 were also not asked F7.

*Confidential*

**Exhibit D.6B**
**Berkshire Bank Survey Results - Overdrafters Only**
*Monitoring Balance*

| | 2010 Group | | 2015 Group | |
|---|---|---|---|---|
| | # | % of Total | # | % of Total |
| *F5. ... In the past 12 months, have you or have you not checked the balance of your checking account ... ?* [1] | | | | |
| I have checked the balance of my checking account in the past 12 months | 34 | 91.9% | 27 | 90.0% |
| I have not checked the balance of my checking account in the past 12 months | 2 | 5.4% | 2 | 6.7% |
| Don't recall / Unsure | 1 | 2.7% | 1 | 3.3% |
| *F6. ... when was the last time you checked the balance of your checking account?* [2] | | | | |
| Today | 16 | 43.2% | 16 | 53.3% |
| Within the past seven days but not today | 10 | 27.0% | 6 | 20.0% |
| Within the past 30 days but not within the past seven days | 3 | 8.1% | 3 | 10.0% |
| Within the past six months but not within the past 30 days | 2 | 5.4% | 2 | 6.7% |
| Within the past 12 months but not within the past six months | 3 | 8.1% | 0 | 0.0% |
| Don't recall / Unsure | 0 | 0.0% | 0 | 0.0% |
| Not Asked[3] | 3 | 8.1% | 3 | 10.0% |
| *F7. ... what method(s) did you use to check the balance of your checking account in the past 12 months?* [4] | | | | |
| Balancing a checkbook | 1 | 2.7% | 2 | 6.7% |
| Information from an ATM | 8 | 21.6% | 3 | 10.0% |
| Online banking | 22 | 59.5% | 20 | 66.7% |
| Mobile banking | 18 | 48.6% | 11 | 36.7% |
| Low balance alerts (e.g., email or text message alerts) | 4 | 10.8% | 2 | 6.7% |
| Monthly statements received in the mail | 7 | 18.9% | 3 | 10.0% |
| Calling the bank | 9 | 24.3% | 4 | 13.3% |
| Inquiring at a bank branch | 3 | 8.1% | 0 | 0.0% |
| Other | 0 | 0.0% | 0 | 0.0% |
| Don't recall / Unsure | 0 | 0.0% | 0 | 0.0% |
| Not Asked[5] | 3 | 8.1% | 3 | 10.0% |
| **Total Respondents in Group** | **37** | **100.0%** | **30** | **100.0%** |

**Notes:**

[1] Based on the answers to F5 ("It is possible to check the balance of your checking account. Banks often allow you to do so via online and mobile banking, low balance alerts, monthly statements received in the mail, information from an ATM, by calling or stopping by a bank branch, or balancing your checkbook. In the past 12 months, have you or have you not checked the balance of your checking account using one of these or any other method?").

[2] Based on the answers to F6 ("You indicated that you checked the balance of your checking account in the past 12 months. If you recall, when was the last time you checked the balance of your checking account?").

[3] Respondents who did not select "I have checked the balance of my checking account in the past 12 months" in F5 were not asked F6.

[4] Based on the answers to F7 ("If you recall, what method(s) did you use to check the balance of your checking account in the past 12 months?"). Respondents were able to select more than one answer in response to F7.

[5] Respondents who did not select "I have checked the balance of my checking account in the past 12 months" in F5 were not asked F7. Respondents who selected "Don't recall / Unsure" in F6 were also not asked F7.

*Confidential*

**Exhibit D.7A**
**Berkshire Bank Survey Results - All Respondents Used for Analysis**
*Survey Experience and Litigation Awareness*

| | 2010 Group | | 2015 Group | |
|---|---|---|---|---|
| | # | % of Total | # | % of Total |
| *F8. ... have you or have you not participated in a survey concerning overdraft fee disclosures?* [1] | | | | |
| I have participated in a survey concerning overdraft fee disclosures in the past three months | 11 | 7.3% | 3 | 1.9% |
| I have not participated in a survey concerning overdraft fee disclosures in the past three months | 133 | 88.1% | 146 | 93.6% |
| Don't recall / Unsure | 7 | 4.6% | 7 | 4.5% |
| *F9. Are you aware or are you not aware of any lawsuits regarding overdraft fee disclosures?* [2] | | | | |
| I am aware of at least one lawsuit | 12 | 7.9% | 11 | 7.1% |
| I am not aware of any lawsuits | 124 | 82.1% | 131 | 84.0% |
| Don't know / Unsure | 15 | 9.9% | 14 | 9.0% |
| **Total Respondents in Group** | **151** | **100.0%** | **156** | **100.0%** |

**Notes:**
[1] Based on the answers to F8 ("In the past three months, have you or have you not participated in a survey concerning overdraft fee disclosures?").
[2] Based on the answers to F9 ("Are you aware or are you not aware of any lawsuits regarding overdraft fee disclosures?").

*Confidential*

**APPENDIX D.A**

**SURVEY SCRIPT**

*Confidential*

## Programmer Instructions

**[PROGRAMMER NOTES IN BOLD CAPS AND IN BRACKETS]**

**[FOR CLOSED-ENDED QUESTIONS, DO NOT ALLOW RESPONDENT TO CLICK "NEXT" WITHOUT CHOOSING AN ANSWER OPTION. FOR OPEN-ENDED QUESTIONS, DO NOT ALLOW RESPONDENT TO CLICK "NEXT" WITHOUT TYPING IN AN ANSWER OR CHOOSING ANOTHER ANSWER OPTION IF PRESENT.]**

**[QUALIFYING RESPONDENTS WILL BE RANDOMLY ASSIGNED TO ONE OF TWO GROUPS: 2010 AND 2015. 2010 GROUP RESPONDENTS WILL BE SHOWN BERKSHIRE BANK'S 2010 REG. E OPT-IN FORM. 2015 GROUP RESPONDENTS WILL BE SHOWN THE 2015 REG. E OPT-IN FORM. AFTER REVIEWING THE IMAGES, RESPONDENTS WILL BE PRESENTED WITH HYPOTHETICAL PURCHASE SCENARIOS AND ASKED QUESTIONS ABOUT THEIR PERCEPTIONS AND LIKELY BEHAVIORS.]**

**[ROTATE ORDER OF YES/NO ANSWERS IN THE FIRST INSTANCE OF A YES/NO QUESTION. USE THE SAME ORDER FOR ALL OTHER YES/NO QUESTIONS. NOTE THAT YES AND NO ARE NOT EXPLICITLY STATED IN THE ANSWER OPTIONS]**

**[DISABLE THE BROWSER "BACK" BUTTON]**

### Introduction and Screening

**[NO SURVEY/SECTION TITLES TO BE DISPLAYED TO RESPONDENTS]**

**[18+ SAMPLE FROM MASSACHUSETTS, VERMONT, NEW YORK, CONNECTICUT, NEW JERSEY, OR PENNSYLVANIA.**

**AT LEAST 150 OF THE FINAL COMPLETES IN EACH GROUP SHOULD RESPOND TO Q1 WITH A NUMBER BETWEEN -200 AND 200 OR BY SELECTING "UNSURE / NO OPINION"**

**PANEL MEMBERS WHO START THE SURVEY AND ANSWER QUESTIONS S2-S5 SHOULD BE MATCHED TO THE CENSUS ON AGE AND GENDER DISTRIBUTION IN MASSACHUSETTS, VERMONT, NEW YORK, CONNECTICUT, NEW JERSEY, AND PENNSYLVANIA.]**

**[DETECT DEVICE RESPONDENT IS USING; IF IT'S A SMARTPHONE OR OTHER MOBILE DEVICE (NOT A DESKTOP, LAPTOP, OR TABLET COMPUTER), INSTRUCT TO LOG BACK IN WITH APPROVED DEVICE WITH THE MESSAGE:**
"Sorry, your device cannot be used for this survey. Please close this window and go to a desktop, laptop computer, or tablet device to take the survey to maximize your window. Once you are at one of these devices, click on the same link to take the survey."**]**

*Confidential*

**[EACH QUESTION ON A NEW PAGE UNLESS OTHERWISE SPECIFIED]**

**S0. Digital fingerprinting**

S1. Captcha

*Thank you for your participation in our study. All your answers will remain confidential. Please try to answer all questions to the best of your ability. We are interested in your opinions and reactions. There are no right or wrong answers and we will not try to sell you anything based on your answers. Please do not consult any outside sources (e.g., internet or phone) while taking the survey.*

*If you do not know, do not recall, are unsure, or have no opinion, please do not try to guess and simply select the "No Opinion / Don't Know / Don't Recall / Unsure" options.*

*The "Back" button on your browser has been disabled for the duration of the survey. Please do not use it while taking the survey.*

☐ If you understand these instructions and agree with participating in this survey, please check this box and click "Next" to continue.

S2. How old are you? *(Select only one option)* **[RANDOMIZE BETWEEN THIS ORDER AND REVERSE; KEEP "PREFER NOT TO ANSWER" LAST]**
   ☐ Under 18 years old **[TERMINATE]**
   ☐ 18 – 29 years old
   ☐ 30 – 39 years old
   ☐ 40 – 49 years old
   ☐ 50 – 59 years old
   ☐ 60 years or older
   ☐ Prefer not to answer **[TERMINATE]**
**[TERMINATE IF AGE DOES NOT MATCH THE VALUE ON FILE]**

S3. Please indicate your gender: *(Select only one option)* **[RANDOMIZE "FEMALE" AND "MALE"]**
   ☐ Female
   ☐ Male
   ☐ Prefer not to answer **[TERMINATE]**
**[TERMINATE IF GENDER DOES NOT MATCH THE VALUE ON FILE]**

S4. What state do you live in? *(Select only one option)*
**[INSERT DROP DOWN MENU FOR STATE. TERMINATE IF NOT IN ONE OF THE SIX STATES LISTED ABOVE]**

*Confidential*

S5. Are you or any of your family members employed by or working as …? *(Select all that apply)* **[RANDOMIZE ORDER; KEEP "NONE OF THE ABOVE" LAST]**

☐ An outdoor recreation or sporting goods manufacturer or retailer
☐ A home hardware or power tools manufacturer or retailer
☐ A grocery store or supermarket
☐ A university or school
☐ A financial services firm or bank **[TERMINATE]**
☐ A marketing, market research, or advertising agency **[TERMINATE]**
☐ None of the above **[EXCLUSIVE]**

**[THOSE WHO ARE ASKED S6 SHOULD BE MATCHED TO THE CENSUS ON AGE, GENDER, AND REGION]**

S6. In the <u>past 12 months</u>, which of the following, if any, have you used? *(Select all that apply)* **[RANDOMIZE ORDER; KEEP "NONE OF THE ABOVE" LAST]**

☐ A debit card
☐ A credit card
☐ A personal check
☐ Transfer from a checking account
☐ Apple Pay / PayPal / Venmo
☐ A gift card
☐ A cashier's check
☐ None of the above **[EXCLUSIVE]**
**[TERMINATE IF "DEBIT CARD" IS NOT SELECTED]**

S7. For quality control purposes, please select "Second" from the list below. *(Select one only)*

⊙ First **[TERMINATE]**
⊙ Second
⊙ Third **[TERMINATE]**
⊙ Fourth **[TERMINATE]**

**[RECORD IF THE RESPONDENT QUALIFIES OR NOT. FOR NON-QUALIFYING RESPONDENTS, DISPLAY PANEL'S TERMINATION PAGE. RANDOMLY ASSIGN QUALIFYING RESPONDENTS TO 2010 OR 2015 GROUP, 150 RESPONDENTS PER GROUP.]**

*Confidential*

**Stimuli**

Q0. Please take a look at the bank form on the following screen. Imagine that you are offered to sign this form when you open a checking account associated with a debit card. You can look at the form for as long as you like. You can click on the image to view a larger version in a pop-up window. You can then zoom to enlarge it further. We will then ask you several questions about it.

**[SHOW STIMULUS BELOW TO THE APPROPRIATE GROUP ON A SEPARATE PAGE.]**

**[2010 GROUP (N=150 RESPONDENTS)**

- **REG. E OPT-IN FORM, AUGUST 2010, BB0000097**

**2015 GROUP (N=150 RESPONDENTS)**

- **REG. E OPT-IN FORM, MARCH 2015, BB0000104**

**AFTER EACH IMAGE IS BROUGHT UP ON THE SCREEN, THERE SHOULD BE A 15 SECOND DELAY BEFORE THE "NEXT" BUTTON APPEARS.**

**A COUNT-DOWN SHOULD BE PRESENTED UNDER THE IMAGE WITH THE FOLLOWING TEXT:** "*The "Next" button will appear in X seconds*" **(THIS TEXT SHOULD BE REMOVED WHEN X=0) FOLLOWED BY** *Click "Next" when ready.*

**THE STIMULI SHOWN TO THE RESPONDENT SHOULD REMAIN AVAILABLE TO THE RESPONDENT UNTIL THE END OF THE MAIN QUESTIONNAIRE IN THE FORM OF CLICKABLE THUMBNAILS IN EACH QUESTION SCREEN ABOVE THE QUESTION TEXT. IF A THUMBNAIL IS CLICKED, THE IMAGE SHOULD APPEAR IN A POP-UP WINDOW (THE INITIAL VIEWING OF THE STIMULI SHOULD HAPPEN IN THE MAIN SURVEY SCREEN). CLICKING THE FULL-SCREEN BUTTON IN THE POP-UP WINDOW SHOULD ENLARGE THE IMAGE. IMMEDIATELY BELOW THE THUMBNAIL AND ABOVE EACH QUESTION WHERE THE THUMBNAIL IS DISPLAYED, INSERT THE INSTRUCTION "***To enlarge, click on the image.***"]**

**[NEXT PAGE]**

We will now ask you several questions. The form you viewed will remain available to you as a thumbnail throughout the next set of questions. You can click on the thumbnail to open the image in a pop-up window. Once the image appears, you can zoom to enlarge the form.

*Click "Next" when ready.*

*Confidential*

## Main Questionnaire

Q1. Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. When you leave the store, how much money is in your account? *(Please enter a whole number (no commas or decimals) or click "Unsure / No opinion.")*

$ [          ]

☐   Unsure / No opinion

**[RESPONDENT CAN PROCEED IF A WHOLE NUMBER BETWEEN -1,000,000 AND 1,000,000 IS ENTERED OR "UNSURE / NO OPINION" IS SELECTED]**

Q2. Imagine, again, that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. You once again have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. On the way home from the grocery store, you consider withdrawing $40 from the ATM using the same debit card. Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank? *(Select only one option)*

☐   The $40 withdrawal would be allowed
☐   The $40 withdrawal would be declined **[SKIP TO F0]**
☐   Unsure / No opinion **[SKIP TO F0]**

Q3. Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee? *(Select only one option)*

☐   The $40 withdrawal would result in an overdraft fee
☐   The $40 withdrawal would not result in an overdraft fee
☐   Unsure / No opinion

*Confidential*

Q4. Thinking again about the same scenario, given the $80 transaction that occurred that day, would you or would you not try to withdraw the $40? *(Select only one option)*

- ☐ I would try to withdraw the $40
- ☐ I would not try to withdraw the $40
- ☐ Unsure / No opinion


**[REMOVE THUMBNAIL]**

## Follow-Up Questions

F0. The following screens contain additional questions about your banking practices.

F1. Many banks offer *overdraft services for ATM withdrawals and non-recurring debit card transactions*. That means that the bank will allow your ATM withdrawal or non-recurring debit card transaction to go through even if you don't have enough money in your account. Banks typically charge an "overdraft fee" each time such a situation occurs. Which of the following best describes your experience with overdraft services? *(Select only one option)* **[RANDOMIZE BETWEEN THIS ORDER AND REVERSE; KEEP "DON'T RECALL / UNSURE" LAST]**

- ☐ I have opted into overdraft services in the past 12 months
- ☐ I opted into overdraft services earlier than in the past 12 months and continued to have overdraft services over the past 12 months
- ☐ I opted into overdraft services earlier than in the past 12 months but I have not had overdraft services in the past 12 months **[SKIP TO F3]**
- ☐ I have never opted into overdraft services **[SKIP TO F3]**
- ☐ Don't recall / Unsure [**SKIP TO F3**]

F2. You indicated that you have opted into [/continued to have] overdraft services for ATM and non-recurring debit card transactions in the past 12 months. If you recall, why did you choose to opt in [/ keep it]? *(Select all that apply)* **[RANDOMIZE ORDER; KEEP "OTHER" AND "DON'T RECALL / UNSURE" LAST]**

- ☐ I was planning to use it to cover transactions on a regular basis (e.g., right before a paycheck)
- ☐ I was not planning to use it but signed up [/kept it] just in case I would not have money for an important payment
- ☐ Signing up [/Keeping it] was free
- ☐ The bank employee recommended it
- ☐ The bank's website recommended it
- ☐ I signed up [/kept it] accidentally without realizing it
- ☐ Other *(please specify):* _____
- ☐ Don't recall / Unsure

*Confidential*

F3. If you recall, <u>in the past 12 months</u>, have you or have you not been charged an overdraft fee in your checking account? *(Select only one option)*

- ☐ I have been charged an overdraft fee in my checking account <u>in the past 12 months</u>
- ☐ I have not been charged an overdraft fee in my checking account <u>in the past 12 months</u> [**SKIP TO F5**]
- ☐ Don't recall / Unsure [**SKIP TO F5**]

F4. You indicated that you have been charged an overdraft fee in your account <u>in the past 12 months</u>. Which of the following best describes how that occurred? *(Select only one option)* [**RANDOMIZE BETWEEN THIS ORDER AND REVERSE; KEEP "DON'T RECALL / UNSURE" LAST**]

- ☐ Every time I was charged an overdraft fee <u>in the past 12 months</u> I knew that I did not have enough money in my account
- ☐ Some, but not all, of the times I was charged an overdraft fee <u>in the past 12 months</u> I knew that I did not have enough money in my account
- ☐ Every time I was charged an overdraft fee <u>in the past 12 months</u> I did not know that I did not have enough money in my account
- ☐ Don't recall / Unsure

F5. It is possible to check the balance of your checking account. Banks often allow you to do so via online and mobile banking, low balance alerts, monthly statements received in the mail, information from an ATM, by calling or stopping by a bank branch, or balancing your checkbook. <u>In the past 12 months</u>, have you or have you not checked the balance of your checking account using one of these or any other method? *(Select only one option)*

- ☐ I have checked the balance of my checking account <u>in the past 12 months</u>
- ☐ I have not checked the balance of my checking account <u>in the past 12 months</u> [**SKIP TO F8**]
- ☐ Don't recall / Unsure [**SKIP TO F8**]

F6. You indicated that you checked the balance of your checking account <u>in the past 12 months</u>. If you recall, when was the last time you checked the balance of your checking account? *(Select only one option)* [**RANDOMIZE BETWEEN THIS ORDER AND REVERSE; KEEP "DON'T RECALL / UNSURE" LAST**]

- ☐ Today
- ☐ Within the past seven days but not today
- ☐ Within the past 30 days but not within the past seven days
- ☐ Within the past six months but not within the past 30 days
- ☐ Within the past 12 months but not within the past six months
- ☐ Don't recall / Unsure [**SKIP TO F8**]

*Confidential*

F7. If you recall, what method(s) did you use to check the balance of your checking account <u>in the past 12 months</u>? *(Select all that apply)* **[RANDOMIZE ORDER; KEEP "OTHER" AND "DON'T RECALL / UNSURE" LAST]**

- ☐ Balancing a checkbook
- ☐ Information from an ATM
- ☐ Online banking
- ☐ Mobile banking
- ☐ Low balance alerts (e.g., email or text message alerts)
- ☐ Monthly statements received in the mail
- ☐ Calling the bank
- ☐ Inquiring at a bank branch
- ☐ Other *(please specify)*: _____
- ☐ Don't recall / Unsure **[EXCLUSIVE]**

F8. In the <u>past three months</u>, have you or have you not participated in a survey concerning overdraft fee disclosures? *(Select only one option)*

- ☐ I have participated in a survey concerning overdraft fee disclosures in the <u>past three months</u>
- ☐ I have not participated in a survey concerning overdraft fee disclosures in the <u>past three months</u>
- ☐ Don't recall / Unsure

F9. Are you aware or are you not aware of any lawsuits regarding overdraft fee disclosures? *(Select only one option)*

- ☐ I am aware of at least one lawsuit
- ☐ I am not aware of any lawsuits
- ☐ Don't know / Unsure

**[GO TO PANEL 'THANK YOU' PAGE]**

*Confidential*

# APPENDIX D.B

# SURVEY SCREENSHOTS

*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



To enlarge, click on the image.

Imagine that you were presented with the bank form you just saw when opening a checking account with an associated debit card. Imagine further that you chose to opt into the services specified at the bottom of the form. Imagine further that you have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. When you leave the store, how much money is in your account?

Please enter a whole number (no commas or decimals) or click "Unsure / No opinion".

$ [✎ ..........]

| Unsure / No opinion |
| --- |

| Next › |
| --- |

© Powered by SSI

*Confidential*



To enlarge, click on the image.

Imagine, again, that you were presented with the bank form you just saw when opening a checking account with an associated debit card. You once again choose to opt into the services specified at the bottom of the form. You once again have $100 in this checking account. You then use that debit card to make an $80 purchase at the grocery store. On the way home from the grocery store, you consider withdrawing $40 from the ATM using the same debit card. Assuming you make no other transactions or deposits that day, do you think that a $40 withdrawal would be allowed or declined by the bank?

Select only one option

The $40 withdrawal would be allowed

The $40 withdrawal would be declined

Unsure / No opinion

Next ›

© Powered by SSI

*Confidential*



To enlarge, click on the image.

Thinking again about the same scenario, do you think that a $40 withdrawal would or would not result in an overdraft fee?

Select only one option

The $40 withdrawal would result in an overdraft fee

The $40 withdrawal would not result in an overdraft fee

Unsure / No opinion

Next ❯

© Powered by SSI

*Confidential*



To enlarge, click on the image.

Thinking again about the same scenario, given the $80 transaction that occurred that day, would you or would you not try to withdraw the $40?

Select only one option

I would try to withdraw the $40

I would not try to withdraw the $40

Unsure / No opinion

Next >

© Powered by SSI

*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*



*Confidential*

**APPENDIX D.C**

**SURVEY STIMULI**



**Overdraft Opt In Form**

**New Overdraft Rules for Debit and ATM Cards**

An **overdraft** occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have **standard overdraft practices** that come with your account
2. We also offer **overdraft protection plans**, such as a link to a savings account, or an overdraft line of credit, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our **standard overdraft practices**.

**What are the <u>standard overdraft practices</u> that come with my account?**
We **do** authorize and pay overdrafts for the following types of transactions:

- Checks and other transactions made using your checking account number
- Automatic bill payments

We will **not** authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we **do not guarantee** that we will always authorize and pay any type of transaction.

If we do **not** authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if Berkshire Bank pays my overdraft?**

Under our standard overdraft practices:
We will charge you a fee of up to **$31.00** each time we pay an overdraft.

There is **no limit** on the total fees we can charge you for overdrawing your account.

**What if I want Berkshire Bank to authorize and pay overdrafts on my ATM and everyday debit card transactions?**

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please:

- Call 800-773-5601, or
- Stop into any Berkshire Bank branch, or
- Complete the form below and return to the branch.

---

**Your choice to opt in or opt out of our standard overdraft services will go into effect within 5 days of receipt of this notice.**

     ✕   I **DO** want Berkshire Bank to authorize and pay overdrafts on my ATM and everyday debit card transactions.

Name:_____

Date:_____Phone:_____

Email:_____

Checking Account Number(s):_____
                               _____

Customer Signature:_____



**Overdraft Opt In Form**

**New Overdraft Rules for Debit and ATM Cards**

An **overdraft** occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have **standard overdraft practices** that come with your account
2. We also offer **overdraft protection plans**, such as a link to a savings account, or an overdraft line of credit, which may be less expensive than our standard overdraft practices. To learn more, ask us about these plans.

This notice explains our **standard overdraft practices**.

**What are the standard overdraft practices that come with my account?**
We **do** authorize and pay overdrafts for the following types of transactions:
- Checks and other transactions made using your checking account number
- Automatic bill payments

We will **not** authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we **do not guarantee** that we will always authorize and pay any type of transaction.

If we do **not** authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if Bank XYZ pays my overdraft?**

Under our standard overdraft practices:
We will charge you a fee of up to **$31.00** each time we pay an overdraft.

There is **no limit** on the total fees we can charge you for overdrawing your account.

**What if I want Bank XYZ to authorize and pay overdrafts on my ATM and everyday debit card transactions?**

If you want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please:
- Call 123-456-7890, or
- Stop into any Bank XYZ branch, or
- Complete the form below and return to the branch.

---

**Your choice to opt in or opt out of our standard overdraft services will go into effect within 5 days of receipt of this notice.**

      ✕  I **DO** want Bank XYZ to authorize and pay overdrafts on my ATM and everyday debit card transactions.

Name:_____

Date:_____Phone:_____

Email:_____

Checking Account Number(s):_____
                      _____

Customer Signature:_____




## WHAT YOU NEED TO KNOW ABOUT OVERDRAFTS AND OVERDRAFT FEES

### Overdraft Rules for Debit and ATM Cards

An **overdraft** occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. If we are presented with an item drawn against your account, we will pay the item based on your available balance.  The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft.  Debit card preauthorizations can reduce your account's available balance, which can result in overdraft fees if additional items are presented for payment.

We can cover your overdrafts in two different ways:

(1)  We have **standard overdraft practices** that come with your account (refer to Courtesy Pay Disclosure for details).
(2)  We also offer **overdraft protection plans**, such as a link to a savings account, or an overdraft line of credit,  which may be less expensive than our standard overdraft practices.  To learn more, ask us about these plans.

This notice explains our **standard overdraft practices**.

### What are the <u>standard overdraft practices</u> that come  with my account?

We **do** authorize and pay overdrafts for the following types of transactions:
*   Checks and other transactions made using your  checking account number
*   Automatic bill payments

We do **not** authorize and pay overdrafts on the following  types of transactions unless you ask us to (see below):
*   ATM transactions
*   Everyday debit card transactions

We pay overdrafts at our discretion, which means we **do not  guarantee** that we will always authorize and pay any type of  transaction.

If we do **not** authorize and pay an overdraft, your transaction  will be declined.

### What fees will I be charged if Berkshire Bank pays my  overdraft?

Under our **standard overdraft practices**:
We will charge you a fee of up to **$35.00** each time we  pay an:
*   Overdraft created by check, in-person, withdrawal, or other electronic means
*   UAF (Uncollected/Unavailable Funds) Overdraft
    *   We will charge a maximum of five (5) per item  fees per day for consumer accounts
*   In addition, a Continuous OD (Overdraft) Fee of $35.00 will be imposed every five (5) business  days until you bring your account positive.  This  fee is applied to your account when it has been  overdrawn for five (5) or more consecutive business  days. A maximum of 5 charges or $175 will be charged for each time period your  account remains in a negative status. Other fees can lead to a negative balance, which can  lead to additional fees.

Under our **overdraft protection plan**:
*   We will charge you a fee of **$10.00** for each transfer to pay an item from your linked Berkshire Bank deposit account.
    *   Transfer limitations apply from a statement savings or money market account to another account or to third parties by preauthorized, automatic, Internet banking, telephone transfer, check, draft, or similar order to third parties are limited to six per monthly statement cycle.  You will be charged a **$15.00** for each time you exceed the limit.

### What if I want Berkshire Bank to authorize and pay overdrafts on my ATM and everyday debit card transactions?

If you also want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please:
*   Call 800-773-5601, or
*   Change your Opt In option through your Online Banking account, or
*   Visit any Berkshire Bank branch, or
*   Complete the form below and present it at a branch

---

**Your choice to opt in will go into effect within 5 days of receipt of this notice.**

☐  I want Berkshire Bank to authorize and pay overdrafts on my ATM and everyday  debit card transactions.

Printed Name: _____

Date: _____

Checking Account Number(s): _____  _____  _____

Customer Signature: _____

If you change your mind and wish to remove your consent, please contact us at 800-773-5601 or visit any Berkshire Bank  branch. Thank you for giving us your permission to cover your ATM and everyday debit card overdrafts.

Confidential



## WHAT YOU NEED TO KNOW ABOUT OVERDRAFTS AND OVERDRAFT FEES

### Overdraft Rules for Debit and ATM Cards
An **overdraft** occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway. If we are presented with an item drawn against your account, we will pay the item based on your available balance.  The available balance is the amount of funds you can use for withdrawal from your account without causing an overdraft.  Debit card preauthorizations can reduce your account's available balance, which can result in overdraft fees if additional items are presented for payment.

We can cover your overdrafts in two different ways:

(1)  We have **standard overdraft practices** that come with your account.
(2)  We also offer **overdraft protection plans**, such as a link to a savings account, or an overdraft line of credit,   which may be less expensive than our standard overdraft practices.  To learn more, ask us about these plans.

This notice explains our **standard overdraft practices**.

### What are the <u>standard overdraft practices</u> that come  with my account?
We **do** authorize and pay overdrafts for the following types  of transactions:
- Checks and other transactions made using your  checking account number
- Automatic bill payments

We do **not** authorize and pay overdrafts on the following  types of transactions unless you ask us to (see below):
- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we **do not  guarantee** that we will always authorize and pay any type of  transaction.

If we do **not** authorize and pay an overdraft, your transaction  will be declined.

### What fees will I be charged if Bank XYZ pays my  overdraft?
Under our **standard overdraft practices**:
We will charge you a fee of up to **$35.00** each time we  pay an:
- Overdraft created by check, in-person, withdrawal, or other electronic means
- UAF (Uncollected/Unavailable Funds) Overdraft
  - We will charge a maximum of five (5) per item  fees per day for consumer accounts
- In addition, a Continuous OD (Overdraft) Fee of $35.00 will be imposed every five (5) business  days until you bring your account positive.  This  fee is applied to your account when it has been  overdrawn for five (5) or more consecutive  business days. A maximum of 5 charges or $175 will be charged for each time period your  account remains in a negative status.  Other fees can lead to a negative balance, which can  lead to additional fees.
Under our **overdraft protection plan**:
- We will charge you a fee of **$10.00** for each transfer to pay an item from your linked Bank XYZ deposit account.
  - Transfer limitations apply from a statement savings or money market account to another account or to third parties by preauthorized, automatic, Internet banking, telephone transfer, check, draft, or similar order to third parties are limited to six per monthly statement cycle.  You will be charged a **$15.00** for each time you exceed the limit.

### What if I want Bank XYZ to authorize and pay overdrafts on my ATM and everyday debit card transactions? If you
also want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please:
- Call 123-456-7890, or
- Change your Opt In option through your Online Banking account, or
- Visit any Bank XYZ branch, or
- Complete the form below and present it at a branch

---

**Your choice to opt in will go into effect within 5 days of receipt of this notice.**

☐     I want Bank XYZ to authorize and pay overdrafts on my ATM and everyday  debit card transactions.

Printed Name: _____

Date: _____

Checking Account Number(s): _____ _____ _____

Customer Signature: _____

If you change your mind and wish to remove your consent, please contact us at 123-456-7890 or visit any Bank XYZ  branch. Thank you for giving us your permission to cover your ATM and everyday debit card overdrafts.

*Confidential*

**APPENDIX D.D**

**PRETEST MODERATOR INSTRUCTIONS**

*Confidential*

**Bank Services Survey**
**Pretest Moderator Instructions**

- 10 respondents from the survey target population
- Interviews are conducted over the phone by blind-to-the-purpose interviewers at SSI while respondent completes the survey online.

Q-INTRO. Could I speak with **[INSERT NAME]?**

**[If needed]** We are calling him/her for a phone interview that he/she scheduled with **[INSERT PANEL].** It is a research study regarding bank services and he/she agreed to help us by giving his/her opinions.

❏Yes
❏No **[Schedule callback]**

This call may be monitored for quality assurance purposes. [Do not wait for an answer; continue with the survey unless the respondent says otherwise.]

Q-INTRO2. Thanks for taking the time to do this survey with us, **[INSERT NAME]**. First off, do you have access to a computer right now?

❏Yes
❏No **[Wait until they are at a desktop, laptop, or tablet computer]**

Q-INTRO3. Thank you! The link to the website you need to go to was provided in the email you received from us, please follow that link. **[IF NECESSARY REMIND WHO THE SENDER OF THE EMAIL WAS].** Please enter the following access code **[PROVIDE ACCESS CODE]**. I will be on the phone the entire time you are taking the survey, so feel free to "think out loud" or bring up anything you would like while you are taking the survey. Please be thorough in your response and take as much time as you need.

ALLOW THE RESPONDENT TO TAKE THE SURVEY AND FINISH.

QUESTIONS TO ASK AFTER THE RESPONDENT FINISHED RESPONDING TO ALL SURVEY QUESTIONS.

Q1. Did you have any problems while taking the survey?

Q2. Did you think any questions were unclear? If so, which ones and why?

Q3. Did you think any answer options were unclear? If so, which ones and why?

Q4. Did you have any difficulty viewing any parts of the survey?

Q5. What do you think might be the purpose for conducting this survey?

Q6. What makes you think so?

Q7. Is there anything else you would like to say about the survey?

Thank you so much for your time. Your participation is appreciated and we will make sure you get credit for completing this survey.