# Exhibit 11

```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3


 4   --------------------------------x

 5   SANDRA BOND, individually and on
     behalf of all others similarly
 6   situated,

 7           Plaintiffs,
                                          Case No.
 8   vs.                                  16-30050-MGM

 9   BERKSHIRE BANK and BERKSHIRE
     HILLS BANCORP,
10
             Defendants.
11
     --------------------------------x
12

13            DEPOSITION OF SONYA KWON, a

14       witness called by the Plaintiffs, taken

15       pursuant to the applicable provisions of

16       the Federal Rules of Civil Procedure,

17       before James A. Scally, RMR, CRR, a

18       Notary Public in and for the Commonwealth

19       of Massachusetts, at the offices of

20       Pierce Atwood LLP, 100 Summer Street,

21       Boston, Massachusetts, on Thursday, April

22       26, 2018, commencing at 10:17 a.m.

23

24

25
```

Page 2

```
 1              A P P E A R A N C E S
 2
 3    McLAUGHLIN & STERN LLP
 4    260 Madison Avenue
 5    New York, New York  10016
 6    212-448-1100
 7    By: Wade C. Wilkinson, Esq.
 8        Counsel for the Plaintiffs
 9
10    LAW OFFICE OF ANGELA EDWARDS
11    72 Canterbury Circle
12    East Longmeadow, Massachusetts  01028
13    413-525-3820
14    By: Angela M. Edwards, Esq.
15        Counsel for the Plaintiffs
16
17    PIERCE ATWOOD LLP
18    Merrill's Wharf
19    254 Commercial Street
20    Portland, Maine  04101
21    207-791-1100
22    By: Lucus A. Ritchie, Esq.
23        Counsel for the Defendants
24
25
```

Page 3

```
 1              A P P E A R A N C E S
 2
 3    PIERCE ATWOOD LLP
 4    100 Summer Street
 5    Boston, Massachusetts  02110
 6    617-488-8100
 7    By: Donald R. Frederico, Esq.
 8        Counsel for the Defendants
 9
10    Also Present:
11    Pia Carretta, Edgeworth Economics LLC
12    (Via Telephone)
13
```

Page 4

```
 1                   I N D E X
 2   WITNESS                              EXAMINATION
 3   SONYA KWON
 4   (By Mr. Wilkinson)                        5
 5
 6
 7
 8
                   E X H I B I T S
 9   NO.                                        PAGE
10   1   2/27/18 expert report of Sonya Kwon       9
11   2   Deposit transactions report Bates      106
         stamped BB-BOND-0003104 through 3105 and
12       4/15/12 statement Bates stamped
         BB-BOND-0000305 through 306
13
     3   Balance traceability report Bates      154
14       stamped BB-BOND-0000652 and cardholder
         financial activity report Bates stamped
15       BB-BOND-0001535
16   4   Spreadsheet, balance traceability report 156
         Bates stamped BB-BOND-0000663 through
17       664, and balance traceability report
         Bates stamped BB-BOND-0000828 through
18       829
19
20       (Exhibits were given to the court
          reporter to attach to the transcript.)
21
```

Page 5

```
 1            SONYA KWON, having been
 2       satisfactorily identified by the
 3       production of her driver's license and
 4       duly sworn by the Notary Public, was
 5       examined and testified as follows in
 6       answer to direct interrogatories:
 7
 8                  EXAMINATION
 9   BY MR. WILKINSON:
10       Q.  Hi, Ms. Kwon.  I'm Wade Wilkinson from
11   McLaughlin & Stern.  We represent the plaintiff
12   Sandra Bond in this matter.  And I understand you've
13   been deposed before; correct?
14       A.  Yes, I have.
15       Q.  How many times?
16       A.  20 to 35 times.
17       Q.  So just -- just to refresh, I'm sure you
18   remember, just try to have verbal responses.  The
19   court reporter can't take -- take down shakes or nods
20   or anything like that.  Even if you know the
21   question, just wait for me to finish.  You know, if
22   you have any questions about how I phrased the
23   question, just let me know.  I'll try to rephrase it.
24   I'm sure some of the terms -- I'm -- you know, I'm
25   the lawyer, so I'm just asking about some stuff.  So,
```

```
                                            Page 22
 1   it.
 2       A.  And you're asking if during the OSI period --
 3       Q.  Yes.  During the time frame that OSI was
 4   utilized, that same program, that same software
 5   program, was utilized for every account; right?
 6           MR. RITCHIE:  Objection.
 7       Q.  Every eligible account.
 8       A.  There's one -- one system that was being
 9   used.
10       Q.  Right.  Okay.  And now currently Berkshire
11   utilizes the FIS system; correct?
12       A.  That's correct.
13       Q.  Okay.  And when Berkshire switched over from
14   the OSI system to the FIS system in, I believe it was
15   September of 2012, that changeover was for all
16   consumer checking accounts; correct?
17           MR. RITCHIE:  Objection.
18       A.  I believe the changeover was broader than
19   that.  It was for -- I think Berkshire changed the
20   entire system platform.
21       Q.  So an individual account didn't have some
22   different operating system for that specific account;
23   correct?
24           MR. RITCHIE:  Objection.
25       Q.  As it relates to overdraft fees.

                                            Page 23
 1       A.  Yes, I believe one system was used.
 2       Q.  How transactions are posted in Berkshire's
 3   computer system is uniform for each consumer checking
 4   account; correct?
 5           MR. RITCHIE:  Objection.
 6       A.  There's a lot of things that that question
 7   encompasses.  But if you're asking is there a certain
 8   posting order for the bank, yes.
 9       Q.  Yes, okay.  And each consumer checking
10   account has the same rules applied to it in
11   Berkshire's automated computer system with respect to
12   pre-authorization holds; correct?
13           MR. RITCHIE:  Objection.
14       A.  Can you repeat the question?
15       Q.  Sure.
16           (Question read.)
17       A.  There is one system that's used for holds,
18   yes.
19       Q.  And the same fee for an overdraft is applied
20   to any account that is deemed to be overdrawn; right?
21           MR. RITCHIE:  Objection.
22       A.  Same overdraft fee?
23       Q.  Uh-huh.
24       A.  The amount of the fee?
25       Q.  Yes.

                                            Page 24
 1       A.  Yes.
 2       Q.  And you're not aware of any ability of
 3   customers to negotiate any changes to the mechanics
 4   of the computer system; correct?
 5           MR. RITCHIE:  Objection.  Beyond
 6           the scope of the report.
 7       A.  I don't know what customers can negotiate.  I
 8   do know that they can go to a teller and negotiate
 9   refunds, for example, for fees that are assessed on
10   their account.
11       Q.  Right.  But they can't negotiate how the
12   calculation is actually made; correct?
13           MR. RITCHIE:  Objection.
14           Foundation, beyond the scope of the
15           report.  Object to the form of the
16           question.
17       A.  I don't know what customers can negotiate.
18       Q.  And whether or not a customer knew or
19   understand -- understood how Berkshire's overdraft
20   policies and procedures actually worked would not
21   have changed how Berkshire applied its overdraft
22   practices to any account; correct?
23           MR. RITCHIE:  Objection.
24           Foundation, beyond the scope of the
25           report.  Objection to the form of the

                                            Page 25
 1           question.
 2       A.  Besides the fact that, you know, consumers
 3   can opt out of that Courtesy Pay service?  Is that
 4   what you're asking?
 5       Q.  No.  I'm asking, so a customer's knowledge of
 6   how Berkshire calculates overdraft fees doesn't
 7   change how Berkshire's system works; correct?
 8           MR. RITCHIE:  Objection.
 9       A.  The -- that's right.
10       Q.  And the overdraft policies at Berkshire apply
11   to all consumer checking accounts, eligible consumer
12   checking accounts that were part of Courtesy Pay or
13   Regulation E regardless of the individual's knowledge
14   about the practices; right?
15           MR. RITCHIE:  Objection.
16       A.  I think, again, the knowledge matters because
17   individuals will either participate or not
18   participate in the program.
19       Q.  Right.  But the knowledge doesn't matter with
20   respect to how the computer system works; correct?
21           MR. RITCHIE:  Objection.
22       A.  Okay.  If it's specifically about the
23   computer system and how that works, that's right.
24       Q.  So if, for example, a customer knew a
25   transaction would result in an overdraft and they
```

Page 30

```
 1        MR. RITCHIE:  Objection to the
 2     form.
 3  A.  What I'm saying is --
 4        MR. RITCHIE:  Beyond the scope.
 5  A.  What I'm saying is I just -- in instances
 6  where a customer knew, for example, about it, they
 7  may not have spent or gone into overdraft and
 8  incurred a fee.  So it could -- there could be
 9  different fees assessed based on what people know
10  because it changes consumer behavior is my --
11  Q.  That's not what I'm asking.  I'm asking when
12  an overdraft fee is charged on an account, that's
13  charged because the available balance went below
14  zero; right?
15  A.  That is true.
16  Q.  Okay.  And whether or not the customer knew
17  the transaction was going to result in the available
18  balance going below zero is irrelevant on whether or
19  not the fee is actually charged.  If they go below
20  zero in the available balance, the fee is assessed;
21  correct?
22        MR. RITCHIE:  Objection.
23  A.  That's true, yes.
24  Q.  Berkshire also currently has a continuous
25  overdraft policy; right?
```

Page 31

```
 1  A.  Yes, that's my understanding.
 2  Q.  And the same rules with respect to the
 3  continuous overdraft policy apply to all consumer
 4  checking accounts; correct?
 5        MR. RITCHIE:  Objection.
 6  A.  From a systems standpoint?
 7  Q.  Yes.
 8  A.  That's my understanding.
 9  Q.  So how the system determines to calculate a
10  continuous overdraft fee doesn't vary from customer
11  to customer; correct?
12  A.  From a systems standpoint, that's correct,
13  how it impacts customers, yes, it varies.
14  Q.  And you're familiar with how Berkshire
15  calculates available balance; correct?
16  A.  Yes, I am.
17  Q.  And it's calculated based on a customer's
18  available balance; is that correct?
19        MR. RITCHIE:  Objection.
20  A.  Are you asking about the overdraft fee?
21  Q.  Yes.  Sorry.
22        MR. RITCHIE:  The question you
23     asked --
24        MR. WILKINSON:  Yes, you're
25     correct.  I'll rephrase.
```

Page 32

```
 1  Q.  Berkshire calculates overdraft fees based
 2  upon a customer's available balance; correct?
 3  A.  That's correct.
 4  Q.  Has it always calculated overdraft fees based
 5  on available balance?
 6  A.  That's my understanding, yes.
 7  Q.  So since -- strike that.
 8     And this is my understanding -- just correct
 9  me if I'm wrong -- available balance is calculated as
10  follows:  Ledger balance minus holds minus
11  collectible float or available float plus unused PRA
12  if overdraft protection is available; is that right?
13        MR. RITCHIE:  Objection to form.
14     Beyond the scope of the report.
15  A.  Generally available balance is ledger balance
16  adjusted for pending debits and includes deposits
17  that have been made available.
18  Q.  Okay.  Let's walk through some of these.
19  What are holds?
20  A.  Generally?
21  Q.  Uh-huh.
22  A.  Are you talking about deposit holds?
23  Q.  No.  Just in general for -- for the -- for
24  the calculation of overdraft fees at Berkshire.  What
25  are holds?
```

Page 33

```
 1  A.  There are different types of holds, first of
 2  all.
 3  Q.  Okay.
 4  A.  Deposit holds are when deposits are made,
 5  certain deposits are subject to holds, depending on
 6  the amount, the type, who the deposit is from, and
 7  there are various factors that go into that.  And
 8  there could be holds made until the funds are
 9  actually available to the account.
10     Debit holds --
11  Q.  Sorry.  Go ahead.
12  A.  Sorry.
13  Q.  That's what I was going to ask next.
14  A.  Debit holds are generally, they're pending
15  debit authorizations.
16  Q.  Are those the same as pre-authorization
17  holds?  Is that what a debit hold would be?  Or
18  something different?
19  A.  I think that's how you refer to it as pre-
20  authorizations.
21  Q.  And what is collectible float?
22  A.  It's an amount that is also on hold that's
23  collectible to the account.
24  Q.  What does that mean, "collectible to the
25  account"?
```