```
 1            IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3      * * * * * * * * * * * * *
       SANDRA BOND           *    16CV30050-MGM
 4                           *
       VS.                   *
 5                           *    OCTOBER 2, 2018
       BERKSHIRE BANK and    *    11:15 A.M.
 6     BERKSHIRE HILLS BANCORP,*
       INC.                  *
 7                           *    BOSTON, MA
        * * * * * * * * * * * * *
 8

 9           BEFORE THE HONORABLE MARK G. MASTROIANNI

10                      DISTRICT JUDGE

11                     (Motion Hearing)

12     APPEARANCES:

13     FOR THE PLAINTIFF:      ANGELA M. EDWARDS, ESQ.
                               Law Office of Angela Edwards
14                             72 Canterbury Circle
                               East Longmeadow, MA 01028
15
                               WADE C. WILKINSON, ESQ.
16                             LEE S. SHALOV, ESQ.
                               McLaughlin & Stern, LLP
17                             260 Madison Avenue
                               New York, NY  10016
18
       FOR THE DEFENDANTS:     DONALD R. FREDERICO, ESQ.
19                             Pierce Atwood, LLP
                               100 Summer Street
20                             Suite 2250
                               Boston, MA  02110
21
                               LUCUS A. RITCHIE, ESQ.
22                             Pierce Atwood, LLP
                               Merrill's Wharf
23                             254 Commercial Street
                               Portland, ME  04101
24
       Court Reporter:         Debra D. Lajoie, RPR-FCRR-CRI-RMR
25                             One Courthouse Way
                               Boston, MA  02210
```

1      2 OCTOBER 2018 -- 11:15 A.M.

2              THE CLERK:  Your Honor, the matter before the

3      Court is Civil Action No. 16-30050, Sandra Bond v.

4      Berkshire Bank, et al.

5              Court is now in session.  You may be seated.

6      Would counsel please identify themselves for the Court

7      and for the record.

8              MS. EDWARDS:  Good morning, Your Honor.

9      Angela Edwards on behalf of the Plaintiff.

10             THE COURT:  Hi.

11             MR. SHALOV:  Good morning, Your Honor.

12     Lee Shalov from McLaughlin & Stern, also for the

13     Plaintiff.

14             MR. WILKINSON:  Good morning, Your Honor.

15     Wade Wilkinson from McLaughlin & Stern, also for the

16     Plaintiff.

17             THE COURT:  Okay.  Good morning.

18             MR. FREDERICO:  Good morning, Your Honor.

19     Donald Frederico from Pierce Atwood for Defendants.

20             MR. RITCHIE:  And Lucus Ritchie, also from

21     Pierce Atwood, for the Defendants.

22             THE COURT:  Okay, thank you.  Good morning.

23             All right.  I've reviewed the submissions of the

24     parties, which were very well done, and I appreciate

25     that.  Thank you.

1          So, we have the timing scheduling order for the

2     arguments, so any time you're ready, we can start.

3     Plaintiff.

4          MS. EDWARDS:  Thank you, Your Honor.  And good

5     morning.

6          My name is Attorney Angela Edwards from the Law

7     Office of Angela Edwards on behalf of Plaintiff,

8     Sandra Bond, in this matter.

9          I'm joined by my co-counsel, Attorney Lee Shalov

10    who will be speaking on the topics of adequacy,

11    typicality and *Daubert* motions.

12          THE COURT:  All right.

13          MS. EDWARDS:  This is a proposed class action

14    under Federal Rule 23 to recover millions of dollars in

15    overdraft fees that were wrongfully imposed by the

16    Defendant, Berkshire Bank.  Berkshire charged customers

17    overdraft fees on transactions that did not actually

18    exceed or overdraw the actual money in a customer's

19    account but, rather, exceeded an available balance that

20    was systematically calculated and imposed by its

21    automated computer systems, which applied to every

22    single customer in the same way.  And notably,

23    Your Honor, Berkshire Bank violated its disclosures

24    from 2000 until today because all of Berkshire Bank's

25    disclosures have inaccurately reflected how Berkshire

1    Bank's systems calculate its overdraft fees.

2        Berkshire Bank is a Massachusetts bank.  It

3    operates in six different states, including

4    Massachusetts.  Overdraft charges have been a primary

5    source of income for Berkshire Bank that have steadily

6    increased.  For example, in 2014, they had over

7    $10 million in overdraft fees, and a significant amount

8    of these overdraft fees are paid by what Berkshire Bank

9    refers to internally as frequent flyers.

10        Berkshire Bank had uniform methodologies for

11   charging overdraft fees.  Evidence shows that Berkshire

12   Bank's computerized processing systems impose overdraft

13   fees in exactly the same way and under exactly the same

14   circumstances for all customers.  Berkshire Bank has

15   always used an available-balance methodology to assess

16   its overdraft fees.  Therefore, every customer is

17   damaged by Berkshire Bank by its overdraft fees in the

18   same ways, by their computer processing systems and by

19   their inaccurate and materially misleading disclosures.

20        Berkshire Bank's uniform terms and conditions

21   and disclosures regarding its overdraft fees were

22   comprised basically in four different documents:  The

23   terms and conditions, the courtesy pay disclosures, the

24   overdraft opt-in forms and some letters to customers.

25   It's important to note, Your Honor, that throughout the

1    entire class period, these disclosures were inaccurate

2    and misleading, as they did not accurately reflect

3    Berkshire Bank's actual practices of assessing

4    overdraft fees.  And that's true from the beginning of

5    the class period to the end of the class period.  Even

6    though there were different iterations of the

7    disclosures, they were all misleading.

8         Internal Berkshire Bank executives recognized

9    the inadequacies of the Bank's disclosures.  They knew

10   that their overdraft disclosures posed a risk to the

11   Bank.  Executive Vice-President Deborah Stephenson was

12   concerned about Berkshire Bank's disclosures of

13   available balance, and emailed her colleagues and the

14   higher-ups at the Bank suggesting that, "We should

15   clearly, right upfront, define available balance."

16   Stephenson was so alarmed that, in March of 2015, she

17   believed Berkshire Bank would be cited for "Truth in

18   savings violation and a Regulation E violation" for not

19   being clear about Berkshire Bank's disclosures.

20        Consistent with numerous decisions that have

21   certified classes in overdraft cases like this, this

22   case too should be certified, Your Honor.  The

23   Defendants have completely ignored the slew of

24   multiple, multiple Federal and state class actions that

25   have certified overdraft cases like this.  They have

1    just ignored them.

2         They consist of many different cases, such as

3    the *TD Bank* decision, it's a 75 -- very well

4    thought-out decision by the Judge in that case, 75-page

5    decision that went down this year; the *Gunter v.*

6    *United Federal Credit Union* case, Your Honor, in 2017;

7    the "In re:  Checking Account Litigation" cases;

8    different cases involving different banks with

9    different entities, such as Wells Fargo, Wachovia Bank,

10   PNC, Comerica, Capital One, Bancorp South, United Bank

11   and many others, Your Honor.

12        Plaintiff moves pursuant to Federal Rule 23 for

13   certification of two classes in this case.  The first

14   is Berkshire Bank's sufficient funds class, which is

15   comprised of all persons with Berkshire Bank consumer

16   checking accounts who, on or after July 1st, 2010, were

17   charged an overdraft fee as a result of Berkshire

18   Bank's practice of assessing overdraft fees when a

19   customer has sufficient funds in his or her account to

20   pay the amount of the posted transaction.

21        Second is the EFTA class, which is comprised of

22   all persons with Berkshire Bank consumer checking

23   accounts who, from July 1st, 2010, were charged an

24   overdraft fee for an ATM or one-time debit card

25   transaction when Berkshire Bank did not:  One, include

1    the required header on the Reg. E form; or, two,

2    explain in the Regulation E form for the method for

3    assessing overdraft fees; or, three, send written

4    confirmation to customers of their consent to opt in to

5    Reg. E.  The EFTA class in particular is seeking only

6    statutory damages, and it's a strict liability statute

7    that does not require a proof of any reliance.

8         Certification is proper under Rule 23 if the

9    Court, after conducting rigorous analysis, finds the

10   prerequisites of Rule 23 have been satisfied.  The

11   first requirement is numerosity.  In this case,

12   numerosity has not been contested, and the requirement

13   is met if the size of the proposed class is

14   sufficiently large to make joinder impractical, and the

15   Courts in this District have consistently held that

16   40 class members is sufficient for the requirement.  In

17   this case, Berkshire Bank's own records recognize that

18   over 98,000 customers have incurred at least one

19   overdraft fee during the requisite class period.

20        Number two, commonality.  Plaintiffs' claims all

21   satisfy the commonality requirement, and this has been

22   recognized by many, many, many recent decisions ignored

23   by Defendants.  The Rule requires that common issues

24   predominate over any questions affecting individual

25   class members and that a class action is the superior

1  method to other methods of fair and efficient

2  adjudication of the controversy.

3      Under the US Supreme Court *Dukes* decision, class

4  members, "Must depend upon a common contention that is

5  capable of class-wide resolution, which means that

6  determination of its truth or its falsity will resolve

7  an issue that is central to the validity of each of the

8  claims in one stroke."

9      The Rule only requires the resolution if common

10 questions affect all or a substantial number of the

11 members of the class.  Your Honor, this prerequisite is

12 qualitative, not quantitative.  A single common issue

13 to members of the class will suffice.  Notably, Courts

14 have routinely found commonality in overdraft cases

15 like this, the extensive *TD Bank* decision, the *Comerica*

16 case, the *Wachovia Bank* case, Your Honor, and many

17 others.  All the recent overdraft cases have

18 consistently found predominance and have satisfied

19 cases in overdraft cases just like this because there

20 were common questions of law and fact to every member

21 of the class.

22     The Berkshire Bank sufficient funds class has

23 five common questions:

24     First, whether Berkshire Bank assesses overdraft

25 fees using available balance, as calculated by

1    Berkshire Bank's computer system rather than actual

2    balance.

3         Number two, importantly, whether Berkshire Bank

4    breaches contracts with class members by charging them

5    overdraft fees when they have sufficient funds in their

6    accounts.

7         Three, whether Berkshire Bank fails to provide

8    class members with complete and accurate disclosures

9    about its overdraft practices, including the use of

10   aggregated pre-authorization holds.

11        Four, whether Berkshire Bank charges additional

12   overdraft fees when pre-authorization holds settle even

13   though Berkshire Bank already reduced customers'

14   balances by held amounts.

15        And, five, whether Berkshire Bank's alleged

16   misstatements and omissions regarding overdraft fees

17   are material and likely to mislead the class.

18        Regarding the EFTA class, there are four common

19   questions, Your Honor:

20        One, whether Berkshire Bank's opt-in form failed

21   to accurately describe Berkshire Bank's actual

22   overdraft practices.

23        Two, whether Berkshire Bank failed to provide

24   class members with written confirmation of their Reg. E

25   opt-in.

1          Three, whether Berkshire Bank obtained
2    affirmative consent from class members before charging
3    overdraft fees.
4          And, four, whether Berkshire Bank should be
5    assessed statutory penalties for violating the EFTA.
6          These common questions easily satisfy the
7    requirement of Federal Rule 23(a)(2) and involve common
8    predominating issues.  This is key in class
9    certification.  Three common predominating issues:
10   One, the existence and scope of Berkshire Bank's
11   account agreements; two, Berkshire Bank's automated
12   computer systems and how they assess overdraft fees;
13   and, three, the adequacy of Berkshire Bank's
14   disclosures.  In this case, all of Plaintiffs' claims
15   have common themes and common questions, the hallmark
16   of predominance.
17          In *TD Bank*, the Court found predominance when
18   the Bank's "checking account policies and procedures
19   were governed by form contracts with terms applicable
20   to Plaintiff and class members alike and from the
21   context of computer-controlled processing systems that
22   treat all checking account customers and transactions
23   alike."
24          Similarly, Berkshire Bank utilized standardized
25   terms and conditions in overdraft disclosures and

1    computer systems program precisely the same for every

2    Berkshire Bank customer when imposing overdraft fees on

3    class members who had sufficient funds in their

4    account.  Individual questions raised by Defendants do

5    not undermine predominance.  These same tired arguments

6    have been soundly rejected by other Courts in overdraft

7    cases like this, such as *TD Bank*, for one example.

8         Individual damage questions also fail to defeat

9    predominance because damages "are measurable class-wide

10   using common methodology."  Courts routinely recognize

11   that common issues predominate when Defendants' own

12   records can be used to identify class members and

13   calculate damages, such as *TD Bank*.  That is exactly

14   what Plaintiffs' expert, Dr. David, concluded in this

15   case.

16        Dr. Jesse David, whose report has been

17   submitted, has explained that Berkshire Bank's data can

18   be used in a formulaic manner for him to calculate

19   damages on a class-wide base.  This measure of damages

20   has routinely been adopted in overdraft cases such as

21   this and have concluded that customers' "consent,

22   reliance and knowledge are irrelevant in assessing

23   damages on a class-wide basis," as the *TD Bank* Court

24   had concluded.  This is because, as Berkshire's own

25   experts have conceded, Berkshire Bank's computer system

1   is structured to automatically assess overdraft fees

2   regardless of a customer's knowledge or understanding

3   of how or when fees are imposed.

4        Berkshire Bank's substantially similar

5   disclosures render Plaintiffs' contract claims well

6   suited to a finding of predominance.  Berkshire Bank's

7   materially uniform contracts render Plaintiffs'

8   contract-based claims perfectly suited for a finding of

9   predominance in this case.  Like in *TD Bank*, Berkshire

10  Bank's contracts are contracts of adhesion involving

11  non-negotiable terms and vast bargaining and

12  informational imbalances between the parties.

13       As the *TD Bank* Court reasoned, "If there is any

14  type of standardized agreement that ought to be

15  interpreted uniformly, it is a consumer checking

16  account agreement."  Berkshire's overdraft policy was

17  applied to every Berkshire customer.  There was no

18  option for a customer to elect the use of actual

19  balance versus available balance or negotiate, changing

20  how Berkshire Bank systematically determined available

21  balance and overdrafts.  It was done systematically.

22  It's automatically by a computer software program.

23       Berkshire Bank's claims that individuals' issues

24  predominate because there were different versions of

25  their disclosures is a red herring.  The reality is

1    that, throughout the class period, all of these

2    disclosures failed to accurately reflect Berkshire

3    Bank's actual practices and contained inaccurate

4    information about how Berkshire Bank's overdraft fees

5    were assessed -- this is critical -- and also

6    inaccurate information about how Berkshire Bank's

7    payment order worked, which also directly affected

8    overdrafts.

9         These, Your Honor, are the key terms and the key

10   issues in this case, as opposed to the extraneous and

11   irrelevant information that Defendants allege changed.

12   Overdraft cases have routinely held that, while there

13   may be some individual issues, they recognize that,

14   these individual variations will not predominate

15   over the pervasive commonality of the Bank's practices

16   and the Bank's practices' adverse impact on many,

17   many thousands of depositors.  The *Union Bank* case

18   cited that, also citing another case, *Gutierrez v.*

19   *Wells Fargo*.

20        Even with several or different iterations of

21   disclosures, Your Honor, the common question remains

22   whether the disclosures accurately reflect Berkshire

23   Bank's practices.  What Defendants are suggesting, the

24   fact that they changed some contract language

25   throughout the class period, is a perversity of the

1   class action system, claiming that, because they

2   changed their disclosures, they should get a free pass

3   and leave Plaintiff and the class with nothing, despite

4   the fact that they've breached all of their contracts

5   with customers from 2010 until today, and their

6   disclosures were unfair, they were deceptive, and they

7   resulted in millions of dollars of improper overdraft

8   fees to Plaintiff and the class.

9        Your Honor, this is simple.  Jurors can be given

10  and will be given the disclosures, all iterations, in

11  one binder with the operative language highlighted and

12  are intelligent enough to make assessments about

13  whether the language is actionable or not.  For

14  example, number one, is the 2010 iteration actionable

15  based upon the evidence of Berkshire Bank's actual

16  practices?  They can say yes, or they can say no.

17  Number two, they can go to the next iteration, Is this

18  iteration actionable?  And so on and so forth.

19       The question still remains:  Does the

20  disclosure, at whatever time it may be in effect,

21  sufficiently or insufficiently disclose Berkshire

22  Bank's actual practices in assessing overdraft fees?

23  Different iterations are not a reason to deny a class

24  in this case.

25       The bottom line is that, like in *TD Bank*,

1  predominance is satisfied because Berkshire Bank's

2  "account balances and practices were governed by form

3  contracts with terms applicable to Plaintiff and class

4  members alike and from the context of

5  computer-controlled processing systems that treats all

6  checking account customers and transactions in like

7  fashion."

8       I'm going to wrap up because I'm going to have

9  Attorney Shalov --

10      THE COURT:  That's fine.

11      MS. EDWARDS:  So, I thank you for your time,

12 Your Honor, but the bottom line is that, as briefed in

13 Plaintiffs' submissions -- I'm sorry, Your Honor.  We

14 had an issue with the timing.  I thought I had to wrap

15 up, but I have been told I have ten additional minutes.

16      THE COURT:  Okay.

17      MS. EDWARDS:  So, my apologies for the

18 interruption.

19      THE COURT:  No.  Go right ahead.

20      MS. EDWARDS:  So, just to backtrack for a

21 minute, the issue is whether the Bank used form

22 contracts and disclosures in conjunction with a

23 centralized computer system that imposed overdraft fees

24 on every customer in exactly the same way.

25      Plaintiffs' conversion and unjust enrichment

1    claims also meet the predominance requirement.

2    Regarding conversion, as articulated in *TD Bank*, "Given

3    the uniform automated processes at issue, it is clear

4    that the questions relevant to whether the Bank's

5    taking or detention of funds was wrongful can be

6    answered on a class-wide basis," adding that the

7    resolution of these questions apply to and will resolve

8    the claims of all class members "irrespective of any

9    individual knowledge, intent or understanding on the

10   part of the class members."

11       Regarding unjust enrichment, similarly, the

12   *TD Bank* Court dismissed the idea that individual proof

13   would be relevant to unjust enrichment claims "because

14   the questions relevant to the unjust enrichment claim

15   relate to uniform corporate policies and practices, and

16   the Court joins other Courts that have found the

17   predominance requirement satisfied for unjust

18   enrichment cases in similar context."

19       Similarly, Plaintiffs' 93A claim meets the

20   predominance requirement.  Defendants' sole opposition

21   to Plaintiffs' 93A claim is that the statute requires

22   detrimental reliance.  Defendants have heavily relied

23   and spent many, many pages of their briefing on

24   individual experiences and circumstances.  These are

25   red herrings, Your Honor, and completely irrelevant.

1    The First Circuit and numerous Districts in this

2    Circuit have expressly rejected that proposition.  All

3    that is required is a causal connection between the

4    deception and the loss, and Plaintiffs have shown that

5    here.

6         Plaintiffs may assert claims also on behalf of

7    absent class members under the consumer protection

8    statutes of other states.  Multi-state laws do not

9    preclude predominance.  Courts routinely certify

10   classes involving the application of multi-state laws,

11   finding that the differences in state laws can be

12   appropriately managed when central facts are common to

13   the class.

14        A consumer may maintain a class action on behalf

15   of a nationwide class involving different states' laws

16   regardless of whether the Plaintiff herself has

17   individual standing to assert the claims, provided the

18   claims have similar characteristics.  Your Honor, this

19   is well-settled authority.

20        Plaintiff Bond may properly assert defective

21   practices claims for consumer protection in other

22   states, as those claims are based on the same essential

23   facts and characteristics.  That would be the

24   utilization of a centralized automated computer system

25   that imposes overdraft fees and systematically imposes

1    overdraft fees when customers exceed their available

2    balance even when they have enough money in their

3    account.

4         Berkshire Bank's affirmative defenses do not

5    defeat predominance.  Defendants' claims that their

6    individual knowledge mantra precludes class

7    certification, such as secret refunds or customers

8    intentionally overdrawing their account, are complete

9    completely irrelevant.  These arguments about

10   affirmative defenses fail for the same reasons I have

11   already articulated, and most importantly, Your Honor,

12   every recent overdraft fee decision has rejected that

13   idea.  *TD Bank*, the checking account -- *In re: Checking*

14   *Account Overdraft* litigation cases, the *Comerica* case,

15   the *United Bank* case, even the *TD Bank* case back in

16   2012, and this Court should follow as well.

17        A class action is superior to other methods of

18   adjudication.  The second part of Rule 23(b)(3)

19   analyzes whether a class action is superior to "other

20   methods for fairly and efficiently adjudicating the

21   controversy."  The superiority requirement ensures that

22   the resolution by class action will achieve economies

23   of time, effort and expense.  Defendants' only

24   objection to this seems to be manageability for the

25   same reason that they claim predominance is not

1    satisfied.  They cite to different contracts, in other

2    words, Your Honor, give us a free pass because we

3    changed some language about how we disclosed

4    overdrafts, so too unmanageable.

5         Well, juries are a lot smarter than that, and we

6    have the actual documents, can highlight the actual

7    language, and they can go through each one individually

8    and say, Did this violate the Bank's policies,

9    practices and procedures or not?  And make that

10   determination.  It is not a reason to deny

11   certification, and it is certainly not a reason to say

12   that the class action mechanism is not superior in this

13   case.

14        Multi-state laws also do not preclude

15   predominance.  In fact, Courts regularly certify

16   classes involving the application of multi-state laws,

17   finding that the differences in state laws can be

18   appropriately managed when central facts are common to

19   the class.  If there are no material conflicts among

20   the states, a finding of complete state law uniformity

21   is unnecessary.  All that is required is that the

22   different state law claims be subdivided into

23   subgroups, and numerous Courts, including overdraft

24   cases like this and other class cases, have utilized

25   special verdict forms to manage class actions involving

1      multiple state laws.  And we have done that in your

2      case, Your Honor.  We have submitted an extensive trial

3      plan that is attached as Appendix 2, and it supports

4      the applicable state laws and divides them into

5      subclasses with materially identical legal standards.

6           Also, Plaintiff has submitted special verdict

7      forms that articulate the element of each cause of

8      action and identified minor state law variances.  The

9      bottom line is that, regardless of application of

10     multi-state laws, you still have common issues of fact

11     and law that will remain the primary focus of this

12     litigation.  Therefore, a class action is superior.

13     The classes are also ascertainable by the Defendants'

14     own records in this case, and we contend that

15     ascertainability has been met.  And the Plaintiffs'

16     expert concluded that he can identify class members on

17     a systematic basis from Berkshire Bank's own

18     transactional records.

19          Plaintiffs' counsel should be appointed class

20     action counsel in this case, Your Honor.  Federal

21     Rule 23 also requires -- provides that, in certifying a

22     class action case, the Court must appoint class

23     counsel.  In this case, we propose that, and Plaintiff

24     proposes, that McLaughlin & Stern and the Law Office of

25     Angela Edwards be appointed class counsel.

1        Thank you, Your Honor.  I will turn over to

2   Attorney Shalov for the remainder of the argument.

3   Thank you.

4        THE COURT:  All right.  Thank you.

5        MR. SHALOV:  Good morning, Your Honor.

6   Lee Shalov from McLaughlin & Stern for the Plaintiff.

7        THE COURT:  Good morning.

8        MR. SHALOV:  Good morning.

9        I'm going to address the typicality requirement,

10  which is Federal Rule 23(a)(3), and also the *Daubert*

11  motion as to the Defendants' expert.

12        Rule 23(a)(3) simply says that the claims of the

13  Plaintiff have to be typical of the claims of absent

14  class members, and what that means is that the claims

15  have to arise out of a common course of conduct and

16  that the claims need to be similar.  The Rule does not

17  require that the claims be identical.  The Rule does

18  not require that the factual circumstances associated

19  with the Plaintiff have to be the same as absent class

20  members.

21        The Rule does not prohibit outliers, which is

22  the way that the Defendants characterize Ms. Bond.

23  It's not the Rule, and it's not in the statute, it's

24  not in any case law; instead, it just requires that the

25  claims of the Plaintiff be typical, arise out of the

1    same course of conduct and be similar.  The Plaintiff

2    clearly satisfies that test.  She was charged an

3    overdraft fee and multiple overdraft fees based upon a

4    computer system that applied to everybody in the same

5    way.  She's governed by the same contracts as everybody

6    else, and she was sent the same disclosures as

7    everybody else.  So, clearly, as a factual matter and a

8    legal matter, her claims arise out of the same common

9    course of conduct, and she is typical.

10         What do the Defendants say?  Well, first let's

11   examine what they do not say.  The Defendants do not

12   say that the Plaintiffs' claims do not arise out of the

13   same common course of conduct.  The Defendants do not

14   say that her claims are not similar to the claims of

15   absent members of the class.  They make no challenges

16   on the issue of adequacy.  They don't say she has any

17   conflicts, they don't say that her counsel are

18   inadequate.

19         Instead, what they say, and you'll repeatedly

20   hear from them today, that she is an outlier, that she

21   had many more overdrafts than other people, that she

22   recalls some things and doesn't recall other things,

23   that she got some documents and she didn't get some

24   other documents, that she started her bank account at a

25   predecessor to Berkshire Bank while others it didn't.

1          They also say that she mismanaged her account,

2     that's their terminology, she didn't look at her

3     account statements, they say.  She got charged many

4     overdraft fees, she never went to the Bank to complain,

5     and so he mismanaged her account, and as a result,

6     she's subject to what they call a unique defense of

7     failure to mitigate damages.

8          Well, that argument fails for a whole series of

9     reasons.  The first is, Your Honor, that, as a legal

10    matter, issues about damages do not provide a

11    disqualifying unique defense.  That's in every single

12    case that we've ever seen concerning overdraft fees.

13    It's in the *TD Bank* case, it's in the Florida overdraft

14    cases, it's in the *Gunter* case.  These and other Courts

15    have clearly and unequivocally and repeatedly said that

16    issues about damages don't arise to unique defenses.

17         And the *Gunter* case, which we recently submitted

18    as supplemental authority, is right on point because

19    they made exactly the same argument as Defendants make

20    here, and what did the Court say?  "United further

21    argues that Gunter's claims are not typical of either

22    proposed class because United has few clients who

23    overdrafted as much as Gunter.  Gunter's unusual

24    frequent overdrafts suggest that she has suffered from

25    United's practices more than most, not that her claims

1    are qualitatively different."  So, as a legal matter,

2    Your Honor, this unique defense argument does not work.

3         It doesn't work for another reason.  A unique

4    defense requires just that, the defense has to be

5    unique.  If the defense applies to other members of the

6    same class as it applies to the proposed class

7    representatives, by definition, it's not a unique

8    defense.  And so what does the record show?

9    Defendants' own documents demonstrate that there were

10   thousands of people, literally thousands of people,

11   who've had more than 50 overdraft charges, and there

12   were hundreds of people who had as many overdraft

13   charges as Ms. Bond.  So, there is nothing unique about

14   Ms. Bond's experience that is dissimilar to many other

15   thousands of class members.  They're going to assert

16   the same argument as to other class members as they're

17   going to assert to Ms. Bond.

18        And even in their answer to the complaint, they

19   admit very clearly, We're going to assert this

20   affirmative defense of failure to mitigate.  We're

21   going to assert it to the Plaintiff, and we're going to

22   assert it to other members of the class.  So, on that

23   basis alone, the unique defense argument does not work.

24        Third, even if you do not accept those other two

25   reasons to reject the unique defense, the unique

1  defense requires that the defense consume the merits of

2  the claims.  That's the language of all the cases from

3  District of Massachusetts through every District Court

4  in the country.  It has to consume the merits of the

5  claims.  Defendants don't even attempt to demonstrate

6  how this is true.  They don't tell you how the trial

7  will look, they don't tell you what witnesses are going

8  to testify about Ms. Bond's experiences.  The reality

9  is, Your Honor, there are going to be ten to 20

10  witnesses in this case who testify about contracts, who

11  testify about disclosures, who testify about the

12  computer system.  There'll be multiple exhibits that

13  have absolutely nothing to do with Ms. Bond's alleged

14  mismanagement of her account.

15        So, if anything, Your Honor, it's our position

16  that the overdraft charges that Ms. Bond incurred only

17  make her even more suitable to be a class

18  representative here because she sustained substantial

19  damages here, and so she's incentivized just as much as

20  anybody else to be a class representative.  So, it only

21  really works in our favor to show that she's a suitable

22  class representative and not an unsuitable class

23  representative.

24        Fourth reason, Your Honor.  Massachusetts Courts

25  are very clear that, rather than not certifying a

1   class, they will undertake an effort to bifurcate the

2   proceeding so that, if there's a unique defense that

3   arguably applies to a class certification, the Court is

4   not going to say, Okay, there's a unique defense here,

5   and I'm not going to certify any class, and I'm going

6   to leave thousands of people who arguably have claims

7   out in the cold.

8           Instead, what the Court in the *Credit Suisse*

9   case, which is a District of Massachusetts case, said,

10  "I am unsatisfied with the sterile incantation by the

11  Defendants that because Schwack is subject to a unique

12  defense, she categorically cannot be the class

13  representative.  If the question is whether Schwack's

14  incentives align with those of absent class members,

15  the answer is clearly yes.  Her claims against the

16  Defendants rise or fall on the same legal theory.  If,

17  on the other hand, the concern is that the unique

18  defense to which Schwack is vulnerable will derail the

19  litigation, consuming all of counsel's time and energy

20  and thereby injuring the interests of absent class

21  members, the bifurcation mechanism outlined above will

22  provide an adequate safeguard."

23          So, here what the District of Massachusetts is

24  saying, I'm not going to prejudice the interests of

25  thousands of people that got harmed if there's an

1    arguable unique defense that applies to the Plaintiff.

2    What I'm going to do is, if this is in fact an issue, I

3    can bifurcate these proceedings, I can adjudicate the

4    common questions first, I can analyze the predominating

5    questions first, and then I can bifurcate the issue

6    associated with the class representative and deal with

7    that later.

8         Fifth, there's another potentially available

9    alternative in the event you reject all of these

10   reasons and find that unique defenses is an arguable

11   reason for finding her atypical.  Courts usually find

12   that you can substitute a class representative in the

13   event that you find a Plaintiff atypical.  And there

14   are many cases on this, and we cited this in our brief.

15        And we submitted the affidavit of a gentleman

16   who's more than willing to appear as a class

17   representative.  We have other people who could appear

18   as class representatives.  So, I don't think,

19   Your Honor, that the explanation here that she's

20   atypical is a reason to deny relief to thousands of

21   people, and I think the Courts in Massachusetts would

22   say exactly the same.

23        The Defendants have other challenges to the

24   named Plaintiff.  They say that she doesn't have

25   standing to assert the consumer fraud claims of other

1      class members.  Well, that's true, she doesn't have

2      standing to assert a New Jersey claim or New York

3      claim, but the issue is whether or not she's typical,

4      her claims are typical, and we've demonstrated that her

5      claims are similar, and so, therefore, she is a typical

6      representative and could represent the consumer fraud

7      claims of people who live in other states.

8              Next, they say that she doesn't have standing to

9      assert the EFTA claim that has a one-year statute of

10     limitations.  Well, there's a split of authority on

11     that, Your Honor.  There's some cases that say, It's

12     true, you only have one year after the first transfer,

13     and after that year, you can't seek relief with respect

14     to other transfers.  But there are other cases that say

15     that every time you sustain an EFTA overdraft charge,

16     you have a separate and independent cause of action, a

17     recurring claim.  And what's notable here, Your Honor,

18     is that one Court that expressly holds that is a

19     District of Massachusetts Court.  It's the *Affinion*

20     case, and we've cited that in our brief.

21             Let me address the *Daubert* motion.  I have

22     limited time here, Your Honor.  Relevance is clearly

23     the key standard here, and I don't think anybody

24     debates that, that unless the opinions of the proposed

25     expert are relevant, they shouldn't be admissible at

1    trial.  And here, the opinions of the expert are the

2    antithesis of relevance.  What does the expert say?

3    Well, she says she's an outlier.  You're going to hear

4    that for much of the 40 minutes that the Defendant is

5    allotted today.  She didn't recall certain things, and

6    other people recalled certain things.  She didn't call

7    the Bank, other people called the Bank.  She had a lot

8    of overcharges, many people didn't have a lot of

9    overcharges.

10         Well, that's very interesting from a statistical

11   and economic point of view, and perhaps if you wanted

12   to look at issues about economics and finance, you

13   might find this relevant.  But as a legal matter

14   Your Honor, as a legal matter, it's irrelevant.  Courts

15   don't prohibit outliers.  The statute doesn't say we're

16   not going to accept outliers as typical

17   representatives.  It's not in the Federal Rules, it's

18   not statute, it's not case law.  In fact, the cases say

19   precisely the opposite.  They say that outliers can be

20   adequate representatives.

21         What do the Defendants next say in their expert

22   opinion?  Well, you can't extrapolate, that's their

23   language, you can't extrapolate her experience to

24   absent members of the class.  But, again, that's

25   interesting, but it's legally irrelevant.  Nobody's

1   putting Ms. Bond on the stand and saying to the jury,

2   Look at her facts, look at her circumstances,

3   extrapolate her circumstances and her claims to other

4   members of the class and, therefore, find for the

5   Plaintiff.  We can't do that as a legal matter, and we

6   don't intend to do it here.  We're not trying to

7   extrapolate her circumstances to other members of the

8   class.  They might be different, but so what?

9   Circumstances are different, claims can be different,

10   as long as they're similar and they arise out of the

11   same common course of conduct.

12        Last point, Your Honor, is you're going to hear

13   a lot about people have different experiences, people

14   have different understandings about overdraft fees,

15   people have different subjective perceptions about what

16   overdraft fees mean, when they're imposed, when they're

17   not imposed, do they do it intentionally, do they not

18   do it intentionally.

19        Every Court, every Court that has looked at this

20   has rejected this argument.  *TD Bank*, the Florida case

21   of Judge King, the Court in the *Gunter* case, every

22   single case, except one that I know of, which is, like,

23   from 11 years ago from a State Court in New Mexico,

24   which had different claims, every Court has said

25   individual experiences, individual perceptions,

 1      individual understandings are not relevant.  The claims

 2      are based upon objective proof, they focus on the

 3      Defendants' conduct.  What did the Defendant do?  What

 4      did the contract say?  What did the disclosures say?

 5            So, this whole litany of analysis in the report

 6      about different experiences and understandings are

 7      legally irrelevant, and therefore, we think,

 8      Your Honor, that the expert report of Ms. Fair should

 9      not be admissible.

10            Thank you, Your Honor.

11            THE COURT:  Thank you.

12            MR. FREDERICO:  Your Honor, before I begin, I

13      think that there's an issue about an exhibit I would

14      like to use that was raised by Plaintiffs' counsel this

15      morning.  We submitted this morning a package of

16      materials.  We also have them electronically.  We

17      intend to display most of them.

18            And there are two things in here that counsel

19      tells me they object to.  They are really just

20      demonstrative aids.  Tab 1 I understand there's an

21      objection to, which is a summary of information that is

22      in the record.  We didn't cite the record references,

23      and we provided it to them this morning because we

24      didn't have it until last night.  And then Exhibit 9 is

25      just meant to illustrate part of my argument.  I'm not

1   even sure I'm going to get to it, but I may.

2          So, before I -- the clock starts on my argument,

3   I just want to make sure that I may refer to these

4   items in the course of my argument.

5          THE COURT:  What's your objection to No. 1?

6          MS. EDWARDS:  Your Honor, just for clarification

7   purposes, we got this literally five minutes before

8   11:00, and it got handed -- it was handed to us.  I did

9   go through it.  We are not objecting to everything.

10  What we are objecting to is Item No. 1, which

11  summarizes a number of different things.  Your Honor,

12  these things are not in the record.  They're summaries

13  of communications and exhibits without any citations to

14  the record.

15         If Attorney Frederico had prepared this last

16  night, I would have expected it overnight or this

17  morning, not literally as Your Honor was ready to go on

18  the bench.  We had no time to review it.  We don't

19  think it's reasonable and in good faith for them to

20  give it to us as we're ready to start our argument and

21  not have the ability to check it or verify it or

22  connect it with any exhibits or any part of --

23         THE COURT:  So, you're questioning accuracy?

24         MS. EDWARDS:  Well, the accuracy and also the

25  ability to refute it and to formulate arguments against

1    it in our reply.  We're virtually left without any

2    ability to do this or check it or to be able to counter

3    it, so we're objecting to it and asking that it not be

4    allowed for submission.

5          The same argument with respect to Item No. 9.

6    It has to do with hypothetical customers, it's a

7    hypothetical, it's a graphic.  But, again, Your Honor,

8    it has no evidentiary support, and we just feel that

9    it's not in good faith, and we have no ability to be

10   able to properly respond to it.

11         MR. FREDERICO:  Your Honor, these are just items

12   that I intend to use to illustrate the points I make in

13   argument.  I think they're helpful to the Court.  They

14   help to visualize the points I'm making.  I'm not

15   offering them in to the record.  I just would like to

16   use them during the course of my argument.

17         THE COURT:  All right.  I can see No. 9, but

18   what about No. 1?

19         MR. FREDERICO:  Oh, you're asking me,

20   Your Honor?

21         THE COURT:  Yeah.

22         MR. FREDERICO:  Yeah.  So, most of the

23   information in No. 1 is taken either from the

24   declaration of Kristen Ricker, which is in the record,

25   or from the deposition of Sandra Bond, which is also in

1      the record.  So, for example, the written

2      communications --

3          THE COURT:  The other side didn't have a chance

4      to kind of look at this and verify.

5          MR. FREDERICO:  I'm sorry, Your Honor?

6          THE COURT:  The other side didn't have a chance

7      to look at this and try to verify.

8          MR. FREDERICO:  Well, I understand that.

9          THE COURT:  9 is fine, I understand 9, and you

10     can use that kind of as a chalk in your argument, and

11     this is not coming in to evidence --

12         MR. FREDERICO:  Right.

13         THE COURT:  -- which is important, but I

14     appreciate the Plaintiffs' concerns over 1 and just not

15     having time to even look at this, to digest it, to

16     see -- I mean, frankly, I don't see what the harm's

17     going to be for you to be arguing this to me, but I

18     think it was bad form that you didn't give it to them

19     earlier.

20         MR. FREDERICO:  Your Honor, we were -- we didn't

21     finish preparing it until last night, and we provided

22     it to them as soon as we could this morning.

23         THE COURT:  What's the harm if they rely on

24     this, if they're looking at it when they're making

25     their argument?

1          MS. EDWARDS:  Understood.  The harm is that we

2     don't -- in good faith, and in proper preparation to be

3     able to do a rebuttal in this case, if they are relying

4     on assertions in here, they are making representations

5     to this Court, we do not know if they're accurate.

6     Attorney Frederico is representing they came from

7     different sources.  We have no ability to spend time to

8     look at this.  Your Honor, we communicate by email all

9     the time.  If they did it last night, it should have

10    been sent last night.  I check my email usually before

11    7:00 in the morning --

12         THE COURT:  Well, he's going to be making the

13    argument anyway.  He's going to be making the argument

14    anyway.  This is just a visual.

15         MS. EDWARDS:  Correct.

16         THE COURT:  So, when he's making the argument,

17    if you have points about it, you can supplement.  But,

18    I mean, this is just a visual to his argument.  I'm

19    going to let him use it.  You know, it's a little bit

20    disappointing that this came late and --

21         MR. FREDERICO:  I understand, Your Honor.

22         THE COURT:  -- it wasn't turned over.

23         So, I appreciate your point, Plaintiff, but I

24    don't think this can hurt you .  And, quite frankly, if

25    there's information in here that you show me in a

1  supplement that is not true, then that hurts them for

2  putting something forward like this.  And I won't lose

3  sight of the fact that, if it is inaccurate and they

4  gave it to you late, that's not an impression that

5  Defendants would want to leave me with, I'm sure.

6  　　　　MR. FREDERICO:  That's correct.

7  　　　　THE COURT:  So, I'm going to let him go with it;

8  okay?

9  　　　　MS. EDWARDS:  Fair enough.  Thank you for your

10  consideration, Your Honor.

11  　　　　MR. FREDERICO:  Thank you, Your Honor.

12  　　　　MR. RITCHIE:  And before we start, Mr. Bartlett,

13  can you make sure that we can put our demonstratives on

14  the screen?

15  　　　　MR. FREDERICO:  Good afternoon, Your Honor.  I

16  think it's afternoon now.

17  　　　　Your Honor, what I would like to do is begin

18  really talking about many of the facts that we believe

19  are important on this motion and then come back and tie

20  it in to the standards for class certification and some

21  of the relevant law.

22  　　　　I will just preface it to say that Rule 23

23  really represents a balancing of interests, and that's

24  why we have rules like typicality, adequacy,

25  predominance.  Typicality, for example, which is one of

1  the standards we're going to focus on, is really there

2  both to protect Defendants from defending and perhaps

3  having a judgment entered against them for a whole

4  class where of the Plaintiffs' claim really isn't

5  typical of the class, but it also protects the absent

6  class members from having somebody representing them

7  whose interests aren't fully aligned, whose claims

8  aren't quite the same, who might have different

9  defenses asserted against them, causing them all to

10  lose because of the lack of typicality of the

11  Plaintiff.

12       Predominance is also meant to protect a number

13  of things but in part the interests of the Defendant in

14  making sure that, if the Defendant has defenses against

15  class members that can only be understood and asserted

16  on an individual basis, they don't lose the right to

17  assert those defenses because a Court has certified the

18  case as a class action and there's no way, then, to

19  assert those defenses against the individual class

20  members.

21       So, these are really important issues.  They're

22  important to Defendants, they're important to Courts,

23  they're important to Plaintiffs, they're important to

24  absent class members, and it's a balancing of all of

25  those interests that the Rule protects.

1          So, let me start with talking about the

2    relationship between the Bank and the customer because

3    this is very important.  What you heard today and what

4    you see in the briefs is an emphasis on two major

5    uniform things, or what are alleged to be uniform

6    things:

7          The computer system.  Sure, the computer system

8    operates in a uniform manner.  It changed over time.

9    In 2012, they went from one system operated by a

10   company called OSI to another system operated by a

11   company called FIS, and the way that transactions were

12   processed changed in 2012.  But the way they were

13   processed in each of those time periods certainly was

14   uniform.

15          The disclosures that have been drafted.  In

16   large part, we don't contest that an opt-in form that

17   was created in 2010 was the same opt-in form that was

18   used over a number of years.

19          Those are sort of the big trees, but there's a

20   lot of forest that's being ignored by the Plaintiffs

21   that really affects liability in this case, not just

22   damages, but liability in this case.  So, I want to

23   talk about that.  And if I may, I'm just a little dry

24   so...

25          THE COURT:  Sure.

1          MR. FREDERICO:  I'm going to borrow a phrase

2     that was used by our expert.  I'm not talking about her

3     opinion, but in her deposition, she used a phrase that

4     I liked, and I want to borrow it.  She said that a

5     checking account is a high-involvement product.  She

6     said it's not like buying a bottle of water.  You don't

7     just go in to a store, buy it, drink it and you're

8     done, but you're involved with this product over time.

9     There's a relationship between the customer and the

10    bank with a lot of interaction over time, and different

11    people interact in different ways, different people

12    interact to different degrees, some people don't really

13    interact much at all.

14          These many interactions between the bank and the

15    customer are what I have on Exhibit 1 in the materials

16    that we just talked about.  And they break down in to

17    oral communications and written communications, so --

18    and they happen at different times.  So, there's

19    account-opening at the branch, somebody goes in to open

20    an account at Berkshire Bank, they go to the branch,

21    and they have a conversation with an employee at the

22    branch about how the account works, what the different

23    features are, how overdrafts work.

24          Since 2010, when Reg. E went in to effect,

25    representatives at the branch, when they were opening

1   new accounts, were required to talk about how

2   overdrafts work.  And in some of those conversations,

3   if not all of those conversations, they talked about

4   available balance, and this is discussed in the

5   declarations of the Bank employees that we submitted as

6   part of the record in this case.

7           After an account is opened, there are numerous

8   other communications between the Bank and its

9   customers.  There are outbound calls to existing

10  customers that took place in 2010 when Reg. E was going

11  in to effect, people who hadn't elected yet to opt in

12  were getting phone calls from the Bank.  Again, the

13  employees were trained to talk about how the overdrafts

14  work, often they talked about the available balance

15  method.

16          There are courtesy pay elections, so people

17  could elect, after they've opened an account, if they

18  didn't do it at that time, they could later opt in to

19  courtesy pay, and when they did that, sometimes they

20  would go to the branch, they could also do it by phone,

21  again, they would have a conversation with a Bank

22  employee.

23          Outbound customer calls, if people were

24  experiencing a high volume of overdrafts, they would

25  get calls from the Bank, the Bank employees would try

to explain to them what was happening, why they were having these overdrafts and what alternatives were available to them that might save them money.  There was a line of credit that they could apply for; there was also a possibility of linking a savings account to a checking account, so if your checking account was being overdrawn, it would automatically draw money from your savings account, and you wouldn't get an overdraft fee.

Refund request conversations.  Customers frequently would, if they were surprised by their overdrafts, they would contact the Bank and ask for a refund.  That had to be an oral communication.  Every time a customer wants a refund, they have to speak to a Bank employee.  Customer -- the Bank employees were trained, again, on those occasions to talk to the customers about their overdrafts, what caused the overdrafts, try to educate them on, Here's why you had an overdraft on this day, here's what you can do to avoid it in the future.  So, there were refund requests.  And 36 percent of customers of Berkshire Bank who experienced overdrafts received refunds at one point or another.  I'll get back to that a little later.  That's an important point.

And then there are other conversations.

1    Somebody might not request a refund, but if they have a

2    question about overdrafts, they could call the Bank,

3    ask, have somebody explain it to them.  So, those are

4    the oral communications.

5         Now, the written communications.  And when I

6    put this together, I followed the declaration of

7    Kristen Ricker, which is in the record, who walks

8    through I believe all of this.  Maybe one or two things

9    aren't in there, but I think they're all in there.  And

10   she describes in her declaration account-opening at the

11   branch.  When you open an account at the branch, you

12   receive the terms and conditions document, you receive

13   the courtesy pay disclosure, and if you want -- if

14   you're interested in opting in to ATM and one-time

15   debit card overdraft protection, then you also received

16   the opt-in form.  And these are the forms that the

17   Plaintiffs rely on for their breach of contract and

18   unfair practices claim.

19        Now, those forms, by the way, changed a lot over

20   time, and we have Appendix B to our opposition, which

21   summarizes the changes.  They didn't all change at the

22   same time.  Sometimes the courtesy pay disclosure would

23   change, sometimes the terms and conditions changed.

24   So, we've calculated, just by looking at the changes,

25   that essentially, if these are the main contract

1    documents, there were nine different versions over the

2    class period of 2010 to 2017.  You heard a lot, by the

3    way, about the *TD Bank* case.  There was one contract in

4    that case, one uniform agreement.  Here we've got nine

5    over the class period.

6         Then, online account-opening.  People could open

7    accounts online.  Again, if they're doing that at their

8    computer, they have to open the terms and conditions

9    link, that has to be displayed; they have to open the

10   courtesy pay disclosure; if they want to opt in, they

11   have to open the link to the Reg. E disclosure.  And

12   then, if they do opt in to courtesy pay, they get a

13   courtesy pay disclosure in the mail, all additional

14   information and materials that you get if you opt in --

15   open an account online.

16        What happens to people in terms of written

17   materials after account opening?

18        THE COURT:  Wait.  So, I understand all this.  I

19   mean, you don't -- I understand banking -- the banking

20   dynamic and the relationship between customers and the

21   Bank.  You don't really need to go through and read me

22   this.  So, what's your argument?  Just get to the

23   point.

24        MR. FREDERICO:  Well, the argument, Your Honor,

25   is that --

1          THE COURT:  Well, you're not making the

2     argument; you're just telling me about the different

3     banking relationships between customers and the Bank.

4     I appreciate that.  I get it.  So, now roll that in to

5     your typicality argument.

6          MR. FREDERICO:  Well, all right.  I'll go to

7     typicality.

8          THE COURT:  You can go wherever you want, but

9     just make your argument.

10          MR. FREDERICO:  I hear you, Your Honor.

11          THE COURT:  All right.

12          MR. FREDERICO:  There's a large mix of

13     information.  Different people get different

14     information.

15          THE COURT:  Right.

16          MR. FREDERICO:  Much of the information is

17     designed to educate people about overdrafts, informs

18     people about available balances and puts people really

19     in very different situations throughout the class.

20     That's a predominance argument, Your Honor.

21          THE COURT:  Sure, okay.

22          MR. FREDERICO:  And, again, I won't refer to any

23     of this, but Tabs 2 through 6 I think give examples of

24     some of these different materials, and -- well, maybe I

25     will just point out some things, Your Honor, if I may.

1        On the fourth page of what's in the Tab 2,

2   that's the Bonds' -- one of their bank statements, and

3   you see at the end, it lists their overdraft fees, it

4   gives a number to call if people have questions, it's

5   highlighting for them that they've received a lot of

6   overdraft fees.  The next exhibit is an overdraft

7   notice that was mailed to them, again, informing them

8   of the overdrafts that they incurred, giving them a

9   phone number for assistance.  The next document is an

10  education letter for people that were high-frequency

11  overdrafters.

12       The next document is an online display of the

13  account -- of an account, and it shows available

14  balance.  It says, "The available balance is the amount

15  of funds you can use without causing an overdraft."  It

16  has the available balance listed towards the bottom.

17  This is an intra-day balance; okay?  These are

18  different from monthly statements.  Monthly statements

19  don't show every transaction during every minute of

20  every day.  So, that becomes important because

21  people -- some people have access -- or some people

22  look at this information, some people don't look at

23  this information.  They have different understandings

24  of available balance.  And then, finally, there's a

25  mobile app at the end, also showing the available

1    balance.  That came in to effect, I think, in 2015 for

2    customers that wanted it.

3         Now, if we go back to Tab 1, what is showing now

4    on the screen, Your Honor, is it's showing how these

5    applied to Sandra Bond.  So, you had many customers who

6    had all of these experiences with oral communications

7    where information was provided about how available

8    balance worked, about how overdrafts work.  Bond

9    testified in her deposition that she never spoke to a

10   Bank representative, so she's different in that sense.

11   This is more the typicality argument.  It's both a

12   predominance argument and typicality.  She never had

13   the opportunity or gave herself the opportunity to

14   become educated by Bank personnel through an oral

15   conversation about overdrafts.

16        If you go to the next page, she was sent -- and,

17   again, this is in the record.  She was sent -- she

18   didn't open her account -- I'm sorry.  I just touched

19   the screen.  That arrow wasn't meant to go there.

20        THE COURT:  Yeah, that was quite a bit.

21        MR. FREDERICO:  So, she didn't open her account

22   at Berkshire Bank; she opened it at Woronoco Bank back

23   in 2002.  So, unlike many of the potential class

24   members, she did not get all the account-opening

25   documents because she was just converted over to

1     Berkshire.  She was mailed many of the other

2     disclosures that educate about overdraft fees, that

3     educate about available balance.  She testified in her

4     deposition she never opened any mail she got from the

5     Bank.  She never read anything she got from the Bank.

6         So, all this information was in her mailbox, it

7     was on her kitchen counter.  She didn't open it, she

8     didn't read it.  And, therefore, all the efforts that

9     the Bank made to educate its customers about

10    overdrafts, which many other customers presumably read,

11    she never read, separating her and creating defenses

12    for Berkshire Bank.  There is a mitigation of damages

13    defense.  She was negligent in the way she managed her

14    account.  That would sidetrack the trial.

15         The standard for typicality on unique defenses,

16    it doesn't necessarily have to be unique.  There's the

17    *Schwack*, which I believe counsel referred to in

18    argument, and the standard which was quoted in the

19    *Credit Suisse* case, if I my quote it, "Whether the

20    putative class representative can fairly and adequately

21    pursue the interests of the absent class members

22    without being sidetracked by her own particular

23    concerns."  That's the standard, at least quoted by

24    some of these Courts.

25         There's going to be a lot of sidetracking in

1    Sandra Bond's case because, again, there was a ton of

2    information mailed to her that would have educated her

3    about overdraft fees, that would have helped her avoid

4    overdraft fees and that she never looked at.

5        Now, we have some of that --

6        THE COURT:  Now, what about when Plaintiff says,

7    Well, you know, they only have to be similar; they

8    don't have to be identical, and there is a substitute

9    class rep. that we could just put in here?

10        MR. FREDERICO:  So --

11        THE COURT:  Maybe those are two very

12    different --

13        MR. FREDERICO:  They're two different issues.

14   On the similarity of the claims, they have to be

15   similar, but if there are defenses that will sidetrack

16   the trial because of that person's particular concerns,

17   they're not similar enough.  And, again, you're trying

18   to protect the class.  Imagine if Sandra Bond's case

19   went to trial and a jury found against her because she

20   wasn't managing her account properly.

21        By the way, it's not just a defense; they have a

22   93A claim, unfair or deceptive practice causing injury.

23   Well, is it unfair for the Bank to have assessed her

24   fees if it was telling her about them all the way and

25   she wasn't listening, if it was mailing her all this

1   information and she wasn't reading it?  Those would be
2   some of the defenses.  She could lose that case.  If
3   she loses that case, the whole class loses the case.
4           So, that's --
5           THE COURT:  If you step out of your role for a
6   minute, arguably they lose the whole case because of
7   her negligence, which other members of the class don't
8   have that affirmative --
9           MR. FREDERICO:  Some might, some don't.
10  Predominance issue there, but yes.
11          In terms of substituting another Plaintiff,
12  Your Honor, we just think that comes too late.  We're
13  two years in to the litigation.  They raised it in the
14  course of the briefing of this motion with --
15          THE COURT:  Is there a bar to --
16          MR. FREDERICO:  There's no -- Your Honor has
17  discretion.  You have discretion, Your Honor.
18          THE COURT:  Yeah.
19          MR. FREDERICO:  Now, the person, I believe -- if
20  I remember correctly, I believe the person they want to
21  substitute closed his account in 2014.  There were a
22  lot of new disclosures that came out in 2015, 2016,
23  2017.  So, even if he -- and we haven't had a chance to
24  take discovery of him, we don't know whether he's a
25  suitable class representative, but if he closed his

1    account in 2014, he can't represent people from 2015 to

2    2017.  That would be a very limited class.

3         And there might also be statute of limitations

4    arguments with respect to him coming in late.  We

5    haven't explored that, we haven't briefed that, but

6    there are a lot of potential issues there, Your Honor.

7    So, we would oppose adding him.  We've cited some case

8    law where Courts have refused to allow new Plaintiffs

9    to come in.

10        THE COURT:  Fair enough.

11        What about -- okay, your argument -- for the

12   sake of argument, she was negligent in managing her

13   account.  But if the class and the action is attacking

14   the policies and the overdraft fee schedule in place,

15   what does her negligence really have to do with

16   anything?

17        MR. FREDERICO:  Well, again, you have to look at

18   the nature of the claims and the affirmative defenses.

19   So, the claims -- let's focus on the 93A claim.  Again,

20   we would argue that somebody that -- that there's no

21   unfair or deceptive act and certainly no causation for

22   somebody who isn't reading or listening to the

23   information she's being provided.  So, that makes

24   her -- I'm not sure I'm addressing exactly the question

25   you raised, but that makes her atypical, again, because

1       we're going to focus a lot of attention at her trial on

2       that point.  That goes right to the merits of the

3       underlying claim.

4            There are affirmative defenses besides

5       mitigation of damages that might apply.  Ratification,

6       waiver, estoppel, all of those things may be available

7       at trial, again, because she wasn't really paying

8       attention.  So, all of those things will color the case

9       in a way that could be prejudicial not only to the

10      Bank but also to some class members.

11           THE COURT:  The Plaintiffs are saying she wasn't

12      paying attention, so she was getting harmed by the --

13      kind of the way Berkshire set up -- to try to use some

14      analogies, so there's these traps set by the Bank, and

15      I don't mean -- this is just for sake of argument, but

16      they set up these fee schedules that are kind of traps

17      for the unwary, and she's not paying attention, so she

18      keeps falling in, in to the trap.

19           Now, other people in the class are paying

20      attention, so they're walking around the trap, and

21      they're not falling in, and they know it's there, so

22      they're staying away.  But it seems to me the Plaintiff

23      is saying this lawsuit is just about the existence of

24      traps, not about who maneuvers around them and who

25      steps in because they're negligent; it's just that they

1    exist, so that's why they're similar for typicality.

2         MR. FREDERICO:  I think what you're saying,

3    Your Honor, if I might try to rephrase what you've just

4    said?

5         THE COURT:  Sure, maybe -- I'm sure you can do

6    it better.

7         MR. FREDERICO:  And I'm not sure I can do it,

8    Your Honor, but I think what you're saying is that--

9         THE COURT:  I wasn't saying it; I was trying to

10   ask a question based on what the Plaintiff had told me.

11        MR. FREDERICO:  Right.

12        THE COURT:  I mean, they made that argument

13   about typicality and being similar and telling me, you

14   know, doing a nice job telling me that you were going

15   to be be making this argument, so go ahead.

16        MR. FREDERICO:  Well, let's focus, then, on the

17   claim of unfair and deceptive acts.  And you heard

18   Ms. Edwards argue the 93A point, and her focus was on

19   deception; okay?  These are deceptive, and the

20   deception has to cause the loss.  Those were her words,

21   which were correct.  I mean, that is what the case law

22   says.  And that's the basis of their 93A claim.

23        How was Ms. Bond deceived if she didn't read the

24   deceptive material?  How did it cause her loss if she

25   didn't read the deceptive materials?  And what about

1    all the other people out there?  You know, we're

2    focused a lot on Sandra Bond in particular, but the

3    evidence shows -- and some of this is through our

4    expert, some of it is through a Berkshire Bank survey

5    that was done in the regular course of business a few

6    years ago before we had an expert -- the evidence shows

7    that there's a lot of variation among consumer checking

8    customers, both Berkshire's and in general.

9        And some of those people are fully aware of how

10   overdrafts work, of how the available balance works.

11   Some people intentionally overdraw their accounts

12   because they see it as a convenience, I've got this

13   nice feature on my checking account, I don't have

14   enough money in the bank, I'm still going to go through

15   this transaction because I know I'm covered, and I know

16   I'm going to get charged a fee and I'll do it.  How

17   does that person recover in a case like this?  How is

18   there an unfair or deceptive act as to that person?

19   But they're trying to certify a class that includes

20   that person, and it includes probably thousands of

21   those people.

22        Now, the refunds, I do want to come back to the

23   refund point, Your Honor.  The refunds are an important

24   point as well because they give another defense, an

25   accord-and-satisfaction defense, that will apply to

1    potentially a third or more of the class members

2    because we submitted evidence of how the Bank deals

3    with refund requests.  When somebody comes in, they

4    request a refund, the Bank person is trained to tell

5    them, We'll give you a refund this time -- maybe it's

6    their first time, maybe it's their second time, it

7    doesn't usually go beyond that -- we'll give you a

8    refund this time.  Here's why you overdrew your

9    account.  Here's why you were charged your fee.  Here's

10   what you can do to avoid it happening again.  And, by

11   the way, if we give you the refund, we want you to

12   agree that we're not going to give you any more refunds

13   if this happens again, and the customers agree to that.

14   That creates an accord-and-satisfaction defense.  We

15   would able to assert it against any of thousands of

16   class members who got refunds, but we can't assert it

17   against Sandra Bond because she never requested a

18   refund.

19        So, there's a mismatch both in terms of she's

20   not typical of everybody in the class, but there's also

21   a variety of circumstances in the class that don't

22   apply to her that, again, if the class were certified,

23   the Defendant would be deprived of the opportunity to

24   assert that defense if Sandra Bond is the Plaintiff and

25   really deprived of the opportunity to figure out or to

1    allow a finder of fact to figure out, Who does that

2    apply to?  Because these are individual conversations,

3    individual exchanges between the customer service

4    representative and the customer that can only be dealt

5    with by looking at each individual transaction.  And in

6    that circumstance, a class can't be certified.

7         Now, let me talk a little bit about the

8    causation issue in 93A, please.  Yes, the case law says

9    causation is all that is required.  First of all,

10   causation is enough.  If you have to show that an

11   unfair or deceptive act or practice caused you a loss,

12   that can be a very individualized inquiry.

13        We cite a case in our brief called *Markarian*,

14   which was a Judge Wolf decision from I think 2001.  It

15   involved the sale of vanishing premium policies to

16   customers.  And the Judge said what reliance -- 93A

17   doesn't require reliance, but it does require

18   causation, and in this situation where people are being

19   sold those policies based on oral -- a variety of oral

20   representations, causation is an individualized issue .

21        Other decisions, and we cite some of them in

22   Tab 10, so this is just a summary of a few cases from

23   the First Circuit, from the District of Massachusetts,

24   a Judge Young decision.  The Federal Court cases at the

25   top basically say, Yes, 93A doesn't per se require

1    reliance; however, there are some cases where the only

2    way to demonstrate causation is by demonstrating

3    reliance.  And that's true where the claim is one of

4    deception.  What is the causation theory in a deception

5    case if it's not that I relied on the misstatement you

6    told me or I relied on the fact that you omitted

7    something that would have changed my behavior?

8         That, again, in a case like this where the

9    theory, the 93A theory, is one of reliance -- or is one

10   of deception, then the only way they can prove that

11   that customer was harmed by deception is to show that

12   they relied; and the Courts are quite uniform in

13   holding that, where reliance is an issue, it's an

14   individualized issue, predominance is not met, and a

15   class cannot be certified.

16        Now, Your Honor, I added in this also a

17   Massachusetts case that we neglected to cite in our

18   brief, it's a Chapter 93A decision of the SJC from

19   2014.  It talks about causation.  It doesn't talk about

20   reliance, but I just would want the Court to be aware

21   of that case, read the case.  I think it's very helpful

22   in understanding that, if the alleged deception or

23   conduct did not alter the behavior of the Plaintiff, or

24   if it altered the behavior of some but wouldn't have

25   altered the behavior of others, that becomes an

1  individualized issue that precludes class

2  certification.  The 93A standard for class

3  certification is more liberal than the Rule 23

4  standard, and yet even under that standard, the SJC

5  held in that case that a class couldn't be certified

6  because of the individualized causation inquiry.

7        I don't know how much time I have left,

8  Your Honor.

9        THE CLERK:  Ten minutes.

10        MR. FREDERICO:  Okay.

11        You know, similarly, the same types of

12  individualized issues that affect unfairness and

13  deception also come in to play in an implied covenant

14  case.  So, one of the claims in this case is breach of

15  the implied covenant of good faith and fair dealing.

16        To get to that, you have to know what the

17  dealings were between the Plaintiff and the Defendant.

18  It is based on, What are the justified expectations of

19  the Plaintiff?  But to understand what the justified

20  expectations are, you have to know, What information

21  did they receive?  What information did they review?

22  All of those things that were on that slide, the

23  written disclosures, the oral communications, become

24  relevant, and they're going to vary from one Plaintiff

25  to another.

1        Unjust enrichment, it's the same thing as the

2    unfairness issue under 93A.  Is it unjust under the

3    circumstances?  You have to look at the individual

4    circumstances to determine whether charging the

5    overdraft fee was unjust as to that person.  That may

6    vary across the board too, that you're going to have

7    different people in different situations.  The person

8    who chose to overdraw, who intentionally overdrew, if

9    they were in the Court trying to present their claim

10   and they admit that they did this on purpose

11   understanding it, they're going to lose, and they're

12   going to lose the unjust enrichment claim as well as

13   the other claims.  And we should have the right to be

14   able to pull them out of the class, but the only way to

15   do that is through an individualized inquiry, which is

16   why Rule 23 doesn't allow class certification in this

17   kind of case.

18        You heard a lot about all the other overdraft

19   fee cases where Courts have certified.  First of all,

20   we've cited a few where Courts have denied

21   certification, but it's important to note that the vast

22   majority of the cases the Plaintiffs are citing were

23   the repetitive decisions of a single Judge in a single

24   MDL, Judge King in the Southern District of Florida.

25   So, it's not as if the ten cases cited in a footnote

1    are in ten different Courts; they're really just one

2    decision of one Judge being made over and over and over

3    again.

4         The *TD Bank* case was another Judge who once, at

5    the motion to dismiss stage of that case, referred to

6    the Southern District of Florida MDL decisions as an

7    echo chamber.  She actually decided a dismissal, a

8    preemption issue differently from the way Judge King

9    did in the Southern District of Florida.  She didn't

10   feel that she was bound by those decisions.

11        You heard a lot about the *TD Bank* case.  I've

12   already mentioned that, in the *TD Bank* case, there

13   were -- there was only one uniform contract.  Here

14   there were multiple versions over different periods of

15   time that very much complicates both the number of

16   individualized issues that exist but also whether this

17   would be a manageable case because of all the different

18   contracts that would apply to all the different groups

19   and class members.

20        THE COURT:  So, is that why you think that

21   perhaps bifurcation for unique defenses wouldn't be

22   manageable?

23        MR. FREDERICO:  Your Honor, we don't think

24   bifurcation is appropriate or contemplated by Rule 23.

25   But, yeah, it is -- I think it is unmanageable.  I

1    don't know, first of all, how you manage nine different

2    contracts.  You're going to have class members who

3    might have had only one of the contracts, you're going

4    to have other class members who might have had all nine

5    of them, it's going to be all over the lot.

6    Sandra Bond would have been subject to all nine of

7    those agreements, and how do you instruct a jury, how

8    do you parse through the changes in the language?

9         And available balance, by the way, we think it

10   was always adequately disclosed, but it was really

11   disclosed in 2015 and 2016 in a much heightened way.

12   And there were, again, many changes to those

13   disclosures in those years.  So, I don't think that's

14   manageable.  It also highlights the individualized

15   issues because you've got different people subject to

16   different agreements.  It becomes a very complicated

17   task.

18        *TD Bank* didn't have that.  We believe the Judge

19   in the *TD Bank* case decided that case wrongly.  It

20   hasn't been reviewed by the Fourth Circuit yet.  But

21   that's -- Mr. Ritchie and I represented *TD Bank* in that

22   case, Your Honor, and we did seek interlocutory review

23   of the class certification order.  It was denied by the

24   Fourth Circuit.  That case is still out there, and some

25   day, if it isn't resolved on summary judgment or in

1    some other way, we intend to appeal that to the Fourth

2    Circuit.

3          So, the vast amount of precedent going their way

4    isn't really a vast amount, and all those cases in the

5    Southern District of Florida had to do with a

6    completely different situation.  They weren't available

7    balance cases; these were pre-Reg. E cases that

8    involved a practice that many banks used of posting

9    transactions from high to low, debit transactions.  So,

10   many banks -- and Berkshire Bank never did this, but

11   many banks, national banks, posted debits from the

12   highest dollar amount to the lowest dollar amount.

13   That maximizes your number of overdrafts you're going

14   to have on any given day and the number of overdraft

15   fees you incur.  And the argument there was that was an

16   unfair practice.

17         That's not what this case is about.  The

18   available balance practice is something that is highly

19   defensible.  It's highly disclosed.  All of the things

20   that are relied on in the Plaintiffs' exhibits as well

21   as in our exhibits show that the Bank went to great

22   lengths to try to educate its customers about the

23   available balance practice, to teach them how to avoid

24   overdraft fees, and it's a very different situation

25   from MDL-2036.

1          I'll mention just -- comment just for a minute

2      on superiority.  We do believe that this is an

3      unmanageable class action.  I know the Plaintiffs often

4      will say, Well, these are low-dollar cases; and, you

5      know, how can you say that a class action isn't

6      superior to other forms of adjudication?  And that is a

7      challenging argument, but I would point the Court to

8      the fact that the banking industry is highly regulated,

9      and there are regulators who look over practices, there

10     are regulators who have authority to assess fines, to

11     assess penalties for practices that it believes are

12     unfair to consumers.

13          I can't talk about any particular regulator

14     action or inaction with respect to any particular bank

15     because those are subject to a regulator privilege.  We

16     don't even have that privilege; it's the regulator's

17     privilege, so I can't go in to that.  But the very fact

18     that there are regulators who closely oversee not only

19     the safety and soundness of banks but also the fairness

20     to the consumer does mean that consumers without a

21     class action aren't left unprotected.  They still have

22     the protection of the law and the regulatory system.

23          I guess I'll just, in the last minute or two,

24     turn to *Daubert*.  And, you know, I think we've briefed

25     it adequately.  There's no reliability challenge; it's

1    strictly a relevance challenge that the Plaintiffs have

2    made.  They don't challenge the excellent work that

3    Rebecca Kirk Fair's analysis group has done in this

4    case on issues that we think are important both to

5    class certification and to the merits of the case.

6          And what she has shown through her own survey --

7    she did a survey, and she also looked at past surveys

8    that were done, one by Berkshire Bank in particular --

9    what she has shown, again, is this great variation

10   among potential class members, among consumer checking

11   customers, that some wanted this, some wanted overdraft

12   protection, knew what they were getting, understood

13   they were going to be assessed fees, understood that

14   when they swiped their card at the POS, their balance

15   would be immediately reduced, and if they then had

16   another transaction, it would cause an overdraft, and

17   they would be charged a fee.

18          Many people understood that.  Some did not, and

19   there's a lot of variation in her study.  We think

20   that's important and helpful to the Court both now on

21   class certification and if we eventually have to argue

22   about whether the disclosures were deceptive or not,

23   whether the practices were deceptive or not.  We will

24   rely on Rebecca Kirk Fair for that.  It's completely

25   relevant to the issues in this case, and we think the

1        *Daubert* motion should be denied, Your Honor.

2              Your Honor, I have nothing else.  I don't know

3        if Your Honor has any final questions, or I'll just

4        wait for surrebuttal.

5              THE COURT:  I think you can wait.  I think you

6        did a very nice job.

7              MR. FREDERICO:  Thank you, Your Honor.

8              THE COURT:  All right.  I'm going to step off

9        for maybe ten minutes, and you can probably use that --

10       obviously, maybe 15, so just use that time

11       appropriately, and we'll come back and hear the

12       rebuttal and surrebuttal arguments, and perhaps I'll

13       have some more questions.

14             All right.

15             (Recess, 12:40 p.m.)

16             (Resumes, 1:15 p.m.)

17             THE COURT:  All right.

18             Most of the time during my break was spent

19       talking about your case, so maybe -- all right.  Go

20       right ahead.

21             MR. SHALOV:  Thank you, Your Honor.  Lee Shalov

22       for the Plaintiff.

23             As expected, Your Honor, we heard a lot today

24       from defense counsel about the individual experiences

25       of many class members, some --

1          THE COURT:  You told me what they were going to

2     say, and you were correct.  I think they explained it

3     from their perspective better than you explained it for

4     them, but yeah.

5          MR. SHALOV:  Be that as it may, Your Honor --

6          THE COURT:  No, but you announced it, it was

7     very well done, so go ahead.

8          MR. SHALOV:  The fact remains that we just have

9     a difference of opinion about what the cases say.  My

10    esteemed colleague suggests to you that our claims rely

11    upon a showing of what somebody knew and what somebody

12    perceived and what somebody read and what somebody

13    understood.

14         We demonstrated to you in spades, I think,

15    Your Honor, that the cases don't say that.  In fact,

16    the cases say precisely the opposite.  Every single

17    case that I'm aware of, with the exception of one 2003

18    case from the State of New Mexico, not even applying

19    Federal 23, expressly considered this exact same

20    argument and --

21         THE COURT:  Hold on one second.  Did you want to

22    say something?

23         MR. FREDERICO:  We had an agreement that the

24    predominance arguments would be presented by

25    Ms. Edwards, the typicality and adequacy arguments

1   would be presented by Mr. Shalov because I didn't agree

2   to having two counsel responding to my -- or addressing

3   my arguments at any one point.  I think it's unfair to

4   now have Mr. Shalov arguing outside of the typicality

5   and adequacy issues that he had already said he would

6   argue.  I'm being double-teamed all of a sudden.

7          THE COURT:  Well, it was probably unfair for you

8   to give them your handout this morning too, so go

9   ahead.

10          MR. SHALOV:  Thank you, Your Honor.

11          So, I think what the reality is, Your Honor, is

12  that every case has rejected this, and it's just not an

13  isolated number of cases; there are multiple cases that

14  we've cited in the brief, the Florida cases, the

15  *TD Bank* -- I don't have repeat myself because I think

16  we've said it to you before, and it's outlined in the

17  brief, but the cases just don't say what Mr. Frederico

18  says that they say.

19          If you look at our trial plan, Your Honor, just

20  by way of example, we outlined in the trial plan all

21  the elements of causes of action for breach of

22  contract, breach of the implied covenant of good faith

23  and fair dealing, conversion, unjust enrichment, the

24  consumer fraud statutes.  None of them, zero, require

25  an element of reliance.  They don't.

1          No breach of contract claim in any state that

2     we're suing on behalf of residents of require an

3     element of what the person understood when they read

4     the contract, what the person actually saw, what

5     interpretation could you plausibly give the contract.

6     And I commend you, Your Honor, I'm sure, to a large

7     extent, you've already looked at this, but I commend

8     you to read the cases because they don't say what

9     Mr. Frederico said that they said.  They don't require

10    a showing of reliance.

11          The 93A claim, the cases are uniform in saying

12    that reliance is not required.  What those cases do say

13    is you need a causal relationship -- that's the

14    language -- you need a causal relationship between the

15    misconduct and the damage.  You don't need to show what

16    the Plaintiff knew or what the Plaintiff understood,

17    and here you clearly have that.  They had a centralized

18    computer system that overcharged people in

19    circumstances in which they shouldn't have been

20    overcharged.  That deception, that misconduct caused an

21    injury in the form of an overdraft that a person should

22    not have incurred.  You have the element of causation.

23    93 has been established.  No need to show reliance.

24          Your Honor, I think, at the end of the day, the

25    *TD Bank* case said it best, that if you endorsed this

1    notion of what somebody read and what somebody

2    understood and when they went in to the Bank and who

3    they spoke to and what that person said, and if that

4    was a basis to decertify, to deny certification, you

5    could never have class action, you couldn't.  And

6    here's what the *TD Bank* said in that case, and I think

7    it's important here and worthy of the Court's

8    consideration:  "If the Court were to find that this

9    case could not be certified as a class action based

10   upon Defendants' assertion regarding the predominance

11   of individual issues, the logical consequence would be

12   that no contract-based claim would be certifiable

13   because any prospective defendant could defeat

14   certification simply by raising the spectre of putative

15   class members' idiosyncratic understanding of the terms

16   at issue."

17          So, I think what's clear, Your Honor, is if you

18   endorsed or you accepted this idea in contravention of

19   what every single case has said is not relevant, no

20   case could ever be certified.  You could have a

21   product-defect case involving a car, you could have an

22   overcharge case involving some other fee, and all the

23   defendants would have to do is walk in and say, Well,

24   you know, what was the person told when they bought the

25   car?  Did they like that car?  Did they like another

1    car?  Did they contemplate buying a used car?  And I

2    think every case has come to the conclusion that that

3    is not a valid argument.

4            Let me get to the affirmative defenses for a

5    second, Your Honor.

6            THE COURT:  Well, that's why the defense took

7    some time to talk to me, though, about the different

8    degrees of relationship between some customers with the

9    Bank versus other customers with the Bank, to kind of

10   highlight that issue.  And that in fact is true.  There

11   are people who have a high degree of interaction with

12   their bank, and there are people who don't open much of

13   the mail from the bank.

14           MR. SHALOV:  True.

15           THE COURT:  How does that play in to

16   what I heard from the defense regarding the

17   uniqueness-of-defense issue here and that cutting

18   against finding that there was typicality?

19           MR. SHALOV:  Well, let me address that,

20   Your Honor.  There are a couple of things on the

21   affirmative defenses.

22           The first thing I would note, Your Honor, is

23   that, for the first time, we're now hearing that there

24   are other potentially available defenses as to the

25   named Plaintiff.  I heard accord and satisfaction, I

1    heard waiver.  Respectfully, Your Honor, this is the

2    first time that the Defendants have ever raised this

3    argument.  It is not in their brief, and to show up in

4    Court and make a new argument about other potential

5    affirmative defenses I don't think is fair.

6         But to the extent the Court considers it, as I'm

7    sure it will, the cases are, again, very clear that

8    affirmative defenses, accord and satisfaction, waiver,

9    mitigation of damages, those don't defeat a finding of

10   typicality.  I refer you to the *TD Bank* case, I refer

11   you to the *Gunter* case, I refer you to the Florida

12   cases where the Defendants made exactly the same

13   arguments, Hey, we have an accord-and-satisfaction

14   defense as to this named Plaintiff, maybe the person

15   accepted the benefits of the charges; we have a waiver

16   defense; we have a laches defense, the person took too

17   long; we have a mitigation-of-damages defense because

18   the person mismanaged her account and had too many

19   overdraft fees.

20        You see that in every single case, Your Honor,

21   the Defendants argue the same exact thing.  And every

22   single case says, No, that's not a valid affirmative

23   defense, and the reason why the Courts say that is

24   because there's no showing that those defenses will, to

25   use the language of every single Court that I've seen

1  consider the issue, they do not consume the merits of

2  case.  I heard some language about being sidetracked.

3  I've never seen that language before.

4       It probably appears in some case, that a case,

5  you know, might be sidetracked, but when I read the

6  District of Massachusetts cases, they say the

7  following, and I'm reading from the *Mass. Mutual* case,

8  which is a District of Massachusetts case, it says,

9  "Yet the presence of an affirmative defense does not,"

10  does not, "automatically destroy typicality.  It is

11  only when the unique defense will consume the merits of

12  the case that a class should not be certified,"

13  consume the merits of the case.

14       And, again, I say to you, Your Honor, it might

15  be, when we get to trial, that Mr. Frederico and

16  counsel will spend some time with the Plaintiff and

17  say, You had a lot of overdraft charges; right?  And

18  you didn't read your mail; right?  It might be true,

19  they might do that, but does that mean it's going to

20  consume the merits of the case?  It's a small part of

21  what this case is about, Your Honor.

22       This case is about hundreds of exhibits and

23  multiple witnesses who are going to talk about

24  contracts, they're going to talk about disclosures,

25  they're going to talk about other matters that are

1    common questions that apply to every single class
2    member in exactly the same way.  So, the fact that
3    there might be some time devoted to the trial
4    concerning Ms. Bond, it's not surprising; it happens in
5    every single trial, they're going to focus on the
6    Plaintiffs' experience.  But that doesn't mean it'll
7    consume the merits of the case.  It doesn't mean that
8    the jury is going to be distracted by the individual
9    experiences of the named Plaintiff, and it certainly
10   doesn't mean, it certainly doesn't mean that Ms. Bond
11   is going to spend any less time devoting her attention
12   to the interests of the class who she purports to
13   represent than her own interests.
14          So, this whole idea of consuming the merits of
15   the case just hasn't been substantiated, and the
16   Defendants haven't even come close, other than
17   invoking, as the Court said in the *Credit Suisse* case,
18   a mere incantation of the unique defense language.
19   Just saying somebody's going to be subject to a unique
20   defense doesn't make it so.
21          Let me get, Your Honor, to the bifurcation
22   issue.  And I think that case, which, again, is a
23   District of Massachusetts Court case, is emblematic of
24   the way that Courts in Massachusetts look at these
25   cases.  Courts in Massachusetts don't say, You know

1   what, I got an issue with a Plaintiff, I'm not going to

2   certify the class, you're all out of luck.  That's not

3   what Courts in Massachusetts say.

4          What Courts in Massachusetts say is, I've got a

5   whole group of people here who have arguably been

6   injured by the same misconduct, and I'm going to find a

7   way, if I can find a way utilizing the mechanisms

8   available to me under Federal Rule 23, to certify the

9   class and see if I can get compensation for those

10  people, to the extent that the jury concludes that

11  Plaintiffs have valid claims.  So, if I'm confronted

12  with a unique defense and somebody is going to be

13  sidetracked, to use their language, I'm not going to

14  say, Okay, everybody's out of luck and doesn't get

15  anything; I'm going to find a mechanism in place that

16  Courts utilize to confront these kind of situations.

17         I could bifurcate the issues, I could say, Okay,

18  let's adjudicate the common questions, the

19  predominating questions first, and if you can prove to

20  me, Mr. Defendant, that there's a real issue with the

21  Plaintiff, I'll bifurcate that for another time.

22  That's one mechanism in place.

23         THE COURT:  Yeah, defense talked about that

24  bifurcation and was fairly compelling in saying that

25  this -- how would that bifurcation work, or can it even

1    be applied?

2              MR. SHALOV:  Of course.  It worked in that case,

3    the Court found it appropriate.  I think they were

4    focused on a different kind of bifurcation.  I wasn't

5    quite clear about what he was saying.  What I'm saying

6    is you're only bifurcating the unique -- assuming you

7    even think that --

8              THE COURT:  You're saying bifurcating in -- you

9    know, if we have a little bit of dissimilarities, you

10   can bifurcate here and there --

11             MR. SHALOV:  Correct.

12             THE COURT:  -- and everyone kind of follows.

13             MR. SHALOV:  Correct.

14             THE COURT:  Defense is saying, No, we're

15   bifurcating big chunks of this case --

16             MR. SHALOV:  No.

17             THE COURT:  -- which become too confusing and

18   not manageable.

19             MR. SHALOV:  No, nobody's saying that,

20   Your Honor.

21             THE COURT:  At least I thought that's what they

22   were saying.  You'll have --

23             MR. SHALOV:  Well, he might.  But that's not

24   what the Court said in the *Credit Suisse* case.  What

25   the Court said is --

1          THE COURT:  Well, right, but the defense spent

2     all, their time telling me why there are such

3     dissimilarities in this case, that it would create

4     bifurcation of big chunks and jury confusion.

5          MR. SHALOV:  But we're not seeking to do that,

6     Your Honor.  The only thing that the Court --

7          THE COURT:  You're not seeking, but the reality

8     is, the defense is saying, is that's what happens,

9     what's going to happen here.

10          MR. SHALOV:  But that's not true.

11          THE COURT:  Okay, go ahead.

12          MR. SHALOV:  That's not true.  The only issue

13     concerning bifurcation has to do with the named

14     Plaintiff and the unique defense issue.  That's it.

15     Nobody's suggesting that we bifurcate an issue about

16     breach of contract, that we bifurcate an issue about a

17     consumer fraud claim.  That's what I think he was

18     addressing, but it has nothing to do with that.

19          All it has to do with is a circumstance where a

20     defendant walks in to Court, just like Berkshire Bank

21     has walked in to Court, and saying you got a

22     problematic Plaintiff, I got a unique defense as to

23     that Plaintiff, and the Court said, Okay, I'm not going

24     to -- I don't believe that, as a legal matter,

25     particularly here where all the cases say that issues

1    concerning damages are not of themselves a basis to

2    find a unique defense.

3         But put that aside.  Even if I find a unique

4    defense as to that Plaintiff, here's what I'm going to

5    do:  I'm going to adjudicate the common questions,

6    we're going to get before the jury, the jury is going

7    to consider the contracts, the jury is going to

8    consider the disclosures, the jury is going to consider

9    the computer system, and we're going to adjudicate all

10   those common questions.  And if you, Defendant, think

11   that you have a unique defense that's potentially

12   disqualifying as to the named Plaintiff, I can do that

13   later.

14        And Rule 23 actually contemplates that kind of

15   scenario where -- and I'm not suggesting it here, but

16   there's a mechanism in place where you could actually

17   adjudicate common questions and then deal with

18   individualized questions later.  That might be what he

19   was referring to.  I'm not quite sure.  We're not

20   proposing that, but all I'm saying is the Federal Rules

21   are incredibly pliable and flexible, and they bend over

22   backwards to make it so that, if you have a case where

23   people -- a lot of people have been harmed and you got

24   potential side issues concerning issues about, for

25   example, the named Plaintiff, the answer is not a

1    wholesale denial of class certification; the answer is,

2    Let's find a way to see if we can adjudicate these

3    claims.  You can do what the Court in *Credit Suisse*

4    did, you can bifurcate the named Plaintiff's individual

5    circumstance and adjudicate that later.  You can

6    substitute Plaintiffs.  It happens all the time.

7           And when I hear, for example, that it's too late

8    to do this, let's not forget that the first time this

9    was ever raised, ever, was when the Defendants served

10   their opposition brief in opposition to our motion for

11   class certification.  It's not like they said, after we

12   filed our complaint, We're going to attack your

13   Plaintiff on suitability and typicality grounds so that

14   we could go out and find other Plaintiffs.  As soon as

15   we got the opposition brief, they attacked Ms. Bond,

16   they said she was atypical, they said she's an outlier,

17   other people stepped forward.  That's just the

18   chronology.  It's not too late if the Court thinks that

19   that's appropriate, in the event that you believe that

20   the affirmative defense of unique -- mitigation of

21   damages is a viable defense.

22          So, it's just not too late, and I don't accept

23   that, Your Honor.  And if they wanted to take

24   discovery, we would have had Mr. -- this gentleman

25   deposed.  I mean, we had more than enough time between

1       the briefing to proffer him, to look at his documents.

2       But I can tell you, Judge, having done this for many

3       years, they would have found him unsuitable, they would

4       have found something wrong with him.  He closed his

5       account in 2014, so he's not suitable.  If we proffered

6       somebody else, Oh, he wouldn't be suitable.

7                Remember, because it made me chuckle a little

8       bit, when defense counsel said, Well, we have to

9       protect the interests of the class members.  They don't

10      care about the class members.  They want to walk out

11      the door with a "get out of jail free" card.  They

12      don't want any class certified.  It's like a phrase

13      from a case that I read a long time ago, it's like the

14      fox guarding with the hen house, and that's what it is.

15      Their only interest is in getting a class not

16      certified, that's it, so they don't really care.  So,

17      there are many mechanisms in place, Judge.  We could --

18      even assuming you reject all these other legal matters

19      as to why this unique defense doesn't fly, but there

20      are other mechanisms in place to let this case go

21      forward.

22               Let me address the *Bellermann* case, which is the

23      new case that they cited.  Today we got it for the

24      first time.  The only thing I would note, Your Honor,

25      as I expected, this case had nothing to do with

1    overdraft charges.  It was about people who lost power

2    in an ice storm, and theoretically they probably

3    asserted some claim that had as an element of the claim

4    reliance, so the Court said, Well, I have to look at

5    everybody's individual understandings.  That doesn't

6    surprise me.  When you assert a claim that has as a

7    basis in that claim reliance, knowledge, understanding,

8    perceptions, then you have to examine that, and maybe

9    class certification is inappropriate.

10           But we carefully, carefully, Judge, constructed

11   our claim so that it would not be an issue.  We looked

12   at the *TD Bank* case very closely, we followed the trial

13   plan there, we looked at the decision there, and we

14   very carefully tailored our case to that case so that

15   wouldn't be an issue.

16           Unless the Judge has -- the Court has any

17   questions, I'll defer.

18           THE COURT:  All right.

19           MR. SHALOV:  Thank you, Your Honor.

20           THE COURT:  So, Attorney Frederico, to the

21   extent that you thought you might be getting

22   double-teamed, you're certainly -- even if that was so,

23   you're certainly up to the task, so --

24           MR. FREDERICO:  Thank you, Your Honor.

25           THE COURT:  -- go right ahead.

1    MR. FREDERICO:  And I also appreciate that he

2    spent a lot of his time on typicality, so it wasn't

3    that bad.  So --

4    THE COURT:  I mean, what's being painted in a

5    very nice way by very able counsel are two very

6    different cases.  I need somebody to bring me to the

7    middle here of what really the issues are, and you can

8    argue however you want, but each of you coming at the

9    polar opposites of where this case is and talking about

10   the extreme uniqueness of some and the Plaintiff

11   saying, Oh, there's no uniqueness, they're all the same

12   really in this, neither of those is exactly correct.

13   MR. FREDERICO:  Well, no.  That's right.  And

14   that's why the standard is predominance.  Rule 23(b)(3)

15   recognizes that, in most cases, there are going to be

16   both common issues and individual issues, and what the

17   Court has to weigh is, Which one outweighs the other?

18   Are there a predominance of individual issues?  Are

19   there a predominance of common issues?

20   THE COURT:  But isn't it true that there's

21   outliers in any type of class case?

22   MR. FREDERICO:  Well, I don't know about any

23   type of class cases --

24   THE COURT:  Generally speaking.

25   MR. FREDERICO:  -- but there are certainly going

1    to be outliers in class cases.

2         Again, you know, to get back to where I started

3    my argument earlier, the framework that Rule 23

4    embodies is really a framework of fairness.  You

5    don't -- you cannot, under the Rules Enabling Act,

6    under the due process clause, certify a class if in

7    doing so you are depriving a Defendant of some of its

8    substantive rights or some of its procedural rights or

9    expanding the rights of some members of the class.

10   And that's -- Rule 23 gives you the framework for

11   trying to avoid that kind of due process and Rules

12   Enabling Act violation.

13        What we're saying here is these people are so

14   differently situated by and large, that it's

15   unavoidable that, if you certify this class and then

16   the case goes to trial, we're going to be grabbing in

17   to this class a lot of people who have different

18   issues, many people who would admit and acknowledge, if

19   we had the opportunity to cross-examine each one of

20   them, that they were fine with the overdraft practices,

21   they understood them, they weren't harmed by them.

22   But by putting all these people in a class action,

23   we're deprived of the opportunity to identify those

24   people, eliminate them and not have to pay damages if

25   we were to lose the case at trial.  So that's the

1   balance, and --

2       THE COURT:  What do you say when the Plaintiff

3   argues that, if you apply that rationale, you're not

4   going to have many class action suits, you might have

5   one or two a year in the country, I mean --

6       MR. FREDERICO:  No, I don't think that's

7   right at all.  And certainly there are cases like

8   this that perhaps shouldn't be certified, but there

9   are plenty of other types of situations where there's

10  more uniform practices.  Take securities litigation,

11  for example.  In a securities case, there's often a

12  fraud-on-the-market theory, so that the theory is that

13  anybody who bought the stock based on a fraud on the

14  market is paying an appreciated value for the stock

15  that isn't reflective of the true facts, well, there

16  you had the market.  You do have an element of reliance

17  in those cases, but there's a presumption of reliance

18  because it was the market that relied on the

19  misrepresentations, and then everybody got -- had to

20  pay the same price.

21      That's a very different situation from what we

22  have here where you've got a little -- a certain

23  practice, a defined narrow practice but in a context

24  where it's not just somebody buying stock on a stock

25  exchange; it's a customer engage -- entering in to a

1   relationship with a bank, again, a high-involvement

2   product, and having a lot of interaction with the

3   people at the Bank.

4          So, it's in that situation, so yes, you'll still

5   have class actions, you'll have class actions where

6   there are uniform practices affecting uniform people in

7   products that are not as highly involved over a course

8   of months or years as this one is.  But in this

9   particular situation, it's different, it's really very

10  different.

11         We heard about there are mechanisms to certify a

12  class, and what I heard counsel saying, if I understood

13  it correctly, was that was just to bifurcate the claims

14  of the named plaintiff from different issues that

15  affect the class.  But that's not an -- I've never seen

16  any Court that has allowed -- found typicality in that

17  situation.  If there's a unique defense, typicality

18  isn't there.

19         Counsel said he had never heard this language

20  before about sidetracked.  Well, it's in the cases that

21  they cite.  It's in the *Schwack* case, which is a

22  District of Massachusetts case; it's in a decision by

23  Judge Saris, which cited the *Schwack* case.  And, again,

24  the standard there is not that it has to consume the

25  trial, but it has to be enough to sidetrack the trial.

1              You heard a little bit about the EFTA claim, and
2      I would just add that the EFTA claim, there's a
3      typicality argument we raise on the EFTA claim.  It's
4      in our briefs, it's in our notices of supplemental
5      authority.  It has to do with the fact that we believe,
6      under the majority rule of EFTA claims, Ms. Bond's
7      claim is barred and -- time-barred under the statute of
8      limitations.  Therefore, she doesn't have standing.
9      There is a minority view that goes the other way.  We
10     cited cases back and forth.  They cite a District of
11     Massachusetts case, which, frankly, we neglected to
12     cite in our brief for which I apologize, but we cited a
13     District of New Hampshire case that talks about it, so
14     we weren't trying to hide the ball.  But under the
15     majority rule, she has no standing to bring an EFTA
16     claim.  One judge in this District, and I don't
17     remember who it was, feels otherwise, you know,
18     interprets the statute of limitations differently, but
19     again, that's a minority rule.
20             I think the one other thing I guess I would
21     leave you with, Your Honor, is that, if there were any
22     way to try to manage this litigation to address all
23     these individual issues through bifurcation or any
24     other mechanism, that's really just kicking the problem
25     down the road because, ultimately, some trier of fact

1   is going to have to probe those individual issues and

2   decide who's entitled to relief, if anybody, who's not

3   entitled to relief, who's -- what damages people are

4   going to get if there is a judgment for the Plaintiff,

5   again, we don't believe there should be a judgment for

6   the Plaintiff, but if there is.  And that just kicks

7   the can down the road.  Rule 23 requires the Court to

8   take a look at the whole case, decide predominance

9   based on the whole case.

10          THE COURT:  What do you say about the difficult

11   position you're in of trying to talk about the *TD Bank*

12   case?

13          MR. FREDERICO:  Right.  So, again, there's

14   a -- there are two distinctions, and I neglected to

15   mention one of them.  One of the distinctions, as I

16   mentioned earlier, is that it was a uniform contract,

17   so that issue is out of that case.  You don't have

18   these nine different variations of the contract over a

19   period of seven years.

20          The other distinction is that there were about

21   25 named plaintiffs in that case.  There wasn't one

22   Sandra Bond.  There wasn't one atypical Plaintiff.

23   They covered the bases by having a lot of different

24   plaintiffs, so the typicality -- we could challenge

25   typicality for some people.  We weren't going to be

1     able to challenge typicality for everybody.

2          That's a distinction here.  It doesn't help them

3     with the typicality issues in this case.  And, as I

4     mentioned before, you know, we just think that that

5     decision was wrongly decided, so...

6          THE COURT:  Fair enough.  All right.

7          MR. FREDERICO:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          I am interested in just going back and forth

10    maybe one more time, like, two or three minutes, if you

11    just want to -- you want to pick up on or just

12    highlight some of the points that you think were just

13    made?  I mean --

14         MR. SHALOV:  Would you like me to approach?

15         THE COURT:  Go ahead, yeah.  Go ahead.

16         MR. SHALOV:  Oh, I'm sorry.  I thought you might

17    have questions for me.

18         THE COURT:  Whatever you want to say.  No, no.

19    I just -- I'm giving you the opportunity, if you want,

20    just to have another round here.

21         MR. SHALOV:  Your Honor, a couple of things.  I

22    heard that this case is different than a securities

23    fraud case.  In a prior life, I used to litigate these

24    security fraud cases, and the fraud-on-the-market

25    theory is just a presumption.  Reliance is a major

1    issue in those cases.  So, you know, in circumstances

2    where the presumption has been rebutted, the Defendants

3    can make arguments about, you know, what a person read

4    and what a person reviewed and what a person relied

5    upon when they purchased the stock.  So, it's not like,

6    you know --

7         THE COURT:  Well, it's not so much a person

8    relying upon; it's the market relying upon it.

9         MR. SHALOV:  Right.  But then my only point is

10   that trying to make a distinction about a case that is

11   appropriate for certification, and he's citing

12   securities fraud cases because there's a presumption of

13   reliance, but all it is, is a presumption, it's a

14   rebuttal presumption.  That's all I wanted to point out

15   out.

16        Your Honor, I guess at the end of the day, you

17   have to decide which of the cases is the more

18   compelling line of cases.  I know you're going to look

19   at *TD Bank*, and I know you're going to look at all the

20   Florida cases and the *Gunter* decisions, and they all

21   address the same arguments that the Defendants raise

22   here, and it's ultimately what you think is appropriate

23   in terms of what's fair to these people who got

24   improperly overcharged, and hopefully you'll come out

25   on the side of following these cases.

1          THE COURT:  Well, and I appreciate the need to

2     be -- for fairness to the class, or potential class,

3     but as Attorney Frederico pointed out, there's an

4     element of fairness to the Defendant as well.

5          MR. SHALOV:  Your Honor, defendants make that

6     argument all the time, they come up and --

7          THE COURT:  Well, that doesn't mean it doesn't

8     have merit.

9          MR. SHALOV:  Well, it might have merit, but

10    there are ways of dealing with that.

11         THE COURT:  Okay.

12         MR. SHALOV:  So, defendants get up and say, Well

13    we're going to be prejudiced because we don't have the

14    opportunity to raise these issues.  It's just not true.

15    As a matter of trial procedure, Defendant retains the

16    right to make all these arguments whenever it wants.

17    If it -- and the interesting thing to me, I think,

18    among other things, is they had the opportunity,

19    Your Honor, during a long period of discovery to

20    proffer at a deposition or in a declaration one

21    Berkshire Bank customer who said, I looked at these

22    disclosures, I understood what available balance means,

23    and I don't think I have a case, not one.  You won't

24    find a single declaration, you won't find a single

25    piece of deposition testimony.  This is all

1    hypothetical conjecture about these supposed individual

2    variations that people have.

3         Now, it's true that the record contains

4    reference to that from the expert report of Ms. Fair,

5    but she didn't interview a single Berkshire Bank

6    customer.  So, the underlying evidence just doesn't

7    exist about these hypothetical scenarios where people

8    have different understandings and different

9    perceptions, and you can't walk in to Court and try to

10   oppose a motion for class certification and base your

11   entire argument about some hypothetical scenario that

12   you don't have any proof for.

13        THE COURT:  Okay.

14        MR. SHALOV:  Thank you, Your Honor.

15        THE COURT:  All right.  Thank you.

16        THE COURT:  Last word.

17        MR. FREDERICO:  Thanks, Your Honor.

18        Well, first of all, I just want to address two

19   points.  One is regarding this hypothetical conjecture

20   that Mr. Shalov says we're engaged in.  It's not right.

21   We've submitted declarations from several customer

22   service representatives, the names are Tanner, Gagne, I

23   think there's one or two others --

24        MR. RITCHIE:  Masterson.

25        MR. FREDERICO:  -- who all testified to the fact

1    that, in their interactions with customers, it's clear

2    that customers have a variety of understandings and

3    preferences and choices that they make with respect to

4    overdrafts.

5         And the other point I'll make is, regardless of

6    all these other cases that I keep hearing about, most

7    of which are factually different from ours, not the

8    *TD Bank* case so much, although it is in some respects,

9    ultimately, this Court has to decide this case on this

10   record under this jurisdiction's law.  And Rule 23 and

11   all the cases under it are very clear that class

12   certification requires a rigorous analysis.

13        So, regardless of what other Courts have done on

14   specific facts and specific other cases, this Court has

15   to make a ruling on this record, and we think that

16   Plaintiffs, who bear the burden of proof under Rule 23,

17   have failed to meet their burden.

18        Thank you, Your Honor.

19        THE COURT:  All right.  Thanks.  Okay, very

20   good.  Thank you to both sides.  All right.

21        MR. FREDERICO:  Thank you, Your Honor.

22        MR. SHALOV:  Thank you, Your Honor.

23        MS. EDWARDS:  Oh, just for clarification,

24   Your Honor, we had stipulated to amend two of our

25   exhibits so that they're 100 percent accurate and

1   complete and actually include the entire statements

2   that are referred to within the body of the brief.  So,

3   I have them.  They're Exhibit 33 and Exhibit 35.

4          THE COURT:  That's an agreed amount?

5          MR. FREDERICO:  Yes, Your Honor.  No objection.

6          THE COURT:  Okay, agreed between the parties.

7   That's allowed.

8          (Adjourned, 1:50 p.m.)

1

2       C E R T I F I C A T I O N

3

4

5

6

7

8

9       I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do

10   hereby certify that the foregoing pages are a true and

11   accurate transcription of my stenographic notes in the

12   above-entitled case.

13

14

15

16

17

18       /s/ Debra D. Lajoie

19

20

21

22

23       10/16/18

24

25